# EXHIBIT 1

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Western District of New York

| | |
|---|---|
| Wilmington Trust, National Association, as Trustee for the Benefit of the Registered Holders of Corevest American Finance 2020-1 Trust Mortgage Pass-Through Certificates,<br><br>*Plaintiff(s)*<br><br>v.<br><br>Hirschhorn Estates LLC, Meyer Hirschhorn, City of Rochester and John Doe No. 1 through John Doe No. XXX, inclusive, the last thirty names being fictitious and unknown to plaintiff, the persons parties intended being the tenants, occupants, persons or corporations, if any, having or claiming an interest in or lien upon the premises described in the complaint,<br><br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No.   23-cv-6662 |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  c/o New York Secretary of State - Dept. of State
One Commerce Plaza, 99 Washington Avenue, Albany, New York 11231

Hirschhorn Estates, LLC
P.O. Box 901 Tallman, New York 10982

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Polsinelli PC
600 Third Avenue, 42nd Floor
New York, New York 10016

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

CLERK OF COURT

Date: _____11/22/2023_____     _____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Western District of New York

| | |
|---|---|
| Wilmington Trust, National Association, as Trustee for the Benefit of the Registered Holders of Corevest American Finance 2020-1 Trust Mortgage Pass-Through Certificates, | ) ) ) ) |
| *Plaintiff(s)* | ) ) |
| v. | ) Civil Action No. 23-cv-6662 |
| Hirschhorn Estates LLC, Meyer Hirschhorn, City of Rochester and John Doe No. 1 through John Doe No. XXX, inclusive, the last thirty names being fictitious and unknown to plaintiff, the persons parties intended being the tenants, occupants, persons or corporations, if any, having or claiming an interest in or lien upon the premises described in the complaint, | ) ) ) ) ) ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* Meyer Hirschhorn
14 Stoneham Lane, New City, New York 10956

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Polsinelli PC
600 Third Avenue, 42nd Floor
New York, New York 10016

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

CLERK OF COURT

Date: 11/22/2023

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Western District of New York

| | |
|---|---|
| Wilmington Trust, National Association, as Trustee for the Benefit of the Registered Holders of Corevest American Finance 2020-1 Trust Mortgage Pass-Through Certificates, <br><br> *Plaintiff(s)* <br> v. <br> Hirschhorn Estates LLC, Meyer Hirschhorn, City of Rochester and John Doe No. 1 through John Doe No. XXX, inclusive, the last thirty names being fictitious and unknown to plaintiff, the persons parties intended being the tenants, occupants, persons or corporations, if any, having or claiming an interest in or lien upon the premises described in the complaint, <br> *Defendant(s)* | ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No. 23-cv-6662 |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  City of Rochester
Law Department, 30 Church Street, Rochester, New York 14614

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Polsinelli PC
600 Third Avenue, 42nd Floor
New York, New York 10016

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____11/22/2023_____        _____
*Signature of Clerk or Deputy Clerk*

POLSINELLI PC
Bradley R. Gardner
600 Third Avenue, 42nd Floor
New York, New York 10016
(212) 684-0199
bgardner@polsinelli.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| WILMINGTON TRUST, NATIONAL ASSOCIATION, AS TRUSTEE FOR THE BENEFIT OF THE REGISTERED HOLDERS OF COREVEST AMERICAN FINANCE 2020-1 TRUST MORTGAGE PASS-THROUGH CERTIFICATES, <br><br><br> Plaintiff, <br><br> -against- <br><br> HIRSCHHORN ESTATES LLC, MEYER HIRSCHHORN, CITY OF ROCHESTER and JOHN DOE NO. I THROUGH JOHN DOE NO. XXX, inclusive, the last thirty names being fictitious and unknown to plaintiff, the persons or parties intended being the tenants, occupants, persons or corporations, if any, having or claiming an interest in or lien upon the premises described in the complaint, <br><br> Defendants. | Case No. |

## COMPLAINT FOR MORTGAGE FORECLOSURE

Plaintiff Wilmington Trust, National Association, as Trustee for the benefit of the registered holders of Corevest American Finance 2020-1 Trust Mortgage Pass-Through Certificates ("**Lender**"), by and through its attorneys, brings forth its cause of action against Defendants Hirschhorn Estates LLC, Meyer Hirschhorn, the City of Rochester, and John Doe No. I through John Doe No. XXX and states as follows:

## PARTIES

1.     Plaintiff is a securitized trust, the trustee of which is Wilmington Trust, National Association ("**Wilmington**") is a national banking association organized under the laws of the United States. Wilmington serves as trustee for the registered holders of Corevest American Finance 2020-1 Trust Mortgage Pass-Through Certificates (the "**Trust**").

2.     Defendant Hirschhorn Estates LLC ("**Borrower**") is a limited liability company organized and existing under the laws of the State of Delaware.  Borrower may be served at its principal place of business located at P.O. Box 901 Tallman, NY 10982.

3.     Defendant Meyer Hirschhorn ("**Guarantor**") is an individual residing in the State of New York and may be served at 14 Stoneham Lane, New City, New York 10956.

4.     Defendant City of Rochester, is a municipal corporation duly organized under the laws of the State of New York, having its principal office at City Hall, 30 Church Street, Rochester, NY 14614 and is named herein as a party that may claim an interest in the properties that are the subject of this mortgage foreclosure action by its pending suit against Borrower and Guarantor entered as Index No. E2023010950, Monroe County, New York.

5.     Defendants John Does I through XXX are currently unknown to Plaintiff, but, on information and belief, are tenants, occupants, persons or corporations, if any, having or claiming an interest in or lien upon the premises described in the Complaint.

## JURISDICTION AND VENUE

6.     This is a civil action over which this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

7.     In *Navarro Sav. Ass'n v. Lee*, 446 U.S. 458 (1980) and *Americold Realty Tr. V. Conagra Foods, Inc.*, 577 U.S. 378 (2016), the United States Supreme Court confirmed a long-

standing rule of jurisprudence that an express, "traditional" trust is not a juridical person—it is a fiduciary relationship—and, therefore, for purposes of diversity jurisdiction, only the citizenship of the trustee is considered. Courts sitting in the Second Circuit have adhered to the principles set forth in *Navarro* and *Americold* and held that the citizenship of the trustee of a traditional trust litigating in its own right, controls for the purposes of diversity jurisdiction. *See, e.g.*, *Raymond Loubier Irrevocable Trust v. Loubier*, 858 F.3d 719, 731 (2d Cir. 2017) ("because the party trusts here are not organized according to state law as distinct juridical entities but, rather, are traditional trusts, establishing only fiduciary relationships . . . it is the trustees' citizenship that must determine diversity"); *U.S. Bank N.A. v. 2150 Joshua's Path, LLC*, No. 13-CV-1598, 2017 WL 4480869, *3 (E.D.N.Y. 2017) (affirming that an express common law trust is deemed to have the citizenship of its trustee); *SPV-LS, LLC v. Bergman*, No. 15 CV 6231, 2019 WL 2257244, *16 (E.D.N.Y. 2019) ("For traditional trusts, it is the citizenship of the trustees holding legal right to sue on behalf of the trusts that is relevant to jurisdiction").

8.      Plaintiff is a traditional trust, and its trustee, Wilmington, is the real party in interest. Plaintiff's trustee, Wilmington, brings this action in its own name and in its capacity as trustee. The New York Civil Practice Law and Rules provides that a trustee of an express trust may sue in its own name. *See* N.Y. CPLR § 1004. Thus, for purposes of diversity jurisdiction, Plaintiff has the citizenship of its trustee. Plaintiff's trustee, Wilmington, is a national banking association and is a citizen of the state where the bank has its main office, as set forth in its articles of incorporation. Wilmington's main office is in Wilmington, Delaware. Accordingly, Plaintiff is a citizen of Delaware for purposes of federal diversity jurisdiction.

9.      Defendant Borrower is a limited liability company which, for diversity jurisdiction purposes, has the citizenship of its members. The sole member of Borrower is Guarantor, and

Guarantor is a citizen and resident of the State of New York; therefore, Borrower's citizenship for federal diversity jurisdiction purposes is New York.

10.     Guarantor, as discussed above, is an individual and a citizen and resident of the State of New York, and Guarantor's citizenship for federal diversity jurisdiction purposes is New York.

11.     Finally, Defendant City of Rochester is a New York governmental entity that, for the purposes of federal diversity jurisdiction, resides in New York.

12.     Thus, there exists complete diversity between Plaintiff (Delaware citizenship) and all Defendants (New York citizenship).

13.     Borrower is indebted to Plaintiff pursuant to a commercial mortgage loan transaction, as described in more detail below. The outstanding balance on the loan exceeds $75,000.00. Accordingly, the amount in controversy is greater than the $75,000.00 threshold for diversity jurisdiction.

14.     The action properly lies in the Western District of New York as the real property which is the subject of this action lies in this judicial district, and all or substantially all of the events or omissions giving rise to the claims occurred in this judicial district. 28 U.S.C. § 1391(a)(2).

## STATEMENT OF FACTS

### *The Loan Transaction*

15.     On March 31, 2021, Borrower entered into a $1,023,500.00 loan transaction (the "**Loan**") with Corevest American Finance Lender LLC ("**Original Lender**").  The terms and

4

conditions of the Loan are set forth in that certain Loan Agreement (the "**Loan Agreement**")[1] dated as of March 31, 2021, by and between Borrower and Original Lender. A true and correct copy of the Loan Agreement is attached hereto as **Exhibit A.**

16.     The Loan is evidenced by that certain Promissory Note (the "**Note**") in the original principal amount of $1,023,500.00 and dated March 31, 2021, the maker of which is Borrower. A true and correct copy of the Note, with affixed alloges, is attached hereto as **Exhibit B.**

17.     In connection with the Note, Guarantor executed the following: (i) a certain Pledgor Guaranty dated March 31, 2021 (the "**Pledgor Guaranty**"), pursuant to which Guarantor absolutely and unconditionally guaranteed the payment of certain amounts owed in connection with the Loan and (ii) a certain Sponsor Guaranty dated March 31, 2021 ("**Sponsor Guaranty**" and together with Pledgor Guaranty collectively, "**Guaranty Agreements**"), pursuant to which Guarantor unconditionally and absolutely guaranteed certain amounts due and owing under the Note, all as further described in the Guaranty Agreements. True and correct copies of the Guarantees are attached hereto as **Exhibit C.**

18.     The indebtedness owed in connection with the Loan is secured by that certain Mortgage, Assignment of Leases and Rents Security Agreement and Fixture Filling (the "**Mortgage**") dated March 31, 2021, which Mortgage encumbers certain real and personal property located at 103 Marion St, Rochester, NY 14610; 117 W Filbert Street, East Rochester, NY 14445; 136 Campbell St Apts 1-6, Rochester, NY 14611; 236 Saratoga Ave Apts 1-6, Rochester, NY 14608; 258 Avis St, Rochester, NY 14615; 294 Lexington Ave, Rochester, NY 14613; 301 Selye Ter, Rochester, NY 14613; 31 Alice St, Rochester, NY 14611; 36 Sterling St,

---

[1] Unless otherwise defined herein, all defined terms shall be given the same meaning as set forth in the Loan Agreement.

Rochester, NY 14606; 404 Emerson St, Rochester, NY 14613; 74 Starling St, Rochester, NY 14613; 76 Oriole St, Rochester, NY 14613; 8 Immel St, Rochester, NY 14606; 8 Velox St, Rochester, NY 14615; 87 Dix St, Rochester, NY 14606; 968 Ridgeway Ave, Rochester, NY 14615; 14 Durgin St, Rochester, NY 14605 and further described in the Mortgage and Schedule A of the Loan Agreement (collectively, the "**Property**"). The Mortgage was recorded on June 4, 2021 in the Real Property Records of Monroe County, New York (the "**Register**"), as Document No. 202106041414. A true and correct copy of the Mortgage, as recorded, is attached hereto as **Exhibit D.**

19.     The Note, Loan Agreement, Pledge Agreement, Mortgage, Guarantees, and all other documents further evidencing, securing or executed in connection with the Loan are referred to herein collectively as the "**Loan Documents**."

20.     Prior to the commencement of this action, the Original Lender with respect to the Loan, assigned the Note and the Mortgage to Corevest Purchaser 2 LLC ("**Corevest Purchaser**") as evidenced by a certain Assignment of Security Instrument, dated March 31, 2021 and recorded with the Register on September 10, 2021 as Document No. 202109101047. A true and correct copy of the recorded assignment to Corevest Purchaser is attached hereto as **Exhibit E**.

21.     Thereafter, Corevest Purchaser CAF assigned the Note and Mortgage to CAF Term Borrower WF, LLC ("**CAF**") as evidenced by a certain Assignment of Security Instrument dated March 31, 2021 and recorded with the Register on September 10, 2021 as Document No. 202109101048. A true and correct copy of the recorded assignment to CAF is attached hereto as **Exhibit F**.

22.     CAF subsequently reassigned the Note and Mortgage to Corevest Purchaser as evidenced by a certain Assignment of Security Instrument dated April 30, 2021 and recorded with

the Register on September 20, 2022 as Document No. 202209201014. A true and correct copy of the recorded assignment to Corevest Purchaser is attached hereto as **Exhibit G**.

23. Corevest Purchaser thereafter assigned the Note and Mortgage to Corevest American Finance Depositor LLC ("**Corevest Depositor**"), as evidenced by a certain Assignment of Security Instrument dated April 30, 2021, and recorded with the Register on September 20, 2022, as Document No. 202209201015. A true and correct copy of the recorded assignment to Corevest Depositor is attached hereto as **Exhibit H**.

24. Thereafter, Corevest Depositor assigned the Note and Mortgage to Plaintiff as evidenced by a certain Assignment of Security Instrument dated April 30, 2021 and recorded with the Register on September 20, 2022 as Document No. 202209201016. A true and correct copy of the recorded assignment to Plaintiff is attached hereto as **Exhibit I**.

25. The original Loan Documents, including the Note together with Allonge affixed to the Note making the Note payable to Plaintiff, were delivered to Plaintiff, and, thus, Plaintiff is the current holder and owner of the Loan Documents.

26. Prior to the commencement of this action, Plaintiff has been in exclusive possession of the original Note and has not transferred the same to any other person or entity.

**_Default Under the Loan Documents_**

27. The Loan Documents provide, among other things:

    a. Borrower shall make monthly payments of principal and interest and other amounts;

    b. Borrower shall comply with all applicable legal requirements as required by any Governmental Authority;

c. Borrower shall maintain the Property in good and safe working order and condition and to repair the Property;

d. Borrower agreed to provide notice to Lender of any litigation or governmental proceedings pending or threatened against the Borrower and the Property;

e. in the event of a default by the Borrower, the entire unpaid principal, accrued interest, and all other amounts payable under the Loan Documents may be accelerated at Plaintiff's option;

f. in the event of a default by the Borrower, Borrower's license to collect the rents generated by the Property may be revoked;

g. in any action to foreclose, Plaintiff shall be entitled to the appointment of a receiver without notice or regard to value;

h. Plaintiff shall be entitled to legal expenses, costs and fees; and

i. in the event of a default by the Borrower, interest at the default rate set forth in the Loan Documents shall be owed by the Borrower.

28.     Borrower defaulted under the Loan Documents by failing to pay the debt due and owing under the Note as provided for therein. Thereafter, Plaintiff and Borrower executed that certain Forbearance Agreement (the "**Forbearance Agreement**"), pursuant to which Plaintiff agreed to forebear from enforcing its rights and remedies under the Loan and Note until September 30, 2024, pursuant to the terms and conditions set forth in the Forbearance Agreement. In the Forbearance Agreement, Borrower and Plaintiff agreed that a Forbearance Termination Event would occur if an Event of Default occurred under the Loan Documents, as provided for therein. A true and correct copy of the Forbearance Agreement is attached hereto as **Exhibit J**.

29.     Borrower failed to maintain the Property in a good and safe manner, to repair the Property and in compliance with law as required under the terms of the Loan Documents and Forbearance Agreement. Borrower and Guarantor are parties to numerous violations and claims asserted by the City of Rochester related to the manner in which Borrower and Guarantor are maintaining and managing properties under their control, including, without limitation, the Property.  As a result, an Event of Default and Forbearance Termination Event under the Loan Documents and Forbearance Agreement. A true and correct copy of the City of Rochester's Petition is attached hereto as **Exhibit K**.

30.     By a letter dated November 13, 2023, Plaintiff provided notice to Borrower that Borrower was in default under the terms of the Loan Documents and Forbearance Agreement and that Plaintiff had elected to accelerate the debt due and owing under the Note and Loan. A true and correct copy of the notice sent to Borrower is attached hereto as **Exhibit L.**

31.     As a result of the foregoing, Borrower and Guarantor have triggered recourse liability under the Loan Documents, and, following foreclosure of the Property, Lender has the right to seek from Borrower and Guarantor its damages and other amounts owed under the Note and Loan Documents on a recourse basis.

### *Amounts Due Under the Loan Documents*

32.     As of November 9, 2023, the following amounts are due and owing under the Note: the unpaid principal balance in the amount of $1,004,408.48; past due interest in the amount of $62,551.62; past due default interest in the amount of $57,832.75; late charges in the amount of $10,854.71; an PPA's in the amount of $12,239.69; servicing fees in the amount of $5,695.00; and any and all fees and costs incurred by Plaintiff, both to date and hereafter, in connection with the collection of the amounts due and owing under the Loan Documents for the protection,

preservation and realization of the Property, including processing fees, late charges, inspection fees, environmental fees, appraisal fees, expenses, administrative fees, servicing fees, attorneys' fees, and costs incurred in connection with the issuance of the third-party reports in connection with the Property.

### *Right to Possession and Rents*

33.     Under the Mortgage, upon a default thereunder, Plaintiff is entitled to collect and receive the rents and the value of the use and occupation of the Property. Plaintiff is also entitled to an order directing all rents, issues and profits from the Property be remitted to Plaintiff in accordance with the terms of the Mortgage and other Loan Documents and directing that any such amounts be used to reduce the indebtedness described above.

### *Right to Foreclosure*

34.     Under the Mortgage, upon an event of default, Plaintiff has the right to institute a proceeding for foreclosure. Thus, Plaintiff is entitled to an Order from the Court that the Mortgage be foreclosed, that the liens provided therein be declared as first and prior liens on the Property, and that Plaintiff be granted the right of immediate possession of the Property.

35.     No other action is pending to recover any part of the debt under the Mortgage, Note, or other Loan Documents.

36.     Plaintiff may not be deemed to have waived, altered, released, or changed its election to foreclose by reason of any payment made after the date of commencement of this action of any and all of the defaults identified herein.

37.     Plaintiff specifically reserves the right to pursue a temporary injunction, appointment of receiver, or other relief with respect to its rights under the Loan Documents. Pursuant to N.Y. Real Prop. Acts. Law §1371, Plaintiff will move the Court to enter final judgment

against Borrower and Guarantor for any residue of the debt under the Note remaining unsatisfied after the foreclosure sale of the Property is completed.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff for foreclosure of the Property as follows:

A.      Finding that Plaintiff has a first and best lien on the Property;

B.      Ordering that Plaintiff has the legal right and is authorized to foreclose on the Property:

(i)      in one parcel according to law together with the fixtures and articles of personalty upon the premises;

(ii)     subject to zoning restrictions and ordinances adopted by any municipality or other governmental authority, and violations thereof;

(iii)    subject to any state of facts that an accurate survey would show;

(iv)     subject to covenants and restrictions of record, if any; and

(v)      subject to violations, if any, noted by any federal, state, city, town or village agency having authority over the premises;

C.      Finding that such foreclosure will vest in the purchaser thereat free and clear title to the Property, free of any and all interests that are or might be asserted by the Defendants to this Complaint;

D.      Ordering that Plaintiff has the right to credit bid at such foreclosure sale any and all amounts due to Plaintiff under the Loan Documents;

E.      Ordering and directing that the U.S. Marshall Service or any special master appointed in this action, foreclose the Property and deliver title via a Deed and bill of sale, as appropriate, to the successful bidder at such foreclosure;

F.      Ordering and directing that the proceeds of the sale be applied as follows:

(i)      to payment of the expenses of the sale;

(ii)     to the payment of the debt owed to Plaintiff under the Note;

(iii)    to the payment of foreclosure costs and other accrued costs in connection with the foreclosure;

(iv)     to the payment, at Plaintiff's option, of any real property taxes that may be due and unpaid in connection with the Property;

(v)      to the payment, at Plaintiff's option, of all other assessments against or attributable to the Property; and

(vi)     the surplus, if any, to the payment of debts secured by junior liens on the Property and then, to Borrower, in accordance with further order of the Court;

G.      Ordering that Borrower has no right of redemption or reinstatement with respect to the Property;

H.      Finding that Plaintiff has preserved its right to pursue any deficiency, on a recourse basis, that may exist under the Note and other Loan Documents after application of the proceeds of the foreclosure sale pursuant to N.Y. Real Prop. Acts. Law §1371 and may move the Court to enter final judgment against Borrower and Guarantor for such deficiency; and

I.      Ordering all further relief is just, proper, and equitable.

Dated:  New York, New York
          November 21, 2023

POLSINELLI PC


By:  */s/ Bradley R. Gardner*
     BRADLEY R. GARDNER
     600 Third Avenue, 42nd Floor
     New York, New York 10016
     (212) 684-0199
     adavis@polsinelli.com

ATTORNEYS FOR PLAINTIFF

13

# EXHIBIT A

# LOAN AGREEMENT BETWEEN COREVEST AMERICAN FINANCE LENDER LLC AND HIRSCHHORN ESTATES, LLC

## SUMMARY OF LOAN TERMS

The following terms are applicable to this Loan Agreement (this "**Agreement**") between Borrower and Lender, dated as of March 31, 2021:

"**Lender**": COREVEST AMERICAN FINANCE LENDER LLC, a Delaware limited liability company, together with its successors and assigns

"**Borrower**": HIRSCHHORN ESTATES, LLC, a Delaware limited liability company

"**Pledgor**": MEYER HIRSCHHORN, an individual resident of the State of New York

"**Sponsor**": MEYER HIRSCHHORN, an individual resident of the State of New York

"**Loan Amount**": $1,023,500.00

"**Closing Fee**": $10,235.00

"**Closing Date**": March 31, 2021

"**Stated Maturity Date**": April 9, 2026

"**Interest Rate**": 6.18% per annum

"**Principal Amortization Period**": Thirty (30) years

"**Monthly Debt Service Payment**": $6,312.41

"**Closing Date Tax Reserve Deposit**": $18,850.16

"**Initial Monthly Tax Reserve Deposit**": $4,712.54

"**Closing Date Insurance Reserve Deposit**": $3,105.62

"**Initial Monthly Insurance Reserve Deposit**": $1,552.81

"**Holdback Deposit Amount**": $18,937.23

"**Par Prepayment Date**": the 54th Payment Date

"**Required Rent to Debt Service Ratio**": 1.80:1.00

"**Property Manager**": EASTMAN PROPERTY MANAGEMENT, INC., a New York corporation

"**Property Management Agreement**": Property Management Agreement, between Borrower and Property Manager

"**Maximum Management Fee Percentage**": 8% of Rents for the applicable calendar month

**This Loan Agreement Includes Attached Riders That Modify the Terms and Conditions:** ☐ Yes ☒ No

**Borrower's Legal Counsel**: N/A

**IN WITNESS WHEREOF**, Lender and Borrower are executing this Agreement as of the date set forth above.

**BORROWER:**

**HIRSCHHORN ESTATES, LLC,**
a Delaware limited liability company

By: _____
Name: Meyer Hirschhorn
Title: Member

Address:

14 Stoneham Lane
New City, NY 10956
Attention: Meyer Hirschhorn

**LENDER:**

**COREVEST AMERICAN FINANCE LENDER LLC**,
a Delaware limited liability company

By: _____

Name:   J. Christopher Hoeffel

Title: CFO


Address:

CoreVest American Finance Lender LLC
1920 Main Street, Suite 850
Irvine, CA 92614
Attention:  Head of Term Lending
Email:  termloannotices@cvest.com


With a copy to:

Scoville Law, PLLC
700 Sleater Kinney RD SE, STE B-130
Lacey, WA 98503
Attention: Mark Scoville

## TERMS AND CONDITIONS

<u>RECITALS</u>

Borrower desires to obtain from Lender the Loan (as hereinafter defined) in connection with the financing of the Properties (as hereinafter defined);

Lender is willing to make the Loan on the terms and subject to the conditions set forth in this Agreement; and

In consideration of the agreements, provisions and covenants contained herein and in the other Loan Documents, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lender and Borrower agree as follows:

**ARTICLE I**
**DEFINITIONS**

**Section 1.1 <u>Defined Terms</u>**. When used in this Agreement, the following capitalized terms have the following meanings:

"**Affiliate**" means, as to any Person, any other Person that, directly or indirectly, is in Control of, is Controlled by or is under common Control with such Person or is a director or officer of such Person or of an Affiliate of such Person.

"**Allocated Loan Amount**" means with respect to each Property, the portion of the Loan Amount allocated thereto as set forth in **Schedule A**, as the same may be reduced in accordance with **Section 2.2(j)**.

"**Approved Management Agreement**" means the Property Management Agreement and any other property management agreement that is approved by Lender.

"**Approved Property Manager**" means Property Manager or any other property management company approved by Lender, until Lender requests the termination of that management company pursuant to **Section 6.9(b)**.

"**Award**" means any compensation paid by any Governmental Authority in connection with a Condemnation in respect to all or any part of a Property.

"**Business Day**" means any day other than (i) a Saturday and a Sunday and (ii) a day on which federally insured depository institutions in the State of New York or the state in which the offices of Lender, its trustee, its Servicer are located are authorized or obligated by law, governmental decree or executive order to be closed.

"**Calculation Date**" means the last date of each calendar quarter, commencing with the calendar quarter ended immediately after the Closing Date; *provided*, that if the Closing Date is less than 45 days prior to the last day of the calendar quarter that includes the Closing Date, then the first Calculation Date shall be the last day of the calendar quarter that immediately follows the calendar quarter that includes the Closing Date.

"**Capital Expenditure**" means hard and soft costs incurred by Borrower with respect to replacements and capital repairs made to a Property in each case to the extent capitalized in accordance with GAAP.

"**Code**" means the Internal Revenue Code of 1986, as amended, and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto.

"**Collateral**" means, collectively, all of the real, personal and mixed property in which Liens are purported to be granted in favor of Lender pursuant to the Loan Documents as security for the Obligations.

"**Condemnation**" means a taking or voluntary conveyance of a Property or any interest in, right accruing to, use of or access to a Property, as the result of, or in settlement of, any condemnation or other eminent domain proceeding by any Governmental Authority.

"**Constituent Entity**" means, if Borrower is a limited partnership, the general partner of Borrower.

"**Contingent Obligation**" means, with respect to any Person, any obligation of such Person directly or indirectly guaranteeing any Debt of any other Person in any manner and any contingent obligation to purchase, to provide funds for payment, to supply funds to invest in any other Person or otherwise to assure a creditor against loss.

"**Control**" means the power to direct the management and policies of an entity, directly or indirectly, whether through the ownership of voting securities or other beneficial interests, by contract or otherwise. The terms "Controlled" and "Controlling" shall have correlative meanings.

"**Cooperation Agreement**" means that certain Mortgage Loan Cooperation Agreement, dated as of the date hereof, among Borrower, Lender and Sponsor.

"**Damages**" to a Person means any and all liabilities, obligations, losses, demands, damages, penalties, assessments, actions, causes of action, judgments, proceedings, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including reasonable attorneys' fees and other costs of defense and/or enforcement whether or not suit is brought), fines, charges, fees, settlement costs and disbursements imposed on, incurred by or asserted against such party; *provided*, *however*, that "Damages" shall not include consequential or punitive damages, except to the extent imposed upon Lender by one or more third parties or otherwise required to be paid by Borrower under the Loan Documents.

"**Debt**" means: (i) all indebtedness for borrowed money, (ii) the deferred purchase price of property or services; (iii) letters of credit and all unreimbursed amounts drawn thereunder; (iv) indebtedness secured by a Lien on any property owned by the applicable Person (whether or not such indebtedness has been assumed), except obligations for Taxes that are not yet due and payable; (v) Contingent Obligations; (vi) payment obligations under any interest rate protection agreement (including any interest rate swaps, floors, collars or similar agreements) and similar agreements; (vii) any material actual or contingent liability to any Person or Governmental Authority with respect to any employee benefit plan (within the meaning of Section 3(3) of ERISA) subject to Title IV of ERISA, Section 302 of ERISA or Section 412 of the Code and (viii) any other contractual obligation for the payment of money, including trade payables.

"**Default**" means the occurrence of any event that, but for the giving of notice or the passage of time, or both, would be an Event of Default.

"**Default Rate**" means a rate per annum equal to the lesser of (i) the maximum rate permitted by applicable law or (ii) five percent (5%) above the Interest Rate.

"**Disbursement Certificate**" means an Officer's Certificate that (A) describes all items of work to be funded, (B) certifies that the work to be funded has been performed at the applicable Property(ies), (C) states that such work has been completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements, (D) states that such work has not been the subject of a previous disbursement, and has been paid for in full by Borrower (including any cost in excess of the requested disbursement), (E) for any expenditure greater than $1,000, is delivered together with copies of any invoices for the work performed, and (E) is delivered with such mechanics lien releases and waivers that are requested by Lender.

"**Eligible Account**" means a separate and identifiable account from all other funds held by the holding institution that is an account (or a subaccount thereof) maintained with an Eligible Institution. An Eligible Account shall not be evidenced by a certificate of deposit, passbook or other instrument.

"**Eligible Institution**" means a federal or state-chartered depository institution or trust company insured by the Federal Deposit Insurance Corporation (i) whose long-term senior unsecured debt obligations are rated at "A3" by Moody's (or equivalent ratings by another rating agency approved by Lender if not rated by Moody's) or (ii) such other banking institution as is approved by Lender.

"**Eligible Lease**" means, unless otherwise approved by Lender in writing, a written Lease that (i) is executed by an Eligible Tenant and Borrower (or, in the case of a Lease existing on the Closing Date, such Lease has been assigned to Borrower), (ii) has a rental rate and terms consistent with rates and terms then prevailing in the local market where the Property is located, (iii) on its commencement date has a term of at least one year and not more than three years, (iv) complies with all applicable Legal Requirements in all material respects and includes all disclosures required by applicable Legal Requirements and (v) covers 100% of the square footage of the applicable Residential Unit.

"**Eligible Tenant**" means a bona fide third-party Tenant of a Property who satisfies each of the following criteria: (i) prior to the time the Tenant executed a Lease, Borrower or Manager screened the Tenant and determined, based on bona fide written documentation, that the Tenant had sufficient financial resources to satisfy its obligations under the Lease for the Property, (ii) the Tenant is not subject to an ongoing Event of Bankruptcy as of such date of initial screening (or if not so initially screened, as of the Closing Date) and (iii) the Tenant is not a Restricted Party or any Affiliate thereof or an immediate family member (ancestor, spouse or lineal descendant) of any of the foregoing.

"**Embargoed Person**" means a Person subject to trade restrictions under any Federal Trade Embargo.

"**Environmental Indemnity**" means that certain Environmental Indemnity Agreement executed by Borrower as of the date hereof.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated thereunder.

"**ERISA Affiliate**" at any time, means each trade or business (whether or not incorporated)

3

that would, at the time, be treated together with Borrower as a single employer under Title IV or Section 302 of ERISA or Section 412 of the Code.

"**Event of Bankruptcy**" means, with respect to any Person: (i) such Person shall fail generally to pay, or admit in writing it inability to pay, its debts as they come due, or shall make a general assignment for the benefit of creditors; (ii) any case or other proceeding shall be instituted by or with the consent or acquiescence of such Person seeking to adjudicate it as bankrupt or insolvent, or seeking liquidation, reorganization, debt arrangement, dissolution, winding up, or composition or readjustment of debts of it or its debts, or the appointment of a trustee, receiver, custodian, liquidator, assignee, sequestrator or the like for such Person or all or substantially all of its assets, or any similar action, or such Person shall take any corporate, partnership, limited partnership or limited liability company action to authorize any of such actions; or (iii) a case or other proceeding described in the foregoing clause (ii) shall be commenced, without the application, consent or acquiescence of such Person, and (A) such case or proceeding shall continue undismissed, or unstayed and in effect, for a period of sixty (60) consecutive days or (B) an order for relief in respect of such Person shall be entered in such case or proceeding or a decree or order granting such other requested relief shall be entered.

"**Excluded Taxes**" means Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes that are imposed by the jurisdiction in which Lender is organized or in which Lender's applicable lending officer is located.

"**Federal Trade Embargo**" means any federal law imposing trade restrictions, including (i) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended), (ii) the International Emergency Economic Powers Act (50 U.S.C. §§ 1701 et seq., as amended), (iii) any enabling legislation or executive order relating to the foregoing, (iv) Executive Order 13224, and (v) the PATRIOT Act.

"**GAAP**" means generally accepted accounting principles in the United States of America, consistently applied.

"**Governmental Authority**" means any United States or foreign federal, state, county, regional, local or municipal government, any bureau, department, agency or political subdivision thereof and any Person with jurisdiction exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government or monetary policy (including any court).

"**HOA**" means a home owners or condominium association, board, corporation or a similar entity with authority to create a Lien on a Property as a result of the non-payment of HOA Fees that are payable with respect to such Property.

"**HOA Fees**" means all homeowner's and condominium dues, fees, assessments and impositions, and any other charges levied or assessed or imposed against a Property, or any part thereof, by an HOA.

"**Indebtedness**" means the Principal Indebtedness, together with interest and all other obligations and liabilities of Borrower under the Loan Documents, including all transaction costs, Yield Maintenance Premium, late fees and other amounts due or to become due to Lender pursuant to the Loan Documents.

"**Indemnified Taxes**" means all Taxes (including any stamp, court, documentary, intangible, recording, filing or similar Taxes) that arise from or are imposed upon any payment made under, from the execution, delivery, performance, or enforcement of any of the Loan Documents, or the registration of, from the receipt or perfection of any Lien under any Loan Document, other than Excluded Taxes.

"**Insurance Proceeds**" means property and business interruption insurance proceeds paid or payable to Borrower or Lender in connection with damage to or destruction of a Property.

"**Insurance Requirements**" means the terms of any insurance policy required pursuant to this Agreement.

"**Interest Accrual Period**" means each period from and including the first day of a calendar month through and including the last day of such calendar month; provided, that, prior to a Securitization, Lender shall have the right, in connection with a change in the Payment Date in accordance with the definition thereof, to make a corresponding change to the Interest Accrual Period. Notwithstanding the foregoing, the first Interest Accrual Period shall commence on and include the Closing Date.

"**Lease**" means any agreement or arrangement pursuant to which any Person has or claims a possessory interest in, or right to use or occupy, a Residential Unit, and every modification, amendment or other agreement relating thereto, including any sublease, assignment and guarantee.

"**Legal Requirements**" means all governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities or any

homeowners' or similar associations (including securities laws, Environmental Laws and zoning restrictions) affecting a Restricted Party, the Properties or any other Collateral or any portion thereof or the construction, ownership, use, alteration or operation thereof (whether now or hereafter enacted and in force), and all permits, licenses and authorizations relating thereto.

"**Lien**" means any mortgage, lien (statutory or other), pledge, hypothecation, assignment, preference, priority, security interest, restrictive covenant, easement, or any other encumbrance or charge on or affecting any Collateral or any portion thereof, or any interest therein, including any conditional sale or other title retention agreement, any sale-leaseback, any financing lease or similar transaction having substantially the same economic effect as any of the foregoing, the filing of any financing statement or similar instrument under the Uniform Commercial Code or comparable law of any jurisdiction, and mechanics', materialmen's and similar liens and encumbrances, and any option to purchase, right of first refusal, right of first offer or similar right.

"**Loan Documents**" means this Agreement, the Note, each of the Mortgages, the Environmental Indemnity, each Subordination of Property Management Agreement, the Cooperation Agreement, the Sponsor Guaranty, the Pledgor Guaranty, the Pledge Agreement, and all other agreements, instruments, certificates and documents necessary to effectuate the granting to Lender of first-priority Liens on the Collateral or otherwise in satisfaction of the requirements of this Agreement or the other documents listed above or hereafter entered into by Lender and Borrower in connection with the Loan.

"**Loan Parties**" means, collectively, Borrower and Pledgor, each of which shall individually be a "**Loan Party**".

"**Loss Proceeds**" means (i) Insurance Proceeds or (ii) Awards, whichever the case may be, and in each case after deduction of Lender's reasonable costs and expenses (including reasonable counsel fees) in collecting and disbursing the same.

"**Material Adverse Effect**" means a material adverse effect on (a) the property, business, operations or financial condition of a Restricted Party, (b) the use, operation or value of a Property, (c) the ability of a Restricted Party to satisfy its Obligations under the Loan Documents when due, or (d) the enforceability or validity of any Loan Document, the perfection or priority of any Lien created under any Loan Document or the rights, interests and remedies of Lender under any Loan Document.

"**Material Agreements**" means each contract and agreement (other than Leases) relating to the Properties, or otherwise imposing obligations on Borrower, under which Borrower would have the obligation to pay more than $10,000 per annum and that cannot be terminated by Borrower without cause upon thirty (30) days' notice or less without payment of a termination fee, or that is with an Affiliate of Borrower.

"**Maturity Date**" means the Stated Maturity Date, or such earlier date as may result from acceleration of the Loan in accordance with this Agreement.

"**Moody's**" means Moody's Investors Service, Inc. and its successors.

"**Mortgage**" means, with respect to each Property, that certain mortgage, deed of trust or deed to secure debt, as the case may be, assignment of rents and leases, security agreement and fixture filing encumbering such Property, executed by Borrower as of the date hereof, as the same may from time to time be amended, restated, replaced, substituted, supplemented or otherwise modified in accordance herewith.

"**Note(s)**" means that certain promissory note, dated as of the date hereof, made by Borrower to the order of Lender to evidence the Loan, as such note may be replaced by multiple Notes in accordance with the Cooperation Agreement and as otherwise assigned (in whole or in part), amended, restated, replaced, supplemented or otherwise modified in accordance herewith.

"**Obligations**" means, collectively, each and all of the obligations of the Restricted Parties under the Loan Documents, including Borrower's obligations for payment of the Indebtedness and payment of all operating expenses necessary for the operation of the Properties and Capital Expenditures necessary to maintain the Properties in accordance with this Agreement.

"**OFAC List**" means the list of specially designated nationals and blocked persons subject to financial sanctions that is maintained by the U.S. Treasury Department, Office of Foreign Assets Control and any other similar list maintained by the U.S. Treasury Department, Office of Foreign Assets Control pursuant to any applicable governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities, including trade embargo, economic sanctions, or other prohibitions imposed by Executive Order of the President of the United States. The OFAC List currently is accessible at http://www.treasury.gov/ofac/downloads/t11sdn.pdf.

"**Officer's Certificate**" means a certificate delivered to Lender that is signed by an authorized officer of Borrower and certifies the information therein to the best of such officer's knowledge.

"**Other Charges**" means (i) HOA Fees and (ii) any other charges levied or assessed or imposed upon a Property, or any part thereof, other than Taxes.

"**PATRIOT Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), as amended from time to time.

"**Payment Date**" means, with respect to each Interest Accrual Period, the ninth (9th) day of the calendar month immediately succeeding such Interest Accrual Period; provided, that prior to a Securitization, Lender shall have the right to change the Payment Date in connection with a change to the Interest Accrual Period.

"**Payment Shortfall**" means any amount of principal, interest and other components of the Indebtedness and other Obligations due under the Loan Documents that cannot be funded from the operation of the Properties.

"**Permits**" means all licenses, permits, variances and certificates used in connection with the ownership, operation, use or occupancy of each of the Properties (including certificates of occupancy, business licenses, state health department licenses, licenses to conduct business and all such other permits, licenses, consents, approvals and rights, obtained from any Governmental Authority or private Person concerning ownership, operation, use or occupancy of a Property).

"**Permitted Debt**" means with respect to Borrower, (i) the Obligations; (ii) Taxes not yet due and payable; (iii) Capital Expenditure costs permitted to be incurred under the Loan Documents that are paid on or prior to the date when due; (iv) security deposits and any interest thereon required to be paid to any Tenant pursuant to the applicable Lease or Legal Requirements and (v) trade payables not represented by a note, paid by Borrower within sixty (60) days of incurrence, which are incurred in the ordinary course of Borrower's ownership and operation of the Properties, in amounts reasonable and customary for similar properties and not exceeding three percent (3.0%) of the Loan Amount in the aggregate.

"**Permitted Encumbrances**" means: (i) the Liens created by the Loan Documents; (ii) all Liens and other matters specifically disclosed on Schedule B of the mortgagee title insurance policies obtained by Lender with respect to the Properties; (iii) Liens for Taxes not yet delinquent; (iv) Liens for Taxes or Other Charges becoming delinquent after the date hereof, in each case only if being diligently contested in good faith and by appropriate proceedings pursuant to and in accordance with **Section 6.4**; (v) any workers', mechanics' or other similar Liens on any Property arising after the date hereof that are (a) discharged of record within sixty (60) days of attachment, or by the expiration of such sixty (60) day period, Borrower deposits with Lender an amount that at all times equals at least 125% of the dollar amount of such Lien (including any increases thereto from time to time) or a bond in the aforementioned amount from such surety, and upon such terms and conditions, as is reasonably satisfactory to Lender as security for payment or release of such Lien and (b) if contested, are contested in good faith and by appropriate proceedings pursuant to and in accordance with **Section 6.4** and (vi) rights of Tenants as tenants only pursuant to written Leases entered into in conformity with the provisions of this Agreement.

"**Permitted Transfer**" means (a) a residential Lease for a Residential Unit entered into in accordance with the Loan Documents; (b) a Permitted Encumbrance; (c) a Transfer of a Property in accordance with **Section 3.5**, (d) a Condemnation, provided Borrower complies with **Section 6.15** with respect to such Condemnation, (e)Transfers (of the interest itself, but not any pledge or grant or creation of any Lien) of indirect equity interests in Borrower which in the aggregate (i) do not exceed forty-nine percent (49%) of the total indirect legal or beneficial ownership interests in Borrower, (ii) do not result in any Person's interest in Borrower exceeding forty-nine percent (49%) of the total indirect legal or beneficial ownership interests in Borrower (other than a Person that owned forty-nine percent (49%) of the total indirect legal or beneficial ownership interests in Borrower on the date hereof) and (iii) do not result in a change in Control of Borrower, (f) an inter vivos or testamentary Transfer of an indirect equity interest in Borrower to (i) one or more immediate family members (ancestors, spouse or lineal descendants) of the current holders of such equity interests (a "**Current Owner**"), or (ii) a trust or other entity in which all of the beneficial interest is held by a Current Owner or one or more immediate family members of a Current Owner; provided, that in each case (x) such Transfer is made in connection with a Current Owner's bona fide, good faith estate planning and (y) no change in Control of Borrower results therefrom and (g) with the prior written consent of Lender and the payment by Borrower to Lender of a nonrefundable fee in an amount equal to 1.0% of the Principal Indebtedness, any other Transfer of any direct or indirect interest in Borrower. Borrower shall pay all costs and expenses of Lender in connection with a Transfer contemplated by clause (g), whether or not such Transfer is approved by Lender, including all fees and expenses of Lender's counsel, whether internal or outside, the cost of any required counsel opinions related to REMIC or other securitization or tax issues, any Rating Agency fees and the greater of $20,000 and the customary fee assessed by the Servicer in connection with Transfer approvals. Borrower shall provide prior written notice to Lender of any Transfer contemplated by clauses (e), (f) and (g) above and all documentation relating thereto.

"**Person**" means any natural person, corporation, limited liability company, partnership, joint

venture, estate, trust, unincorporated association or Governmental Authority and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Plan Assets**" means assets of any (i) employee benefit plan (as defined in Section 3(3) of ERISA) subject to Title I of ERISA, (ii) plan (as defined in Section 4975(e)(1) of the Code) subject to Section 4975 of the Code, or (iii) governmental plan (as defined in Section 3(32) of ERISA) subject to federal, state or local laws, rules or regulations substantially similar to Title I of ERISA or Section 4975 of the Code.

"**Pledge Agreement**" means that certain Pledge Agreement, dated as of the date hereof, by and between Pledgor and Lender.

"**Pledgor Guaranty**" means that certain Pledgor Guaranty, dated as of the date hereof, executed by Pledgor for the benefit of the Lender.

"**Prepayment Rate**" means the bond equivalent yield (in the secondary market) on the United States Treasury Security that as of the Prepayment Rate Determination Date has a remaining term to maturity closest to, but not exceeding, the remaining term to the Stated Maturity Date as most recently published in the "Treasury Bonds, Notes and Bills" section in The Wall Street Journal as of such Prepayment Rate Determination Date. If more than one issue of United States Treasury Securities has the same remaining term to the Stated Maturity Date, the "Prepayment Rate" shall be the yield on such United States Treasury Security most recently issued as of the Prepayment Rate Determination Date. The rate so published shall control absent manifest error. If the publication of the Prepayment Rate in The Wall Street Journal is discontinued, Lender shall determine the Prepayment Rate on the basis of "Statistical Release H.15 (519), Selected Interest Rates," or any successor publication, published by the Board of Governors of the Federal Reserve System, or on the basis of such other publication or statistical guide as Lender may reasonably select.

"**Prepayment Rate Determination Date**" means the date that is five (5) Business Days prior to the date of a prepayment of principal.

"**Principal Indebtedness**" means the principal balance of the Loan outstanding from time to time.

"**Properties**" means the real property described on Schedule A hereto, together with all buildings and other improvements thereon and all personal property owned by Borrower and encumbered by the Mortgages, together with all rights pertaining to such property; and "Property" means an individual property included in the Properties or all Properties collectively, as the context may require.

"**Rating Agency**" means, prior to the final Securitization of the Loan, each of S&P, Moody's, Fitch, Inc., DBRS, Inc., Morningstar Credit Ratings, LLC, Kroll Bond Rating Agency, Inc. (or, in each case, its Affiliates and successors), or any other nationally-recognized statistical rating agency that has been designated by Lender and, after the Securitization of the Loan, shall mean any of the foregoing that have rated and continue to rate any of the Certificates (excluding unsolicited ratings).

"**Rating Agency Confirmation**" means a written affirmation from each of the Rating Agencies that the credit rating of the Certificates by such Rating Agency immediately prior to the occurrence of the event with respect to which such Rating Agency Confirmation is sought will not be qualified, downgraded or withdrawn as a result of the occurrence of such event, which affirmation may be granted or withheld in such Rating Agency's sole and absolute discretion. In the event that, at any given time, no Certificates are then outstanding, then the term Rating Agency Confirmation shall be deemed instead to require the written approval of Lender based on its reasonable, good faith determination of whether the Rating Agencies would issue a Rating Agency Confirmation if any such Certificates were outstanding.

"**Regulatory Change**" means any change after the Closing Date in Legal Requirements or the adoption or the making, after such date, of any interpretations, directives or requests applying to Lender, or any Person in Control of Lender or to a class of banks or companies Controlling banks of or under any Legal Requirements by any court or Governmental Authority.

"**Release Price**" means, with respect to the release of any Property, 120% of the initial Allocated Loan Amount for such Property.

"**REMIC**" means a "real estate mortgage investment conduit" as defined in Section 860D of the Code.

"**Rents**" means, with respect to each Property, all rents and rent equivalents and any fees, payments or other compensation from any Tenant.

"**Rent Statement**" means a schedule of the Properties in the form of, and containing the information included in, the rent roll attached hereto as **Exhibit A**.

"**Rent to Debt Service Ratio**" means, as of any date of determination, a ratio determined by Lender of (a) Revenues actually collected by Borrower for the Properties for the twelve (12) completed, full calendar months prior to such date of determination to (b) the Monthly

Debt Service Payment as of the Payment Date immediately preceding such date of determination, annualized; provided that for any date of determination prior to the first anniversary of the Closing Date, the amount in clause (a) shall be determined by annualizing Revenues for the Properties actually collected by Borrower for the completed full calendar months occurring after the Closing Date.

"**Request for Release**" means a request for release of a Property in connection with any Transfer of a Property, substantially in the form attached hereto as **Exhibit B**.

"**Reserves**" means, collectively, the Tax Reserve, the Insurance Reserve, the Holdback Reserve and the Capital Expenditure Reserve, each of which shall, individually, be a "**Reserve**".

"**Residential Unit**" means each separate residential address comprising all or part of a Property.  For example, a Residential Unit may include a single family residence, a housing unit in a duplex or triplex, a condominium or a townhome.

"**Restoration**" means the repair and restoration of a Property after a Casualty or Condemnation as nearly as possible to the condition such Property was in immediately prior to such Casualty or Condemnation, with such material alterations as may be approved by Lender, which such approval shall not to be unreasonably withheld.

"**Restricted Parties**" means, collectively, Borrower, Pledgor and Sponsor, each of which shall individually be a "**Restricted Party**".

"**Revenues**" means all Rents, moneys payable as damages pursuant to a Lease or in lieu of rents (including lease termination fees), royalties, revenues, deposits (including security, utility and other deposits that have been forfeited), charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower from any and all sources including proceeds from the sale, lease, license, concession or other grant of the right of the use and occupancy of property or rendering of services by Borrower and proceeds, if any, from business interruption or other loss of income insurance.

"**S&P**" means Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies, Inc., and its successors.

"**Servicer**" means the entity or entities appointed by Lender from time to time to serve as servicer and/or special servicer of the Loan. If at any time no entity is so appointed, the term "Servicer" shall be deemed to refer to Lender.

"**Sponsor Financial Covenant**" means the requirement that Sponsor (i) maintain liquidity of not less than 5% of the Loan Amount, (ii) have net worth in excess of 25% of the Loan Amount (exclusive of Sponsor's direct or indirect interest in Borrower) and (iii) not be subject to any Event of Bankruptcy.

"**Sponsor Guaranty**" means that certain Sponsor Guaranty, dated as of the date hereof, executed by Sponsor for the benefit of Lender.

"**Subordination of Property Management Agreement**" means an Assignment of Management Agreement and Subordination of Management Fees among Borrower, an Approved Property Manager and Lender, substantially in the form delivered on the date hereof by Borrower, the initial Approved Property Manager and Lender.

"**Taxes**" means all real estate and personal property taxes, assessments, fees, taxes on rents or rentals, water rates or sewer rents, facilities and other governmental, municipal and utility district charges or other similar taxes or assessments now or hereafter levied or assessed or imposed against the Properties or Borrower with respect to the Properties or rents therefrom or that may become Liens upon any of the Properties, without deduction for any amounts reimbursable to Borrower by third parties and including any interest, additions to tax or penalties applicable thereto.

"**Tenant**" means any Person liable by contract or otherwise to pay monies pursuant to a Lease.

"**Transfer**" means any transfer of any kind (including any gift, conveyance, lease, sublease, sale, or Lien) with respect to all or any part of or any interest (whether direct or indirect, ownership, beneficial or otherwise, and irrespective of the number of tiers of parties having interests) in any Collateral or Borrower, or any direct or indirect constituent of Borrower, whether voluntarily or involuntarily and whether directly or indirectly, by operation of law or otherwise. Without limitation, "Transfer" includes (i) an installment sales agreement wherein by which a Property or any part thereof is to be sold for a price to be paid in installments; (ii) an agreement for the leasing of a Residential Unit for any purpose other than the actual residential occupancy by a Tenant thereunder; (iii) a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any Revenues; (iv) if any direct or indirect constituent is a corporation, the voluntary or involuntary sale, conveyance or transfer of such corporation's stock, or the creation or issuance of new stock, or entering into any agreement to do any of the foregoing; (v) if Borrower or any direct or indirect constituent is partnership, limited liability company, or

other entity, any change, withdrawal, removal, resignation, addition, or change of control of any partner, member, or other interest holder, or the issuance of any new partnership, membership or other entity interest, or the transfer of any partnership, membership or other entity interest, or entering into any agreement to do any of the foregoing; (vi) any pledge, hypothecation, assignment, transfer or other Lien or encumbrance of any direct or indirect ownership interest in Borrower; and (vii) granting or sufferance of any purchase option, right of first refusal, right of first offer or other similar rights in favor of any Tenant or other Persons.

"**Waste**" means any material abuse or destructive use (whether by action or inaction) of the Property.

"**Yield Maintenance Premium**" means an amount determined by Lender to be equal to the greater of (a) one percent (1%) of the principal amount of the Loan prepaid and (b) the excess, if any, of (i) the sum of the present values of all then-scheduled payments of principal and interest on the principal amount of the Loan being prepaid through the Stated Maturity Date (including a balloon payment on the Stated Maturity Date of the remaining principal on the Stated Maturity Date), with each such payment discounted to its present value at the date of prepayment at the rate which, when compounded monthly, is equivalent to the Prepayment Rate when compounded semi-annually, and deducting from the sum of such present values any interest paid for the period from the date of prepayment to the next succeeding Payment Date in the event such payment is not made on a Payment Date, over (ii) the principal amount of the Loan being prepaid.

**Section 1.2 Additional Definitions**. The following terms are defined in the documents, exhibits or Sections indicated below:

| Term | Location |
| --- | --- |
| "Agreement" | Summary of Loan Terms |
| "Borrower" | Summary of Loan Terms |
| "Capital Expenditure Reserve" | Section 4.3 |
| "Casualty" | Section 6.14 |
| "Certificates" | Cooperation Agreement |
| "Closing Date" | Summary of Loan Terms |
| "Closing Fee" | Summary of Loan Terms |
| "Environmental Laws" | Environmental Indemnity |
| "Event of Default" | Section 8.1 |
| "Holdback Deposit Amount" | Summary of Loan Terms |
| "Holdback Reserve" | Section 4.7 |
| "Holdback Reserve Funds" | Section 4.7 |
| "Increased Costs" | Section 2.4 |
| "Indemnified Parties" | Section 9.5(a) |
| "Insurance Reserve" | Section 4.2 |
| "Interest Rate" | Summary of Loan Terms |
| "Lender" | Summary of Loan Terms |
| "Loan" | Section 2.1 |
| "Loan Amount" | Summary of Loan Terms |
| "Maximum Management Fee Percentage" | Summary of Loan Terms |
| "Monthly Debt Service Payment" | Summary of Loan Terms |
| "Par Prepayment Date" | Summary of Loan Terms |
| "Payment Shortfall Reserve Funds" | Section 4.7 |
| "Pledgor" | Summary of Loan Terms |
| "Policy" and "Policies" | Section 6.13(b) |
| "Property Management Agreement" | Summary of Loan Terms |
| "Property Manager" | Summary of Loan Terms |
| "Rent Deposit Account" | Section 4.6 |
| "Required Rent to Debt Service Ratio" | Summary of Loan Terms |
| "Securitization" | Cooperation Agreement |
| "Security Deposit Account" | Section 6.7 |
| "Severed Loan Documents" | Section 8.2(g) |
| "Special Purpose Entity" | Schedule D |
| "Sponsor" | Summary of Loan Terms |
| "Stated Maturity Date" | Summary of Loan Terms |
| "Tax Reserve" | Section 4.1 |
| "Tenant Direction Letter" | Section 4.6 |

**ARTICLE II**
**GENERAL TERMS**

**Section 2.1**    **The Loan**. On the Closing Date, subject to the terms and conditions of this Agreement, Lender shall make a loan to Borrower (the "**Loan**") in an amount equal to the Loan Amount. Any amount borrowed and repaid in respect of the Loan may not be reborrowed.  The Loan shall be evidenced by one or more Notes.

**Section 2.2**    **Interest and Principal**.

(a)    The Principal Indebtedness shall accrue interest at the Interest Rate.

(b)   Interest on the Loan and other portions of the Indebtedness shall be calculated by multiplying (a) the actual number of days in the Interest Accrual Period or other period for which the calculation is being made by (b) a daily rate based on a three hundred sixty (360) day year (i.e., the Interest Rate expressed as an annual rate divided by 360) by (c) the Principal Indebtedness as of the first day of the applicable Interest Accrual Period or the amount of such other portions of the Indebtedness, as applicable.

(c)   For so long as any Event of Default is continuing, the Principal Indebtedness and all other portions of the Indebtedness, shall accrue interest at the Default Rate.  Interest at the Default Rate shall be paid immediately upon demand, which demand may be made as frequently as Lender shall determine.

(d)   On each Payment Date, Borrower shall pay to Lender a monthly payment of interest, and, if the Loan is amortizing as indicated in the Summary of Loan Terms, principal, equal to the Monthly Debt Service Payment.  Notwithstanding the foregoing, on the Closing Date, Borrower shall pay interest from and including the Closing Date through the end of the first Interest Accrual Period, in lieu of making such payment on the first Payment Date following the Closing Date. Except during the continuance of an Event of Default, all payments received from Borrower shall be applied by Lender in the following order of priority: (i) *first*, to the payment of interest then due and payable; (ii) *second*, to the payment of principal then due and payable; and (iii) *third*, to all other amounts then due and payable under the Loan Documents.

(e)   If the Loan is amortizing as indicated in the Summary of Loan terms and a prepayment of principal is made, then Lender will adjust the Monthly Debt Service Payment to reflect the remaining Principal Indebtedness outstanding and the remaining portion of the Principal Amortization Period.  Lender will notify Borrower in writing of its determination of the adjusted Monthly Debt Service Payment, which notice shall be conclusive and binding absent manifest error.  Borrower will pay the new Monthly Debt Service Payment commencing with the Payment Date for the Interest Accrual Period that follows the date of such prepayment.

(f)   Borrower shall pay to Lender on the Maturity Date the remaining Principal Indebtedness, all accrued and unpaid interest and all other amounts due under the Loan Documents.

(g)   Notwithstanding anything to the contrary contained herein, amounts received by Lender in respect of the Indebtedness during the continuance of an Event of Default and amounts on deposit in the Reserves during the continuance of an Event of Default may be applied by Lender toward interest, principal and other components of the Indebtedness or to other Obligations in such order as Lender shall determine.

(h)   If any amount due under the Loan Documents is not paid on the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of (i) five percent (5.00%) of such unpaid sum or (ii) the maximum amount permitted by Legal Requirements in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment.

(i)   Whenever any payment to be made under any Loan Document shall be stated to be due on a day that is not a Business Day, the due date thereof shall be deemed to be the immediately preceding Business Day.

(j)   All reductions of principal, whether prepayments or, if the Loan is amortizing as indicated in the Summary of Loan Terms, regularly scheduled amortization, shall reduce the Allocated Loan Amounts of the Properties on a *pro rata* basis, except only that prepayments of the Release Price for any Property released shall reduce the Allocated Loan Amount for such Property until the same is zero, and then any excess of such principal shall reduce the Allocated Loan Amounts of the remaining Properties on a pro rata basis.

**Section 2.3   Method and Place of Payment**. Except as otherwise specifically provided in this Agreement, all payments and prepayments under this Agreement and the Note shall be made to Lender not later than 1:00 p.m., New York City time, on the date when due and shall be made in lawful money of the United States of America by wire transfer in federal or other immediately available funds to the account specified from time to time by Lender. Any funds received by Lender after such time shall be deemed to have been paid on the next succeeding Business Day. Lender shall notify Borrower in writing of any changes in the account to which payments are to be made.

**Section 2.4   Increased Costs**. If as a result of any Regulatory Change or compliance of Lender therewith, the basis of taxation to Lender or its Affiliate of payments in respect of a Loan is changed or Lender or its Affiliate becomes subject to any increased cost, reduction in income or additional expense in respect of the Loan Documents, including, without limitation (i) any Indemnified Tax or (ii) any reserve, special deposit or similar requirements relating to any extensions of credit or other assets of, or any deposits with or other liabilities (such increase in cost, reduction in income or additional expense being herein called "**Increased Costs**"), then Borrower shall upon demand promptly pay to Lender such Increased Costs to the extent that Lender reasonably determines that such Increased Costs are allocable to the Loan.

**Section 2.5   Taxes**. Any payments by or on account of any obligation of Borrower under any Loan Document shall be made without deduction or withholding for any Tax; provided, however, that if Legal Requirements require deduction or withholding of a Tax, then Borrower shall deduct or withhold and pay such Tax to the relevant Governmental Authority in accordance with Legal Requirements, and, if such Tax is an Indemnified Tax, then the sum payable by Borrower shall be increased so that after such deduction or withholding (including deductions or withholdings applicable to additional amounts payable) Lender receives an amount equal to the sum it would have received had no such deduction or withholding been made. Borrower shall promptly indemnify Lender for all Indemnified Taxes (including Taxes in respect of additional amounts payable) and related expenses, and such indemnity obligation shall survive any assignment or replacement of Lender or satisfaction or discharge of other obligations under the Loan Documents. Borrower shall promptly deliver evidence satisfactory to Lender of any payments made pursuant to this **Section 2.5**.

**Section 2.6   Closing Fee**. Borrower shall pay the Closing Fee to Lender on the Closing Date.  The Closing Fee shall be payable by wire transfer of immediately available funds or may be paid by netting the Closing Fee from the Loan proceeds funded to Borrower on the Closing Date.  The Closing Fee is deemed earned by Lender on the Closing Date and will be non-refundable.

**Section 2.7   ACH Payments**.  Borrower agree that all payments due and owing under this Agreement or any other Loan Documents shall be made through automated clearing house ("**ACH**") transfers from the Borrower's designated Operating Account (the "**Payment Account**") directly to Lender's Servicer.  In this regard, Borrower hereby agrees to execute and deliver to Lender an authorization agreement for direct payments whereby, among other things, Lender's Servicer shall be irrevocably authorized to initiate ACH transfers from the Payment Account to Lender or as otherwise provided in this Agreement and the other Loan Documents in the amounts required or permitted under this Agreement and all other Loan Documents, including for scheduled payments of principal, interest and Reserves and payment of all other fees or charges due under this Agreement or any other Loan Documents.  Lender's authorization for direct ACH transfers as hereby provided shall be irrevocable and such ACH transfers shall continue until all Obligations are paid in full.  For so long as any Obligations remain outstanding, Borrower shall: (i) not revoke Lender's authority to initiate ACH transfers as hereby contemplated; (ii) not change, modify, close or otherwise affect the Payment Account; (iii) deposit all Revenues of any nature or kind whatsoever only into the Payment Account; and (iv) be responsible for all costs, expenses or other fees and charges incurred by Lender as a result of any failed or returned ACH transfers, whether resulting from insufficient sums being available in the Payment Account, or otherwise. The Borrower hereby agrees to undertake any and all required actions, execute any required documents, instruments or agreements, or to otherwise do any other thing required or requested by Lender in order to effectuate the requirements of this **Section 2.7**. The failure of the Borrower to abide by any of the provisions of this **Section 2.7** shall constitute an Event of Default without further notice.

**ARTICLE III**
**PREPAYMENT; PROPERTY RELEASES**

**Section 3.1   Voluntary Prepayment**. Borrower may, at its option, upon not less than thirty (30) days' prior written notice to Lender, prepay the Loan in whole or in part on any Business Day, which prepayment shall be made together with the amounts required by **Section 3.7**.  Borrower's notice of prepayment shall create an obligation of Borrower to prepay the Loan as set forth therein, but may be rescinded with five (5) days' written notice to Lender (subject to payment of any reasonable costs and expenses resulting from such rescission). All amounts collected by Lender after an Event of Default shall be deemed to be voluntary prepayments.

**Section 3.2   Casualty**. If any Casualty of a Property occurs, then Borrower shall prepay the Principal Indebtedness in an amount equal to the Release Price for such Property, together with the amounts required under **Section 3.7** (other than Yield Maintenance Premium), which prepayment shall be made within five (5) Business Days of the payment of Insurance Proceeds under Borrower's property insurance Policy with respect to such Casualty; provided, that no such prepayment shall be required if the Insurance Proceeds are less than thirty percent (30%) of the initial Allocated Loan Amount for such Property or if Lender consents in writing to the use of the Insurance Proceeds for the Restoration of the Property.  Lender shall apply any applicable Loss Proceeds in its possession towards the payment of the required prepayment amount. If the required prepayment amount exceeds the applicable Loss Proceeds held by Lender, then Borrower shall be liable for the excess. If the applicable Loss Proceeds held by Lender exceeds the required prepayment amount, then the excess shall be released to Borrower.  After a prepayment required under this **Section 3.2** has been made in full, Lender will prepare, execute and deliver to Borrower such instruments as shall be necessary to release the applicable Property from the Liens of the Loan Documents.

**Section 3.3   Complete Condemnation**.  If a complete Condemnation of a Property occurs (which, for purposes hereof, shall include any Condemnation that interferes with the continuing use of such Property as a residential rental property, as determined by Lender), then Borrower shall prepay the Principal Indebtedness in an amount equal to the Release Price for such Property, together with the amounts required under **Section 3.7** (other than

Yield Maintenance Premium), which prepayment shall be made within five (5) Business Days of the payment of Award from the condemning authority. Lender shall apply any applicable Loss Proceeds in its possession towards the payment of the required prepayment amount. If the required prepayment amount exceeds the applicable Loss Proceeds held by Lender, then Borrower shall be liable for the excess. If the applicable Loss Proceeds held by Lender exceeds the required prepayment amount, then the excess shall be released to Borrower. After a prepayment required under this **Section 3.3** has been made in full, Lender will prepare, execute and deliver to Borrower such instruments as shall be necessary to release the applicable Property from the Liens of the Loan Documents.

**Section 3.4    Partial Condemnation**. If a Condemnation of a Property not described in **Section 3.3** occurs, then Borrower shall prepay the Principal Indebtedness, together with the amounts required under **Section 3.7** (other than Yield Maintenance Premium), in an aggregate amount equal to the Loss Proceeds paid by the condemning authority, which prepayment shall be made within five (5) Business Days of the payment of Loss Proceeds from the condemning authority; provided, that no such prepayment shall be required if Lender consents in writing to the use of the Net Proceeds for the Restoration of the Property. Lender shall apply any applicable Loss Proceeds in its possession towards the payment of the required prepayment amount.

**Section 3.5    Property Releases**.

(a)  Borrower shall have the right, at its option, on not less than thirty (30) days' prior written notice to Lender, to obtain the release of one or more of the Properties from the Liens of the Loan Documents, provided that the following conditions shall been satisfied:

        (i)        *Borrower shall submit to Lender, not less than ten (10) nor more than thirty (30) Business Days prior to the proposed Transfer date, a Request for Release, together with evidence reasonably satisfactory to Lender that the conditions set forth in this Section 3.5(a) will be satisfied upon the consummation of such Transfer;*

        (ii)        *No Event of Default shall have occurred and be continuing as of the consummation of the release;*

        (iii)        *The applicable Property shall be transferred to a Person that is not an Affiliate of Borrower;*

        (iv)        *The applicable Property shall be transferred pursuant to a bona fide all-cash sale on arms-length terms and conditions;*

        (v)        *On the Transfer date, Borrower shall prepay the Principal Indebtedness in an amount equal to the applicable Release Price, together with the amounts required by Section 3.7 (including Yield Maintenance Premium), which aggregate amount shall be transferred directly to Lender by the closing title company or escrow agent for the Transfer;*

        (vi)        *The pro forma Rent to Debt Service Ratio as of the last day of the most recent calendar month ended immediately prior to such release, after giving pro forma effect for the elimination of the Revenues for the applicable Property and, if applicable, reduction of the Monthly Debt Service Payment as determined by Lender pursuant to Section 2.2(e) shall equal or exceed the greater of (i) the Required Rent to Debt Service Ratio and (ii) the actual Rent to Debt Service Ratio as of the last day of the most recent calendar month ended immediately prior to such release; and*

        (vii)        *Borrower shall reimburse Lender for any actual out-of-pocket costs and expenses incurred by Lender in connection with this Section 3.5 (including the reasonable fees and expenses of legal counsel and the reasonable out-of-pocket expenses of the Servicer).*

(b)  Upon satisfaction of the requirements set forth in this **Section 3.5**, Lender will prepare, execute and deliver to Borrower such instruments as shall be necessary to release the applicable Property from the Liens of the Loan Documents.

**Section 3.6    REMIC Savings Clause**. Notwithstanding anything to the contrary contained herein, including **Sections 3.2, 3.3** and **3.5**, if the Loan is included in a REMIC trust and the ratio of the unpaid principal balance of the Loan to the value of the remaining Properties (as determined by Lender using any commercially reasonable method permitted to a REMIC trust, and which shall exclude the value of any personal property (other than fixtures) or going concern value, if any) exceeds or would exceed 125% immediately after giving effect to the release of a Property, no release of such Property will be permitted unless the principal balance of the Loan is prepaid by an amount not less than the greater of (i) the Release Price or (ii) the least amount that is a "qualified amount" as that term is defined in Internal Revenue Service Revenue Procedure 2010-30, as the same may be

amended, replaced, supplemented or modified from time to time, unless Lender receives an opinion of counsel that, if this paragraph is applicable but not followed or is no longer applicable at the time of such release, the REMIC trust will not fail to maintain its status as a REMIC trust as a result of the release of such Property.

**Section 3.7    Prepayment Requirements**.

(a)  Any prepayment of principal shall be accompanied by (i) all interest accrued on the amount prepaid, plus, the amount of interest that would have accrued on the amount prepaid had the Loan remained outstanding through the end of the Interest Accrual Period in which such prepayment occurs, (ii) if such prepayment is made prior to the Par Prepayment Date, the applicable Yield Maintenance Premium (except with respect to any prepayment pursuant to **Sections 3.2, 3.3** or **3.4**), (iii) all reasonable costs and expenses of Lender incurred in connection with the prepayment (including reasonable attorneys' fees) and (iv) all other amounts then due under the Loan Documents.

(b)  Except during the continuance of an Event of Default, funds delivered to Lender in connection with any prepayment shall be applied in the following order of priority: (i) first, to any amounts (other than principal, interest and Yield Maintenance Premium) then due and payable under the Loan Documents, including any costs and expenses of Lender in connection with such prepayment; (ii) second, interest on the principal amount being prepaid through the end of the Interest Accrual Period in which such prepayment occurs; (iii) third, if applicable, Yield Maintenance Premium on the principal amount being prepaid; and (iv) fourth, to principal. Any partial prepayment of the Loan shall be applied to the last payments of principal due under the Loan.

(c)  Borrower acknowledges that (i) a prepayment will cause damage to Lender; (ii) the Yield Maintenance Premium is intended to compensate Lender for the loss of its investment and the expense incurred and time and effort associated with making the Loan, which will not be fully repaid if the Loan is prepaid; (iii) it will be extremely difficult and impractical to ascertain the extent of Lender's damages caused by a prepayment after an acceleration or any other prepayment not permitted by the Loan Documents; and (iv) the Yield Maintenance Premium represents Lender's and Borrower's reasonable estimate of Lender's damages from the prepayment and is not a penalty.

**LOAN RESERVES**

**Section 4.1    Tax Reserve**. Borrower shall deposit with Lender (i) on the Closing Date an amount sufficient to pay all Taxes by the 30th day prior to the date they come due, assuming subsequent monthly fundings on Payment Dates of one-twelfth (1/12) of projected annual Taxes, plus (ii) on each Payment Date, an amount equal to one-twelfth (1/12) of the Taxes that Lender estimates will be payable during the next ensuing twelve (12) months (the "**Tax Reserve**"). The amount of the Closing Date Tax Reserve deposit and the initial monthly Tax Reserve deposit to be remitted to Lender on each subsequent Payment Date are set forth in the Summary of Loan Terms. If at any time Lender reasonably determines that the amount in the Tax Reserve will not be sufficient to accumulate (upon payment of subsequent monthly amounts in accordance with the provisions of this Agreement) the full amount of all installments of Taxes by the date on which such amounts come due, then Lender shall notify Borrower of such determination and Borrower shall increase its monthly deposit to the Tax Reserve by the amount that Lender reasonably estimates is sufficient to achieve such accumulation. Borrower shall provide Lender with copies of all tax bills relating to each Property promptly after Borrower's receipt thereof. Provided that no Event of Default is continuing, Lender shall release funds from the Tax Reserve to pay Taxes due, subject to such conditions as Lender may reasonably require, including that Lender shall have received tax bills for the same not less than thirty (30) days before the due dates thereof. Borrower shall provide, at Borrower's expense, a tax service contract for the term of the Loan issued by a tax reporting agency reasonably acceptable to Lender.

**Section 4.2    Insurance Reserve**. Borrower shall deposit with Lender on the Closing Date an amount sufficient to pay all insurance costs for the Properties that Lender estimates will be payable for the ensuing twelve (12) months and thereafter on each Payment Date one-twelfth (1/12) of the insurance premiums that Lender reasonably estimates will be payable during the ensuing twelve (12) months for renewal or replacement of the Policies upon the expiration thereof (the "**Insurance Reserve**"). The amount of the initial Insurance Reserve deposit is set forth in the Summary of Loan Terms. If at any time Lender reasonably determines that the amount in the Insurance Reserve will not be sufficient to pay the insurance premiums becoming due, Lender may so notify Borrower, and then commencing with the first Payment Date thereafter, the monthly deposits to the Insurance Reserve shall be increased by the amount that Lender estimates is sufficient to make up the deficiency at least thirty (30) days prior to expiration of the Policies. Provided no Event of Default is continuing, Lender shall release funds in the Insurance Reserve to pay insurance premiums due with respect to the Policies, subject to such conditions as Lender may reasonably require, including that Lender shall have received invoices for the same not less than thirty (30) days before the due dates thereof.

**Section 4.3    Capital Expenditure Reserve**. Borrower shall deposit with Lender on the Closing Date the initial amount for each Property and on each Payment Date the monthly amount for each Property the amount set forth on **Schedule C** (the "**Capital Expenditure**

Reserve"). Provided no Event of Default is continuing, Lender shall release funds in the Capital Expenditure Reserve to reimburse Borrower for completed work constituting bona fide Capital Expenditures with respect to the Properties actually paid for by Borrower, subject to the satisfaction or waiver by Lender of the following conditions: (i) Borrower shall have complied with **Section 6.2** if applicable to the work for which the release is sought, (ii) the request for disbursement shall be accompanied by a Disbursement Certificate and (iii) if the amount of Capital Expenditure requested to be released with respect to a Property exceeds $5,000, Lender shall have completed a Property inspection reasonably satisfactory to Lender. Borrower shall not be entitled to receive funds from the Capital Expenditure Reserve for work as to which Borrower is entitled to reimbursement from any security deposit, Insurance Proceeds or Awards. Disbursements of funds from the Capital Expenditure Reserve shall occur only once per calendar month on a date that is not less than five (5) Business Days after a written request for release provided by Borrower to Lender; provided, that if the amount requested to be released is less than $2,500, then such funds shall remain on deposit with Lender until an amount equal to or greater than $2,500 is to be disbursed.

**Section 4.4      Reserve Funds Generally.** Any funds remaining in the Reserves (other than earnings or interest thereon) after the Obligations have been paid in full shall be returned to Borrower. Borrower shall not be entitled to any earnings or interest on funds deposited into the Reserves.

**Section 4.5      Security Interest.** As security for the Obligations, Borrower hereby grants to Lender a first-priority security interest in the Reserves and the proceeds thereof and will take all actions necessary to maintain in favor of Lender a perfected first priority security interest therein, including filing UCC-1 financing statements and continuations thereof.

**Section 4.6      Rent Deposit Account.** During the continuance of an Event of Default, Lender may, in addition to all other rights and remedies available to Lender, require that Borrower notify and advise each current and future Tenant via an instruction letter in the form approved by Lender (a "**Tenant Direction Letter**") to send all payments of rent (whether by cash, check or electronic means) directly to an account designated by Lender (a "**Rent Deposit Account**"). Without the consent of Lender, neither Borrower nor Manager shall terminate, amend, revoke or modify any Tenant Direction Letter in any manner whatsoever, or direct or cause any Tenant to pay any amount in any manner other than as provided in such Tenant Direction Letter, whether or not an Event of Default is continuing. Borrower hereby grants to Lender an irrevocable power of attorney, coupled with an interest, to execute and deliver to Tenants such Tenant Direction Letters. Funds deposited into a Rent Deposit Account shall be considered amounts received by Lender in respect of the Indebtedness and shall be applied in accordance with Section 2.2(g) hereof during the continuance of an Event of Default.

**Section 4.7      Holdback Reserve.**

(a)   Borrower shall deposit with Lender on the Closing Date the Holdback Deposit Amount as a reserve for the payment of principal, interest, property taxes, insurance premiums, operating expenses and Capital Expenditures with respect to the Properties and other amounts due with respect to the Obligations (the "**Holdback Reserve**"). At any time during the continuance of an Event of Default, Lender shall have the right, but not the obligation, in its sole and absolute discretion, to apply any funds in the Holdback Reserve (the "**Holdback Reserve Funds**") to the payment of principal, interest, property taxes, insurance premiums, operating expenses and Capital Expenditures with respect to the Properties or to any other Obligations, in such order and in such manner as Lender shall determine.

(b)   $12,624.83 of the Holdback Reserve Funds is hereinafter referred to as the "**Payment Shortfall Reserve Funds**". In the event there is a Payment Shortfall prior to the occurrence of an Event of Default, Borrower may request a portion of the Payment Shortfall Reserve Funds be applied by Lender toward the payment of interest, principal and other components of the Indebtedness or to other Obligations, each in such amounts and in such order as Lender shall determine, subject to Borrower's satisfaction of the following conditions:

(i) Not later than ten (10) Business Days prior to Borrower's requested Payment Shortfall Reserve Funds disbursement date, Borrower shall have submitted to Lender a written statement of the amount of the applicable Payment Shortfall, which shall include a written request to apply an amount of the Payment Shortfall Reserve Funds equal to the Payment Shortfall toward the payment of interest, principal and other components of the Indebtedness or to other Obligations, which written request shall also include:

(1) certified current financial statements from Borrower's operation of the Property, for the prior month, and reconciled bank statements of Borrower and Sponsor for the three (3) months preceding such request;

(2) an explanation of the circumstances causing such Payment Shortfall, together with Borrower's written plans, to the extent available, to correct such circumstances;

(3) a certification by Borrower that no Default or Event of Default has occurred and is continuing under the Loan Documents; and

(4) such other information regarding the Properties as Lender requests.

(c) Notwithstanding the foregoing, not later than the date that is sixty (60) days following Borrower's written request to Lender for the complete release of the remaining Payment Shortfall Reserve Funds to Borrower, Lender shall release to Borrower any remaining Payment Shortfall Reserve Funds not previously released in accordance with this Section upon satisfaction of the following conditions: (i) such request is not made before the first day of the month following the date that is thirty-six (36) months after the Closing Date; (ii) no Payment Shortfall Reserve Funds have been applied toward the payment of interest, principal and other components of the Indebtedness or to other Obligations during the twelve (12) calendar months preceding or at any time after the date of such request, (iii) the Rent to Debt Service Ratio as of the date of such request and as of the two preceding calendar quarters and any calendar quarter ending between the date of such request and the requested date of such release is greater than or equal to the Required Rent to Debt Service Ratio, and (iv) no Default or Event of Default has occurred or be continuing as of the date of such request or the date on which such Payment Shortfall Reserve Funds are to be released.

(d) Lender shall not be required to disburse Payment Shortfall Reserve Funds pursuant to Section 4.7(b) above for any costs which are to be reimbursed from any other Reserve. Disbursement of Payment Shortfall Reserve Funds pursuant to Section 4.7(b) above shall not be made more frequently than once a month. Nothing in this Agreement shall obligate Lender to apply all or any portion of the Holdback Reserve Funds to cure any Event of Default. Borrower is and shall remain obligated and responsible for the payment of all amounts due under the Loan Documents regardless of whether any disbursements from the Holdback Reserve are made by Lender pursuant to the terms of this Agreement. Borrower shall pay within ten (10) days of request from Lender (1) all reasonable costs and expenses incurred by Lender in connection with collecting, holding and disbursing the Holdback Reserve Funds; and (2) all costs and expenses incurred by Lender (including court costs and attorneys' fees and expenses) in exercising any of Lender's rights or obligations pursuant to the terms of this Agreement or holding the Holdback Reserve Funds. Holdback Reserve Funds shall not be credited toward the satisfaction of the liquidity or net worth requirements set forth in the Sponsor Financial Covenant.

**ARTICLE V**
**REPRESENTATIONS**

Borrower represents to Lender that, as of the Closing Date, except as set forth in **Schedule B**:

**Section 5.1      Organization.** Each Restricted Party that is an entity is duly organized, validly existing and in good standing under the laws of the state of its organization, and is in good standing in each other jurisdiction where ownership of its properties or the conduct of its business requires it to be so, and each such Restricted Party has all power and authority under such laws and its organizational documents and all material organizational licenses, authorizations, consents and approvals required to carry on its business as now conducted. The sole business of Borrower is the acquisition, development, management, leasing, ownership, maintenance and operation of Properties and activities incidental thereto.

**Section 5.2      Authorization; Capacity.** Each Restricted Party that is an entity has the power and authority to enter into the Loan Documents to which it is a party, to perform its Obligations thereunder and to consummate the transactions contemplated thereby and has by proper action duly authorized the execution and delivery of the Loan Documents to which it is a party. Each natural person who executed a Loan Document, either on behalf of a Restricted Party or on his or her own behalf, had capacity to do so and executed such Loan Document free from coercion and duress.

**Section 5.3      No Conflicts.** Neither the execution and delivery by any Restricted Party of the Loan Documents to which it is a party, nor the consummation of the transactions contemplated therein, nor performance of and compliance with the terms and provisions thereof will (i) violate or conflict with any provision of the formation and governance documents for any Restricted Party that is an entity, (ii) violate any Legal Requirement, (iii) violate or conflict with contractual provisions of any indenture, loan agreement, mortgage, contract or other Material Agreement to which Borrower or any of its direct or indirect equityholders is a party or may be bound, or (iv) result in or require the creation of any Lien or other charge or encumbrance upon or with respect to the Collateral in favor of any Person other than Lender.

**Section 5.4      Consents.** No consent, approval, authorization or order of, or qualification with, any court or Governmental Authority is required in connection with the execution, delivery or performance by any Restricted Party of the Loan Documents to which it is a party, except for any of the foregoing that have already been obtained.

**Section 5.5 Enforceable Obligations**. The Loan Documents have been duly executed and delivered by each Restricted Party party thereto and constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms, subject to bankruptcy, insolvency and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles. The Loan Documents are not subject to any right of rescission, offset, abatement, counterclaim or defense by any Restricted Party, including the defense of usury or fraud.

**Section 5.6 Payment of Taxes**. Borrower has filed all tax returns (federal, state, local and foreign) required to be filed and paid all amounts of taxes due (including interest and penalties) and has paid all other taxes, fees, assessments and other governmental charges (including mortgage recording taxes, documentary stamp taxes and intangible taxes) owing by it.

**Section 5.7 Compliance with Law**. Borrower, each Property and the residential use thereof comply in all material respects with all applicable Insurance Requirements and Legal Requirements (including with respect to security deposits) and is neither an illegal nor a legal nonconforming use. Borrower is not in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority the violation of which could adversely affect any Property or the condition (financial or otherwise) or business of Borrower. There has not been committed by or on behalf of Borrower or, to Borrower's knowledge, any other person in occupancy of or involved with the operation or use of any Residential Unit, any act or omission affording any Governmental Authority the right of forfeiture as against any Property or any portion thereof or any monies paid in performance of its Obligations under any of the Loan Documents. No Restricted Party or any of its Affiliates has purchased any portion of the Properties with proceeds of any illegal activity.

**Section 5.8 ERISA**. Neither Borrower nor any ERISA Affiliate of Borrower has incurred or could be subjected to any liability under Title IV or Section 302 of ERISA or Section 412 of the Code or maintains or contributes to, or is or has been required to maintain or contribute to, any employee benefit plan (as defined in Section 3(3) of ERISA) subject to Title IV or Section 302 of ERISA or Section 412 of the Code. The consummation of the transactions contemplated by this Agreement will not constitute or result in any non-exempt prohibited transaction under Section 406 of ERISA, Section 4975 of the Code or substantially similar provisions under federal, state or local laws, rules or regulations.

**Section 5.9 Investment Company Act**. Borrower is not an "investment company", or a company "controlled" by an "investment company", registered or required to be registered under the Investment Company Act of 1940, as amended.

**Section 5.10 Other Debt**. Borrower has no Debt outstanding other than Permitted Debt.

**Section 5.11 Litigation**. There are no actions, suits, proceedings, arbitration or governmental investigations by or before any Governmental Authority now filed or otherwise pending, and to Borrower's knowledge there are no such actions, suits, proceedings, arbitrations or governmental investigations threatened, against or affecting any Restricted Party or any of the Collateral, except as listed on **Schedule B** and none of the matters listed on **Schedule B**, even if determined against such Restricted Party or such Collateral, would reasonably be expected to have a Material Adverse Effect.

**Section 5.12 Leases; Material Agreements**.

(a) Borrower has delivered to Lender true and complete copies of all Leases, including all modifications and amendments thereto. No person has any possessory interest in any of the Residential Unit or right to occupy the same except under and pursuant to the provisions of such Leases. The initial Rent Statement attached to this Agreement as **Exhibit A** is accurate and complete in all material respects as of the Closing Date. Except as indicated **Exhibit A**, no security deposits are being held by Borrower (including bonds or letters of credit being held in lieu of cash security deposits), no Tenant has any termination options (except in connection with a Casualty or Condemnation), no Tenant has any extension or renewal rights (except as set forth in its Lease), no Tenant or other party has any option, right of first refusal or similar preferential right to purchase all or any portion of any Property, no rent has been paid more than thirty (30) days in advance of its due date and no payments of rent are more than thirty (30) days delinquent. Each of the following is true and correct with respect to each Lease:

(i) such Lease is an Eligible Lease with an Eligible Tenant;

(ii) such Lease is valid and enforceable and full force and effect;

(iii) Borrower is the sole owner of the entire lessor's interest in such Lease;

(iv) neither Borrower nor, to Borrower's knowledge, any other party under such Lease is in default thereunder in any material respect,

and there exist no offsets or defenses to the payment of any portion of the Rents thereunder;

(v) each Tenant is in actual, physical occupancy of the premises demised under its Lease and no event has occurred giving any Tenant the right to terminate its Lease or pay reduced rent to Borrower under any of the terms of such Lease; and

(vi) all conditions to each Tenant's obligations thereunder have been satisfied, no Tenant has the right to require Borrower to perform or finance alterations at any Property (except to the extent required pursuant to Legal Requirements), no leasing commissions or finder's fees are owed or would be owed upon the exercise of any Tenant's existing renewal options and Borrower has no other monetary obligation to any Tenant under any Lease.

(b) Borrower has made available to Lender true and complete copies of all Material Agreements. Each Material Agreement has been entered into at arm's length in the ordinary course of business by or on behalf of Borrower. The Material Agreements are in full force and effect and there are no defaults thereunder by Borrower or, to Borrower's knowledge, any other party thereto. Borrower is not in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any Permitted Encumbrance or any other agreement or instrument to which it is a party or by which it or any of the Properties is bound.

**Section 5.13 Full and Accurate Disclosure**. No documents or information heretofore delivered by, or on behalf of any Restricted Party or any of their Affiliates to Lender in respect of the Properties or any Restricted Party contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained therein not misleading unless subsequently corrected (except that the foregoing representation, as it relates to any title policy delivered to Lender in connection with the closing of the Loan, shall be limited to Borrower's knowledge). There is no event or condition that has not been disclosed to Lender that has had or could reasonably be expected to have a Material Adverse Effect.

**Section 5.14 Financial Condition**. The financial statements and operating statements with respect to the Properties heretofore delivered to Lender are accurate and complete in all material respects and fairly present in all material respects in accordance with GAAP or the cash basis of accounting the financial results of the Properties as of their respective dates and do not omit to state any material fact necessary to make statements contained herein or therein not misleading.

**Section 5.15 Use of Loan Proceeds**. The Loan is solely for the business purpose of Borrower or for distribution to Borrower's equityholders in accordance with Legal Requirements and no portion thereof shall be used for personal, consumer, household purposes for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulations T, U or X of the Board of Governors of the Federal Reserve System or for any other purpose.

**Section 5.16 Labor Matters**. Borrower has no employees.

**Section 5.17 Title**. Borrower owns good, marketable and insurable fee title to the Properties and the Loan Parties own good and marketable title to the related personal property included in the Collateral, in each case free and clear of all Liens whatsoever except the Permitted Encumbrances. The Mortgages, when properly recorded in the appropriate records, together with any Uniform Commercial Code financing statements to be filed in connection therewith, will create (i) valid, perfected first priority Liens on the Properties and the rents therefrom, enforceable as such against creditors of and purchasers from Borrower and subject only to Permitted Encumbrances, and (ii) perfected Liens in and to all personalty, all in accordance with the terms thereof, in each case subject only to any Permitted Encumbrances. The Permitted Encumbrances do not and will not, individually or in the aggregate, materially and adversely affect or interfere with the value, or current or contemplated use or operation, of the Properties, or the security intended to be provided by the Mortgage, the ability of any Property to generate net cash flow sufficient to service the Loan or Borrower's ability to pay its obligations as and when they come due, including its ability to repay the Indebtedness in accordance with the terms of the Loan Documents. There are no claims for payment for work, labor or materials affecting the Properties that are or may become a Lien prior to, or of equal priority with, the Liens created by the Loan Documents. No creditor of Borrower other than Lender has in its possession any goods that constitute or evidence the Collateral. No Person, including any Person that previously occupied any of the Properties, has any right of redemption or similar right or claim with respect to any Property.

**Section 5.18 No Encroachments**. All of the improvements on each Property lie wholly within the boundaries and building restriction lines of such Property, and no improvements on adjoining property encroach upon any Property, and no easements or other encumbrances upon any Property encroach upon any of the improvements, so as, in either case, to materially adversely affect the value, use or marketability of the applicable

Property.

**Section 5.19    Physical Condition**. Each Property and all building systems (including sidewalks, storm drainage system, roof, plumbing system, HVAC system, fire protection system, electrical system, equipment, exterior sidings and doors, irrigation system and all structural components) are free of all material damage and are in good condition, order and repair in all respects material to such Property's use, operation and value. Borrower is not aware of any material structural or other material defect or damages in any of the Properties, whether latent or otherwise.

**Section 5.20    Fraudulent Conveyance**. No Restricted Party has entered into the Loan Documents with the actual intent to hinder, delay or defraud any creditor and no Affiliate of Borrower has transferred any Property to Borrower with the actual intent to hinder, delay or defraud any creditor. Borrower has received reasonably equivalent value in exchange for its Obligations under the Loan Documents.

**Section 5.21    Management**. Except for any Approved Management Agreement, no property management agreements are in effect with respect to the Properties. The Approved Management Agreement is in full force and effect and there is no event of default thereunder by any party thereto and no event has occurred that, with the passage of time and/or the giving of notice would constitute a default thereunder.

**Section 5.22    Condemnation**. No Condemnation has been commenced or, to Borrower's knowledge, is contemplated or threatened with respect to all or any portion of any of the Properties or for the relocation of roadways providing access to any of the Properties.

**Section 5.23    Utilities and Public Access**. Each Property has adequate rights of access to dedicated public ways (and makes no material use of any means of access or egress that is not pursuant to such dedicated public ways or recorded, irrevocable rights-of-way or easements) and is adequately served by all public utilities, including water and sewer (or well and septic), necessary to the continued use and enjoyment of such Property as presently used and enjoyed.

**Section 5.24    Assessments**. There are no pending or, to Borrower's knowledge, proposed special or other assessments (whether by any Governmental Authority or homeowners association or any similar association) for public improvements or otherwise affecting any of the Properties, nor are there any contemplated improvements to any of the Properties that may result in such special or other assessments. No extension of time for assessment or payment by Borrower of any federal, state or local tax is in effect. As of the Closing Date, there are no delinquent Other Charges outstanding with respect to any Property and there are no pending or, to Borrower's knowledge, proposed, special or other assessments for HOA improvements affecting the Property.

**Section 5.25    No Joint Assessment**. Neither Borrower nor any of its Affiliates have suffered, permitted or initiated the joint assessment of any Property (i) with any other real property constituting a separate tax lot, or (ii) with any personal property, or any other procedure whereby the Lien of any Taxes that may be levied against such other real property or personal property shall be assessed or levied or charged to any of the Properties as a single Lien.

**Section 5.26    Separate Lots**. No portion of any of the Properties is part of a tax lot that also includes any real property that is not Collateral.

**Section 5.27    Permits; Certificate of Occupancy**. Borrower has obtained all Permits necessary for the present and contemplated use and operation of each Property. The uses being made of each Property are in conformity in all material respects with the certificate of occupancy and/or Permits for such Property and any other restrictions, covenants or conditions affecting such Property (including any homeowners association requirements). The certificate of occupancy for each Property does not permit the use of such Property for any purpose other than as a one to four unit single-family residential home or residential condominium. No Property is (i) zoned for, or being used for, any purpose other than a one to four unit single-family residential or residential condominium occupancy, (ii) an assisted living or similar facility, (iii) subject to any rent control, rent stabilization or similar Legal Requirements limiting, or placing conditions upon, the amount of rent that can be charged under a Lease or the ability of a landlord to decline the renewal or extension of a Lease.

**Section 5.28    Flood Zone**. None of the improvements on any of the Properties is located in an area identified by the Federal Emergency Management Agency or the Federal Insurance Administration as a "100 year flood plain" or as having special flood hazards (including Zones A and V), or, to the extent that any portion of any of the Properties is located in such an area, such Property is covered by flood insurance meeting the requirements set forth in **Section 6.13**.

**Section 5.29    Insurance**. Borrower has obtained insurance policies reflecting the insurance coverages, amounts and other requirements set forth in this Agreement. All premiums on such insurance policies required to be paid as of the Closing Date have been paid for the current policy period. No Person, including Borrower, has done, by act or omission, anything that would impair the coverage of any such policy.

**Section 5.30    Federal Trade Embargos**. Each Restricted Party is in compliance with all Federal Trade Embargos in all material respects. No Embargoed Person owns any direct or indirect equity interest in Borrower. No Tenant at any Property is identified on the OFAC List. Borrower has implemented procedures, and will consistently apply those procedures throughout the term of the Loan, to ensure that the foregoing representations and warranties remain true and correct with respect to each Tenant at each Property at the time such Tenant is initially screened by Borrower or an Approved Property Manager prior to entering into a Lease with such Tenant.

**Section 5.31    Survival**. All of the representations of the Restricted Parties set forth in the Loan Documents shall survive for so long as any portion of the Indebtedness is outstanding. All representations, covenants and agreements made by Borrower in the Loan Documents shall be deemed to have been relied upon by Lender or on its behalf.

**ARTICLE VI**
**AFFIRMATIVE COVENANTS**

Borrower covenants and agrees as follows:

**Section 6.1    Existence; Licenses; Tax Status**. Borrower shall do or cause to be done all things necessary to (a) maintain its entity existence, rights, franchises and privileges in its state of organization, (b) preserve, renew and keep in full force and effect all rights, licenses, Permits, franchises, certificates of occupancy, consents, approvals and other agreements necessary for the continued use and operation of each Property and (c) qualify and remain in good standing in each other jurisdiction where the same is required under applicable Legal Requirements. Borrower shall not and shall cause any Constituent Entity not to (x) engage in or consent to any dissolution, liquidation or consolidation or merger with or into any other Person, (y)  transfer, lease or sell, in one transaction or any combination of transactions, all or substantially all of the Collateral except as permitted by the Loan Documents or (z) modify, amend, waive or terminate its organizational documents.  Neither Borrower nor any Constituent Entity shall form or acquire any subsidiary. Borrower shall deliver and shall cause any Constituent Entity to deliver to Lender a copy of each amendment or other modification to any of their respective organizational documents promptly after the execution thereof. Borrower shall at all times elect to be treated for tax purposes as a "disregarded entity" that is not taxable as a corporation for U.S. federal tax purposes.

**Section 6.2    Maintenance of Properties**. Borrower shall cause each Property to be maintained in good and safe working order and repair, reasonable wear and tear excepted, and in keeping with the condition and repair of properties of a similar use, value, age, nature and construction and from time to time make, or cause to be made, all necessary repairs, renewals, replacements, betterments and improvements thereto; *provided* that Borrower shall not make any structural alterations to any Property (including, without limitation, any alterations to the roof of a Property) that exceed $15,000 (in the aggregate, together with all other alterations then being undertaken) or any repairs or alterations that might have a Material Adverse Effect, without Lender's prior written consent. Borrower shall not use, maintain or operate any Property in any manner that constitutes a public or private nuisance. No improvements or equipment located at or on any Property shall be removed, demolished or materially altered without the prior written consent of Lender (except for replacement of equipment in the ordinary course of Borrower's business with items of the same utility and of equal or greater value and sales of obsolete equipment no longer needed for the operation of the applicable Property). Borrower shall not make any change in the use of any Property or do or permit to be done thereon anything that could reasonably be expected to result in a Material Adverse Effect. Borrower shall not install or permit to be installed on any Property any underground storage tank. Except as approved by Lender in writing, Borrower shall not permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of any Property, regardless of the depth thereof or the method of mining or extraction thereof.

**Section 6.3    Compliance with Legal Requirements**. Borrower shall comply with, and shall cause each Property to comply with and be leased, operated, maintained, repaired and improved in compliance, in all material respects, with all Legal Requirements, Insurance Requirements and all material contractual obligations by which Borrower is bound.

**Section 6.4    Taxes, Other Charges and Other Claims**. Borrower shall pay and discharge all Taxes and Other Charges levied upon it, its income and its assets as and when such Taxes and Other Charges are due and payable, as well as all lawful claims for labor, materials and supplies or otherwise.  Borrower shall file all federal, state and local tax returns and other reports that it is required by law to file. Notwithstanding the foregoing, after prior written notice to Lender, Borrower may contest by appropriate legal proceedings conducted in good faith and with due diligence, the amount or validity of any such Taxes, Other Charges and claims and, in such event, may permit such Taxes, Other Charges and claims being so contested to remain unsatisfied or unpaid during such contest so long as (a) no Event of Default shall exist, (b) such proceeding shall be permitted under and conducted in accordance with all applicable Legal Requirements, (c) no Property or other Collateral nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost, as determined by Lender, (d) enforcement of the contested

such Taxes, Other Charges and claims is effectively stayed for the entire duration of such contest, (e) any such Taxes, Other Charges and claims determined to be due, together with any interest or penalties thereon, shall be promptly paid as required after final resolution of such contest, (f) Borrower has set aside on its books adequate reserves in accordance with GAAP, (g) Borrower shall deliver to Lender cash security in an amount determined by Lender to be sufficient to insure the payment of such Taxes, Other Charges and other claims, together with all interest and penalties thereon, (h) failure to pay such Taxes, Other Charges and other claims will not, as determined by Lender, present an unreasonable risk of any civil or criminal liability to Lender or any Material Adverse Effect, (i) such contest shall not affect the ownership, use or occupancy of any Property or other Collateral, and (j) Borrower shall, upon request by Lender, give Lender prompt notice of the status of such proceedings and/or confirmation of the continuing satisfaction of the conditions set forth above. Notwithstanding the foregoing, Borrower shall comply with all Legal Requirements and pay any contested Taxes, Other Charges and other amounts (or, if cash or other security has been provided, Lender may pay over any such cash or other security held by Lender to the claimant) if, in the Lender's reasonable judgment, any of the foregoing conditions is not satisfied at any time or there shall be any danger of the Lien of any Collateral Document being extinguished. Borrower shall promptly pay for all utility services provided to each Property as they become due and payable (other than any such utilities, which are, pursuant to the terms of any Lease, required to be paid by the Tenant thereunder directly to the applicable service provider).

**Section 6.5**  **Access to Properties**.

(a)  Borrower shall permit agents, representatives and employees of Lender and the Servicer to enter and inspect the Properties or any portion thereof, and/or inspect, examine, audit and copy the books and records of Borrower (including all recorded data of any kind or nature, regardless of the medium of recording), at such reasonable times as may be requested by Lender upon reasonable advance notice. The cost of such inspections, examinations, audits and copying, if not paid for by Borrower following demand, may be added to the Indebtedness and shall bear interest thereafter until paid at the Default Rate.

(b)  If, in connection with any inspection of any Property, Lender determines that the condition of such Property has deteriorated (ordinary wear and tear excepted) since the Closing Date, Lender may obtain, at Borrower's expense, a physical needs assessment of such Property. Lender's right to obtain a physical needs assessment pursuant to this **Section 6.5(b)** shall be in addition to any other rights available to Lender under this Loan Agreement in connection with any such deterioration. Any such inspection or physical needs assessment may result in Lender requiring additional Capital Expenditures at the applicable Property and/or an increase in monthly deposits to the Capital Expenditure Reserve.

**Section 6.6**  **Cooperate in Legal Proceedings**. Except with respect to any claim by Borrower against Lender, Borrower shall reasonably cooperate with Lender with respect to any proceedings before any Governmental Authority that may in any way affect the rights of Lender under any of the Loan Documents and, Lender may, at its election, participate or designate a representative to participate in any such proceedings.

**Section 6.7**  **Security Deposits**.  All security deposits of Tenants shall be deposited into one or more Eligible Accounts (each, a "**Security Deposit Account**"), held in compliance with all Legal Requirements, and shall not be commingled with any other funds of Borrower. Borrower shall maintain books and records of sufficient detail to identify all security deposits of Tenants separate and apart from other payments received from Tenants. Borrower shall cause all security deposits received by Borrower or an Approved Property Manager after the Closing Date to be deposited into a Security Deposit Account within three (3) Business Days of receipt. Upon Lender's written request following the occurrence and during the continuance of an Event of Default, Borrower shall deliver (or cause to be delivered) to Lender or to one or more accounts designated by Lender the security deposits, and upon a foreclosure of any Property or action in lieu thereof, Borrower shall deliver to Lender or to an account designated by Lender the security deposit applicable to the Leases with respect to such Property, in each case, for safe-keeping and not for application against the Indebtedness, except to the extent such security deposit is forfeited pursuant to the terms of the applicable Leases.

**Section 6.8**  **Plan Assets, etc**. Borrower will do, or cause to be done, all things necessary to ensure that it will not be deemed to hold Plan Assets at any time.

**Section 6.9**  **Management of Collateral**.

(a)  Each Property shall be managed at all times by an Approved Property Manager pursuant to an Approved Management Agreement. Borrower may from time to time appoint a replacement Approved Property Manager to manage the applicable Property pursuant to an Approved Management Agreement, *provided* that (i) no Event of Default is continuing, (ii) Lender receives at least sixty (60) days' prior written notice of same and (iii) such successor manager shall execute and deliver to Lender for Lender's benefit a Subordination of Property Management Agreement in form and substance satisfactory to Lender. The management fees payable to any Approved Property Manager shall not exceed management fees calculated at the Maximum Management Fee Percentage.

(b)  Lender may terminate or require Borrower to terminate the engagement of the Property Manager and engage an Approved Property Manager selected by Lender to serve as replacement Approved Property Manager pursuant to an Approved Management Agreement (i) during the continuance of an Event of Default, (ii) following any foreclosure, conveyance in lieu of foreclosure or other similar transaction, (iii) during the continuance of a material default by the Approved Property Manager under the Approved Management Agreement (after the expiration of any applicable notice and/or cure periods), (iv) if an Event of Bankruptcy occurs in respect of the Approved Property Manager or (v) if the Approved Property Manager engages in gross negligence, willful misconduct, fraud or misappropriation of funds in respect of the Properties or its duties with respect thereto.

(c)  Without limitation of the foregoing, if the Approved Management Agreement is terminated pursuant to the Subordination of Property Management Agreement, ceases to be in full force or effect or is for any other reason no longer in effect, then Lender may require Borrower to engage, in accordance with the terms and conditions set forth herein and in the Subordination of Property Management Agreement, a new Approved Property Manager to manage the Property, which such new Approved Property Manager shall be engaged pursuant to an Approved Management Agreement.

(d)  Notwithstanding that the Properties will be managed by an Approved Property Manager, Borrower shall ensure that the Properties are managed in a commercially reasonable manner and that its obligations as the lessor under all Leases are performed. Borrower shall enforce, in a commercially reasonable manner, the obligations of the Tenants under such Leases.

**Section 6.10**  **Notice of Material Event**. Borrower shall give Lender prompt notice (containing reasonable detail) of (i) any material change in the financial or physical condition of any Property, (ii) the termination or cancellation of any insurance required by this Agreement, (iii) any default under the Approved Management Agreement beyond any applicable notice and cure periods, (iv) any litigation or governmental proceedings pending or threatened in writing against Borrower or any Property that is reasonably expected to result in a Material Adverse Effect, (v) an Event of Bankruptcy occurs in respect of Borrower, Pledgor, Sponsor, Approved Property Manager or an Affiliate of any of the foregoing, (vi) any Default or Event of Default and (vii) any other circumstance or event that could reasonably be expected to result in a Material Adverse Effect.

**Section 6.11**  **Financial Reporting**. Borrower shall deliver to Lender the following financial reports:

(a)  As soon as available, and in any event within thirty (30) days after the end of each calendar quarter (including year end), Borrower shall deliver to Lender quarterly and year-to-date unaudited financial statements for such calendar quarter of Borrower, including a balance sheet of Borrower as of the end of such calendar quarter, together with related statements of operations, equityholders' capital and cash flows for Borrower for such calendar quarter and for the portion of the calendar year ending with such calendar quarter, which such statement shall be accompanied by an Officer's Certificate in the form of **Exhibit E** together with all attachments contemplated thereby.  Each quarterly report shall be accompanied by (i) a statement in reasonable detail that calculates the Rent to Debt Service Ratio for such calendar quarter and year-to-date and (ii) such other information as Lender shall reasonably request.

(b) Within thirty (30) days following the end of each calendar quarter, Borrower shall deliver to Lender a true, complete, correct and accurate Rent Statement for such calendar quarter, certified by Borrower.

(c) In addition to Lender's other rights and remedies hereunder, if any financial statement or other document to be delivered pursuant to this **Section 6.11** is not timely delivered, Borrower shall promptly pay to Lender, as a late charge, the sum of $500 per delinquent item.  In addition, Borrower shall promptly pay to Lender an additional late charge of $500 per each such delinquent item for each full month during which such item remains undelivered following written notice from Lender.  Borrower acknowledges that Lender will incur additional expenses as a result of any such late deliveries, which expenses would be impracticable to quantify, and that Borrower's payments under this **Section 6.11(c)** are a reasonable estimate of such expenses.  Borrower acknowledges further that the payment by Borrower of this late charge does not in any manner affect or otherwise impair or waive any rights and remedies Lender may have hereunder, under the Loan Documents or pursuant to any Legal Requirements for any Event of Default.

**Section 6.12**  **Other Reports**.

(a)  Borrower shall deliver to Lender, within ten (10) Business Days of Lender's request therefor, copies of any requested Tax or HOA assessment or insurance bills, statements or invoices received by Borrower with respect to the Properties and evidence reasonably satisfactory to Lender of payment thereof.

(b)  Borrower shall, as soon as reasonably practicable after request by Lender, furnish or cause to be furnished to Lender in such manner and in such detail as may be reasonably requested by Lender, such evidence of compliance with the Loan Documents, copies of

Leases and such additional information, documents, records or reports as may be reasonably requested with respect to any Property or the conditions or operations, financial or otherwise, of the Restricted Parties.

**Section 6.13** <u>Insurance</u>.

(a) Borrower shall obtain and maintain insurance policies for Borrower and the Properties providing at least the coverages set forth in **Exhibit C**.

(b) All insurance policies required pursuant to this **Section 6.13** (collectively, the "**Policies**" or in the singular, the "**Policy**") shall (i) be subject to the approval of Lender as to insurance companies, limits, deductibles, terms and conditions, loss payees and named- or additional- insureds, and (ii) be issued by insurance companies having a claims paying ability rating of "A3" or better by Moody's, or, if such insurance company is not rated by Moody's, (1) "A-" or better by S&P or "A:X" or better in the current Best's Insurance Reports.

(c) Certificates of insurance evidencing the Policies shall be delivered to Lender on the Closing Date with respect to the current Policies. Not less than ten (10) days prior to the expiration dates of the Policies evidenced to Lender, Borrower shall deliver to Lender certificates of insurance evidencing the renewed or replacement Policies and provide evidence satisfactory to Lender of payment of the premiums due thereunder. Upon written request by Lender Borrower will provide: (x) copies of the binders within ten (10) days after inception, and/or, (y) copies of the in-force Policies to be delivered within sixty (60) days after inception.

(d) All policies of insurance except Worker's Compensation shall: (i) name the applicable Borrower as the named insured; (ii) name Lender and its successors and/or assigns as mortgagee and loss payee, as its interests may appear, (iii) with respect to all liability policies, name Lender and its successors and/or assigns as additional insured, and (iv) with respect to all Property Insurance policies, contain a mortgagee clause in favor of Lender providing that the loss shall be payable to Lender.

(e) If at any time Lender is not in receipt of written evidence all insurance required herein is in full force and effect, Lender has the right, without notice to Borrower, to take such action as Lender deems necessary to protect its interest in the Properties, including, without limitation, obtaining such insurance coverage as Lender determines. All cost incurred by Lender in connection with such action or in obtaining such insurance and keeping insurance in-force shall be paid by Borrower to Lender upon demand and, until paid, shall be secured by the Loan Documents and shall bear interest at the Default Rate.

**Section 6.14** <u>Casualty</u>. If a Property is damaged or destroyed, in whole or in part, by fire or other casualty (in either case, a "**Casualty**"), Borrower shall give prompt written notice thereof to Lender. Lender may, but shall not be obligated to make proof of loss if not made promptly by Borrower. In addition, Lender may participate in any settlement discussions with any insurance companies and Borrower shall not settle or permit any settlement of any claim in excess of thirty percent (30%) of the initial Allocated Loan Amount for such Property without Lender's approval. Any Insurance Proceeds in connection with any Casualty (whether or not Lender elects to settle and adjust the claim or Borrower settles such claim) shall be due and payable solely to Lender and held and disbursed by Lender in accordance with the terms of this Agreement. If Borrower or any party other than Lender receives any Insurance Proceeds, Borrower shall immediately deliver such proceeds to Lender and shall endorse, and cause all such third parties to endorse, check payable therefor to the order of Lender. Borrower hereby irrevocably appoints Lender as its attorney-in-fact, coupled with an interest, to endorse any such check payable to the order of Lender. Borrower hereby releases Lender from any and all liability with respect to the settlement and adjustment by Lender of any claims in respect of any Casualty other than for actions that constitute gross negligence or intentional misconduct.

**Section 6.15** <u>Condemnation</u>. Borrower shall promptly give Lender notice of the actual or threatened commencement of any proceeding for the Condemnation of all or any portion of a Property and shall deliver to Lender copies of any and all papers served in connection with such proceedings. Lender may participate in any such proceedings, and Borrower shall from time to time deliver to Lender all instruments requested by it to permit such participation. Borrower shall, at its expense, diligently prosecute any such proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings which is reasonably expected to involve an Award of an amount greater than thirty percent (30%) of the initial Allocated Loan Amount for such Property. Notwithstanding any taking by any public or quasi-public authority through Condemnation or otherwise (including any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Indebtedness at the time and in the manner provided for its payment in this Agreement and the Indebtedness shall not be reduced until any Loss Proceeds shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Indebtedness. If Borrower or any party other than Lender receives any Award, Borrower shall immediately deliver such proceeds to Lender and shall endorse, and cause all such third parties to endorse, check payable thereto to the order of Lender. Lender shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the applicable rate provided herein.

**Section 6.16** <u>Restoration</u>. Except in the case of a Casualty or condemnation for which a prepayment is required by **Sections 3.2,3.3** or **3.4**, if a Casualty or to condemnation of a Property occurs, then (i) Borrower shall commence the Restoration as soon as reasonably practicable (but in no event later than thirty (30) days after payment of Loss Proceeds by the insurance company or condemning authority (as applicable) with respect to the Casualty or Condemnation) and shall diligently pursue the same to satisfactory completion; (ii) Borrower shall cause the affected Property and the use thereof after the Restoration to be in compliance with and permitted under all applicable Legal Requirements and such Property, after Restoration, shall be of the same character as prior to such damage or destruction; (iii) the Restoration shall be done and completed by Borrower in an expeditious and diligent fashion and in compliance with all applicable Legal Requirements and (iv) Borrower shall deliver, or cause to be delivered, to Lender a signed detailed budget approved in writing by Borrower's architect or engineer stating the entire cost of completing the Restoration, which budget shall be reasonably acceptable to Lender. If at any time the Loss Proceeds or the unused portion thereof shall not, in the opinion of Lender, be sufficient to pay in full the balance of the costs which are estimated by Lender to be incurred in connection with the completion of the Restoration, Borrower shall deposit the deficiency with Lender before any further use or disbursement of the Loss Proceeds shall be made. Any request by Borrower for disbursement of Loss Proceeds in connection with a Restoration shall be made pursuant to a Disbursement Certificate and, if requested by Lender, shall be subject to the completion of a Property inspection reasonably satisfactory to Lender.

**Section 6.17** <u>Compliance with Material Agreements</u>. Borrower shall (a) comply with all material terms, conditions and covenants of each Material Agreement and each material Permitted Encumbrance, including any reciprocal easement agreement, ground lease, declaration of covenants, conditions and restrictions, and any condominium arrangements, (b) promptly deliver to Lender a true and complete copy of each and every notice of default received or served by Borrower with respect to any obligations under the provisions of any Material Agreement and/or Permitted Encumbrance, (c) deliver to each other party to any Permitted Encumbrance and any Material Agreement notice of the identity of Lender and each assignee of Lender of which Borrower is aware if such notice is required in order to protect Lender's interest thereunder, and (d) enforce, short of termination thereof, the performance and observance of each and every material term, covenant and provision of each Material Agreement and Permitted Encumbrance to be performed or observed, if any.

**Section 6.18** <u>Prohibited Persons</u>. Borrower shall not (i) knowingly conduct any business, or engage in any transaction or dealing, with any Embargoed Person, including the making or receiving of any contribution of funds, goods, or services, to or for the benefit of a Embargoed Person, or (ii) knowingly engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any Federal Trade Embargo. Borrower shall cause the representation set forth in **Section 5.30** to remain true and correct at all times.

**Section 6.19** <u>Notice to Tenant</u>. Borrower shall notify and advise each current and future Tenant to make all payments of rent and other Revenues payable to Borrower.

**Section 6.20** <u>Special Purpose Entity</u>. Borrower shall and shall cause any Constituent Entity to at all times be a Special Purpose Entity. Borrower shall not and shall cause any Constituent Entity not to directly or indirectly make any change, amendment or modification to its governing documents, or otherwise take any action, which could result in Borrower or such Constituent Entity not being a Special Purpose Entity.

**Section 6.21** <u>New York Good Standing</u>. Not later than the date that is thirty (30) days from the Closing Date, Borrower shall deliver evidence satisfactory to Lender that Borrower is registered and in good standing in the State of New York.

**ARTICLE VII**
**NEGATIVE COVENANTS**

Borrower covenants and agrees as follows:

**Section 7.1** <u>Liens on the Collateral</u>. Borrower shall not permit or suffer the existence of any Lien on any of its assets, other than Permitted Encumbrances. Borrower will cause Pledgor not to permit or suffer the existence of any Lien on any of the Collateral owned by Pledgor.

**Section 7.2** <u>Ownership</u>. Borrower shall not own any assets other than the Properties and related personal property and fixtures located therein or used in connection therewith.

**Section 7.3** <u>Leases</u>. Borrower shall not enter into any Lease (including any renewal or extension of any existing Lease) for any Property unless such Lease is an Eligible Lease with an Eligible Tenant.

**Section 7.4** <u>Transfers</u>. Borrower shall not cause or suffer to occur any Transfer other than a Permitted Transfer.

**Section 7.5** <u>Debt</u>. Borrower shall not have any Debt other than Permitted Debt.

**Section 7.6    Dissolution; Merger or Consolidation.** Borrower shall not and shall cause Pledgor not to dissolve, terminate, liquidate, merge with or consolidate into another Person.

**Section 7.7    Change in Business.** Borrower shall not make any material change in the scope or nature of its business objectives, purposes or operations or undertake or participate in activities other than the continuance of its present business.

**Section 7.8    Affiliate Transactions.** Borrower shall not enter into, or be a party to, any transaction with any Affiliate of Borrower, except on terms that are intrinsically fair, commercially reasonable and substantially similar to those that Borrower would have obtained in a comparable arm's length transaction with an unrelated third party.

**Section 7.9    Jurisdiction of Formation; Name.** Borrower shall not change its jurisdiction of formation or name without receiving Lender's prior written consent and promptly providing Lender such information and replacement Uniform Commercial Code financing statements as Lender may reasonably request in connection therewith.

**Section 7.10    Modifications and Waivers.** Unless otherwise consented to in writing by Lender:

(a)   Borrower shall not terminate, amend or modify its organizational documents;

(b)   Borrower shall not terminate, amend or modify the Approved Management Agreement; and

(c)   Borrower shall not (x) enter into any Material Agreement, or amend, modify, surrender, grant or withhold any material consent, approval or waiver under any Material Agreement or waive any material rights or remedies under any Material Agreement, except, in each case, on arms-length commercially reasonable terms, (y) terminate any Material Agreement, except for terminations in connection with a material default thereunder, or (y) default in its obligations under any Material Agreement.

**Section 7.11    ERISA.** Borrower shall not maintain or contribute to, or agree to maintain or contribute to, or permit any ERISA Affiliate of Borrower to maintain or contribute to or agree to maintain or contribute to, any employee benefit plan (as defined in Section 3(3) of ERISA) subject to Title IV or Section 302 of ERISA or Section 412 of the Code. Borrower shall not engage in a non-exempt prohibited transaction under Section 406 of ERISA, Section 4975 of the Code, or substantially similar provisions under federal, state or local laws, rules or regulations or in any transaction that would cause any obligation or action taken or to be taken hereunder (or the exercise by Lender of any of its rights under any other Loan Document) to be a non-exempt prohibited transaction under such provisions.

**Section 7.12    Advances and Investments.** Borrower shall not lend money or make advances to any Person, or purchase or acquire any stock, obligations or securities of, or any other interest in, or make any capital contribution to, any Person.

**Section 7.13    Zoning and Uses.** Borrower shall not do any of the following without the prior written consent of Lender:

(a)   initiate or support any limiting change in the permitted uses of any of the Properties (or to the extent applicable, zoning reclassification of any of the Properties) or any portion thereof, seek any variance under existing land use restrictions, laws, rules or regulations (or, to the extent applicable, zoning ordinances) applicable to a Property, use or permit the use of a Property in a manner that would result in the use of such Property becoming a nonconforming use under applicable land-use restrictions or zoning ordinances or that would violate the terms of any Lease, Material Agreement or Legal Requirement (and if under applicable zoning ordinances the use of all or any portion of any Property is a nonconforming use, Borrower shall not cause or permit such nonconforming use to be discontinued or abandoned) or use or permit the use of a Property or any Residential Unit therein for any purpose other than as a residential property;

(b)   execute or file any subdivision plat affecting any of the Properties, or institute, or permit the institution of, proceedings to alter any tax lot comprising any of the Properties; or

(c)   permit or consent to any of the Properties being used by the public or any Person in such manner as might make possible a claim of adverse usage or possession or of any implied dedication or easement.

**Section 7.14    Waste.** Borrower shall not commit or permit any Waste on any of the Properties, nor take any actions that might invalidate any insurance carried on any of the Properties (and Borrower shall promptly correct any such actions of which Borrower becomes aware).

**ARTICLE VIII
DEFAULTS**

**Section 8.1    Event of Default.** The occurrence of any one or more of the following events shall be, and shall constitute the commencement of, an "**Event of Default**" hereunder:

(a)   Payment.

(i)   Borrower shall default in (A) the payment when due of any principal or interest owing hereunder or under the Note (including any mandatory prepayment required hereunder), (B) the payment when due of the Yield Maintenance Premium or (C) the payment when due of any deposit required to be made to any Reserve; or

(ii)   Borrower shall default, and such default shall continue for at least two Business Days after notice to Borrower that such amounts are owing, in the payment when due of fees, expenses or other amounts owing under the Loan Documents (other than amounts described in the foregoing clause (i)).

(b)   Representations. Any representation made by any Restricted Party in any of the Loan Documents, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Lender shall have been false or misleading in any material respect (or, with respect to any representation that itself contains a materiality qualifier, in any respect) as of the date such representation was made.

(c)   Other Loan Documents. Any Loan Document shall fail to be in full force and effect or to convey the Liens, rights, powers and privileges purported to be created thereby; any Restricted Party shall disaffirm or contest in writing such effectiveness; or a default by any Restricted Party or any of their respective Affiliates shall occur under any of the other Loan Documents, in each case, beyond the expiration of any applicable cure period.

(d)   Event of Bankruptcy. An Event of Bankruptcy shall occur with respect to any Restricted Party.

(e)   Prohibited Transfers. A Transfer other than a Permitted Transfer shall occur.

(f)   Insurance. Borrower shall fail to maintain in full force and effect all Policies required hereunder.

(g)   ERISA; Negative Covenants. A Default shall occur in the due performance or observance by Borrower of any term, covenant or agreement contained in **Section 6.8** or in **Article VII**, provided that such default shall not constitute an Event of Default unless and until it shall remain uncured for ten (10) days after Borrower receives written notice thereof.

(h)   Financial Statements. Borrower shall fail to provide to Lender the financial statements and other information specified in **Section 6.11** within the respective time periods specified therein and such failure continues for five (5) Business Days following written notice from Lender.

(i)   Replacement of Property Manager. If (i) Borrower shall fail to replace any Approved Property Manager as required by **Section 6.9(b)**, (ii) without Lender's prior written consent, any Approved Management Agreement is terminated (unless simultaneously therewith, Borrower and a new Approved Property Manager enter into a replacement Approved Management Agreement in accordance with **Section 6.9**), or (iii) there is a default by Borrower under any Approved Management Agreement beyond any applicable notice or grace period that permits such Approved Property Manager to terminate or cancel the applicable Approved Management Agreement (unless, within thirty (30) days after the expiration of such notice or grace period, Borrower and a new Approved Property Manager enter into a replacement Approved Management Agreement in accordance with **Section 6.9**).

(j)   Federal Trade Embargoes. Any failure on the part of Borrower to duly observe or perform any of its covenants set forth in **Section 5.30**.

(k)   Judgments. One or more final judgments for the payment of five percent (5%) of the initial Loan Amount or more rendered against Borrower, and such amount is not covered by insurance or indemnity or not discharged, paid or stayed within sixty (60) days after (i) the date on which the right to appeal thereof has expired if no such appeal has commenced, or (ii) the date on which all rights to appeal have been extinguished.

(l)   Sponsor Financial Covenant. If as of any Calculation Date, Sponsor fails to comply with the Sponsor Financial Covenant.

(m)   Other Covenants. A Default shall occur in the due performance or observance by any Restricted Party of any term, covenant or agreement (other than those referred to in any other subsection of this Section) contained in any Loan Document, except that in the case of a Default that can be cured by the payment of money, such Default shall not constitute an Event of Default unless and until it shall remain uncured for ten (10) days after such Restricted Party receives written notice thereof; and in the case of a Default that cannot be cured by the payment of money but is susceptible of being cured within thirty (30) days, such Default shall not constitute an Event of Default unless and until it remains uncured for thirty (30) days after such Restricted Party receives written notice thereof; and if such non-monetary Default is not cured within such thirty (30) day period despite such Restricted Party's diligent efforts but is susceptible of being cured within ninety (90) days of such

Restricted Party's receipt of Lender's original notice, then such Restricted Party shall have such additional time as is reasonably necessary to effect such cure, but in no event in excess of ninety (90) days from such Restricted Party's receipt of Lender's original notice, provided that such Restricted Party promptly delivers written notice to Lender of its intention and ability to effect such cure prior to the expiration of such ninety (90) day period.

**Section 8.2    Remedies**.

(a)    During the continuance of an Event of Default, Lender may in addition to any other rights or remedies available pursuant to the Loan Documents, at law or in equity, declare by written notice to Borrower all or any portion of the Indebtedness to be immediately due and payable, whereupon all or such portion of the Indebtedness shall so become due and payable, and Lender may enforce or avail itself of any or all rights or remedies provided in the Loan Documents against Borrower and the Collateral (including all rights or remedies available at law or in equity); provided, however, that, notwithstanding the foregoing, if an Event of Default specified in **Section 8.1(d)** shall occur, then the Indebtedness shall immediately become due and payable without the giving of any notice or other action by Lender. Any actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth in the Loan Documents.

(b)    If Lender forecloses on any Collateral, Lender shall apply all net proceeds of such foreclosure to repay the Indebtedness, the Indebtedness shall be reduced to the extent of such net proceeds and the remaining portion of the Indebtedness shall remain outstanding and secured by the remaining Collateral. At the election of Lender, the Note shall be deemed to have been accelerated only to the extent of the net proceeds actually received by Lender with respect to the Properties and applied in reduction of the Indebtedness.

(c)    If any Loan Party fails to pay or perform any obligation under any Loan Document or any Management Agreement, Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder, take any action to cure such failure. Lender may enter upon any or all of the Properties upon reasonable notice to Borrower for such purposes or appear in, defend, or bring any action or proceeding to protect its interest in the Collateral or to foreclose the Mortgage and the other Loan Documents or collect the Indebtedness. The costs and expenses incurred by Lender in exercising rights under this Section (including reasonable attorneys' fees), with interest at the Default Rate for the period after notice from Lender that such costs or expenses were incurred to the date of payment to Lender, shall constitute a portion of the Indebtedness, shall be secured by the Mortgage and other Loan Documents and shall be due and payable to Lender upon demand therefor.

(d)    Interest shall accrue on any judgment obtained by Lender in connection with its enforcement of the Loan at a rate of interest equal to the Default Rate.

(e)    Each of the rights, powers and remedies of Lender under this Agreement and the other Loan Documents and Legal Requirements and at equity shall be cumulative and not exclusive of any other such right, power or remedy.  Lender's rights, powers and remedies may be pursued independently, singly, successively, together or otherwise, at such times and from time to time and as often and in such order as Lender may determine, to the fullest extent permitted by law, without impairing or otherwise affecting any of the other such rights, powers and remedies of Lender.  Without limiting the generality of the foregoing, if an Event of Default is continuing (a) Lender shall not be subject to any "one action" or "election of remedies" law or rule, (b) all Liens and other rights, powers and remedies provided to Lender shall remain in full force and effect until all of the Obligations have been paid in full and (c) Lender may pursue any right, power or remedy against any Person or Collateral with or without accelerating the Obligations or pursuing any other right, power or remedy against any other Person or Collateral.

(f)    Notwithstanding the availability of legal remedies, Lender will be entitled to obtain specific performance, mandatory or prohibitory injunctive relief, or other equitable relief requiring Borrower to cure or refrain from repeating any Default.

(g)    Upon the occurrence and during the continuance of an Event of Default, Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, mortgages and other security documents (the "**Severed Loan Documents**") in such denominations as Lender shall determine for purposes of evidencing and enforcing its rights and remedies provided hereunder. Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender. Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to execute the Severed Loan Documents (Borrower ratifying all that its said attorney shall do by virtue thereof); provided, however, that Lender shall not make or execute any such Severed Loan Documents under such power unless Borrower or Pledgor fails to do so within three (3) days after written demand by Lender.  Borrower shall be obligated to pay any costs or expenses incurred in connection with the preparation, execution, recording or filing of the

Severed Loan Documents. The Severed Loan Documents shall not contain any representations, warranties or covenants not contained in the Loan Documents, and any such representations and warranties contained in the Severed Loan Documents will be given by Borrower only as of the Closing Date.

**ARTICLE IX**
**MISCELLANEOUS**

**Section 9.1    Notices**. All notices, consents, approvals and requests required or permitted under any Loan Document shall be given in writing by expedited prepaid delivery service, either commercial or United States Postal Service, with proof of delivery or attempted delivery, addressed as set forth on the signature pages hereto (except that any party hereto may change its address and other contact information for purposes hereof at any time by sending a written notice to the other parties to this Agreement in the manner provided for in this Section). A notice shall be deemed to have been given when delivered or upon refusal to accept delivery.

**Section 9.2    Preferences; Waiver of Marshalling of Assets**. Lender shall have no obligation to marshal any assets in favor of Borrower or any other party or against or in payment of any or all of the Obligations of Borrower pursuant to the Loan Documents. Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the Obligations of Borrower hereunder and under the Loan Documents. If any payment to Lender is subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then the Obligations hereunder or portion thereof intended to be satisfied by such payment shall be revived and continue in full force and effect, as if such payment had not been made. Borrower hereby waives any legal right otherwise available to Borrower that would require the sale of any Collateral either separate or apart from other Collateral, or require Lender to exhaust its remedies against any Collateral before proceeding against any other Collateral. Without limiting the foregoing, to the fullest extent permitted by law, Borrower hereby waives and shall not assert any rights in respect of a marshalling of Collateral, a sale in the inverse order of alienation, any homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lender under the Loan Documents to a sale of the Collateral or any portion thereof in any sequence and any combination as determined by Lender.

**Section 9.3    Remedies of Borrower**. If a claim is made that Lender or its agents have unreasonably delayed acting or acted unreasonably in any case where by law or under any Loan Document any of such Persons has an obligation to act promptly or reasonably, Borrower agrees that no such Person shall be liable for any monetary damages, and Borrower's sole remedy shall be limited to commencing an action seeking specific performance, injunctive relief and/or declaratory judgment; provided, however, that the forgoing shall not prevent Borrower from obtaining a monetary judgment against Lender if it is determined by a court of competent jurisdiction that Lender acted with gross negligence, bad faith or willful misconduct. Notwithstanding anything herein to the contrary, Borrower shall not assert, and hereby waives, any claim against Lender and/or its Affiliates, directors, employees, attorneys, agents or sub-agents, on any theory of liability, for special, indirect, consequential or punitive damages (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable Legal Requirement) arising out of, as a result of, or in any way related to, the Loan Documents or any agreement or instrument contemplated thereby or referred to therein, the transactions contemplated thereby, the Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, and Borrower hereby waives, releases and agrees not to sue upon any such claim for any such damages, whether or not accrued and whether or not known or suspected to exist in its favor, except for claims arising from any such Person's gross negligence, bad faith or willful misconduct.

**Section 9.4    Brokers and Financial Advisors**. Borrower shall indemnify and hold Lender harmless from and against any and all claims, liabilities, costs and expenses of any kind in any way relating to or arising from a claim by any Person that such Person acted on behalf of Borrower in connection with the transactions contemplated in this Agreement. The provisions of this Section shall survive the expiration and termination of this Agreement and the repayment of the Indebtedness.

**Section 9.5    General Indemnity; Payment of Expenses**.

(a)    Borrower, at its sole cost and expense, shall protect, indemnify, reimburse, defend and hold harmless Lender and its officers, partners, members, directors, trustees, advisors, employees, agents, sub-agents, Affiliates, successors, participants and assigns of any and all of the foregoing (collectively, the "**Indemnified Parties**") for, from and against any and all Damages of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against any of the Indemnified Parties, in any way relating to or arising out of Lender's interest in the Loan; provided, however, that no Indemnified Party shall have the right to be so indemnified to the extent that such Damages have been found by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnified Party.

(b)    If for any reason (including violation of law or public policy) the undertakings to defend,

indemnify, pay and hold harmless set forth in this Section are unenforceable in whole or in part or are otherwise unavailable to an Indemnified Party or insufficient to hold it harmless, then Borrower shall contribute to the amount paid or payable by the Indemnified Party as a result of any Damages the maximum amount Borrower is permitted to pay under Legal Requirements. The obligations of Borrower under this Section will be in addition to any liability that Borrower may otherwise have under the Loan Documents. Any amounts payable to Lender by reason of the application of this Section shall be secured by the Loan Documents and shall become immediately due and payable and shall bear interest at the Default Rate from the date Damages are sustained by the Indemnified Parties until paid.

(c) The provisions of and undertakings and indemnification set forth in this Section shall survive the satisfaction and payment in full of the Indebtedness and termination of this Agreement.

(d) Borrower shall reimburse Lender upon receipt of written notice from Lender for (i) all out-of-pocket costs and expenses incurred by Lender (or any of its Affiliates) in connection with the origination of the Loan; (ii) all out-of-pocket costs and expenses incurred by Lender (or any of its Affiliates) in connection with (A) monitoring Borrower's ongoing performance of and compliance with Borrower's agreements and covenants contained in the Loan Documents on its part to be performed or complied with after the Closing Date, (B) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to the Loan Documents and any other documents or matters relating hereto (including Leases, Material Agreements, and Permitted Encumbrances), (C) filing, registration and recording fees and expenses and other similar expenses incurred in creating and perfecting the Liens in favor of Lender pursuant to this Loan Documents (including the filing, registration or recording of any instrument of further assurance) and all federal, state, county and municipal, taxes (including, if applicable, documentary or intangible taxes), search fees, title insurance premiums, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of the Loan Documents, any mortgage supplemental thereto, any security instrument with respect to the Collateral or any instrument of further assurance, (D) enforcing or preserving any rights, in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower, the Loan Documents or any Collateral, and (E) in connection with any Rating Agency Confirmation in respect of any matter required or requested by Borrower hereunder; and (iii) all actual out-of-pocket costs and expenses (including attorney's fees and, if the Loan has been Securitized, special servicing fees) incurred by Lender (or any of its Affiliates) in connection with the enforcement of any Obligations of any Restricted Party, or a Default or Event of Default by any Restricted Party, under the Loan Documents, including any actual or attempted foreclosure, deed-in-lieu of foreclosure, refinancing, restructuring, settlement or workout and any Event of Bankruptcy (including any applicable transfer taxes). Without limiting the foregoing, Borrower shall pay all costs, expenses and fees of Lender and its Servicer, operating advisor and securitization trustee resulting from Defaults or Events of Default or reasonably imminent Defaults or Events of Default by any Restricted Party or requests by any Restricted Party (including enforcement expenses and any liquidation fees, workout fees, special servicing fees, operating advisor consulting fees or any other similar fees and interest payable on advances made by the Servicer or the securitization trustee with respect to delinquent debt service payments or expenses of curing any Restricted Party's defaults under the Loan Documents, and any expenses paid by Servicer or a trustee in respect of the protection and preservation of any Property, such as payment of taxes and insurance premiums); and the costs of all property inspections, appraisals and broker price opinions (or any updates to any existing inspection, appraisal or broker price opinion) that Servicer may be required to obtain due to a request by a Restricted Party or the occurrence of a Default or Event of Default.

**Section 9.6** **Schedules and Exhibits Incorporated**. The Summary of Loan Terms, Schedules, Exhibits and any riders attached hereto, are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

**Section 9.7** **Successors**. Except as otherwise provided in this Agreement, whenever in this Agreement any of the parties to this Agreement is referred to, such reference shall be deemed to include the successors and permitted assigns of such party. All covenants, promises and agreements in this Agreement contained, by or on behalf of Borrower, shall inure to the benefit of Lender and its successors and assigns.

**Section 9.8** **Modification, Waiver in Writing**. No Loan Document may be amended, changed, waived, discharged or terminated, nor shall any consent or approval of Lender be granted hereunder, unless such amendment, change, waiver, discharge, termination, consent or approval is in writing signed by Lender.

**Section 9.9** **Severability**. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**Section 9.10** **Offsets, Counterclaims and Defenses**. All payments made by Borrower under the Loan Documents shall be made irrespective of, and without any deduction for, any offsets, counterclaims or defenses. Borrower waives the right to assert a counterclaim,

other than a mandatory or compulsory counterclaim, in any action or proceeding brought against it by Lender arising out of or in any way connected with the Loan Documents or the Indebtedness. Any assignee of Lender's interest in the Loan shall take the same free and clear of all offsets, counterclaims or defenses against the assigning Lender.

**Section 9.11** **No Joint Venture**. Nothing in this Agreement is intended to create a joint venture, partnership, tenancy-in-common or joint tenancy relationship between Borrower and Lender, nor to grant Lender any interest in any Property other than that of mortgagee or lender.

**Section 9.12** **Conflict; Construction of Documents**. In the event of any conflict between the provisions of this Agreement and the provisions of the other Loan Documents, the provisions of this Agreement shall prevail. The parties acknowledge that they were each represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that the Loan Documents shall not be subject to the principle of construing their meaning against the party that drafted same.

**Section 9.13** **Counterparts**. This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. Copies of originals, including copies delivered by facsimile, pdf or other electronic means, shall have the same import and effect as original counterparts and shall be valid, enforceable and binding for the purposes of this Agreement.

**Section 9.14** **No Third-Party Beneficiaries**. The Loan Documents are solely for the benefit of the parties thereto, and nothing contained in this Loan Documents shall be deemed to confer upon anyone other than the parties thereto and Indemnified Parties any right to insist upon or to enforce the performance or observance of any of the Obligations contained herein or therein.

**Section 9.15** **Right of Set-Off**. In addition to any rights now or hereafter granted under applicable law or otherwise, and not by way of limitation of any such rights, during the continuance of an Event of Default, Lender may from time to time, without presentment, demand, protest or other notice of any kind (all of such rights being hereby expressly waived), set-off and appropriate and apply any and all deposits (general or special) and any other indebtedness at any time held or owing by Lender (including branches, agencies or Affiliates of Lender wherever located) to or for the credit or the account of Borrower against the Obligations, irrespective of whether Lender shall have made any demand hereunder and although the Obligations may be contingent or unmatured.

**Section 9.16** **Servicer**. Lender may delegate any and all rights and obligations of Lender under the Loan Documents to the Servicer upon notice by Lender to Borrower, whereupon any notice or consent from the Servicer to Borrower, and any action by Servicer on Lender's behalf, shall have the same force and effect as if Servicer were Lender.

**Section 9.17** **Exculpation of Lender**. Lender neither undertakes nor assumes any responsibility or duty to Borrower or any other party to review, inspect, examine, supervise, pass judgment upon or inform Borrower or any third party of (a) the existence, quality, adequacy or suitability of appraisals of the Properties or other Collateral, (b) any environmental report, or (c) any other matters or items, including engineering, soils and seismic reports that are contemplated in the Loan Documents. Any such selection, review, inspection, examination and the like, and any other due diligence conducted by Lender, is solely for the purpose of protecting Lender's rights under the Loan Documents, and shall not render Lender liable to Borrower or any third party for the existence, sufficiency, accuracy, completeness or legality thereof.

**Section 9.18** **PATRIOT Act Records**. Lender hereby notifies Borrower that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies each Restricted Party and certain of their Affiliates.

**Section 9.19** **Prior Agreements**. THE LOAN DOCUMENTS CONTAIN THE ENTIRE AGREEMENT OF THE PARTIES THERETO IN RESPECT OF THE TRANSACTIONS CONTEMPLATED THEREBY, AND ALL PRIOR AGREEMENTS AMONG OR BETWEEN SUCH PARTIES, WHETHER ORAL OR WRITTEN, INCLUDING ANY TERM SHEETS, CONFIDENTIALITY AGREEMENTS AND COMMITMENT LETTERS, ARE SUPERSEDED BY THE TERMS OF THE LOAN DOCUMENTS.

**Section 9.20** **Governing Law**.

(a) THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b) ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR ANY RESTRICTED PARTY ARISING OUT OF OR RELATING TO THE LOAN DOCUMENTS (OTHER THAN ANY ACTION IN RESPECT OF THE CREATION, PERFECTION OR ENFORCEMENT OF A LIEN OR SECURITY INTEREST CREATED PURSUANT TO ANY LOAN DOCUMENTS NOT GOVERNED BY THE LAWS OF THE STATE OF NEW YORK) MAY BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW

YORK. BORROWER AND LENDER HEREBY (i) IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM, (ii) IRREVOCABLY SUBMIT TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUCH SUIT, ACTION OR PROCEEDING, AND (iii) IRREVOCABLY CONSENT TO SERVICE OF PROCESS BY MAIL, PERSONAL SERVICE OR IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW, AT THE ADDRESS SPECIFIED IN **SECTION 9.1** (AND AGREES THAT SUCH SERVICE AT SUCH ADDRESS IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER ITSELF IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT).

**Section 9.21**   <u>Trial by Jury</u>. LENDER AND BORROWER, TO THE FULLEST EXTENT THAT THEY MAY LAWFULLY DO SO, HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY LENDER AND BORROWER AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER AND BORROWER ARE EACH HEREBY INDIVIDUALLY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER

**Section 9.22**   <u>Delay Not a Waiver</u>. Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege under any Loan Document or under any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege. In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under any Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under the Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

**Section 9.23**   <u>Rules of Construction</u>. Unless otherwise specified, (a) all references to sections, schedules and exhibits are to sections, schedules and exhibits in or to this Agreement, (b) all meanings attributed to defined terms in this Agreement shall be equally applicable to both the singular and plural forms of the terms so defined, (c) "including" means "including, but not limited to", (d) the words "hereof," "herein," "hereby," "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision, article, section or other subdivision of this Agreement, (e) unless otherwise indicated, all references to "this Section" shall refer to the Section of this Agreement in which such reference appears in its entirety and not to any particular clause or subsection or such Section, (f) the use of the phrases "an Event of Default exists", "during the continuance of an Event of Default" or similar phrases in the Loan Documents shall not be deemed to grant Borrower any right to cure an Event of Default, and each Event of Default shall continue unless and until the same is waived by Lender in writing in accordance with the requirements of the Loan Documents and (g) terms used herein and defined by cross-reference to another agreement or document shall have the meaning set forth in such other agreement or document as of the Closing Date, notwithstanding any subsequent amendment or restatement of or modification to such other agreement or document. Except as otherwise indicated, all accounting terms not specifically defined in this Agreement shall be construed in accordance with GAAP, as the same may be modified in this Agreement.

**Section 9.24**   <u>Lender's Discretion; Rating Agency Review</u>. Whenever pursuant to this Agreement or any other Loan Document (a) Lender has any right to approve or disapprove any matter or grant any consent or waiver, (b) Lender is entitled to make any determination, or (c) any matter is to be satisfactory to Lender, then Lender shall have the right to so approve, disapprove, grant or withhold, determine, or be satisfied or unsatisfied, as applicable, in its sole discretion, and any such decision shall be final and conclusive and may be conditioned upon obtaining a Rating Agency Confirmation.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**Exhibit A**

<u>Form of Rent Statement</u>

The undersigned officer of Borrower hereby certifies that the information presented below for the calendar quarter ended [_____], 20[__] is true, correct and complete as of such date:

Part A – To be reported quarterly.

1. Street Address;
2. City;
3. State;
4. Zip Code;
5. Occupancy status during each month of applicable quarter;
6. Did Residential Unit become vacant during applicable quarter;
7. Lease start date;
8. Lease end date (if lease term ended indicate "month to month");
9. Contracted rent for applicable quarter;
10. Rent paid for applicable quarter;
11. Other Revenues for applicable quarter;
12. Lease concessions during applicable quarter;
13. Amount of rent more than 30 days past due as of last day of applicable quarter;
14. Tenant delinquency stage (0-30 days, 31-60, 61-90 days, 90+ days);
15. Periodic HOA payment amount, if applicable;
16. Current annual assessed property taxes;
17. Current monthly insurance cost per Property;
18. Amount of tenant security deposits held; and
19. "Section 8" housing status.

Part B – Only need to update for information that changed since prior quarter.

1. Property type (SFR, condo, townhome);
2. Square feet;
3. Number of bedrooms;
4. Number of bathrooms;
5. Pool (yes/no);
6. Year built;
7. Property purchase date;
8. Purchase price;
9. Transaction costs;
10. Renovation costs;
11. Property cost basis (purchase price + renovation costs + transaction costs)
12. HOA (yes/no);
13. HOA contact information (name, address & telephone number); and
14. HOA payment frequency (monthly, quarterly, semi-annually, annually).

**HIRSCHHORN ESTATES, LLC**,
a Delaware limited liability company

By: _____
Name:
Title:

**RENT ROLL**

| Property ID | Address | City | State | Zip | County | Leased | Monthly Rent | Security Deposit | Last Payment | Lease Start Date | Lease End Date |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 616967 | 103 Marion St | Rochester | NY | 14610 | Monroe | Y | 1,200 | | 3/1/2021 | 1/1/2021 | 2/1/2021 |
| 616974 | 117 W. Filbert St | East Rochester | NY | 14445 | Monroe | Y | 1,200 | | 3/1/2021 | 1/1/2021 | 2/1/2021 |
| 616946 | 136 Campbell St | Rochester | NY | 14611 | Monroe | Y | 650 | | 3/1/2021 | 1/1/2021 | 2/1/2021 |
| 616947 | 137 Campbell St | Rochester | NY | 14611 | Monroe | Y | 575 | 575 | 3/1/2021 | 2/2/2021 | 3/2/2021 |
| 616948 | 138 Campbell St | Rochester | NY | 14611 | Monroe | Y | 550 | 550 | 3/1/2021 | 3/3/2020 | 2/28/2021 |
| 616949 | 139 Campbell St | Rochester | NY | 14611 | Monroe | Y | 550 | 550 | 3/1/2021 | 5/13/2020 | 4/30/2021 |
| 616950 | 140 Campbell St | Rochester | NY | 14611 | Monroe | Y | 550 | 550 | 3/1/2021 | 2/1/2021 | |
| 616951 | 141 Campbell St | Rochester | NY | 14611 | Monroe | Y | 775 | 200 | 3/1/2021 | 2/2/2021 | |
| 616945 | 14 Durgin St | Rochester | NY | 14605 | Monroe | Y | 895 | 895 | 3/1/2021 | 12/29/2020 | 12/31/2021 |
| 616952 | 236 Saratoga Ave | Rochester | NY | 14608 | Monroe | Y | 575 | 575 | 3/1/2021 | 8/13/2020 | 7/30/2021 |
| 616953 | 237 Saratoga Ave | Rochester | NY | 14608 | Monroe | N | | | | | |
| 616954 | 238 Saratoga Ave | Rochester | NY | 14608 | Monroe | Y | 625 | 625 | 3/1/2021 | 7/1/2020 | 6/30/2021 |
| 616955 | 239 Saratoga Ave | Rochester | NY | 14608 | Monroe | Y | 625 | 625 | 3/1/2021 | 7/9/2020 | 6/30/2021 |
| 616956 | 240 Saratoga Ave | Rochester | NY | 14608 | Monroe | Y | 575 | 625 | 3/1/2021 | 3/20/2020 | 2/28/2021 |
| 616957 | 241 Saratoga Ave | Rochester | NY | 14608 | Monroe | Y | 575 | 575 | 3/1/2021 | 5/1/2020 | 4/30/2021 |
| 616961 | 258 Avis St | Rochester | NY | 14615 | Monroe | Y | 1,000 | | 3/1/2021 | 6/20/2020 | |
| 616966 | 294 Lexington Ave | Rochester | NY | 14613 | Monroe | Y | 900 | | 3/1/2021 | 1/1/2021 | 2/1/2021 |
| 616970 | 301 Selye Ter | Rochester | NY | 14613 | Monroe | Y | 900 | | 3/1/2021 | 6/20/2020 | |
| 616960 | 31 Alice St | Rochester | NY | 14611 | Monroe | Y | 750 | | 3/1/2021 | 1/1/2021 | 2/1/2021 |
| 616971 | 36 Sterling St | Rochester | NY | 14606 | Monroe | Y | 900 | 900 | 3/1/2021 | 10/27/2020 | 10/31/2021 |
| 616964 | 404 Emerson St | Rochester | NY | 14613 | Monroe | Y | 900 | | 3/1/2021 | 1/1/2021 | 2/1/2021 |
| 616972 | 74 Starling St | Rochester | NY | 14613 | Monroe | Y | 850 | | 3/1/2021 | 1/1/2021 | 2/1/2021 |
| 616968 | 76 Oriole St | Rochester | NY | 14613 | Monroe | Y | 850 | | 3/1/2021 | 1/1/2021 | |
| 616965 | 8 Immel St | Rochester | NY | 14606 | Monroe | Y | 750 | 750 | 3/1/2021 | 2/1/2021 | |
| 616973 | 8 Velox St | Rochester | NY | 14615 | Monroe | Y | 850 | | 3/1/2021 | 1/1/2021 | 2/1/2021 |
| 616963 | 87 Dix St | Rochester | NY | 14606 | Monroe | Y | 900 | | 3/1/2021 | 1/1/2021 | 2/1/2021 |
| 616969 | 968 Ridgeway Ave | Rochester | NY | 14615 | Monroe | Y | 850 | | 3/1/2021 | 1/1/2021 | 2/1/2021 |
| | | | | | | | 20,320 | 7,995 | | | |

**Exhibit B**

Form of Request for Release

[_____] [__], 201[_]

COREVEST AMERICAN FINANCE LENDER LLC, a Delaware limited liability company (the "**Lender**").
From:      HIRSCHHORN ESTATES, LLC, a Delaware limited liability company  (the "**Borrower**")

Re:      Loan Agreement, dated as of March 31, 2021, by and between Borrower and Lender (as amended, restated, supplemented or otherwise modified from time to time, the "**Agreement**").  Capitalized terms used but not defined herein shall have the meanings given to them in the Agreement.

Borrower hereby gives notice of its intent to Transfer each of the Properties listed on **in Annex I** hereto (collectively, the "**Release Properties**").  In connection with such Transfer, Borrower hereby certifies, as of the date hereof, the following:

(a)      enclosed herewith are true, correct and complete copies of each material agreement relating to the proposed Transfer, including any HUD-1 or other closing statements;

(b)      **Annex I** hereto sets forth for each Release Property the following:  (i) gross sales price (including any earnest money, down payment or similar deposit included in the total sales price paid by the purchaser of such Release Property), (ii) Transfer expenses, (iii) Transfer proceeds and (iv) the applicable **Release Price**;

(c)      the date of the proposed Transfer (the "**Transfer Date**") is [_____], 201[_];

(d)      as set forth on **Annex II** hereto, the Rent to Debt Service Ratio as of the last day of the most recent calendar month ended, after giving pro forma effect for the elimination of the Revenue for the applicable release Property and reduction of the Monthly Debt Service Payment as determined by Lender pursuant to **Section 2.2(e)**, is at least equal to the greater of (i) the Required Rent to Debt Service Ratio and (ii) the Rent to Debt Service Ratio as of the last day of the most recent calendar month ended;

(e)      no Event of Default has occurred and is continuing;

(f)      the Release Property is being Transferred to a Person that is not an Affiliate of Borrower; and

(g)      the Release Property is being transferred pursuant to a bona fide all-cash sale of the Release Property on arms-length terms and conditions.

Borrower hereby requests that Lender provide a release with respect to the Release Properties.

**IN WITNESS WHEREOF**, Borrower has caused this certificate to be executed on its behalf this [__] day of [_____], 201[_].

**HIRSCHHORN ESTATES, LLC**,
a Delaware limited liability company

By:      _____
Name:
Title:

ANNEX I

**PROPERTIES TO BE TRANSFERRED**

| Unit Number | Property Address | Gross Transfer Proceeds | Transfer Expenses | Transfer Proceeds | Applicable Release Price |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

**ANNEX II**

**CALCULATION OF PRO FORMA RENT TO DEBT SERVICE RATIO**

A.       Numerator calculation

       1.    Revenues actually collected for the Properties for the twelve (12) completed, full calendar months prior to the date hereof[1]:         $_____

       2.    Revenues for the Properties released actually collected for the twelve (12) completed, full calendar months prior to the date hereof[1]:         $_____

       3.    Line A1 minus Line A2 (pro forma Revenue):         $_____

B.       Denominator calculation

       1.    Monthly Debt Service Payment, as of the Payment Date immediately preceding the date hereof, multiplied by twelve (12):         $_____

       2.    New Monthly Debt Service Payment, as adjusted pursuant to Section 2.2(e), multiplied by twelve (12):         $_____

C.       Pro Forma Rent to Debt Service Ratio (Line A3 ÷ Line B2)         _____: 1.00

D.       Rent to Debt Service Ratio as of the last day of the most recent calendar month ended (Line A1 ÷ B1)         _____: 1.00

E.       Required Rent to Debt Service Ratio:         _____: 1.00[2]

---

[1] If twelve (12) completed, full calendar months have not elapsed since the Closing Date, this amount shall be determined by annualizing Revenues actually collected by Borrower for the completed full calendar months occurring after the Closing Date.

[2] Insert from Summary of Loan Terms.

Exhibit B – Form of Request for Release

**Exhibit C**

Required Insurance

1.     **Property & Business Income/Rental Value Insurance**. Borrower shall obtain for all Properties, their improvements and their personal property, an "All Risk" or Special Form policy using the most recent Insurance Services Offices (ISO) policy form DP3 (DP 00 03), its equivalent or better, with no exclusion or sublimit for theft, vandalism, malicious mischief, riot, civil commotion or vacancy, in each case without approval by Lender; such policy subject to the following:

(a)     Policy limit per occurrence equal to combined (i) and (ii) below and per the noted terms and conditions:

(i)     Insurance replacement cost value of the Properties per Marshall & Swift (or an equivalent insurance valuation tool, or as specified by Lender). Such policy shall contain no coinsurance requirement and shall cover the cost to repair or replace (whichever is less) at the time and place of the loss with materials of like kind and quality, without deduction for depreciation and obsolescence.

(ii)     Business Income / Rental Value in an amount equal to one hundred percent (100%) of the aggregate projected net income plus continuing expenses from the operation of the Properties for a period of at least six (6) months after the date a Property is damaged or destroyed, in whole or in part. Such policy shall contain no coinsurance requirement and shall be written on (x) an actual loss sustained or (y) a business income basis.

(b)     Unless otherwise approved by Lender, for Blanket Limit Insurance (policies covering more than one Property), the per occurrence policy limit, if not 100% of the combined values of (i) and (ii) above for all covered Properties, shall be the greater of the Loan Amount or the highest combined values within a single postal code, but shall not be required to exceed $25,000,000.

(c)     If any Property is located in Florida or Hawaii or within 25 miles of the coast in Alabama, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, Virginia or Texas, Borrower shall obtain for such Property coverage equal to the combined values of 1(a)(i) and (ii) above for windstorm (including named storm and hail) or an endorsement covering damage from windstorm (including named storm and hail).

(d)     For condominiums or townhomes where an association assumes responsibility for the Building Insurance, a Building Insurance policy must be in place at all times and all terms and conditions thereof must be satisfactory to Lender. Unless otherwise approved by Lender, for Property located in Florida, Hawaii or within 25 miles of the coast in Alabama, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, Virginia and Texas, the association must provide 100% Building Insurance replacement cost windstorm (including named storm and hail) coverage with deductible(s) not exceeding 10% of the Building full insurance replacement cost and twelve months Business Income/Rental Value.

(e)     No deductible in excess of (i) for a Loan Amount of $1,000,000 or less, up to 2.5% of the Loan Amount or (ii) for a Loan Amount greater than $1,000,000, up to $25,000 per occurrence for any and all damaged locations is allowed except the windstorm (including named storm and hail) deductible may be up to 10% of a damaged Property's combined total insurance value (replacement cost plus twelve (12) months business income/rental values) and in the case of a policy covering more than one Property for windstorm (including named storm and hail) be allowed a deductible of up to $250,000 per occurrence for any and all damaged Properties. Upon approval by Lender, Borrower may utilize an aggregate deductible stop loss (additional self-insured retention in the form of an annual aggregate deductible) not to be eroded by windstorm (including named storm and hail), flood or earthquake with aggregate limits approved by Lender.

(f)     A Property located in a Special Flood Hazard Area (FEMA Flood Zone prefix "A" or "V") must be provided with either a National Flood Insurance Program (NFIP) policy or a private insurance equivalent policy compliant with the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended, written at the maximum NFIP limit available for the Property.

2.     **Builder's Risk**. During construction, renovation or structural repairs, if coverage is not included in the property insurance policy, Borrower shall obtain a separate so-called Builder's Risk completed value form policy (ISO form CP 00 20, its equivalent, or better) including coverage for all insurable hard and soft costs of construction on a non-reporting basis, including permission to occupy such Property and with coverage equivalent to that proscribed in (a)(i) and (a)(ii) above and without coinsurance. In addition, if coverage is not included in the Commercial General Liability Policy, Borrower shall obtain a separate Owner Contractor's Protective Liability (ISO form CPO 00 09, its equivalent, or better).

3.     **Commercial General Liability (CGL) and Excess (Umbrella) Liability**. Borrower shall obtain a primary commercial general liability policy against claims for personal injury, bodily injury, death or property damage occurring upon, in or about any Property. Such insurance shall be at least as broad as ISO policy "occurrence" form CG 00 01 with a limit of at least $1,000,000 per occurrence and $2,000,000 in the aggregate "per location". For loan amounts over $5,000,000, an umbrella or excess liability policy in an amount not less than $2,000,000 per occurrence and in the aggregate on terms consistent with the commercial general liability insurance policy is required. The Lender may require a greater combined amount at any time so long as 30 days' written notice is provided for any required limit increase. No deductible in excess of $5,000 per occurrence is allowed without approval by Lender, as applicable. Upon approval by Lender, Borrower may utilize an aggregate deductible stop loss (additional self-insured retention in the form of an annual aggregate deductible) with aggregate limits approved by Lender.

4.     **Auto**. If applicable, Borrower shall obtain automobile liability coverage for all owned and non-owned vehicles, including rented and leased vehicles, containing a minimum $1,000,000 limit per occurrence.

5.     **Worker's Compensation**. If applicable, Borrower shall obtain worker's compensation insurance subject to the worker's compensation laws of the applicable state, and employer's liability in amounts acceptable to Lender in respect of any work or operations on or about a Property, or in connection with a Property or its operation.

6.     **Other**. Upon sixty (60) days' written notice, (i) increases in the amounts of coverage required hereunder as may be reasonably requested by Lender taking into consideration changes in the value of money over time, changes in liability laws, changes in prudent customs and practices and (ii) such other reasonable insurance, and in such reasonable amounts as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for properties similar to the Properties located in or around the region in which Properties are located.

Exhibit C – Required Insurance

**Exhibit D**

Form of Tenant Direction Letter

[_____], 201[_]

[TENANT]

        Re:        [Describe Lease] (the "**Lease**")

To Whom it May Concern:

        Please be advised of new Lease payment instructions for your home effective immediately. All payments due under the Lease should be delivered as follows:

(i)        If by check, money order, or its equivalent, please mail such items to:

        [INSERT RENT DEPOSIT ACCT. INFO]

        _____

        _____

        Attention: _____

        Facsimile No.: _____

(ii)       If by wire transfer to:

        [INSERT RENT DEPOSIT ACCT. INFO]

        Payee: _____

        ABA Routing #: _____

        For Account: _____

        Account #: _____

        Bank Contact: _____

        This payment direction may not be rescinded or altered, except by a written direction signed by COREVEST AMERICAN FINANCE LENDER LLC, its successors and/or assigns or agent ("**Lender**"). The foregoing payment direction is irrevocable, except with the written consent of Lender, notwithstanding any future contrary request or direction from the undersigned or any other person (other than Lender).

        Thank you for your cooperation.

**HIRSCHHORN ESTATES, LLC**,
a Delaware limited liability company

By:     _____

Name:

Title:

**Exhibit E**

Form of Officer's Certificate for Quarterly Reporting

[_____] [___], 20[___]

To:   COREVEST AMERICAN FINANCE LENDER LLC
1920 Main Street, Suite 850
Irvine, CA 92614
Attention:  Head of Term Lending
Email:  termloannotices@cvest.com

Re: Quarterly Financial Statements

Ladies and Gentlemen:

Reference is made to that certain Loan Agreement, dated as of March 31, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), by and between **HIRSCHHORN ESTATES, LLC**, a Delaware limited liability company (together with its permitted successors and assigns, collectively, "Borrower"), and COREVEST AMERICAN FINANCE LENDER LLC, a Delaware limited liability company (together with its permitted successors and assigns, collectively, "**Lender**").  Capitalized terms used in this Officer's Certificate have the meanings set forth in the Loan Agreement unless specifically defined herein.

Pursuant to **Section 6.11(a)** of the Loan Agreement, the undersigned officer of Borrower hereby certifies that:

1.       The financial information of Borrower required to be provided for the calendar quarter ended [March 31][June 30][September 30][December 31], 201[__] (the "**Calculation Date**") pursuant to **Section 6.11(a)** of the Loan Agreement, and the calculations attached as **Schedule 1** hereto, have been prepared in accordance with GAAP, consistently applied, and fairly present the financial condition of Borrower.

2.       Such officer has reviewed the terms of the Loan Agreement and has made, or caused to be made under his/her supervision, a review in reasonable detail of the transactions and condition of Borrower during the accounting period covered by the financial statements delivered pursuant to **Section 6.11(a)** of the Loan Agreement.

3. Such officer has reviewed the financial condition of Sponsor and has made, or caused to be made under his/her supervision, a review in reasonable detail of the transactions and condition of Sponsor, and hereby certifies that Sponsor is in compliance with the Sponsor Financial Covenant as of the Calculation Date.

4.       Such review has not disclosed the existence on and as of the date hereof, and the undersigned does not have knowledge of the existence, as of the date hereof, of any event or condition that constitutes a Default or Event of Default, except for such conditions or events listed on **Schedule 2** hereto, specifying the nature and period of existence thereof and what action Borrower has taken, is taking, or proposes to take with respect thereto.

IN WITNESS WHEREOF, this Officer's Certificate is executed by the undersigned this _____ day of _____, 201_.

**HIRSCHHORN ESTATES, LLC**,
a Delaware limited liability company


By:        _____
Name:
Title:

**Schedule 1**

Rent to Debt Service Ratio

**Schedule 2**

Events of Default

**Schedule A**

Properties and Allocated Loan Amounts

| Asset ID | Address | City | State | Zip | County | ALA |
|---|---|---|---|---|---|---|
| 616967 | 103 Marion St | Rochester | NY | 14610 | Monroe | $ 104,974.36 |
| 616974 | 117 W. Filbert St | East Rochester | NY | 14445 | Monroe | $ 86,228.94 |
| 616946 | 136 Campbell St | Rochester | NY | 14611 | Monroe | $ 149,963.37 |
| 616947 | 137 Campbell St | Rochester | NY | 14611 | Monroe | $ - |
| 616948 | 138 Campbell St | Rochester | NY | 14611 | Monroe | $ - |
| 616949 | 139 Campbell St | Rochester | NY | 14611 | Monroe | $ - |
| 616950 | 140 Campbell St | Rochester | NY | 14611 | Monroe | $ - |
| 616951 | 141 Campbell St | Rochester | NY | 14611 | Monroe | $ - |
| 616945 | 14 Durgin St | Rochester | NY | 14605 | Monroe | $ 34,491.58 |
| 616952 | 236 Saratoga Ave | Rochester | NY | 14608 | Monroe | $ 149,963.37 |
| 616953 | 237 Saratoga Ave | Rochester | NY | 14608 | Monroe | $ - |
| 616954 | 238 Saratoga Ave | Rochester | NY | 14608 | Monroe | $ - |
| 616955 | 239 Saratoga Ave | Rochester | NY | 14608 | Monroe | $ - |
| 616956 | 240 Saratoga Ave | Rochester | NY | 14608 | Monroe | $ - |
| 616957 | 241 Saratoga Ave | Rochester | NY | 14608 | Monroe | $ - |
| 616961 | 258 Avis St | Rochester | NY | 14615 | Monroe | $ 43,489.38 |
| 616966 | 294 Lexington Ave | Rochester | NY | 14613 | Monroe | $ 33,741.76 |
| 616970 | 301 Selye Ter | Rochester | NY | 14613 | Monroe | $ 38,990.48 |
| 616960 | 31 Alice St | Rochester | NY | 14611 | Monroe | $ 60,735.16 |
| 616971 | 36 Sterling St | Rochester | NY | 14606 | Monroe | $ 35,241.39 |
| 616964 | 404 Emerson St | Rochester | NY | 14613 | Monroe | $ 40,490.11 |
| 616972 | 74 Starling St | Rochester | NY | 14613 | Monroe | $ 42,739.56 |
| 616968 | 76 Oriole St | Rochester | NY | 14613 | Monroe | $ 37,490.84 |
| 616965 | 8 Immel St | Rochester | NY | 14606 | Monroe | $ 37,490.84 |
| 616973 | 8 Velox St | Rochester | NY | 14615 | Monroe | $ 44,989.01 |
| 616963 | 87 Dix St | Rochester | NY | 14606 | Monroe | $ 33,741.76 |
| 616969 | 968 Ridgeway Ave | Rochester | NY | 14615 | Monroe | $ 48,738.09 |
| | | | | | | $ 1,023,500.00 |

**Schedule B**

<u>Exception Report</u>

Section 5.1 Borrower is not in good standing in the State of New York.

Section 5.27 The certificates of occupancy for the Properties located at  136-141 Campbell St., Rochester, NY  14611 and 236-241 Saratoga Ave., Cohester, NY 14608 permit such Properties to include more than one to four units.

**Schedule C**

Capital Expenditure Reserve Amounts

| ID | Address | City | State | Zip | County | Monthly Cap Ex | Yearly Cap Ex | Initial Cap Ex |
|---|---|---|---|---|---|---|---|---|
| 616967 | 103 Marion St | Rochester | NY | 14610 | Monroe | $ 72.22 | $ 866.67 | $ 144.44 |
| 616974 | 117 W. Filbert St | East Rochester | NY | 14445 | Monroe | $ 72.22 | $ 866.67 | $ 144.44 |
| 616946 | 136 Campbell St | Rochester | NY | 14611 | Monroe | $ 72.22 | $ 866.67 | $ 144.44 |
| 616947 | 137 Campbell St | Rochester | NY | 14611 | Monroe | | | |
| 616948 | 138 Campbell St | Rochester | NY | 14611 | Monroe | | | |
| 616949 | 139 Campbell St | Rochester | NY | 14611 | Monroe | | | |
| 616950 | 140 Campbell St | Rochester | NY | 14611 | Monroe | | | |
| 616951 | 141 Campbell St | Rochester | NY | 14611 | Monroe | | | |
| 616945 | 14 Durgin St | Rochester | NY | 14605 | Monroe | $ 72.22 | $ 866.67 | $ 144.44 |
| 616952 | 236 Saratoga Ave | Rochester | NY | 14608 | Monroe | $ 72.22 | $ 866.67 | $ 144.44 |
| 616953 | 237 Saratoga Ave | Rochester | NY | 14608 | Monroe | | | |
| 616954 | 238 Saratoga Ave | Rochester | NY | 14608 | Monroe | | | |
| 616955 | 239 Saratoga Ave | Rochester | NY | 14608 | Monroe | | | |
| 616956 | 240 Saratoga Ave | Rochester | NY | 14608 | Monroe | | | |
| 616957 | 241 Saratoga Ave | Rochester | NY | 14608 | Monroe | | | |
| 616961 | 258 Avis St | Rochester | NY | 14615 | Monroe | $ 72.22 | $ 866.67 | $ 144.44 |
| 616966 | 294 Lexington Ave | Rochester | NY | 14613 | Monroe | $ 72.22 | $ 866.67 | $ 144.44 |
| 616970 | 301 Selye Ter | Rochester | NY | 14613 | Monroe | $ 72.22 | $ 866.67 | $ 144.44 |
| 616960 | 31 Alice St | Rochester | NY | 14611 | Monroe | $ 72.22 | $ 866.67 | $ 144.44 |
| 616971 | 36 Sterling St | Rochester | NY | 14606 | Monroe | $ 72.22 | $ 866.67 | $ 144.44 |
| 616964 | 404 Emerson St | Rochester | NY | 14613 | Monroe | $ 72.22 | $ 866.67 | $ 144.44 |
| 616972 | 74 Starling St | Rochester | NY | 14613 | Monroe | $ 72.22 | $ 866.67 | $ 144.44 |
| 616968 | 76 Oriole St | Rochester | NY | 14613 | Monroe | $ 72.22 | $ 866.67 | $ 144.44 |
| 616965 | 8 Immel St | Rochester | NY | 14606 | Monroe | $ 72.22 | $ 866.67 | $ 144.44 |
| 616973 | 8 Velox St | Rochester | NY | 14615 | Monroe | $ 72.22 | $ 866.67 | $ 144.44 |
| 616963 | 87 Dix St | Rochester | NY | 14606 | Monroe | $ 72.22 | $ 866.67 | $ 144.44 |
| 616969 | 968 Ridgeway Ave | Rochester | NY | 14615 | Monroe | $ 72.22 | $ 866.67 | $ 144.44 |
| | | | | | | $ 1,227.78 | $ 14,733.33 | $ 2,455.56 |

**Schedule D**

Definition of Special Purpose Entity

"**Special Purpose Entity**" means, in the case of Borrower and any Constituent Entity, an entity that, since the date of its formation and at all times on and after the date thereof, has complied with and shall at all times comply with the following requirements unless it has received either prior consent to do otherwise from Lender, or, while the Loan is securitized, a Rating Agency Confirmation from each of the Rating Agencies:

(a)   has been, is, and will be organized solely for the purpose of (i) in the case of Borrower, acquiring, renovating, rehabilitating, owning, holding, selling, leasing, transferring, exchanging, managing and operating the Properties, entering into and performing its obligations under the Loan Documents to which it is a party, refinancing the Properties in connection with a permitted repayment of the Loan, and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing and (ii) in the case of any Constituent Entity, has been acting as a general partner of Borrower and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing.

(b)   has not engaged and will not engage in any business other than (i) in the case of Borrower, the business described in clause (a)(i) above and (ii) in the case of a Constituent Entity, the business described in clause (a)(ii) above.

(c)   does not own, and will not own any asset or property other than (i) in the case of Borrower, the Properties and incidental personal property necessary for the ownership or operation of the Properties and (ii) in the case of any Constituent Entity, an equity interest in Borrower and incidental personal property necessary for the ownership and administration thereof.

(d)   either (i) has not owned any assets or property other than those described in clause (c) above or (ii) has certified to Lender that it is not subject to any indebtedness, guaranties, indemnities or other liabilities (whether absolute or contingent) relating to any assets or properties previously owned by it.

(e)   has not and will not enter into any contract or agreement with any Affiliate of either Borrower or any Constituent Entity, except upon commercially reasonable terms and conditions that are comparable to those of an arms-length basis with third parties who are not Affiliates.

(f)   if such entity is a limited partnership, has and shall have at least one general partner that is a Special Purpose Entity that holds a direct interest as general partner in the limited partnership of not less than one-tenth of one percent (0.1%).

(g)   has not incurred and will not incur any Debt other than Permitted Debt.

(h)   has not made and will not make any loans or advances to any third party (including any Affiliate or constituent party) and has not and shall not acquire obligations or securities of its Affiliates.

(i)   has been, is, and intends to remain solvent and has paid and intends to pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets; provided that the foregoing shall not require any holder of its equity interests to make any additional capital contributions to it.

(j)   has done or caused to be done, and will do, all things necessary to observe organizational formalities and preserve its existence, and has not and will not (i) terminate or fail to comply with the provisions of its organizational documents, or (ii) unless (A) Lender has consented and (B) following a Secondary Market Transaction, the applicable Rating Agencies have issued a Rating Agency Confirmation in connection therewith, amend, modify or otherwise change its organizational documents.

(k)   has maintained and will maintain all of its books, records, financial statements and bank accounts separate from those of its Affiliates and any other Person. Neither Borrower's nor any Constituent Entity's assets will be listed as assets on the financial statement of any other Person, provided, however, that such assets may be included in a consolidated financial statement of its Affiliates provided that (i) appropriate notation shall be made on such consolidated financial statements to indicate the separateness of such entity and such Affiliates and to indicate that such entity's assets and credit are not available to satisfy the debts and other obligations of such Affiliates or any other Person, and (ii) such assets shall be listed on such entity's own separate balance sheet. Except to the extent that such entity is treated as a "disregarded entity" for tax purposes and is not required to file tax returns under applicable law, it will file its own tax returns (to the extent it is required to file any such tax returns) and will not file a consolidated, combined or unitary income tax return (as provided for in Code Section 1501 or any applicable state or local law) with any other Person.  Such entity has maintained and

shall maintain its books, records, resolutions and agreements in accordance with this Agreement.

(l)   has been, will be, and at all times held and will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any Affiliate of such entity), shall correct any known misunderstanding regarding its status as a separate entity, shall conduct business in its own name, shall not identify itself or any of its Affiliates or holders of its equity securities as a division or department or part of the other and shall maintain and utilize separate stationery, invoices and checks bearing its own name.

(m)   has maintained and intends to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations; provided that the foregoing shall not require any holder of equity interests of such entity to make any additional capital contributions to it.

(n)   has not and will not commingle its funds and other assets with those of any Affiliate or holder of equity securities of such entity or any other Person, and has held and will hold all of its assets in its own name.

(o)   has and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or holder of equity interests of such entity or any other Person.

(p)   has not and will not assume or guaranty or become obligated for the debts of any other Person and has not and will not hold itself out to be responsible for or have its credit available to satisfy the debts or obligations of any other Person, except, in each case, as contemplated by this Agreement or the other Loan Documents.

(q)   the organizational documents of Borrower and any Constituent Entity shall provide an express acknowledgment that Lender is an intended third-party beneficiary of the "special purpose" provisions of such organizational documents.

(r)   has not permitted and will not permit any Affiliate (except an Approved Manager pursuant to an Approved Management Agreement entered into in accordance with this Agreement) or holder of its equity securities of access to its bank accounts.

(s)   has paid and intends to pay its own liabilities and expenses, including the salaries of its own employees (if any) from its own funds, and has maintained and shall maintain a sufficient number of employees (if any) in light of its contemplated business operations; provided that the foregoing shall not require any holder of its equity securities to make any additional capital contributions to it.

(t)   has compensated and shall compensate each of its consultants and agents from its funds for services provided to it and pay from its own assets all obligations of any kind incurred; provided that the foregoing shall not require any holder of its equity securities to make any additional capital contributions to it.

(u)   has allocated and will allocate fairly and reasonably any overhead expenses that are shared with any Affiliate, including shared office space.

(v)   except in connection with the Loan, has not pledged and will not pledge its assets for the benefit of any other Person.

(w)   has not and will not have any obligation to indemnify its officers, directors, or holders of its equity securities, as the case may be, or has such an obligation that is fully subordinated to the Indebtedness and will not constitute a claim against it if cash flow in excess of the amount required to pay the Indebtedness is insufficient to pay such obligation.

(x)   has not and shall not: (i) dissolve, merge, liquidate, consolidate; (ii) sell, transfer, dispose, or encumber (except with respect to the Loan Documents) all or substantially all of its assets or acquire all or substantially all of the assets of any Person; or (iii) in the case of any Constituent Entity, transfer its partnership interest in Borrower.

(y)   does not and will not have any of its obligations guaranteed by an Affiliate (other than the Pledgor Guaranty and the Sponsor Guaranty with respect to the Loan).

# EXHIBIT B

# PROMISSORY NOTE

**PRINCIPAL AMOUNT: $1,023,500.00**

New York, NY
March 31, 2021

FOR VALUE RECEIVED, the undersigned, HIRSCHHORN ESTATES, LLC, a Delaware limited liability company ("*Borrower*"), hereby promises to pay to COREVEST AMERICAN FINANCE LENDER LLC, a Delaware limited liability company (together with its successors and/or assigns, "*Lender*"), in lawful money of the United States in immediately available funds at the office of Lender or such other place as the holder hereof may from time to time designate in writing pursuant to the terms of that certain Loan Agreement dated as of the date hereof (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Loan Agreement</u>"; capitalized terms used herein but not defined herein shall have the meaning given to such terms in the Loan Agreement)), by and between Borrower and Lender (A) on the dates set forth in the Loan Agreement, the principal amount set forth above, (B) interest from the date of this Promissory Note (this "*Note*") on the principal amount from time to time outstanding on the Loan at the rate or rates per annum and payable on such dates as provided in the Loan Agreement and (C) all other amounts payable under the Loan Agreement and the other Loan Documents, including without limitation, any prepayment premiums.

Borrower, promises to pay interest, on demand, on any overdue principal of the Loan made to it under the Loan Agreement and, to the extent permitted by law, overdue interest from the due date for the Loan at the rate or rates provided in the Loan Agreement.

Borrower hereby waives diligence, presentment, demand, protest and notice of any kind whatsoever. The non-exercise by the holder hereof of any of its rights hereunder in any particular instance shall not constitute a waiver thereof in that or any subsequent instance.

The Loan made by Lender shall be evidenced by one or more accounts or records maintained by Lender in the ordinary course of business. Lender may also attach schedules to this note and endorse thereon the date, amount, and maturity of the Loan and payments with respect thereto. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligations of Borrower under this Note.

This Note is the promissory note referred to in the Loan Agreement, which agreement contains, among other things, provisions for (i) the acceleration of the maturity hereof upon the happening of certain events, (ii) optional and mandatory prepayment of the principal hereof prior to the maturity hereof and (iii) the amendment or waiver of certain provisions of the Loan Agreement, all upon the terms and conditions therein specified. This Note does not purport to summarize the Loan Agreement and reference is made to the Loan Agreement for information with respect to the interests, rights, benefits, obligations, proceeds, and duties evidenced hereby and the rights, duties and obligations of the parties thereto. This Note is subject in all respects to the terms, provisions and conditions of the Loan Agreement. In the case of any conflict between terms specified in this Note and terms specified in the Loan Agreement, the terms of the Loan Agreement shall govern.

This Note is secured by the Loan Agreement and the other Loan Documents and is subject

to the terms thereof. Reference is hereby made to the Loan Agreement and the other Loan Documents, for a description of the collateral thereby mortgaged, warranted, bargained, sold, released, conveyed, assigned, transferred, pledged and hypothecated, the nature and extent of the security for this Note, the rights of the holder of this Note and Lender in respect of such security and otherwise.

THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK INCLUDING SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

ANY LEGAL SUIT, ACTION OF PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS NOTE MAY BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK. LENDER AND BORROWER HEREBY (i) IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OR ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM, (ii) IRREVOCABLY SUBMIT TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUCH SUIT, ACTION OR PROCEEDING, AND (iii) IRREVOCABLY CONSENT TO SERVICE OF PROCESS BY MAIL, PERSONAL SERVICE OR IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW, AT THE ADDRESS SPECIFIED IN THE LOAN AGREEMENT (AND AGREES THAT SUCH SERVICE AT SUCH ADDRESS IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER ITSELF IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT).

Notwithstanding anything to the contrary contained herein, (a) all agreements and communications between Borrower and Lender are hereby and shall automatically be limited so that, after taking into account all amounts deemed to constitute interest, the interest contracted for, charged or received by Lender shall never exceed the maximum rate permitted by applicable law, (b) in calculating whether any interest exceeds the maximum rate permitted by applicable law, all such interest shall be amortized, prorated, allocated and spread over the full amount and term of all principal indebtedness of Borrower to Lender, and (c) if through any contingency or event, Lender receives or is deemed to receive interest in excess of the maximum rate permitted by applicable law, any such excess shall be deemed to have been applied toward the payment of the principal of any and all then outstanding indebtedness of Borrower to Lender, or if there is no such indebtedness, shall immediately be returned to Borrower.

This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party(ies) against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

Upon the transfer of this Note by Lender, Borrower hereby waives notice of any such transfer, Lender may deliver all the collateral mortgaged, granted, pledged or assigned pursuant to the Loan Documents, or any part thereof, to the transferee who shall thereupon become vested with all the rights herein or under applicable law given to Lender with respect thereto, and

Lender shall thereafter forever be relieved and fully discharged from any liability or responsibility in the matter; but Lender shall retain all rights hereby given to it with respect to any liabilities and the collateral not so transferred.

BORROWER, AND BY ITS ACCEPTANCE OF THIS NOTE, LENDER, TO THE FULLEST EXTENT THAT THEY MAY LAWFULLY DO SO, HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS NOTE, THE MORTGAGES OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY LENDER AND BORROWER AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER AND BORROWER ARE EACH HEREBY INDIVIDUALLY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER.

[NO FURTHER TEXT ON THIS PAGE]

IN WITNESS WHEREOF, the undersigned Borrower has executed this Note as of the date and year first written above.

BORROWER:

HIRSCHHORN ESTATES, LLC,
a Delaware limited liability company

By: _____
Name: Meyer Hirschhorn
Title: Member

SIGNATURE PAGE TO PROMISSORY NOTE

# EXHIBIT C

# PLEDGOR GUARANTY

This PLEDGOR GUARANTY, dated as of March 31, 2021 (as amended, restated, supplemented or otherwise modified from time to time, this "***Agreement***"), is made by and between MEYER HIRSCHHORN, an individual resident of the State of New York (the "***Guarantor***") and COREVEST AMERICAN FINANCE LENDER LLC, a Delaware limited liability company (together with its successors and assigns, collectively, the "***Lender***").

## RECITALS:

WHEREAS, HIRSCHHORN ESTATES, LLC, a Delaware limited liability company and Lender are party to that certain Loan Agreement, dated as of the date hereof (as amended, restated, supplemented or otherwise modified from time to time, the "***Loan Agreement***").

WHEREAS, Guarantor is the sole member and owner of 100% of the membership interests in Borrower, and accordingly will derive substantial direct and indirect benefits from the transactions contemplated by the Loan Agreement.

WHEREAS, Guarantor and Lender are party to that certain Pledge Agreement, dated as of the date hereof (as amended restated supplemented or otherwise modified from time to time, the "***Pledge Agreement***") pursuant to which Guarantor has pledged to Lender as security for the Guaranteed Obligations (as defined below) the Pledged Collateral (as defined in the Pledge Agreement).

WHEREAS, capitalized terms used herein without definition shall have the meanings ascribed thereto in the Loan Agreement.

WHEREAS, to induce Lender to make the Loan, Guarantor has agreed to execute and deliver this Agreement.

NOW, THEREFORE, in consideration of the covenants set forth in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree, represent and warrant as follows:

## ARTICLE 1

## NATURE AND SCOPE OF GUARANTY

**Section 1.1    Guaranty of Obligation**.    Guarantor hereby irrevocably and unconditionally guarantees the payment and performance of the Guaranteed Obligations (as defined below) as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise.    Guarantor hereby irrevocably and unconditionally covenants and agrees that it is liable for the Guaranteed Obligations as a primary obligor. Notwithstanding any provision to the contrary herein, Lender's recourse against Guarantor with respect to any indebtedness owing under this Agreement shall be limited solely to the Pledged Collateral.

**Section 1.2    Definition of Guaranteed Obligations**.  As used herein, the term "***Guaranteed Obligations***" means:

(a)      the due and prompt payment by Borrower of:

(i)      the principal of and premium, if any, and interest at the rate specified in the Loan Agreement (including default interest and interest accruing during the pendency of any proceeding under the Bankruptcy Code, regardless of whether allowed or allowable in such proceeding ("Post-Petition Interest") and any Yield Maintenance Premium) on the Loan, when and as due, whether at scheduled maturity, date set for prepayment, by acceleration or otherwise, and

(ii)      all other monetary Obligations of Borrower to Lender under the Loan Documents, when and as due, including fees, costs, expenses (including, without limitation, reasonable fees and expenses of counsel incurred by Lender in enforcing any rights under the Loan Documents), contract causes of action and indemnities, whether primary, secondary, direct or indirect, absolute or contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any proceeding under the Bankruptcy Code, regardless of whether allowed or allowable in such proceeding); and

(b)      the due and prompt performance of all covenants, agreements, liabilities and other Obligations of Borrower under the Loan Documents.

Guarantor further agrees that all or any part of the Guaranteed Obligations may be increased, extended, substituted, amended, renewed or otherwise modified without notice to or consent from Guarantor and such actions shall not affect the liability of Guarantor hereunder.  Without limiting the generality of the foregoing, Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by Borrower to Lender under the Loan Documents but for the fact that they are unenforceable or not allowable due to the existence of a proceeding under the Bankruptcy Code involving Borrower.

**Section 1.3      Nature of Guaranty**.  This Agreement is an irrevocable, absolute, continuing guaranty of payment and performance and not a guaranty of collection.  This Agreement may not be revoked by Guarantor and shall continue to be effective with respect to any Guaranteed Obligations arising or created after any attempted revocation by Guarantor.  This Agreement may be enforced by Lender and any subsequent holder of the Note and shall not be discharged by the assignment or negotiation of all or part of the Note.

**Section 1.4      Guaranteed Obligations Not Reduced by Offset**.  The Guaranteed Obligations and the liabilities and obligations of Guarantor hereunder, shall not be reduced, discharged or released because or by reason of any existing or future offset, claim or defense of any Restricted Party, or any other party, against Lender or against payment of the Guaranteed Obligations, whether such offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

**Section 1.5      Payment By Guarantor**.  If all or any part of the Guaranteed Obligations is or shall give rise to a monetary obligation, and such monetary obligation shall not be punctually paid when due, Guarantor shall, immediately upon demand by Lender, and without presentment, protest, notice of protest, notice of non-payment, notice of intention to accelerate the maturity, notice of acceleration of the maturity, or any other notice whatsoever, pay in lawful money of the United States, the amount due on the Guaranteed Obligations to Lender at Lender's address as set forth herein.  Such demand(s) may be made at any time coincident with or after the time for payment of the Guaranteed Obligations.  Such demand shall be deemed made, given and received in accordance with the notice provisions hereof.

**Section 1.6** **No Duty To Pursue Others**.  It shall not be necessary for Lender (and Guarantor hereby waives any rights which it may have to require Lender), in order to enforce the obligations of Guarantor hereunder, first to (a) institute suit or exhaust its remedies against Borrower or others liable for amounts due under the Guaranteed Obligations or any other Person, (b) institute suit or exhaust its remedies with respect to the obligations or any Person, (c) enforce Lender's rights against any collateral which shall ever have been given to secure the Obligations, (d) enforce Lender's rights against any other guarantor of the Guaranteed Obligations, (e) join Borrower or any others liable on the Guaranteed Obligations in any action seeking to enforce this Agreement, (f) exhaust any remedies available to Lender against any collateral which shall ever have been given to secure the Loan, or (g) resort to any other means of obtaining payment of the Guaranteed Obligations.  Lender shall not be required to mitigate damages or take any other action to reduce, collect or enforce the Guaranteed Obligations.

**Section 1.7** **Waivers**.  Guarantor agrees to the provisions of the Loan Documents, and hereby waives notice of (a) any loan made to Borrower, (b) acceptance of this Agreement, (c) any amendment or extension of the Loan Agreement, any Mortgage or of any other Loan Documents, (d) the execution and delivery by Borrower and Lender of any other loan or credit agreement or of Borrower's execution and delivery of any promissory notes or other documents arising under the Loan Documents or in connection with any Property or other Collateral, (e) Lender's transfer or disposition of the Guaranteed Obligations, or any part thereof, (f) the occurrence of any Default or an Event of Default, (g) sale or foreclosure (or posting or advertising for sale or foreclosure) of any collateral under the Loan Documents, (h) protest, proof of non-payment or default by Borrower or any other guarantor of the Guaranteed Obligations and (i) any other action at any time taken or omitted by Lender, and, generally, all demands and notices of every kind in connection with this Agreement or the Loan Documents.

**Section 1.8** **Payment of Expenses**.  Guarantor shall, immediately upon demand by Lender, pay all reasonable costs and out-of-pocket expenses (including court costs and attorneys' fees, disbursements, costs and expenses) incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder and any and all damages, losses, claims, liabilities and related reasonable costs and out-of-pocket expenses, including court costs and attorneys' fees, disbursements, costs and expenses incurred by Lender arising from any breach or failure to timely perform any provisions of this Agreement by Guarantor.

**Section 1.9** **Effect of Bankruptcy**.  In the event that, pursuant to the Bankruptcy Code or any judgment, order or decision thereunder, Lender must rescind or restore any payment, or any part thereof, received by Lender in satisfaction of the Guaranteed Obligations (including pursuant to any settlement entered into by Lender in its discretion), as set forth herein, all obligations under this Agreement shall be reinstated as though such payment had been due but not made at such time and remain in full force and effect and any prior release or discharge from the terms of this Agreement given to Guarantor shall be without effect.  It is the intention of Lender and Guarantor that Guarantor's obligations hereunder shall not be discharged except by its performance of such obligations and then only to the extent of such performance.

**Section 1.10** **Construction**.  The term "Borrower" or "Restricted Party" as used herein shall include any new or successor corporation, association, partnership (general or limited), limited liability company, joint venture, trust or other individual or organization formed as a result of any merger, reorganization, sale, transfer, devise, gift or bequest of Borrower or Restricted Party

or any interest in Borrower or Restricted Party.

Section 1.11 **Obligations**. In no event shall Borrower be liable for any obligations of Guarantor under this Agreement.

## ARTICLE 2

## EVENTS AND CIRCUMSTANCES NOT REDUCING OR DISCHARGING GUARANTOR'S OBLIGATIONS

Guarantor hereby consents and agrees to each of the following, and agrees that Guarantor's obligations under this Agreement shall not be released, diminished, impaired, reduced or adversely affected by any of the following, and waives any common law, equitable, statutory or other rights (including without limitation rights to notice) that Guarantor might otherwise have as a result of or in connection with any of the following:

Section 2.1 **Modifications**. Any renewal, extension, increase, modification, alteration or rearrangement of all or any part of the Guaranteed Obligations, the Loan Documents, or any other document, instrument, contract or understanding between Borrower or Guarantor and Lender, or any other parties, pertaining to the Guaranteed Obligations or any failure of Lender to notify Guarantor of any such action.

Section 2.2 **Adjustment**. Any adjustment, indulgence, forbearance or compromise that might be granted or given by Lender to Borrower or Guarantor.

Section 2.3 **Condition of Borrower or Guarantor**. The insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution or lack of power of any Loan Party, Guarantor (if Guarantor is an entity) or any other party at any time liable for the payment of all or part of the Guaranteed Obligations; any dissolution of Borrower or Guarantor (if Guarantor is an entity) any sale, lease or transfer of any or all of the assets of Borrower or Guarantor (if Guarantor is an entity), or any changes in the shareholders, partners or members of Borrower or Guarantor (if Guarantor is an entity); or any reorganization of Borrower or Guarantor (if Guarantor is an entity).

Section 2.4 **Invalidity of Guaranteed Obligations**. The invalidity, illegality or unenforceability of all or any part of the Guaranteed Obligations, or any document or agreement executed in connection with the Guaranteed Obligations, for any reason whatsoever, including without limitation the fact that (a) the Guaranteed Obligations, or any part thereof, exceeds the amount permitted by law, (b) the act of creating the Guaranteed Obligations or any part thereof is ultra vires, (c) the officers or representatives executing the Loan Agreement or the other Loan Documents or otherwise creating the Guaranteed Obligations acted in excess of their authority, (d) the Guaranteed Obligations violate applicable usury laws, (e) any Restricted Party has valid defenses, claims or offsets (whether at law, in equity or by agreement) which render the Guaranteed Obligations wholly or partially uncollectible from any Restricted Party other than payment in full of the Obligations, (f) the creation, performance or repayment of the Guaranteed Obligations (or the execution, delivery and performance of any document or instrument representing part of the Guaranteed Obligations or executed in connection with the Guaranteed Obligations, or given to secure the repayment of the Guaranteed Obligations) is illegal, uncollectible or unenforceable, or (g) the Loan Agreement or any of the other Loan Documents

have been forged or otherwise are irregular or not genuine or authentic, it being agreed that Guarantor shall remain liable hereon regardless of whether Borrower or any other Person be found not liable on the Guaranteed Obligations or any part thereof for any reason.

**Section 2.5** **Release of Guarantor**. Any full or partial release of the liability of Borrower on the Guaranteed Obligations, or any part thereof, or of any co-guarantors, or any other Person now or hereafter liable, whether directly or indirectly, jointly, severally, or jointly and severally, to pay, perform, guarantee or assure the payment of the Guaranteed Obligations, or any part thereof, it being recognized, acknowledged and agreed by Guarantor that it may be required to pay the Guaranteed Obligations in full without assistance or support of any other party, and it has not been induced to enter into this Agreement on the basis of a contemplation, belief, understanding or agreement that other Persons will be liable to pay or perform the Guaranteed Obligations, or that Lender will look to other Persons to pay or perform the Guaranteed Obligations.

**Section 2.6** **Other Collateral**. The taking or accepting of any other security, collateral or guaranty, or other assurance of payment, for all or any part of the Guaranteed Obligations.

**Section 2.7** **Release of Collateral**. Any release, surrender, exchange, subordination, deterioration, waste, loss or impairment (including without limitation negligent, willful, unreasonable or unjustifiable impairment) of any collateral, property or security at any time existing in connection with, or assuring or securing payment of, all or any part of the Guaranteed Obligations.

**Section 2.8** **Care and Diligence**. The failure of Lender or any other party to exercise diligence or reasonable care in the preservation, protection, enforcement, sale or other handling or treatment of all or any part of any collateral, property or security, including but not limited to any neglect, delay, omission, failure or refusal of Lender (a) to take or prosecute any action for the collection of any of the Guaranteed Obligations or (b) to foreclose, or initiate any action to foreclose, or, once commenced, prosecute to completion any action to foreclose upon any security therefor, or (c) to take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Obligations.

**Section 2.9** **Unenforceability**. The fact that any collateral, security, security interest or lien contemplated or intended to be given, created or granted as security for the repayment of the Guaranteed Obligations, or any part thereof, shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other security interest or lien, it being recognized and agreed by Guarantor that it is not entering into this Agreement in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectibility or value of any of the collateral for the Guaranteed Obligations.

**Section 2.10** **Offset**. Any existing or future right of offset, claim or defense of Borrower or Guarantor against Lender, or any other Person, or against payment of the Guaranteed Obligations, whether such right of offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise, other than the payment of the Guaranteed Obligations.

**Section 2.11** **Merger**. The reorganization, merger or consolidation of Borrower

or Guarantor into or with any other Person.

**Section 2.12** **Preference**. Any payment by Borrower or Guarantor to Lender that is held to constitute a preference under the Bankruptcy Code, or for any reason Lender is required to refund such payment or pay such amount to any other person.

**Section 2.13** **Other Actions Taken or Omitted**. Any other action taken or omitted to be taken with respect to the Loan Documents, the Guaranteed Obligations, or the security and collateral therefor, whether or not such action or omission prejudices Guarantor or increases the likelihood that Guarantor will be required to pay the Guaranteed Obligations pursuant to the terms hereof; it is the unambiguous and unequivocal intention of Guarantor that it shall be obligated to pay the Guaranteed Obligations when due, notwithstanding any occurrence, circumstance, event, action, or omission whatsoever, whether contemplated or not contemplated, and whether or not otherwise or particularly described herein, which obligation shall be deemed satisfied only upon the full and final payment and performance of the Guaranteed Obligations.

**ARTICLE 3**

**REPRESENTATIONS AND WARRANTIES**

**Section 3.1** **Representations and Warranties**. To induce Lender to enter into the Loan Documents and extend credit to Borrower, Guarantor represents and warrants to Lender as of the date hereof as follows:

(a)     If Guarantor is an entity, Guarantor (i) is duly organized and validly existing under the laws of its jurisdiction of organization, (ii) is duly qualified to do business and is in good standing in each jurisdiction where it is required to be so, and (iii) has all requisite power and authority and all rights, licenses, permits and authorizations, governmental or otherwise, necessary to entitle it to own its assets and to transact the businesses in which it is now engaged.

(b)     This Agreement has been duly executed and delivered by or on behalf of Guarantor. Each natural person who executed this Agreement, either on behalf of Guarantor or on his or her own behalf, had capacity to do so and executed this Agreement free from coercion and duress.

(c)     This Agreement constitutes a legal, valid and binding obligation of Guarantor and is enforceable against Guarantor in accordance with its terms, subject only to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(d)     The execution, delivery and performance of this Agreement by Guarantor (i) if Guarantor is an entity, will not contravene Guarantor's governing documents, (ii) will not result in any violation of the provisions of any Legal Requirement applicable to Guarantor or any of Guarantor's properties or assets, (iii) will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under the terms of any indenture, mortgage, deed of trust, deed to secure debt, loan agreement, management agreement or other agreement or instrument to which Guarantor is a party or to, which any of Guarantor's property or assets is subject, and (iv) except for Liens created under the Loan Documents, result in or require the

6

creation or imposition of any Lien upon or with respect to any of the assets of Guarantor.

(e)　　Any consent, approval, authorization, order, registration or qualification of or with a Governmental Authority or other Person required for the execution, delivery and performance by Guarantor of this Agreement has been obtained and is in full force and effect.

(f)　　Guarantor is an Affiliate of Borrower, is the owner of an equity interest in Borrower, and has received, or will receive, direct or indirect benefit from the making of this Agreement.

(g)　　Guarantor is familiar with, and has independently reviewed books and records regarding, the financial condition of Borrower and is familiar with the value of any and all collateral intended to be created as security for the payment of the Guaranteed Obligations; provided, however, Guarantor is not relying on such financial condition or the collateral as an inducement to enter into this Agreement.

(h)　　Neither Lender nor any of its representatives has made any representation, warranty or statement to Guarantor in order to induce Guarantor to execute this Agreement.

(i)　　There are no actions, suits or proceedings at law or in equity by or before any Governmental Authority, arbitrator or other entity now pending or, to Guarantor's actual knowledge, threatened against or affecting Guarantor.

(j)　　Guarantor has (i) not entered into the transaction contemplated by this Agreement with the actual intent to hinder, delay or defraud any creditor and (ii) received reasonably equivalent value in exchange for its obligations under this Agreement. After giving effect to this Agreement, (x) the fair saleable value of Guarantor's assets will exceed its total liabilities, (y) Guarantor's assets will not constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted and (z) Guarantor will be able to pay its liabilities as they mature. In the last ten years, there has not occurred any Event of Bankruptcy in respect of Guarantor. Guarantor is not contemplating an Event of Bankruptcy and to Guarantor's knowledge no other Person is contemplating an Event of Bankruptcy in respect of Guarantor.

(k)　　Guarantor is not a "foreign person" within the meaning of § 1445(f)(3) of the Code.

## ARTICLE 4

## AGREEMENT TO PAY, SUBROGATION AND SUBORDINATION

### Section 4.1　　Subordination of All Guarantor Claims.

(a)　　Without limiting any other right that Lender has at law or in equity against Guarantor, if Borrower fails to pay any Guaranteed Obligation when and as due, whether at maturity, by acceleration, after notice of prepayment or otherwise, Guarantor agrees to promptly pay the amount of such unpaid Guaranteed Obligations to Lender in cash. Upon payment by Guarantor of any sums to Lender as provided herein, all of Guarantor's rights of subrogation, exoneration, contribution, reimbursement, indemnity or otherwise arising therefrom against Borrower with respect to such sum shall be subordinate and junior in right of payment to the prior indefeasible payment in full in cash of all Obligations. If any payment shall be paid to Guarantor

in violation of the immediately preceding sentence on account of such subrogation, exoneration, contribution, reimbursement, indemnity or similar right, such amount shall be held in trust for the benefit of Lender, segregated from other funds of Guarantor, and promptly paid or delivered to Lender in the same form as so received (with any necessary endorsement or assignment) to be credited against the payment of the Obligations, whether due or to become due, in accordance with the terms of the Loan Documents or to be held as Collateral for the Obligations.

(b) Guarantor hereby subordinates any and all debts, liabilities and obligations owed to it by Borrower (including, without limitation, all rights and claims of Guarantor against Borrower as a result of Guarantor's payment of all or part of the Guaranteed Obligations) (the "**Subordinated Obligations**") to the Obligations to the extent provided below:

(i) Guarantor shall not accept, demand or take any action to collect any payment on the Subordinated Obligations without the prior written consent of Lender.

(ii) Guarantor agrees that Lender shall be entitled to receive full payment in cash of all Obligations (including Post-Petition Interest) in any proceeding under the Bankruptcy Code against Borrower before Guarantor receives any payment on account of any Subordinated Obligations.

(iii) After the occurrence and during the continuance of any Event of Default (including the commencement and continuation of any proceeding against Borrower or Guarantor under the Bankruptcy Code), Guarantor shall collect, enforce and receive payments on the Subordinated Obligations as trustee for Lender and deliver such payments to Lender on account of the Obligations (including Post-Petition Interest), together with any necessary endorsements or other instruments of transfer, without reducing or affecting the liability of Guarantor under this Agreement in any respect.

(iv) After the occurrence and during the continuance of any Event of Default (including the commencement and continuation of any proceeding against Borrower or Guarantor under the Bankruptcy Code), Lender is authorized and empowered (but not obligated), in its discretion, (x) in the name of Guarantor, to collect and enforce, and to submit claims in respect of, Subordinated Obligations and to apply any amount so received to the Obligations (including Post-Petition Interest), and (y) to require Guarantor (A) to collect and enforce and to submit claims in respect of, Subordinated Obligations and (B) to pay any amounts received on such obligations to Lender for application to the Obligations (including Post-Petition Interest).

**Section 4.2**   **Payments Held in Trust**.   In the event that, notwithstanding anything to the contrary in this Agreement, Guarantor should receive any funds, payments, claims and/or distributions which are prohibited by this Agreement, Guarantor agrees to hold in trust for Lender an amount equal to the amount of all funds, payments, claims or distributions so received, and agrees that it shall have absolutely no dominion over the amount of such funds, payments, claims and/or distributions so received except to pay such funds, payments, claims and/or distributions promptly to Lender, and Guarantor covenants promptly to pay the same to Lender.

**Section 4.3    Liens Subordinate**.    Guarantor agrees that no liens, security interests, judgment liens, charges or other encumbrances shall exist upon Borrower's assets securing payment of the Subordinated Obligations and if any such liens, security interests, judgment liens, charges or other encumbrances which may exist shall be and remain inferior and subordinate to any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guaranteed Obligations, regardless of whether such encumbrances in favor of Guarantor or Lender presently exist or are hereafter created or attach. Without the prior written consent of Lender, Guarantor shall not (a) exercise or enforce any creditor's right it may have against Borrower, or (b) foreclose, repossess, sequester or otherwise take steps or institute any action or proceedings (judicial or otherwise, including without limitation the commencement of, or joinder in, any proceeding under the Bankruptcy Code) to enforce any liens, mortgages, deeds of trust, deeds to secure debt, security interests, collateral rights, judgments or other encumbrances on assets of Borrower held by Guarantor.

**Section 4.4    Maximum Liability and Contribution**.

(a)    Notwithstanding anything contained herein to the contrary, the Guaranteed Obligations shall at all times be limited to the maximum amount as will result in the Guaranteed Obligations not constituting a fraudulent transfer or conveyance for purposes of the Bankruptcy Code to the extent applicable to this Agreement and the Guaranteed Obligations.

(b)    If any payment shall be required to be made to Lender under this Agreement, Guarantor hereby unconditionally and irrevocably agrees it will contribute, to the maximum extent permitted by law, the outstanding amount of Guaranteed Obligations to Borrower so as to maximize the aggregate amount paid to Lender under or in connection with the Loan Documents.

## ARTICLE 5

## MISCELLANEOUS

**Section 5.1    Waiver**.    No failure to exercise, and no delay in exercising, on the part of Lender, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right. The rights of Lender hereunder shall be in addition to all other rights provided by law.    No modification or waiver of any provision of this Agreement, nor consent to departure therefrom, shall be effective unless in writing and no such consent or waiver shall extend beyond the particular case and purpose involved.    No notice or demand given in any case shall constitute a waiver of the right to take other action in the same, similar or other instances without such notice or demand.

**Section 5.2    Notices**.    All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document shall be given in writing by expedited prepaid delivery service, either commercial or United States Postal Service, with proof of delivery or attempted delivery, addressed as set forth on the signature pages hereto (except that any party hereto may change its address and other contact information for purposes hereof at any time by sending a written notice to the other parties to this Agreement in the manner provided for in this Section).    A notice shall be deemed to have been given when delivered or upon refusal to accept delivery.

**Section 5.3**    **Governing Law, Submission to Jurisdiction, Waivers**.

(a)    THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR GUARANTOR ARISING OUT OF OR RELATING TO THIS AGREEMENT MAY BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK. LENDER AND GUARANTOR HEREBY (i) IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM, (ii) IRREVOCABLY SUBMIT TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUCH SUIT, ACTION OR PROCEEDING, AND (iii) IRREVOCABLY CONSENT TO SERVICE OF PROCESS BY MAIL, PERSONAL SERVICE OR IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW, AT THE ADDRESS SPECIFIED ON THE SIGNATURE PAGES HERETO (AND AGREES THAT SUCH SERVICE AT SUCH ADDRESS IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER ITSELF IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT).

**Section 5.4**    **Severability**.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid pursuant to all Legal Requirements, but if any provision of this Agreement shall be prohibited by or invalid pursuant to Legal Requirements, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**Section 5.5**    **Amendments**.  No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, nor consent to any departure by Guarantor or Lender therefrom, shall in any event be effective unless the same shall be in a writing signed by the party or parties against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.  Except as otherwise expressly provided herein, no notice to, or demand on, Guarantor shall entitle Guarantor to any other or future notice or demand in the same, similar or other circumstances.  Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.  In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, or to declare a default for failure to effect prompt payment of any such other amount.  Lender shall have the right to waive or reduce any time periods that Lender is entitled to under this Agreement in its sole and absolute discretion.

**Section 5.6**      **Headings**.  The Article and/or Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

**Section 5.7**      **Recitals**.  The recital and introductory paragraphs hereof are a part hereof, form a basis for this Agreement and shall be considered prima facie evidence of the facts and documents referred to therein.

**Section 5.8**      **Counterparts**. This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.  Copies of originals, including copies delivered by facsimile, pdf or other electronic means, shall have the same import and effect as original counterparts and shall be valid, enforceable and binding for the purposes of this Agreement.

**Section 5.9**      **Prior Agreements**. This Agreement contains the entire agreement of the parties hereto and their respective affiliates in respect of the transactions contemplated hereby, and all prior agreements among or between such parties, including any confidentiality agreements or any similar agreements between or among any such parties, whether oral or written, are superseded by the terms of this Agreement.

**Section 5.10**      **Rights and Remedies**.   If Guarantor becomes liable for any indebtedness owing by Borrower to Lender, by endorsement or otherwise, other than under this Agreement, such liability shall not be in any manner impaired or affected hereby and the rights of Lender hereunder shall be cumulative of any and all other rights that Lender may ever have against Guarantor.  The exercise by Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy.

**Section 5.11**      **Waiver of Right To Trial By Jury**.   GUARANTOR AND LENDER HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT EITHER PARTY MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY.  GUARANTOR AND LENDER (A) CERTIFY THAT NO AGENT, ATTORNEY, REPRESENTATIVE OR ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF LITIGATION, AND (B) ACKNOWLEDGE THAT EACH HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**Section 5.12**      **Taxes**.  Section 2.5 of the Loan Agreement is hereby incorporated, mutatis mutandis, by reference as if such section were set forth in full herein with respect to the Guaranteed Obligations and Guarantor agrees to observe and perform each of the terms and conditions set forth in Section 2.5 of the Loan Agreement with respect to the Guaranteed Obligations.

**Section 5.13**      **Continuing  Guaranty;  Assignments  Under  the  Loan**

**Agreement**.  This Agreement is a continuing guaranty and shall (i) remain in full force and effect until the repayment and performance in full of the Obligations (subject to Section 1.9), (ii) be binding on Guarantor and its permitted successors and assigns, and (iii) inure to the benefit of and be enforceable by Lender and its successors and assigns.  Lender may assign or otherwise transfer all or any portion of its rights and obligations under this Agreement in connection with any assignment of the Loan and the Loan Documents, and any assignee or transferee shall be entitled to all the benefits afforded to Lender under this Agreement.  Guarantor shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Lender and any attempted assignment without such consent will be null and void.

**Section 5.14**   **Survival**.  Without prejudice to the survival of any other agreement of the Guarantor under this Agreement or any other Loan Document, the agreements and obligations of the Guarantor contained in Section 1.1 (to the extent set forth herein) and Section 1.8, shall survive execution and delivery of this Agreement, termination of this Agreement and the other Loan Documents and the occurrence of the repayment in full of the Debt.

[NO FURTHER TEXT ON THIS PAGE]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above.

GUARANTOR:

MEYER HIRSCHHORN,
an individual resident of the State of New York

Address:

14 Stoneham Lane
New City, NY 10956
Attention: Meyer Hirschhorn

SIGNATURE PAGE TO PLEDGOR GUARANTY

LENDER:

COREVEST AMERICAN FINANCE LENDER
LLC, a Delaware limited liability company

By: _____

Name: J. Christopher Hoeffel
Title: CFO

Address:

CoreVest American Finance Lender LLC
1920 Main Street, Suite 850
Irvine, CA 92614
Attention: Head of Term Lending
Email: termloannotices@cvest.com

With a copy to:

Scoville Law, PLLC
700 Sleater Kinney RD SE, STE B-130
Lacey, WA 98503
Attention: Mark Scoville
Email: mark@scovillepllc.com

## SPONSOR GUARANTY

This SPONSOR GUARANTY dated as of March 31, 2021 (this "***Agreement***"), is made by and between MEYER HIRSCHHORN, an individual resident of the State of New York (together with his, her, its or their respective heirs, executors, administrators, personal representatives and permitted successors and assigns, collectively, "***Guarantor***"), and COREVEST AMERICAN FINANCE LENDER LLC, a Delaware limited liability company, as lender under the Loan Agreement (as defined below) (together with its permitted successors and assigns, collectively, "***Lender***").

### RECITALS:

WHEREAS, reference is made to that certain Loan Agreement, dated as of the date hereof, by and between HIRSCHHORN ESTATES, LLC, a Delaware limited liability company ("***Borrower***"), and Lender (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "***Loan Agreement***"). Capitalized terms used herein without definition shall have the meanings ascribed thereto in the Loan Agreement.

WHEREAS, Guarantor is a direct or indirect owner of an equity interest in Borrower, and accordingly will derive substantial direct and indirect benefits from the transactions contemplated by the Loan Agreement.

WHEREAS, to induce Lender to make the Loan, Guarantor has agreed to execute and deliver this Agreement.

NOW, THEREFORE, in consideration of the covenants set forth in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree, represent and warrant as follows:

### ARTICLE 1
### NATURE AND SCOPE OF GUARANTY

**Section 1.1      Guaranty of Obligation**.      Guarantor hereby irrevocably and unconditionally guarantees the payment and performance of the Guaranteed Obligations (as defined below) as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise.      Guarantor hereby irrevocably and unconditionally covenants and agrees that it is liable for the Guaranteed Obligations as a primary obligor.

**Section 1.2      Definition of Guaranteed Obligations**.  As used herein, the term "***Guaranteed Obligations***" means:

(a)      any loss, damage, cost, expense, liability, claim or other obligation to the extent actually incurred by Lender (including attorneys' fees, costs and out-of-pocket expenses) arising out of or in connection with the acts or omissions of any Restricted Party or any Affiliate of any Restricted Party or agent or representative of any Restricted Party or any Affiliate of any Restricted Party (each a "***Designated Party***") in each case arising with respect to any of the following:

(i)      unintentional misrepresentation or unintentional failure to disclose a material fact by or on behalf of a Designated Party in connection with the Loan,

provided that the assumption will be that any misrepresentation or failure to disclose a material fact by or on behalf of a Designated Party in connection with the Loan was intentional and that the burden of proof will be on the Borrower to prove that there was no intent;

(ii)     wrongful removal or destruction of any Property or damage to any Property caused by willful misconduct or gross negligence of a Designated Party;

(iii)     any Waste of any Property;

(iv)     the forfeiture by Borrower of any Property because of the conduct or purported conduct of criminal activity by a Designated Party in connection therewith;

(v)     the misapplication, misappropriation or conversion by or on behalf of a Designated Party of (A) any Loss Proceeds paid in connection with a Casualty or Condemnation of all or a portion of any Property, or (B) any Revenues or (C) any other funds due under the Loan Documents;

(vi)     (A) the failure to (1) deliver security deposits to any Security Deposit Account in accordance with the Loan Agreement, or (2) deliver any security deposits to Lender or to an account designated by Lender in accordance with the Loan Agreement or (B) any other misapplication, misappropriation or conversion by or on behalf of any Designated Party of any security deposits;

(vii)     failure to pay charges for labor or materials or Other Charges that can create Liens on any portion of any Property;

(viii)     the failure to pay Taxes, to the extent that cash flow from the Properties is sufficient to make such payments;

(ix)     failure to obtain, maintain and pay for the policies of insurance in accordance with Section 6.13 of the Loan Agreement, to the extent that cash flow from the Properties is sufficient to make such payments; or

(x)     Borrower's failure to pay the Monthly Debt Service Payment specified in Section 2.2 of the Loan Agreement in full on or before the first six Payment Dates, to the extent that cash flow from the Properties is sufficient to make such payments.

(b)     the entire amount of the Obligations upon the occurrence of any of the following events:

(i)     Borrower filing a voluntary petition or instituting any other proceeding seeking to adjudicate it as bankrupt or insolvent, or seeking liquidation, reorganization, debt arrangement, dissolution, winding up, or composition or readjustment of debts of it or its debts, under the Bankruptcy Code;

(ii)     the filing of an involuntary petition or other proceeding against any Loan Party seeking to adjudicate it as bankrupt or insolvent, or seeking liquidation,

reorganization, debt arrangement, dissolution, winding up, or composition or readjustment of debts of it or its debts, under the Bankruptcy Code (each an "***Involuntary Proceeding***"), in which any Designated Party colludes with, or otherwise assists, such petitioner, or solicits or causes to be solicited petitioning creditors for any such petition or proceeding;

(iii)    any Designated Party filing an answer consenting to or otherwise acquiescing in or joining in any Involuntary Proceeding against any Loan Party;

(iv)    any Designated Party consenting to or acquiescing in or joining in an application for, or seeking the entry of an order for relief or the appointment of, a trustee, receiver, custodian, liquidator, assignee, sequestrator or the like with respect to any Loan Party or any Property or other Collateral (or any portion of any of the foregoing);

(v)    any Loan Party making an assignment for the benefit of creditors, or admitting in any legal proceeding, its insolvency or inability to pay its debts as they become due unless such statements are compelled and required by law and otherwise true and correct;

(vi)    a breach by any Loan Party of any obligation set forth in <u>Section 6.20</u> of the Loan Agreement;

(vii)    Borrower's failure to obtain Lender's prior written consent to any Transfer of, or consensual lien on, any Property or other Collateral or any direct or indirect interest in any Loan Party, in each case, to the extent not permitted under the Loan Documents;

(viii)    Borrower's failure to obtain Lender's prior written consent to any voluntary incurrence of Debt for borrowed money by any Loan Party or any of their successors or assigns not permitted under the Loan Documents;

(ix)    any delay in Lender's right, or the inability of Lender, to (i) replace the Approved Property Manager pursuant to <u>Section 6.9</u> of the Loan Agreement, (ii) obtain a receiver for any Property after an Event of Default, (iii) foreclose upon any Property or other collateral for the Loan after an Event of Default, or (iv) otherwise exercise any of its rights or remedies under the Loan Documents, which delay or inability would not have occurred but for the interference by Borrower or any other Designated Party with Lender's rights or remedies under the Loan Documents; or

(x)    fraud, willful misconduct, intentional misrepresentation or intentional failure to disclose a material fact by or on behalf of a Designated Party in connection with the Loan.

(c)    all obligations of Borrower under the Environmental Indemnity.

**Section 1.3    <u>Nature of Guaranty</u>**.  This Agreement is an irrevocable, absolute, continuing guaranty of payment and performance and not a guaranty of collection.  This Agreement may not be revoked by Guarantor and shall continue to be effective with respect to any

Guaranteed Obligations arising or created after any attempted revocation by Guarantor.  This Agreement may be enforced by Lender and any subsequent holder of the Note and shall not be discharged by the assignment or negotiation of all or part of the Note.

> **Section 1.4** **Guaranteed Obligations Not Reduced by Offset**.  The Guaranteed Obligations and the liabilities and obligations of Guarantor hereunder, shall not be reduced, discharged or released because or by reason of any existing or future offset, claim or defense of any Restricted Party, or any other party, against Lender or against payment of the Guaranteed Obligations, whether such offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

> **Section 1.5** **Payment By Guarantor**.  If all or any part of the Guaranteed Obligations is or shall give rise to a monetary obligation, and such monetary obligation shall not be punctually paid when due, Guarantor shall, immediately upon demand by Lender, and without presentment, protest, notice of protest, notice of non-payment, notice of intention to accelerate the maturity, notice of acceleration of the maturity, or any other notice whatsoever, pay in lawful money of the United States, the amount due on the Guaranteed Obligations to Lender at Lender's address as set forth herein.  Such demand(s) may be made at any time coincident with or after the time for payment of the Guaranteed Obligations.  Such demand shall be deemed made, given and received in accordance with the notice provisions hereof.

> **Section 1.6** **No Duty To Pursue Others**.  It shall not be necessary for Lender (and Guarantor hereby waives any rights which it may have to require Lender), in order to enforce the obligations of Guarantor hereunder, first to (a) institute suit or exhaust its remedies against any Loan Party or others liable for amounts due under the Guaranteed Obligations or any other Person, (b) institute suit or exhaust its remedies with respect to the obligations or any Person, (c) enforce Lender's rights against any collateral which shall ever have been given to secure the Obligations, (d) enforce Lender's rights against any other guarantor of the Guaranteed Obligations, (e) join any Loan Party or any others liable on the Guaranteed Obligations in any action seeking to enforce this Agreement, (f) exhaust any remedies available to Lender against any collateral which shall ever have been given to secure the Loan, or (g) resort to any other means of obtaining payment of the Guaranteed Obligations.  Lender shall not be required to mitigate damages or take any other action to reduce, collect or enforce the Guaranteed Obligations.

> **Section 1.7** **Waivers**.  Guarantor agrees to the provisions of the Loan Documents, and hereby waives notice of (a) any loan made to any Loan Party, (b) acceptance of this Agreement, (c) any amendment or extension of the Loan Agreement, any Mortgage or of any other Loan Documents, (d) the execution and delivery by any Loan Party and Lender of any other loan or credit agreement or of Borrower's or any Loan Party's execution and delivery of any promissory notes or other documents arising under the Loan Documents or in connection with any Property or other Collateral, (e) Lender's transfer or disposition of the Guaranteed Obligations, or any part thereof, (f) the occurrence of any Default or an Event of Default, (g) sale or foreclosure (or posting or advertising for sale or foreclosure) of any collateral under the Loan Documents, (h) protest, proof of non-payment or default by any Loan Party or any other guarantor of the Guaranteed Obligations and (i) any other action at any time taken or omitted by Lender, and, generally, all demands and notices of every kind in connection with this Agreement or the Loan Documents.

Section 1.8    **Payment of Expenses**.  Guarantor shall, immediately upon demand by Lender, pay all reasonable costs and out-of-pocket expenses (including court costs and attorneys' fees, disbursements, costs and expenses) incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder and any and all damages, losses, claims, liabilities and related reasonable costs and out-of-pocket expenses, including court costs and attorneys' fees, disbursements, costs and expenses incurred by Lender arising from any breach or failure to timely perform any provisions of this Agreement by Guarantor.

Section 1.9    **Effect of Bankruptcy**.  In the event that, pursuant to the Bankruptcy Code or any judgment, order or decision thereunder, Lender must rescind or restore any payment, or any part thereof, received by Lender in satisfaction of the Guaranteed Obligations (including pursuant to any settlement entered into by Lender in its discretion), as set forth herein, all obligations under this Agreement shall be reinstated as though such payment had been due but not made at such time and remain in full force and effect and any prior release or discharge from the terms of this Agreement given to Guarantor shall be without effect.  It is the intention of Lender and Guarantor that Guarantor's obligations hereunder shall not be discharged except by its performance of such obligations and then only to the extent of such performance.

Section 1.10    **Construction**.  The term "Borrower" "Loan Party" or "Restricted Party" as used herein shall include any new or successor corporation, association, partnership (general or limited), limited liability company, joint venture, trust or other individual or organization formed as a result of any merger, reorganization, sale, transfer, devise, gift or bequest of Borrower, Loan Party or Restricted Party or any interest in Borrower, Loan Party or Restricted Party.

Section 1.11    **Obligations**.   In no event shall Borrower be liable for any obligations of Guarantor under this Agreement.

Section 1.12    **Joint and Several Liability**.  Notwithstanding anything to the contrary, if Guarantor is comprised of more than one Person, the obligations and liabilities of each such Person under this Guaranty shall be joint and several.

## ARTICLE 2

## EVENTS AND CIRCUMSTANCES NOT REDUCING OR DISCHARGING GUARANTOR'S OBLIGATIONS

Guarantor hereby consents and agrees to each of the following, and agrees that Guarantor's obligations under this Agreement shall not be released, diminished, impaired, reduced or adversely affected by any of the following, and waives any common law, equitable, statutory or other rights (including without limitation rights to notice) that Guarantor might otherwise have as a result of or in connection with any of the following:

Section 2.1    **Modifications**.  Any renewal, extension, increase, modification, alteration or rearrangement of all or any part of the Guaranteed Obligations, the Loan Documents, or any other document, instrument, contract or understanding between any Loan Party or Guarantor and Lender, or any other parties, pertaining to the Guaranteed Obligations or any failure of Lender to notify Guarantor of any such action.

5

**Section 2.2    Adjustment**.    Any adjustment, indulgence, forbearance or compromise that might be granted or given by Lender to any Loan Party or Guarantor.

**Section 2.3    Condition of any Loan Party or Guarantor**.  The insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution or lack of power of any Loan Party, Guarantor (if Guarantor is an entity) or any other party at any time liable for the payment of all or part of the Guaranteed Obligations; any dissolution of Borrower or Guarantor (if Guarantor is an entity); any sale, lease or transfer of any or all of the assets of Borrower or Guarantor (if Guarantor is an entity); any changes in the shareholders, partners or members of Borrower or Guarantor (if Guarantor is an entity); or any reorganization of Borrower or Guarantor (if Guarantor is an entity).

**Section 2.4    Invalidity of Guaranteed Obligations**.  The invalidity, illegality or unenforceability of all or any part of the Guaranteed Obligations, or any document or agreement executed in connection with the Guaranteed Obligations, for any reason whatsoever, including without limitation the fact that (a) the Guaranteed Obligations, or any part thereof, exceeds the amount permitted by law, (b) the act of creating the Guaranteed Obligations or any part thereof is ultra vires, (c) the officers or representatives executing the Loan Agreement or the other Loan Documents or otherwise creating the Guaranteed Obligations acted in excess of their authority, (d) the Guaranteed Obligations violate applicable usury laws, (e) any Restricted Party has valid defenses, claims or offsets (whether at law, in equity or by agreement) which render the Guaranteed Obligations wholly or partially uncollectible from any Restricted Party other than payment in full of the Obligations, (f) the creation, performance or repayment of the Guaranteed Obligations (or the execution, delivery and performance of any document or instrument representing part of the Guaranteed Obligations or executed in connection with the Guaranteed Obligations, or given to secure the repayment of the Guaranteed Obligations) is illegal, uncollectible or unenforceable, or (g) the Loan Agreement or any of the other Loan Documents have been forged or otherwise are irregular or not genuine or authentic, it being agreed that Guarantor shall remain liable hereon regardless of whether any Loan Party or any other Person be found not liable on the Guaranteed Obligations or any part thereof for any reason.

**Section 2.5    Release of Guarantor**.  Any full or partial release of the liability of any Loan Party on the Guaranteed Obligations, or any part thereof, or of any co-guarantors, or any other Person now or hereafter liable, whether directly or indirectly, jointly, severally, or jointly and severally, to pay, perform, guarantee or assure the payment of the Guaranteed Obligations, or any part thereof, it being recognized, acknowledged and agreed by Guarantor that it may be required to pay the Guaranteed Obligations in full without assistance or support of any other party, and it has not been induced to enter into this Agreement on the basis of a contemplation, belief, understanding or agreement that other Persons will be liable to pay or perform the Guaranteed Obligations, or that Lender will look to other Persons to pay or perform the Guaranteed Obligations.

**Section 2.6    Other Collateral**.  The taking or accepting of any other security, collateral or guaranty, or other assurance of payment, for all or any part of the Guaranteed Obligations.

**Section 2.7    Release of Collateral**.    Any release, surrender, exchange, subordination, deterioration, waste, loss or impairment (including without limitation negligent,

6

willful, unreasonable or unjustifiable impairment) of any collateral, property or security at any time existing in connection with, or assuring or securing payment of, all or any part of the Guaranteed Obligations.

> **Section 2.8    Care and Diligence**.  The failure of Lender or any other party to exercise diligence or reasonable care in the preservation, protection, enforcement, sale or other handling or treatment of all or any part of any collateral, property or security, including but not limited to any neglect, delay, omission, failure or refusal of Lender (a) to take or prosecute any action for the collection of any of the Guaranteed Obligations or (b) to foreclose, or initiate any action to foreclose, or, once commenced, prosecute to completion any action to foreclose upon any security therefor, or (c) to take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Obligations.

> **Section 2.9    Unenforceability**.  The fact that any collateral, security, security interest or lien contemplated or intended to be given, created or granted as security for the repayment of the Guaranteed Obligations, or any part thereof, shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other security interest or lien, it being recognized and agreed by Guarantor that it is not entering into this Agreement in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectibility or value of any of the collateral for the Guaranteed Obligations.

> **Section 2.10    Offset**.  Any existing or future right of offset, claim or defense of any Loan Party or Guarantor against Lender, or any other Person, or against payment of the Guaranteed Obligations, whether such right of offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise, other than the payment of the Guaranteed Obligations.

> **Section 2.11    Merger**.  The reorganization, merger or consolidation of Borrower or (if Guarantor is an entity) Guarantor into or with any other Person.

> **Section 2.12    Preference**.  Any payment by any Loan Party or Guarantor to Lender that is held to constitute a preference under the Bankruptcy Code, or for any reason Lender is required to refund such payment or pay such amount to any other Person.

> **Section 2.13    Other Actions Taken or Omitted**.  Any other action taken or omitted to be taken with respect to the Loan Documents, the Guaranteed Obligations, or the security and collateral therefor, whether or not such action or omission prejudices Guarantor or increases the likelihood that Guarantor will be required to pay the Guaranteed Obligations pursuant to the terms hereof; it is the unambiguous and unequivocal intention of Guarantor that it shall be obligated to pay the Guaranteed Obligations when due, notwithstanding any occurrence, circumstance, event, action, or omission whatsoever, whether contemplated or not contemplated, and whether or not otherwise or particularly described herein, which obligation shall be deemed satisfied only upon the full and final payment and performance of the Guaranteed Obligations.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES

**Section 3.1** **Representations and Warranties**.  To induce Lender to enter into the Loan Documents and extend credit to Borrower, Guarantor represents and warrants to Lender as of the date hereof as follows:

(a) If Guarantor is an entity, Guarantor (i) is duly organized and validly existing under the laws of the state of its formation, (ii) is duly qualified to do business and is in good standing in each jurisdiction where it is required to be so, (iii) has all requisite power and authority and all rights, licenses, permits and authorizations, governmental or otherwise, necessary to entitle it to own its assets and to transact the businesses in which it is now engaged; and (iv) has a term of existence, excluding any renewal or extension options, that does not expire during the term of the Loan.

(b) If Guarantor is an entity, this Agreement has been duly executed and delivered by or on behalf of Guarantor, and if Guarantor is an individual, this Agreement has been executed and delivered by Guarantor.

(c) This Agreement constitutes a legal, valid and binding obligation of Guarantor and is enforceable against Guarantor in accordance with its terms, subject only to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(d) The execution, delivery and performance of this Agreement by Guarantor (i) if Guarantor is an entity, will not contravene Guarantor's governing documents, (ii) will not result in any violation of the provisions of any Legal Requirement applicable to Guarantor or any of Guarantor's properties or assets, (iii) will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under the terms of any indenture, mortgage, deed of trust, deed to secure debt, loan agreement, management agreement or other agreement or instrument to which Guarantor is a party or to, which any of Guarantor's property or assets is subject, and (iv) except for Liens created under the Loan Documents, result in or require the creation or imposition of any Lien upon or with respect to any of the assets of Guarantor.

(e) Any consent, approval, authorization, order, registration or qualification of or with a Governmental Authority or other Person required for the execution, delivery and performance by Guarantor of this Agreement has been obtained and is in full force and effect.

(f) Guarantor is an Affiliate of Borrower, is the owner of a direct or indirect equity interest in Borrower, and has received, or will receive, direct or indirect benefit from the making of this Agreement.

(g) Guarantor is familiar with, and has independently reviewed books and records regarding, the financial condition of Borrower and is familiar with the value of any and all collateral intended to be created as security for the payment of the Guaranteed Obligations; provided, however, Guarantor is not relying on such financial condition or the collateral as an inducement to enter into this Agreement.

(h)    Neither Lender nor any of its representatives has made any representation, warranty or statement to Guarantor in order to induce Guarantor to execute this Agreement.

(i)    There are no actions, suits or proceedings at law or in equity by or before any Governmental Authority, arbitrator or other entity now pending or, to Guarantor's actual knowledge, threatened against or affecting Guarantor.

(j)    Guarantor has (i) not entered into the transaction contemplated by this Agreement with the actual intent to hinder, delay or defraud any creditor and (ii) received reasonably equivalent value in exchange for its obligations under this Agreement.  After giving effect to this Agreement, (x) the fair saleable value of Guarantor's assets will exceed its total liabilities, (y) Guarantor's assets will not constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted and (z) Guarantor will be able to pay its liabilities as they mature.  In the last ten years, there has not occurred any Event of Bankruptcy in respect of Guarantor.  Guarantor is not contemplating an Event of Bankruptcy and to Guarantor's knowledge no other Person is contemplating an Event of Bankruptcy in respect of Guarantor.

(k)    Guarantor is not a "foreign person" within the meaning of § 1445(f)(3) of the Code.

## ARTICLE 4
## AGREEMENT TO PAY, SUBROGATION AND SUBORDINATION

### Section 4.1    Subordination of All Guarantor Claims.

(a)    Without limiting any other right that Lender has at law or in equity against Guarantor, if Borrower or any other Restricted Party fails to pay any Guaranteed Obligation when and as due, whether at maturity, by acceleration, after notice of prepayment or otherwise, Guarantor agrees to promptly pay the amount of such unpaid Guaranteed Obligations to Lender in cash.  Upon payment by Guarantor of any sums to Lender as provided herein, all of Guarantor's rights of subrogation, exoneration, contribution, reimbursement, indemnity or otherwise arising therefrom against any Loan Party with respect to such sum shall be subordinate and junior in right of payment to the prior indefeasible payment in full in cash of all Obligations.  If any payment shall be paid to Guarantor in violation of the immediately preceding sentence on account of such subrogation, exoneration, contribution, reimbursement, indemnity or similar right, such amount shall be held in trust for the benefit of Lender, segregated from other funds of Guarantor, and promptly paid or delivered to Lender in the same form as so received (with any necessary endorsement or assignment) to be credited against the payment of the Obligations, whether due or to become due, in accordance with the terms of the Loan Documents or to be held as Collateral for the Obligations.

(b)    Guarantor hereby subordinates any and all debts, liabilities and obligations owed to it by each Loan Party (including, without limitation, all rights and claims of Guarantor against any Loan Party as a result of Guarantor's payment of all or part of the Guaranteed Obligations) (the "**_Subordinated Obligations_**") to the Obligations to the extent provided below:

(i)    Guarantor shall not accept, demand or take any action to collect any payment on the Subordinated Obligations without the prior written consent of Lender.

(ii)     Guarantor agrees that Lender shall be entitled to receive full payment in cash of all Obligations (including interest accruing during the pendency of any proceeding under the Bankruptcy Code, regardless of whether allowed in such proceeding, "***Post-Petition Interest***") in any proceeding under the Bankruptcy Code against any Loan Party before Guarantor receives any payment on account of any Subordinated Obligations.

(iii)     After the occurrence and during the continuance of any Event of Default (including the commencement and continuation of any proceeding against any Loan Party or Guarantor under the Bankruptcy Code), Guarantor shall collect, enforce and receive payments on the Subordinated Obligations as trustee for Lender and deliver such payments to Lender on account of the Obligations (including Post-Petition Interest), together with any necessary endorsements or other instruments of transfer, without reducing or affecting the liability of Guarantor under this Agreement in any respect.

(iv)     After the occurrence and during the continuance of any Event of Default (including the commencement and continuation of any proceeding against any Loan Party or Guarantor under the Bankruptcy Code), Lender is authorized and empowered (but not obligated), in its discretion, (x) in the name of Guarantor, to collect and enforce, and to submit claims in respect of, Subordinated Obligations and to apply any amount so received to the Obligations (including Post-Petition Interest), and (y) to require Guarantor (A) to collect and enforce and to submit claims in respect of, Subordinated Obligations and (B) to pay any amounts received on such obligations to Lender for application to the Obligations (including Post-Petition Interest).

**Section 4.2     Payments Held in Trust**.     In the event that, notwithstanding anything to the contrary in this Agreement, Guarantor should receive any funds, payments, claims and/or distributions which are prohibited by this Agreement, Guarantor agrees to hold in trust for Lender an amount equal to the amount of all funds, payments, claims or distributions so received, and agrees that it shall have absolutely no dominion over the amount of such funds, payments, claims and/or distributions so received except to pay such funds, payments, claims and/or distributions promptly to Lender, and Guarantor covenants promptly to pay the same to Lender.

**Section 4.3     Liens Subordinate**.     Guarantor agrees that no liens, security interests, judgment liens, charges or other encumbrances shall exist upon any Loan Party's assets securing payment of the Subordinated Obligations and if any such liens, security interests, judgment liens, charges or other encumbrances exist they shall be and remain inferior and subordinate to any liens, security interests, judgment liens, charges or other encumbrances upon any Loan Party's assets securing payment of the Guaranteed Obligations, regardless of whether such encumbrances in favor of Guarantor or Lender presently exist or are hereafter created or attach.  Without the prior written consent of Lender, Guarantor shall not (a) exercise or enforce any creditor's right it may have against any Loan Party, or (b) foreclose, repossess, sequester or otherwise take steps or institute any action or proceedings (judicial or otherwise, including without limitation the commencement of, or joinder in, any proceeding under the Bankruptcy Code) to enforce any liens, mortgages, deeds of trust, deeds to secure debt, security interests, collateral rights, judgments or other encumbrances on assets of any Loan Party held by Guarantor.

**Section 4.4**     <u>Maximum Liability and Contribution</u>.

(a)     Notwithstanding anything contained herein to the contrary, the Guaranteed Obligations shall at all times be limited to the maximum amount as will result in the Guaranteed Obligations not constituting a fraudulent transfer or conveyance for purposes of the Bankruptcy Code to the extent applicable to this Agreement and the Guaranteed Obligations.

(b)     If any payment shall be required to be made to Lender under this Agreement, Guarantor hereby unconditionally and irrevocably agrees it will contribute, to the maximum extent permitted by law, the outstanding amount of Guaranteed Obligations to Borrower so as to maximize the aggregate amount paid to Lender under or in connection with the Loan Documents.

**ARTICLE 5**
**MISCELLANEOUS**

**Section 5.1**     <u>Waiver</u>. Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege. In particular, and not by way of limitation, by accepting payment after the due date of any amount payable hereunder, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, or to declare a default for failure to effect prompt payment of any such other amount.

**Section 5.2**     <u>Notices</u>. All notices, consents, approvals and requests required or permitted hereunder shall be given in writing by expedited prepaid delivery service, either commercial or United States Postal Service, with proof of delivery or attempted delivery, addressed as set forth on the signature pages hereto (except that any party hereto may change its address and other contact information for purposes hereof at any time by sending a written notice to the other parties to this Agreement in the manner provided for in this Section). A notice shall be deemed to have been given when delivered or upon refusal to accept delivery.

**Section 5.3**     <u>Governing Law, Submission to Jurisdiction, Waivers</u>.

(a)     THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b)     ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR GUARANTOR ARISING OUT OF OR RELATING TO THIS AGREEMENT MAY BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK. LENDER AND GUARANTOR HEREBY (i) IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM, (ii) IRREVOCABLY SUBMIT TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUCH SUIT, ACTION OR PROCEEDING, AND (iii)

11

IRREVOCABLY CONSENT TO SERVICE OF PROCESS BY MAIL, PERSONAL SERVICE OR IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW, AT THE ADDRESS SPECIFIED ON THE SIGNATURE PAGES HERETO (AND AGREES THAT SUCH SERVICE AT SUCH ADDRESS IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER ITSELF IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT).

      **Section 5.4**    **Severability**. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid pursuant to all Legal Requirements, but if any provision of this Agreement shall be prohibited by or invalid pursuant to all Legal Requirements, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

      **Section 5.5**    **Amendments**. No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, nor consent to any departure by Guarantor or Lender therefrom, shall in any event be effective unless the same shall be in a writing signed by the party or parties against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.  Except as otherwise expressly provided herein, no notice to, or demand on, Guarantor shall entitle Guarantor to any other or future notice or demand in the same, similar or other circumstances.  Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.  In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, or to declare a default for failure to effect prompt payment of any such other amount.  Lender shall have the right to waive or reduce any time periods that Lender is entitled to under this Agreement in its sole and absolute discretion.

      **Section 5.6**    **Headings**.  The Article and/or Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

      **Section 5.7**    **Recitals**.  The recital and introductory paragraphs hereof are a part hereof, form a basis for this Agreement and shall be considered prima facie evidence of the facts and documents referred to therein.

      **Section 5.8**    **Counterparts**. This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.  Copies of originals, including copies delivered by facsimile, pdf or other electronic means, shall have the same import and effect as original counterparts and shall be valid, enforceable and binding for the purposes of this Agreement.

Section 5.9    **Prior Agreements**. This Agreement contains the entire agreement of the parties hereto and their respective affiliates in respect of the transactions contemplated hereby, and all prior agreements among or between such parties, including any confidentiality agreements or any similar agreements between or among any such parties, whether oral or written, are superseded by the terms of this Agreement.

Section 5.10   **Rights and Remedies**.   If Guarantor becomes liable for any indebtedness owing by any Loan Party to Lender, by endorsement or otherwise, other than under this Agreement, such liability shall not be in any manner impaired or affected hereby and the rights of Lender hereunder shall be cumulative of any and all other rights that Lender may ever have against Guarantor.  The exercise by Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy.

Section 5.11   **Waiver of Right To Trial By Jury**.   GUARANTOR AND LENDER HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT EITHER PARTY MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY.  GUARANTOR AND LENDER (A) CERTIFY THAT NO AGENT, ATTORNEY, REPRESENTATIVE OR ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF LITIGATION, AND (B) ACKNOWLEDGE THAT EACH HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 5.12   **Taxes**.  Section 2.5 of the Loan Agreement is hereby incorporated, mutatis mutandis, by reference as if such section were set forth in full herein with respect to the Guaranteed Obligations and Guarantor agrees to observe and perform each of the terms and conditions set forth in Section 2.5 of the Loan Agreement with respect to the Guaranteed Obligations.

Section 5.13   **Continuing Guaranty; Assignments Under the Loan Agreement**.  This Agreement is a continuing guaranty and shall (i) remain in full force and effect until the repayment and performance in full of the Obligations (subject to Section 1.9), (ii) be binding on Guarantor and its permitted successors and assigns, and (iii) inure to the benefit of and be enforceable by Lender and its successors and assigns.  Lender may assign or otherwise transfer all or any portion of its rights and obligations under this Agreement in connection with any assignment of the Loan and the Loan Documents, and any assignee or transferee shall be entitled to all the benefits afforded to Lender under this Agreement.  Guarantor shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Lender and any attempted assignment without such consent will be null and void.

Section 5.14   **Survival**. Without prejudice to the survival of any other agreement of the Guarantor under this Agreement or any other Loan Document, the agreements and obligations of the Guarantor contained in Section 1.1 (to the extent set forth herein) and Section

13

1.8, shall survive execution and delivery of this Agreement, termination of this Agreement and the other Loan Documents and the occurrence of the repayment in full of the Indebtedness.

### Section 5.15   **Community Property**.

    (a)    Guarantor represents and warrants that Guarantor is married.

    (b)    If Guarantor is married, then Guarantor represents and warrants that Guarantor's state of residence is New York and the state of residence of Guarantor's spouse ("Guarantor's Spouse") is New York.

    (c)    If Guarantor (or any Guarantor, if more than one) is a married person, and the state of residence of Guarantor or his or her Guarantor Spouse is a community property jurisdiction, then each of the following apply:

        (i)    Guarantor (or each such married Guarantor, if more than one) agrees that Lender may satisfy Guarantor's obligations under this Guaranty to the extent of all of Guarantor's separate property and against the marital community property of Guarantor and Guarantor Spouse.

        (ii)    If Guarantor Spouse is not also a Guarantor of the Loan, Guarantor certifies that none of the assets shown on his or her financial statements submitted to Lender for purposes of underwriting the Loan were either (A) Guarantor Spouse's individual property, or (B) community property under the sole management, control, and disposition of Guarantor Spouse.

        (iii)    If (A) Guarantor Spouse is not also a Guarantor of this Loan, and (B) Guarantor or Guarantor Spouse's state of residence is Alaska, Arizona, Idaho, Louisiana, Nevada, New Mexico, Washington, or Wisconsin, then Guarantor must cause Guarantor Spouse to sign a Spousal Consent in form and substance acceptable to Lender.

[NO FURTHER TEXT ON THIS PAGE]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

GUARANTOR:

_____

MEYER HIRSCHHORN,
an individual resident of the State of New York

Address:

14 Stoneham Lane
New City, NY 10956
Attention: Meyer Hirschhorn

SIGNATURE PAGE TO SPONSOR GUARANTY

LENDER:

COREVEST AMERICAN FINANCE LENDER LLC,
a Delaware limited liability company

By: _____

Name:  J. Christopher Hoeffel
Title:  CFO

Address:

CoreVest American Finance Lender LLC
1920 Main Street, Suite 850
Irvine, CA 92614
Attention:  Head of Term Lending
Email:  termloannotices@cvest.com

With a copy to:

Scoville Law, PLLC
700 Sleater Kinney RD SE, STE B-130
Lacey, WA 98503
Attention: Mark Scoville
Email: mark@scovillepllc.com

# EXHIBIT D

MONROE COUNTY CLERK'S OFFICE            THIS IS NOT A BILL. THIS IS YOUR RECEIPT.

Receipt # 2739490

Book   Page   M  29252  0152

Return To:                              No. Pages: 40
OS NATIONAL - RESWARE
3097 SATELLITE BLVD, STE 400            Instrument: MORTGAGE OTHER
DULUTH, GA 30096

Control #:         202106041414
Ref #:             MDM006474

Date: 06/04/2021

HIRSCHHORN ESTATES, LLC,                Time: 5:13:35 PM

COREVEST AMERICAN FINANCE LENDER LLC,

| | | |
|---|---|---|
| Recording Fee | $26.00 | |
| Pages Fee | $195.00 | |
| State Fee Cultural Education | $14.25 | |
| State Fee Records | $4.75 | Employee: AT |
| Management | | |
| Trans Authority Mtg Tax | $2,558.75 | |
| State Mtg Tax | $2,558.75 | |
| Basic Mtg Tax ROCHESTER | $5,117.50 | |
| | | |
| Total Fees Paid: | $10,475.00 | |

State of New York

MONROE COUNTY CLERK'S OFFICE
WARNING – THIS SHEET CONSTITUTES THE CLERKS          Consideration:  $1,023,500.00
ENDORSEMENT, REQUIRED BY SECTION 317-a(5) &
SECTION 319 OF THE REAL PROPERTY LAW OF THE
STATE OF NEW YORK. DO NOT DETACH OR REMOVE.

JAMIE ROMEO

MONROE COUNTY CLERK



PREPARED BY:
CoreVest American Finance Lender LLC
4 Park Plaza, Suite 900
Irvine, CA 92614
Attention: Head of Term Lending

UPON RECORDATION RETURN TO:
OS National, LLC
2170 Satellite Blvd., Suite 200
Duluth, GA 30097
(770) 497-9100

**MORTGAGE, ASSIGNMENT OF LEASES AND RENTS,
SECURITY AGREEMENT AND FIXTURE FILING**

**HIRSCHHORN ESTATES, LLC**
("Mortgagor" or "Borrower")
to and for the Benefit of
**COREVEST AMERICAN FINANCE LENDER LLC**

("Mortgagee" or "Lender")

| | |
|---|---|
| Dated: | As of March 31, 2021 |
| County: | Monroe |
| State: | New York |

Addresses:    103 Marion St, Rochester, NY 14610
117 W Filbert Street, East Rochester, NY 14445
136 Campbell St Apts 1-6, Rochester, NY 14611
236 Saratoga Ave Apts 1-6, Rochester, NY 14608
258 Avis St, Rochester, NY 14615
294 Lexington Ave, Rochester, NY 14613
301 Selye Ter, Rochester, NY 14613
31 Alice St, Rochester, NY 14611
36 Sterling St, Rochester, NY 14606
404 Emerson St, Rochester, NY 14613
74 Starling St, Rochester, NY 14613
76 Oriole St, Rochester, NY 14613
8 Immel St, Rochester, NY 14606
8 Velox St, Rochester, NY 14615
87 Dix St, Rochester, NY 14606
968 Ridgeway Ave, Rochester, NY 14615
14 Durgin St, Rochester, NY 14605

# MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING

THIS **MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING** (this *"Mortgage"*) is made as of March 31, 2021, by **HIRSCHHORN ESTATES, LLC**, a Delaware limited liability company, having an address at 14 Stoneham Lane, New City, NY 10956 (*"Mortgagor"* or *"Borrower"*) to and for the benefit of **COREVEST AMERICAN FINANCE LENDER LLC**, a Delaware limited liability company, as Lender, having an address at 1920 Main Street, Suite 850, Irvine, CA 92614 Attention: Head of Term Lending (together with its successors and/or assigns, *"Mortgagee" or "Lender"*).

## W I T N E S S E T H:

A. This Mortgage is given to secure a loan (the *"Loan"*) in the principal sum of ONE MILLION TWENTY-THREE THOUSAND FIVE HUNDRED AND NO/100 DOLLARS ($1,023,500.00) or so much thereof as may be advanced pursuant to that certain Loan Agreement dated as of the date hereof by and between Borrower and Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the *"Loan Agreement"*), and evidenced by that certain Promissory Note dated the date hereof made by Borrower to Lender (such Promissory Note, together with all extensions, renewals, replacements, restatements or modifications thereof, being hereinafter referred to as the *"Note"*). Capitalized terms used herein without definition shall have the meanings ascribed to such terms in the Loan Agreement.

B. Borrower desires to secure the payment of the outstanding principal amount of the Loan together with all interest accrued and unpaid thereon and all other sums due to Lender in respect of the Loan under the Note, the Loan Agreement and the other Loan Documents (the *"Debt"*) and the performance of all of its obligations under the Note, the Loan Agreement and the other Loan Documents.

C. This Mortgage is given pursuant to the Loan Agreement, and payment, fulfillment and performance by Borrower of its obligations thereunder and under the other Loan Documents are secured hereby, and each and every term and provision of the Loan Agreement and the Note, including the rights, remedies, obligations, covenants, conditions, agreements, indemnities, representations and warranties of the parties therein, are hereby incorporated by reference herein as though set forth in full and shall be considered a part of this Mortgage.

NOW THEREFORE, in consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Mortgage and other good and valuable consideration, the receipt and sufficiency of which are acknowledged by Borrower:

## ARTICLE I.

## GRANTS OF SECURITY

**Section 1.01    Mortgaged Property**. Borrower does hereby irrevocably mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey unto Lender, and its successors and

assigns, WITH POWER OF SALE, all right, title, interest and estate of Borrower now owned, or hereafter acquired by Borrower, in and to the following (collectively, the *"Property"*):

      (a)   <u>Land</u>.  The real property located in the State of New York (the "*State*") that is identified on **Schedule 1** attached hereto and made a part hereof and more particularly described in **Exhibit A**, attached hereto and made a part hereof (collectively, the *"Land"*);

      (b)   <u>Additional Land</u>.  All additional lands, estates and development rights hereafter acquired by Borrower for use in connection with the Land and the development of the Land and all additional lands and estates therein which may, from time to time, by supplemental mortgage or deed of trust or otherwise be expressly made subject to the lien of this Mortgage;

      (c)   <u>Improvements</u>.  The buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter erected or located on the Land (collectively, the *"Improvements"*);

      (d)   <u>Easements</u>.  All easements, rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, and all estates, rights, titles, interests, privileges, liberties, servitudes, tenements, hereditaments and appurtenances of any nature whatsoever, in any way now or hereafter belonging, relating or pertaining to the Land and the Improvements and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, curtesy and rights of curtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Borrower of, in and to the Land and the Improvements and every part and parcel thereof, with the appurtenances thereto;

      (e)   <u>Equipment</u>.  All "equipment," as such term is defined in <u>Article 9</u> of the Uniform Commercial Code (as hereinafter defined), now owned or hereafter acquired by Borrower, which is used at or in connection with the Improvements or the Land or is located thereon or therein (including, but not limited to, all machinery, equipment, furnishings, and electronic data-processing and other office equipment now owned or hereafter acquired by Borrower and any and all additions, substitutions and replacements of any of the foregoing), together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto (collectively, the *"Equipment"*).  Notwithstanding the foregoing, Equipment shall not include any property belonging to Tenants under Leases except to the extent that Borrower shall have any right or interest therein;

      (f)   <u>Fixtures</u>.  All Equipment now owned, or the ownership of which is hereafter acquired, by Borrower which is so related to the Land and Improvements forming part of the Property that it is deemed fixtures or real property under the law of the State in which the Equipment is located, including, without limitation, all building or construction materials intended for construction, reconstruction, alteration or repair of or installation on the Property, construction equipment, appliances, machinery, plant equipment, fittings, apparatuses, fixtures and other items now or hereafter attached to, installed in or used in connection with (temporarily or permanently) any of the Improvements or the Land, including, but not limited to, engines, devices for the operation of pumps, pipes, plumbing, cleaning, call and sprinkler systems, fire extinguishing

2

apparatuses and equipment, lighting, heating, ventilating, plumbing, laundry, incinerating, electrical, air conditioning and air cooling equipment and systems, gas and electric machinery, appurtenances and equipment, pollution control equipment, security systems, disposals, dishwashers, refrigerators and ranges, recreational equipment and facilities of all kinds, and water, gas, electrical, storm and sanitary sewer facilities, utility lines and equipment (whether owned individually or jointly with others, and, if owned jointly, to the extent of Borrower's interest therein) and all other utilities whether or not situated in easements, all water tanks, water supply, water power sites, fuel stations, fuel tanks, fuel supply, and all other structures, together with all accessions, appurtenances, additions, replacements, betterments and substitutions for any of the foregoing and the proceeds thereof (collectively, the *"Fixtures"*). Notwithstanding the foregoing, "Fixtures" shall not include any property which Tenants are entitled to remove pursuant to Leases except to the extent that Borrower shall have any right or interest therein;

      (g)     <u>Personal Property</u>. All furniture, furnishings, objects of art, machinery, goods, tools, equipment, supplies, appliances, general intangibles, contract rights, accounts, accounts receivable, franchises, licenses, certificates and permits, and all other personal property of any kind or character whatsoever (as defined in and subject to the provisions of the Uniform Commercial Code), other than Fixtures, which are now or hereafter owned by Borrower and which are located within or about the Land and the Improvements, together with all accessories, replacements and substitutions thereto or therefor and the proceeds thereof (collectively, the *"Personal Property"*), and the right, title and interest of Borrower in and to any of the Personal Property which may be subject to any security interests, as defined in the Uniform Commercial Code, as adopted and enacted by the State (as amended from time to time, the *"Uniform Commercial Code"*), superior in lien to the lien of this Mortgage, and all proceeds and products of any of the above;

      (h)     <u>Leases and Rents</u>. (i) All leases, subleases or subsubleases, lettings, licenses, concessions or other agreements (whether written or oral) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of the Land and the Improvements, and every modification, amendment, extension, renewal, replacement, or other agreement relating to such leases, subleases, subsubleases, or other agreements entered into in connection with such leases, subleases, subsubleases, or other agreements and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto, heretofore or hereafter entered into, whether before or after the filing by or against Borrower of any petition for relief under 11 U.S.C. §101 et seq., as the same may be amended from time to time (the *"Bankruptcy Code"*) (collectively, the *"Leases"*); (ii) all right, title and interest of Borrower, its successors and assigns, therein and thereunder, including, without limitation, cash or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder and all rents, additional rents, revenues, issues and profits (including all oil and gas or other mineral royalties and bonuses) from the Land and the Improvements, whether paid or accruing before or after the filing by or against Borrower of any petition for relief under the Bankruptcy Code (collectively, the *"Rents"*); (iii) all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment and performance of the Obligations, including the payment of the Debt; (iv) all of Borrower's right, title and interest in, and claims under, any and all lease guaranties, letters of credit and any other credit support (individually, a *"Lease Guaranty"*, and collectively, the *"Lease Guaranties"*) given by any guarantor in connection with any of the Leases or leasing commissions

(individually, a "**_Lease Guarantor_**", and collectively, the "**_Lease Guarantors_**") to Borrower; (v) all rights, powers, privileges, options and other benefits of Borrower as the lessor under any of the Leases and the beneficiary under any of the Lease Guaranties, including, without limitation, the immediate and continuing right to make claims for, and to receive, collect and acknowledge receipt for all Rents payable or receivable under the Leases and all sums payable under the Lease Guaranties or pursuant thereto (and to apply the same to the payment of the Debt or the Other Obligations), and to do all other things which Borrower or any lessor is or may become entitled to do under any of the Leases or Lease Guaranties; (vi) the right, subject to the provisions of the Loan Agreement, at Lender's option, upon revocation of the license granted herein, to enter upon the Property in person, by agent or by court-appointed receiver, to collect the Rents; (vii) during the continuance of an Event of Default, Borrower's irrevocable power of attorney, coupled with an interest, to take any or all other actions designated by Lender for the proper management and preservation of the Land and Improvements; and (viii) any and all other rights of Borrower in and to the items set forth in subsections (i) through (vii) above, and all amendments, modifications, replacements, renewals and substitutions thereof;

   (i) <u>Condemnation Awards</u>.  All awards or payments, including interest thereon, which may heretofore and hereafter be made with respect to the Property, whether from the exercise of the right of eminent domain (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of such right), or for a change of grade, or for any other injury to or decrease in the value of the Property;

   (j) <u>Insurance Proceeds</u>.  All proceeds in respect of the Property under any insurance policies covering the Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments or settlements made in lieu thereof, for damage to the Property;

   (k) <u>Tax Certiorari</u>.  All refunds, rebates or credits in connection with any reduction in Taxes or Other Charges assessed against the Property as a result of tax certiorari proceedings or any other applications or proceedings for reduction;

   (l) <u>Rights</u>.  The right, in the name and on behalf of Borrower, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Lender in the Property;

   (m) <u>Agreements</u>.   All agreements, contracts, certificates, instruments, franchises, management agreements, permits, licenses, plans, specifications and other documents, now or hereafter entered into, and all rights therein and thereto, respecting or pertaining to the use, occupation, construction, management or operation of the Land and any part thereof and any Improvements or respecting any business or activity conducted on the Land and any part thereof and all right, title and interest of Borrower therein and thereunder, including, without limitation, the right, upon the happening and during the continuance of any Event of Default, to receive and collect any sums payable to Borrower thereunder;

   (n) <u>Intellectual Property</u>.  All tradenames, trademarks, servicemarks, logos, copyrights, goodwill, URLs or other online media, books and records and all other general intangibles relating to or used in connection with the operation of the Property;

4

(o) <u>Accounts</u>. All reserves, escrows and deposit accounts maintained by Borrower with respect to the Property, together with all deposits or wire transfers made to such accounts, and all cash, checks, drafts, certificates, securities, investment property, financial assets, instruments and other property held therein from time to time, and all proceeds, products, distributions, dividends and/or substitutions thereon and thereof, excluding the following (the "***Account Collateral***"): all reserves, escrows and deposit accounts in which a security interest is granted to Lender pursuant to the Loan Agreement and all amounts at any time contained therein and the proceeds thereof;

(p) <u>Uniform Commercial Code Property</u>. All documents, instruments, chattel paper and general intangibles, as the foregoing terms are defined in the Uniform Commercial Code, relating to the Property;

(q) <u>Minerals</u>. All minerals, crops, timber, trees, shrubs, flowers and landscaping features now or hereafter located on, under or above Land;

(r) <u>All Other Assets</u>. All other accounts, general intangibles, instruments, investment property, documents, chattel paper, goods, moneys, letters of credit, letter of credit rights, certificates of deposit, deposit accounts, escrow deposits commercial tort claims, oil, gas and minerals, and all other property and interests in property of Borrower, whether tangible or intangible, and including without limitation all of Borrower's claims and rights to the payment of damages arising under the Bankruptcy Code ("***Bankruptcy Claims***") excluding the Account Collateral;

(s) <u>Proceeds</u>. All proceeds of, and proceeds of any sale of, any of the foregoing, including, without limitation, proceeds of insurance and condemnation awards, whether in cash or in liquidation or other claims, or otherwise; and

(t) <u>Other Rights</u>. Any and all other rights of Borrower in and to the items set forth in <u>Subsections (a)</u> through <u>(s)</u> above.

AND, without limiting any of the other provisions of this Mortgage, to the extent permitted by applicable law, Borrower expressly grants to Lender, as secured party, a security interest in all of Borrower's right, title and interest in and to that portion of the Property which is or may be subject to the provisions of the Uniform Commercial Code which are applicable to secured transactions; it being understood and agreed that the Improvements and Fixtures are part and parcel of the Land (the Land, the Improvements and the Fixtures collectively referred to as the *"Real Property"*) appropriated to the use thereof and, whether affixed or annexed to the Land or not, shall for the purposes of this Mortgage be deemed conclusively to be real estate and mortgaged hereby.

It is hereby acknowledged and agreed that Borrower has granted a security interest in the Account Collateral pursuant to the Loan Agreement. Notwithstanding anything to the contrary contained herein, Lender's security interest in the Account Collateral shall be governed by the Loan Agreement and not this Mortgage.

**Section 1.02** **Assignment of Rents**.

(a)      Borrower hereby absolutely and unconditionally assigns to Lender all of Borrower's right, title and interest in and to all current and future Leases, Rents, Lease Guaranties and Bankruptcy Claims; it being intended by Borrower that this assignment constitutes a present, absolute assignment and not an assignment for additional security only.  Nevertheless, subject to any deposit account control agreement, the Loan Agreement and the terms of this Mortgage, Lender grants to Borrower, so long as no Event of Default has occurred and is continuing, a revocable license to (and Borrower shall have the right to) collect, receive, use and enjoy the Rents, as well as any sums due under the Lease Guaranties.  Borrower shall hold the Rents, as well as all sums received pursuant to any Lease Guaranty, or a portion thereof sufficient to discharge all current sums due on the Debt, in trust for the benefit of Lender for use in the payment of such sums.  This assignment is effective without any further or supplemental assignment documents.

(b)      Borrower hereby authorizes and directs the lessees named in the Leases, any other future lessees or occupants of the Real Property and all Lease Guarantors to pay over to Lender or to such other party as Lender directs all Rents and all sums due under any Lease Guaranties, upon such lessee's receipt from Lender of written notice to the effect that Lender is then the holder of this assignment.  Such Rents shall be disbursed and/or applied in accordance with the terms of the Loan Agreement.  In furtherance of the foregoing, Borrower hereby grants to Lender an irrevocable power of attorney, coupled with an interest, to execute and deliver, on behalf of Borrower, to tenants under current and future Leases and counterparties to Lease Guaranties, direction letters to deliver all Rents and all sums due under any Lease Guaranties directly to Lender.  Any exercise of the foregoing power of attorney shall constitute an immediate revocation of the revocable license given pursuant to <u>Section 1.02(a)</u>.

**Section 1.03**   **Security Agreement**.  This Mortgage is both a real property mortgage and a "security agreement" within the meaning of the Uniform Commercial Code.  The Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Borrower in the Property.  By executing and delivering this Mortgage, Borrower hereby grants to Lender, as security for the Obligations, a security interest in the Fixtures, the Equipment, the Personal Property and the other property constituting the Property to the full extent that the Fixtures, the Equipment, the Personal Property and such other property may be subject to the Uniform Commercial Code (said portion of the Property so subject to the Uniform Commercial Code being called the "***Collateral***").  If an Event of Default shall occur and be continuing, Lender, in addition to any other rights and remedies which it may have, shall have and may exercise immediately and without demand, any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the foregoing, the right to take possession of the Collateral or any part thereof, and to take such other measures as Lender may deem necessary for the care, protection and preservation of the Collateral.  Upon request or demand of Lender after the occurrence and during the continuance of an Event of Default, Borrower shall, at its expense, assemble the Collateral and make it available to Lender at a convenient place (at the Land if tangible property) reasonably acceptable to Lender.  Borrower shall pay to Lender on demand any and all expenses, including reasonable attorneys' fees and costs, incurred or paid by Lender in protecting its interest in the Collateral and in enforcing its rights hereunder with respect to the Collateral after the occurrence and during the continuance of an Event of Default.  Any notice of sale, disposition or other intended action by Lender with respect to the Collateral sent to Borrower in accordance with the provisions hereof at least ten (10) days prior to such action, shall, except as otherwise provided by

6

applicable law or the Loan Agreement, constitute reasonable notice to Borrower. The proceeds of any disposition of the Collateral, or any part thereof, may, except as otherwise required by applicable law, be applied by Lender to the payment of the Debt in such priority and proportions as Lender in its discretion shall deem proper. The principal place of business of Borrower (Debtor) is as set forth in the preamble of this Mortgage and the address of Lender (Secured Party) is as set forth in the preamble of this Mortgage.

**Section 1.04     Fixture Filing**.  Certain of the Property is or will become "fixtures" (as that term is defined in the Uniform Commercial Code) on the Land, described or referred to in this Mortgage, and this Mortgage, upon being filed for record in the real estate records of the city or county wherein such fixtures are situated, shall operate also as a financing statement naming Borrower as the Debtor and Lender as the Secured Party filed as a fixture filing in accordance with the applicable provisions of said Uniform Commercial Code upon such of the Property that is or may become fixtures.  This Mortgage constitutes a fixture filing in accordance with the applicable provisions of said Uniform Commercial Code.   For this purpose, the respective addresses of Borrower, as debtor, and Lender, as secured party, are as set forth in the preamble of this Mortgage.

## CONDITIONS TO GRANT

TO HAVE AND TO HOLD the above granted and described Property unto and to the use and benefit of Lender and Lender's successors and assigns, forever, and Borrower does hereby bind itself, its successors and assigns, to WARRANT AND FOREVER DEFEND the title to the Property unto Lender against every Person whomsoever lawfully claiming or to claim the same or any part thereof for the purposes and uses herein set forth;

PROVIDED, HOWEVER, these presents are upon the express condition that, if Borrower shall well and truly pay and perform the Obligations (including the payment of the Debt) at the time and in the manner provided in the Note, the Loan Agreement, this Mortgage, and the other Loan Documents, these presents and the estate hereby granted shall cease, terminate and be void; provided, however, that, subject to Section 9.06, Borrower's obligation to indemnify and hold harmless Lender pursuant to the provisions hereof and the other Loan Documents shall survive any such payment or release.

## ARTICLE II.

## DEBT AND OBLIGATIONS SECURED

**Section 2.01     Obligations**.   This Mortgage and the grants, assignments and transfers made in Article I are given for the purpose of securing the Obligations, including, but not limited to, the Debt.

**Section 2.02     Other Obligations**.   This Mortgage and the grants, assignments and transfers made in Article I are also given for the purpose of securing the following (collectively, the "*Other Obligations*"):

> (a)         the performance of all other obligations of Borrower contained herein;

7

(b)      the performance of each obligation of Borrower contained in the Loan Agreement and in each other Loan Document; and

(c)      the performance of each obligation of Borrower contained in any renewal, extension, amendment, modification, consolidation, change of, or substitution or replacement for, all or any part of the Note, the Loan Agreement or any other Loan Document.

**Section 2.03      Debt and Other Obligations**.  Borrower's obligations for the payment of the Debt and the performance of the Other Obligations shall be referred to collectively herein as the *"Obligations."*

**Section 2.04      Variable Interest Rate.**  The Loan secured by this Mortgage may be a variable interest rate loan, if so provided in the Loan Agreement.

**Section 2.05      Loan Repayment.**  Provided no Event of Default exists, this Mortgage will be satisfied and discharged of record by Lender  in accordance with the terms and provisions set forth in the Loan Agreement.

**Section 2.06      Other Mortgages; No Election of Remedies.**

(a)      The Debt is now or may hereafter be secured by one or more other mortgages, deeds to secure debt, deeds of trust and other security agreements (collectively, as the same may be amended, restated, replaced, supplemented, renewed or otherwise modified and in effect from time  to time, are herein collectively called the "*Other Mortgages*"), which cover or will hereafter cover other properties that are or may be located in various states and in other counties in State (collectively, the "*Other Collateral*").  The Other Mortgages will secure the Debt and the performance of the other covenants and agreements of Borrower set forth in the Loan Documents.  Upon the occurrence and during the continuance of an Event of Default, Lender may proceed under this Mortgage and/or any or all the Other Mortgages against either the Property and/or any or all the Other Collateral in one or more parcels and in such manner and order as Lender shall elect.  Borrower hereby irrevocably waives and releases, to the extent permitted by law, and whether now or hereafter in force, any right to have the Property and/or the Other Collateral marshaled upon any foreclosure of this Mortgage or any Other Mortgage.

(b)      Without limiting the generality of the foregoing, and without limitation as to any other right or remedy provided to Lender in this Mortgage or the other Loan Documents, in the case and during the continuance of an Event of Default (i) Lender shall have the right to pursue all of its rights and remedies under this Mortgage and the Loan Documents, at law and/or in equity, in one proceeding, or separately and independently in separate proceedings from time to time, as Lender, in its sole and absolute discretion, shall determine from time to time, (ii) Lender shall not be required to either marshal assets, sell the Property and/or any Other Collateral in any particular order of alienation (and may sell the same simultaneously and together or separately), or be subject to any "one action" or "election of remedies" law or rule with respect to the Property and/or any Other Collateral, (iii) the exercise by Lender of any remedies against any one item of Property and/or any Other Collateral will not impede Lender from subsequently or simultaneously exercising remedies against any other item of Property and/or Other Collateral, (iv) all liens and other rights, remedies or privileges provided to Lender herein shall remain in full force and effect

8

until Lender has exhausted all of its remedies against the Property and all Property has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Debt, and (v) Lender may resort for the payment of the Debt to any security held by Lender in such order and manner as Lender, in its discretion, may elect and Lender may take action to recover the Debt, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Lender thereafter to foreclose this Mortgage.

(c)       Without notice to or consent of Borrower and without impairment of the lien and rights created by this Mortgage, Lender may, at any time (in its sole and absolute discretion, but Lender shall have no obligation to), execute and deliver to Borrower a written instrument releasing all or a portion of the lien of this Mortgage as security for any or all of the Obligations now existing or hereafter arising under or in respect of the Note, the Loan Agreement and each of the other Loan Documents, whereupon following the execution and delivery by Lender to Borrower of any such written instrument of release, this Mortgage shall no longer secure such Obligations released.

## ARTICLE III.

### BORROWER COVENANTS

Borrower covenants and agrees that throughout the term of the Loan:

**Section 3.01    Payment of Debt**.  Borrower will pay the Debt at the time and in the manner provided in the Loan Agreement, the Note and this Mortgage.

**Section 3.02    Incorporation by Reference**.    All the covenants, conditions and agreements contained in (a) the Loan Agreement, (b) the Note, and (c) all and any of the other Loan Documents, are hereby made a part of this Mortgage to the same extent and with the same force as if fully set forth herein.  In the event of any inconsistency between any of the terms of this Mortgage (including the terms of Section 1.03 herein) and the Loan Agreement, the terms of the Loan Agreement shall control. Without limiting the generality of the foregoing, Borrower (i) agrees to insure, repair, maintain and restore damage to the Property, pay Taxes and Other Charges assessed against the Property, and comply with Legal Requirements, in accordance with the Loan Agreement, and (ii) agrees that the proceeds of insurance and condemnation awards shall be settled, held, applied and/or disbursed in accordance with the Loan Agreement.

**Section 3.03    Performance of Other Agreements**.  Borrower shall observe and perform each and every term, covenant and provision to be observed or performed by Borrower pursuant to the Loan Agreement, any other Loan Document and any other agreement or recorded instrument affecting or pertaining to the Property, and any amendments, modifications or changes thereto.

## ARTICLE IV.

### OBLIGATIONS AND RELIANCES

**Section 4.01    Relationship of Borrower and Lender**.  The relationship between Borrower and Lender is solely that of debtor and creditor, and Lender has no fiduciary or other

special relationship with Borrower, and no term or condition of any of the Loan Agreement, the Note, this Mortgage or the other Loan Documents shall be construed so as to deem the relationship between Borrower and Lender to be other than that of debtor and creditor.

**Section 4.02    No Reliance on Lender**.  The general partners, members, principals and (if Borrower is a trust) beneficial owners of Borrower, as applicable, are experienced in the ownership and operation of properties similar to the Property, and Borrower and Lender are relying solely upon such expertise and business plan in connection with the ownership and operation of the Property.  Borrower is not relying on Lender's expertise, business acumen or advice in connection with the Property.

**Section 4.03    No Lender Obligations**.

(a)    Notwithstanding the provisions of Subsections 1.01(h) and (m) or Section 1.02, Lender is not undertaking the performance of (i) any obligations under the Leases, or (ii) any obligations with respect to any other agreements, contracts, certificates, instruments, franchises, permits, trademarks, licenses or other documents.

(b)    By accepting or approving anything required to be observed, performed or fulfilled or to be given to Lender pursuant to this Mortgage, the Loan Agreement, the Note or the other Loan Documents, including, without limitation, any officer's certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal or insurance policy, Lender shall not be deemed to have warranted, consented to, or affirmed the sufficiency, legality or effectiveness of same, and such acceptance or approval thereof shall not constitute any warranty or affirmation with respect thereto by Lender.

**Section 4.04    Reliance**.  Borrower recognizes and acknowledges that in accepting the Loan Agreement, the Note, this Mortgage and the other Loan Documents, Lender is expressly and primarily relying on the truth and accuracy of the warranties and representations set forth in Article V of the Loan Agreement without any obligation to investigate the Property and notwithstanding any investigation of the Property by Lender; that such reliance existed on the part of Lender prior to the date hereof; that the warranties and representations are a material inducement to Lender in making the Loan; and that Lender would not be willing to make the Loan and accept this Mortgage in the absence of the warranties and representations as set forth in Article V of the Loan Agreement.

### ARTICLE V.

### FURTHER ASSURANCES

**Section 5.01    Recording**.  Borrower forthwith upon the execution and delivery of this Mortgage and thereafter, from time to time, will cause this Mortgage and any of the other Loan Documents creating a Lien or security interest or evidencing the Lien hereof upon the Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect and perfect the Lien or security interest hereof upon, and the interest of Lender in, the Property.  Borrower will pay all taxes, filing, registration or recording fees, and all expenses

10

incident to the preparation, execution, acknowledgment and/or recording of the Note, this Mortgage, the other Loan Documents, any note, mortgage, deed to secure debt or mortgage supplemental hereto, any security instrument with respect to the Property and any instrument of further assurance, and any modification or amendment of any of the foregoing documents, and all federal, state, county and municipal taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of this Mortgage, any mortgage, deed to secure debt or mortgage supplemental hereto, any security instrument with respect to the Property or any instrument of further assurance, and any modification or amendment of any of the foregoing documents, except where prohibited by law so to do.

       **Section 5.02    Further Acts, Etc**. Borrower will, at the cost of Borrower, and without expense to Lender, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, deeds of trust, deeds to secure debt, mortgages, assignments, notices of assignments, transfers and assurances as Lender shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring, and confirming unto Lender the Property and rights hereby mortgaged, deeded, granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Borrower may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of the terms of this Mortgage or for filing, registering or recording this Mortgage, or for complying with all Legal Requirements. Borrower, on demand, will execute and deliver, and in the event it shall fail to so execute and deliver, hereby authorizes Lender to execute in the name of Borrower or without the signature of Borrower to the extent Lender may lawfully do so, one or more financing statements to evidence more effectively the security interest of Lender in the Property and the Collateral. Financing statements to be filed with the Secretary of State of the State in which the Borrower is organized may describe as the collateral covered thereby "all assets of the debtor, whether now owned or hereafter acquired" or words to that effect, notwithstanding that such collateral description may be broader in scope than the collateral described herein. Lender shall provide Borrower with copies of any notices and/or instruments of filings executed by Lender in accordance with the immediately preceding sentence. Borrower grants to Lender an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lender at law and in equity, including, without limitation, such rights and remedies available to Lender pursuant to this Section 5.02. Notwithstanding anything to the contrary in the immediately preceding sentence, Lender shall not execute any documents as attorney in fact for Borrower unless (i) Borrower shall have failed or refused to execute the same within five (5) days after delivery of Lender's request to Borrower or (ii) an Event of Default is continuing.

       **Section 5.03    Changes in Tax, Debt, Credit and Documentary Stamp Laws**.

          (a)     If any law is enacted or adopted or amended after the date of this Mortgage which deducts the Debt from the value of the Property for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Debt or Lender's interest in the Property, Borrower will pay the tax, with interest and penalties thereon, if any (it being understood that nothing hereunder shall require Borrower to pay any income or franchise tax imposed on Lender by reason of Lender's interest in the Property). If Lender is advised by counsel chosen by it that the payment of tax by Borrower would be unlawful or taxable to Lender or unenforceable or provide the basis

for a defense of usury, then Lender shall have the option, by written notice to Borrower, to declare the Debt due and payable no earlier than one hundred twenty (120) days following such notice.

(b)       Borrower will not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the Taxes or Other Charges assessed against the Property, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Property, or any part thereof, for real estate tax purposes by reason of this Mortgage or the Debt. If such claim, credit or deduction shall be required by law, Lender shall have the option, by written notice to Borrower, to declare the Debt due and payable no earlier than one hundred twenty (120) days following such notice.

(c)       If at any time the United States of America, any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note, this Mortgage, or any of the other Loan Documents or shall impose any other tax or charge on the same, Borrower will pay for the same, with interest and penalties thereon, if any.

## ARTICLE VI.

## DUE ON SALE/ENCUMBRANCE

**Section 6.01    Lender Reliance**. Borrower acknowledges that Lender has examined and relied on the experience of Borrower and its general partners, members, principals and (if Borrower is a trust) beneficial owners in owning and operating properties such as the Property in agreeing to make the Loan, and will continue to rely on Borrower's ownership of the Property as a means of maintaining the value of the Property as security for the payment and performance of the Obligations, including the repayment of the Debt. Borrower acknowledges that Lender has a valid interest in maintaining the value of the Property so as to ensure that, should Borrower default in the payment and/or performance of the Obligations, including the repayment of the Debt, Lender can recover the Debt by a sale or foreclosure of the Property or other sale permitted by applicable law as to the Personal Property, Equipment or Fixtures.

**Section 6.02    No Transfer**. Borrower shall not permit or suffer any Transfer to occur except in accordance with the terms of the Loan Agreement.

## ARTICLE VII.

## RIGHTS AND REMEDIES UPON DEFAULT

**Section 7.01    Remedies**. Upon the occurrence and during the continuance of any Event of Default, Borrower agrees that Lender may take such action, without notice or demand, as it deems advisable to protect and enforce its rights against Borrower and in and to the Property, including, but not limited to, the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Lender may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Lender:

(a)       declare the entire unpaid Debt to be immediately due and payable;

(b)       intentionally omitted;

12

(c)      institute proceedings, judicial or otherwise, for the complete or partial foreclosure of this Mortgage under any applicable provision of law, in which case the Property or any interest therein may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner, Lender being hereby expressly granted the power to foreclose this Mortgage and sell the Property at public auction and convey the same to the purchaser in fee simple;

(d)      with or without entry, to the extent permitted and pursuant to the procedures provided by applicable law, institute proceedings for the partial foreclosure of this Mortgage for the portion of the Debt then due and payable, subject to the continuing lien and security interest of this Mortgage for the balance of the Obligations not then due, unimpaired and without loss of priority;

(e)      intentionally omitted;

(f)      to the extent permitted by applicable law, sell for cash or upon credit the Property or any part thereof and all estate, claim, demand, right, title and interest of Borrower therein and rights of redemption thereof, pursuant to power of sale or otherwise, at one or more sales, as an entirety or in parcels, at such time and place, upon such terms and after such notice thereof, all as may be required or permitted by law; and, without limiting the foregoing:

(i)      In connection with any sale or sales hereunder, Lender shall be entitled to elect to treat any of the Property which consists of (x) a right in action, or (y) property that can be severed from the Real Property covered hereby, or (z) any Improvements (without causing structural damage thereto), as if the same were personal property, and dispose of the same in accordance with applicable law, separate and apart from the sale of the Real Property. Where the Property consists of Real Property, Personal Property, Equipment or Fixtures, whether or not such Personal Property or Equipment is located on or within the Real Property, Lender shall be entitled to elect to exercise its rights and remedies against any or all of the Real Property, Personal Property, Equipment and Fixtures in such order and manner as is now or hereafter permitted by applicable law;

(ii)      To the extent permitted by applicable law, Lender shall be entitled to elect to proceed against any or all of the Real Property, Personal Property, Equipment and Fixtures in any manner permitted under applicable law; and if Lender so elects pursuant to applicable law, the power of sale herein granted shall be exercisable with respect to all or any of the Real Property, Personal Property, Equipment and Fixtures covered hereby, as designated by Lender and Lender is hereby authorized and empowered to conduct any such sale of any Real Property, Personal Property, Equipment and Fixtures in accordance with the procedures applicable to real property;

(iii)      To the extent permitted by applicable law, should Lender elect to sell any portion of the Property which is Real Property or which is Personal Property, Equipment or Fixtures that the Lender has elected under applicable law to sell together with Real Property in accordance with the laws governing a sale of the Real Property, Lender shall give such notice of the occurrence of an Event of Default, if any, and its election to sell such Property, each as may then be required by law. Thereafter, upon the expiration of such time and the giving of such notice

13

of sale as may then be required by law, subject to the terms hereof and of the other Loan Documents, and without the necessity of any demand on Borrower, Lender at the time and place specified in the notice of sale, shall sell such Real Property or part thereof at public auction to the highest bidder for cash in lawful money of the United States of America. Lender may from time to time postpone any sale hereunder by public announcement thereof at the time and place noticed for any such sale; and

(iv)     If the Property consists of several lots, parcels or items of property, Lender shall, subject to applicable law, (A) designate the order in which such lots, parcels or items shall be offered for sale or sold, or (B) elect to sell such lots, parcels or items through a single sale, or through two or more successive sales, or in any other manner Lender designates. Any Person, including Borrower or Lender, may purchase at any sale hereunder. Should Lender desire that more than one sale or other disposition of the Property be conducted, Lender shall, subject to applicable law, cause such sales or dispositions to be conducted simultaneously, or successively, on the same day, or at such different days or times and in such order as Lender may designate, and no such sale shall terminate or otherwise affect the Lien of this Mortgage on any part of the Property not sold until all the Obligations have been satisfied in full. In the event Lender elects to dispose of the Property through more than one sale, except as otherwise provided by applicable law, Borrower agrees to pay the costs and expenses of each such sale and of any judicial proceedings wherein such sale may be made;

(g)     institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein, in the Note, in the Loan Agreement or in the other Loan Documents;

(h)     recover judgment on the Note either before, during or after any proceedings for the enforcement of this Mortgage or the other Loan Documents;

(i)     apply for the appointment of a receiver, trustee, liquidator or conservator of the Property, without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of Borrower, any guarantor or indemnitor with respect to the Loan or any Person otherwise liable for the payment of the Debt or any part thereof, and Borrower hereby irrevocably consents to such appointment;

(j)     the license granted to Borrower under Section 1.02 hereof shall automatically be revoked and Lender may enter into or upon the Property, either personally or by its agents, nominees or attorneys and dispossess Borrower and its agents and servants therefrom, without liability for trespass, damages or otherwise and exclude Borrower and its agents or servants wholly therefrom, and take possession of all books, records and accounts relating thereto and Borrower agrees to surrender possession of the Property and of such books, records and accounts to Lender upon demand, and thereupon Lender may do such acts and things as Lender deems necessary or desirable to protect the security hereof, including without limitation, (i) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Property and conduct the business thereat on such terms and for such period of time as Lender may deem proper; (ii) complete any construction on the Property in such manner and form as Lender deems advisable; (iii) make alterations, additions, renewals, replacements and improvements to or on the Property; (iv) exercise all rights and powers of Borrower with respect

14

to the Property, whether in the name of Borrower or otherwise, including, without limitation, the right to make, cancel, enforce or modify Leases, obtain and evict tenants and demand, sue for or otherwise collect and receive all Rents and all sums due under all Lease Guaranties, including, without limitation, those past due and unpaid; (v) require Borrower to pay monthly in advance to Lender, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of such part of the Property as may be occupied by Borrower; (vi) require Borrower to vacate and surrender possession of the Property to Lender or to such receiver and, in default thereof, Borrower may be evicted by summary proceedings or otherwise; and (vii) apply the receipts from the Property to the payment and performance of the Obligations (including, without limitation, the payment of the Debt), in such order, priority and proportions as Lender shall deem appropriate in its sole discretion after deducting therefrom all expenses (including reasonable attorneys' fees and costs) incurred in connection with the aforesaid operations and all amounts necessary to pay the Taxes or Other Charges assessed against the Property, insurance premiums, other expenses and Capital Expenditures incurred in connection with the Property, as well as just and reasonable compensation for the services of Lender, its counsel, agents and employees;

        (k)    exercise any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the foregoing: (i) the right to take possession of the Fixtures, the Equipment and/or the Personal Property, or any part thereof, and to take such other measures as Lender may deem necessary for the care, protection and preservation of the Fixtures, the Equipment and the Personal Property, and (ii) request Borrower, at its sole cost and expense, to assemble the Fixtures, the Equipment and/or the Personal Property and make it available to Lender at a convenient place acceptable to Lender. Any notice of sale, disposition or other intended action by Lender with respect to the Fixtures, the Equipment and/or the Personal Property sent to Borrower in accordance with the provisions hereof at least ten (10) days prior to such action, shall constitute commercially reasonable notice to Borrower;

        (l)    apply any sums then deposited or held in escrow or otherwise by or on behalf of Lender in accordance with the terms of the Loan Agreement, this Mortgage or any other Loan Document to the payment of the following items in any order in its sole discretion:

        (i)    Taxes and Other Charges assessed against the Properties;

        (ii)    Insurance premiums;

        (iii)    Other expenses and Capital Expenditures incurred in connection with the Property;

        (iv)    Interest on the unpaid principal balance of the Note;

        (v)    Amortization of the unpaid principal balance of the Note; and/or

        (vi)    All other sums payable pursuant to the Note, the Loan Agreement, this Mortgage and the other Loan Documents, including, without limitation, the Release Price, if applicable, and advances made by Lender pursuant to the terms of this Mortgage;

15

(m)      pursue such other remedies as may be available to Lender at law or in equity; and/or

(n)      apply the undisbursed balance of any escrow or other deposits held by or on behalf of Lender with respect to the Property, to the payment of the Debt in such order, priority and proportions as Lender shall deem to be appropriate in its sole discretion.

In the event of a sale, by foreclosure, power of sale or otherwise, of less than all of the Property, this Mortgage shall continue as a Lien and security interest on the remaining portion of the Property unimpaired and without loss of priority.

The exercise by Lender of its rights under this <u>Section 7.01</u> and the collection of the Rents and the sums due under the Lease Guaranties and the application thereof as provided in the Loan Documents shall not be considered a waiver of any Default or Event of Default under the Note, the Loan Agreement, this Mortgage or the other Loan Documents.

**Section 7.02     Application of Proceeds**.  The purchase money proceeds and avails of any disposition of the Property or any part thereof, or any other sums collected by Lender pursuant to the Note, this Mortgage or the other Loan Documents, may be applied by Lender to the payment of the Obligations in such priority and proportions as Lender in its discretion shall deem proper, to the extent consistent with law.

**Section 7.03     Right to Cure Defaults.**  During the continuance of any Event of Default, Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder, perform the obligations in Default in such manner and to such extent as Lender may deem necessary to protect the security hereof. Lender is authorized to enter upon the Property for such purposes or appear in, defend or bring any action or proceeding to protect its interest in the Property, to foreclose this Mortgage or collect the Debt, and to make any protective advances that Lender may deem necessary to protect the security hereof, and the cost and expense of any of the foregoing (including reasonable attorneys' fees and disbursements to the extent permitted by law), with interest thereon at the Default Rate for the period after notice from Lender that such cost or expense was incurred to the date of payment to Lender, shall constitute a portion of the Debt, shall be secured by this Mortgage and the other Loan Documents and shall be due and payable to Lender upon demand.

**Section 7.04     Other Rights, Etc**.

(a)      The failure of Lender to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Mortgage.  Borrower shall not be relieved of Borrower's obligations hereunder by reason of (i) the failure of Lender to comply with any request of Borrower or any guarantor or indemnitor with respect to the Loan to take any action to foreclose this Mortgage or otherwise enforce any of the provisions hereof or of the Note or the other Loan Documents, (ii) the release, regardless of consideration, of the whole or any part of the Property, or of any Person liable for the Obligations or any portion thereof, or (iii) any agreement or stipulation by Lender extending the time of payment or otherwise modifying or supplementing the terms of the Note, this Mortgage or the other Loan Documents.

16

(b)     It is agreed that the risk of loss or damage to the Property is on Borrower, and Lender shall have no liability whatsoever for any decline in value of the Property, for failure to maintain the Policies, or for failure to determine whether insurance in force is adequate as to the amount of risks insured.  Possession by Lender shall not be deemed an election of judicial relief, if any such possession is requested or obtained, with respect to any Property or collateral not in Lender's possession.

(c)     Lender may resort for the payment and performance of the Obligations (including, but not limited to, the payment of the Debt) to any other security held by Lender in such order and manner as Lender, in its discretion, may elect.  Lender may take action to recover the Debt, or any portion thereof, or to enforce the Other Obligations or any covenant hereof, without prejudice to the right of Lender thereafter to enforce any remedy hereunder or under applicable law against Borrower, including the right to foreclose this Mortgage.  The rights of Lender under this Mortgage shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others.  No act of Lender shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision.  Lender shall not be limited exclusively to the rights and remedies herein stated but shall be entitled to every right and remedy now or hereafter afforded at law or in equity.

**Section 7.05**   **Right to Release Any Portion of the Property**.  Lender may release any portion of the Property for such consideration as Lender may require without, as to the remainder of the Property, in any way impairing or affecting the Lien or priority of this Mortgage, or improving the position of any subordinate lienholder with respect thereto, except to the extent that the Debt shall have been reduced by the actual monetary consideration, if any, received by Lender for such release, and Lender may accept by assignment, pledge or otherwise any other property in place thereof as Lender may require without being accountable for so doing to any other lienholder.  This Mortgage shall continue as a Lien and security interest in the remaining portion of the Property.

**Section 7.06**   **Right of Entry**.  Subject to the rights of Tenants and upon reasonable prior notice to Borrower, Lender and its agents shall have the right to enter and inspect the Property at all reasonable times.

## ARTICLE VIII.

## INDEMNIFICATION

**Section 8.01**   **Mortgage and/or Intangible Tax**.  Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless Lender and any Person claiming by or through Lender (collectively with Lender, the "***Indemnified Parties***" and each, an "***Indemnified Party***") from and against any and all losses, damages, costs, fees, expenses claims, suits, judgments, awards, liabilities, obligations, debts, fines, penalties or charges imposed upon or incurred by or asserted against any Indemnified Party and directly or indirectly arising out of or in any way relating to any mortgage, recording, stamp, intangible or other similar taxes required to be paid by any Indemnified Party under applicable Legal Requirements in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of this Mortgage or any of the Loan Documents (but excluding any income, franchise or other similar taxes).

17

**Section 8.02**   **No Liability to Lender**.   This Mortgage shall not be construed to bind Lender to the performance of any of the covenants, conditions or provisions contained in any Lease or Lease Guaranty or otherwise impose any obligation upon Lender with respect to the Leases. Lender shall not be liable for any loss sustained by Borrower resulting from Lender's failure to let the Property after an Event of Default or from any other act or omission of Lender in managing the Property after an Event of Default unless such loss is caused by the willful misconduct, bad faith or gross negligence of Lender.  Lender shall not be obligated to perform or discharge any obligation, duty or liability under the Leases or any Lease Guaranties or under or by reason of this Mortgage and Borrower shall indemnify Lender for, and hold Lender harmless from and against, (a) any and all liability, loss or damage which may or might be incurred under the Leases, any Lease Guaranties or under or by reason of this Mortgage, and (b) any and all claims and demands whatsoever, including the defense of any such claims or demands which may be asserted against Lender by reason of any alleged obligations and undertakings on its part to perform or discharge any of the terms, covenants or agreements contained in the Leases or any Lease Guaranties, unless caused by the willful misconduct or bad faith of Lender.  Should Lender incur any such liability, the amount thereof, including costs, expenses and reasonable attorneys' fees and costs, shall be secured by this Mortgage and by the other Loan Documents and Borrower shall reimburse Lender therefor within seven (7) Business Days after demand therefor, and upon the failure of Borrower so to do Lender may, at its option, declare the Obligations to be immediately due and payable. This Mortgage shall not operate to place any obligation or liability for the control, care, management or repair of the Property upon Lender, nor for the carrying out of any of the terms and conditions of the Leases or any Lease Guaranties; nor shall it operate to make Lender responsible or liable for any waste committed on the Property by the tenants or any other parties, or for any dangerous or defective condition of the Property, including, without limitation, the presence of any Hazardous Substances (as defined in the Environmental Indemnity), or for any negligence in the management, upkeep, repair or control of the Property resulting in loss or injury or death to any tenant, licensee, employee or stranger.

**Section 8.03**   **Duty to Defend; Attorneys' Fees and Other Fees and Expenses.**  In connection with any indemnification obligations of Borrower hereunder, upon written request by any Indemnified Party, Borrower shall defend such Indemnified Party (if requested by any Indemnified Party, in the name of the Indemnified Party) by attorneys and other professionals reasonably approved by the Indemnified Parties.  Notwithstanding the foregoing, if the defendants in any such claim or proceeding include both Borrower and any Indemnified Party and Borrower and such Indemnified Party shall have reasonably concluded that there are any legal defenses available to it and/or other Indemnified Parties that are different from or in addition to those available to Borrower, such Indemnified Party shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such Indemnified Party.  Upon demand, Borrower shall pay or, in the sole and absolute discretion of any Indemnified Party, reimburse, such Indemnified Party for the payment of the reasonable fees and disbursements of attorneys, engineers, environmental consultants, laboratories and other professionals in connection therewith.

**ARTICLE IX.**

**WAIVERS**

18

**Section 9.01**   **Waiver of Counterclaim**.  To the extent permitted by applicable law, Borrower hereby waives the right to assert a counterclaim, other than a mandatory or compulsory counterclaim, in any action or proceeding brought against it by Lender arising out of or in any way connected with this Mortgage, the Loan Agreement, the Note, any of the other Loan Documents or the Obligations.

**Section 9.02**   **Marshaling and Other Matters**.  To the extent permitted by applicable law, Borrower hereby waives the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Property or any part thereof or any interest therein. Further, to the extent permitted by applicable law, Borrower hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of this Mortgage on behalf of Borrower, and on behalf of each and every Person acquiring any interest in or title to the Property subsequent to the date of this Mortgage.

**Section 9.03**   **Waiver of Notice**.  To the extent permitted by applicable law, Borrower shall not be entitled to any notices of any nature whatsoever from Lender, except with respect to matters for which this Mortgage or any of the other the Loan Documents specifically and expressly provide for the giving of notice by Lender to Borrower, and except with respect to matters for which Lender is required by applicable law to give notice, and Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Mortgage or any of the other Loan Documents does not specifically and expressly provide for the giving of notice by Lender to Borrower.

**Section 9.04**   **Waiver of Statute of Limitations**.  To the extent permitted by applicable law, Borrower hereby expressly waives and releases its right to plead any statute of limitations as a defense to the payment and performance of the Obligations (including, without limitation, the payment of the Debt).

**Section 9.05**   **Waiver of Jury Trial**.  **TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, BORROWER HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND FOREVER WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST, WITH REGARD TO THE NOTE, THIS MORTGAGE OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER.**

**Section 9.06**   **Survival**.  Except as otherwise set forth in the other Loan Documents, the indemnifications made pursuant to Article VIII herein and the representations and warranties, covenants, and other obligations arising under the Loan Documents, shall continue indefinitely in full force and effect and shall survive and shall in no way be impaired by (a) any satisfaction,

release or other termination of this Mortgage or any other Loan Document, (b) any assignment or other transfer of all or any portion of this Mortgage or any other Loan Document or Lender's interest in the Property (but, in such case, such indemnifications shall benefit both the Indemnified Parties and any such assignee or transferee), (c) any exercise of Lender's rights and remedies pursuant hereto, including, but not limited to, foreclosure or acceptance of a deed in lieu of foreclosure, any exercise of any rights and remedies pursuant to the Loan Agreement, the Note or any of the other Loan Documents, any transfer of all or any portion of the Property (whether by Borrower or by Lender following foreclosure or acceptance of a deed in lieu of foreclosure or at any other time), (d) any amendment to this Mortgage, the Loan Agreement, the Note or any other Loan Document, and/or (e) any act or omission that might otherwise be construed as a release or discharge of Borrower from the Obligations or any portion thereof. Notwithstanding the foregoing or anything to the contrary set forth herein, in no event shall Borrower be obligated to defend or indemnify any Indemnified Party for any damages, losses, claims and liabilities directly resulting from the gross negligence, bad faith or willful misconduct of such Indemnified Party.

## ARTICLE X.

## NOTICES

All notices or other written communications hereunder shall be delivered in accordance with <u>Section 9.6</u> of the Loan Agreement.

## ARTICLE XI.

## APPLICABLE LAW

**Section 11.01 <u>Governing Law; Jurisdiction; Service of Process</u>. WITH RESPECT TO MATTERS RELATING TO THE CREATION, PERFECTION AND ENFORCEMENT OF LIENS AND SECURITY INTERESTS CREATED UNDER THIS MORTGAGE, THIS MORTGAGE SHALL BE GOVERNED BY, AND BE CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE IN WHICH THE PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, EXCEPT AS EXPRESSLY SET FORTH ABOVE IN THIS PARAGRAPH AND TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW) SHALL GOVERN ALL MATTERS RELATING TO THIS MORTGAGE AND THE OTHER LOAN DOCUMENTS AND ALL OF THE INDEBTEDNESS OR OBLIGATIONS ARISING HEREUNDER OR THEREUNDER. ALL PROVISIONS OF THE LOAN AGREEMENT INCORPORATED HEREIN BY REFERENCE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, AS SET FORTH IN THE GOVERNING LAW PROVISION OF THE LOAN AGREEMENT.**

**Section 11.02 <u>Usury Laws</u>.** Notwithstanding anything to the contrary, (a) all agreements and communications between Borrower and Lender are hereby and shall automatically be limited so that, after taking into account all amounts deemed to constitute interest, the interest contracted

for, charged or received by Lender shall never exceed the Maximum Legal Rate, (b) in calculating whether any interest exceeds the Maximum Legal Rate, all such interest shall be amortized, prorated, allocated and spread over the full amount and term of all principal Indebtedness of Borrower to Lender, and (c) if through any contingency or event, Lender receives or is deemed to receive interest in excess of the Maximum Legal Rate, any such excess shall be deemed to have been applied toward payment of the principal of any and all then outstanding Indebtedness of Borrower to Lender, or if there is no such indebtedness, shall immediately be returned to Borrower.

Section 11.03 **Provisions Subject to Applicable Law**.  All rights, powers and remedies provided in this Mortgage may be exercised only to the extent that the exercise thereof does not violate any applicable provisions of law and are intended to be limited to the extent necessary so that they will not render this Mortgage invalid, unenforceable or not entitled to be recorded, registered or filed under the provisions of any applicable law.  If any term of this Mortgage or any application thereof shall be invalid or unenforceable, the remainder of this Mortgage and any other application of the term shall not be affected thereby.

## ARTICLE XII.

### DEFINITIONS

Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Mortgage may be used interchangeably in the singular or plural form and the word "Borrower" shall mean "each Borrower and any subsequent owner or owners of the Property or any part thereof or any interest therein," the word "Lender" shall mean "Lender and any subsequent holder of the Note," the word "Note" shall mean "the Note and any other evidence of Indebtedness secured by this Mortgage," the word "Property" shall include any portion of the Property and any interest therein, and the phrases "attorneys' fees", "legal fees" and "counsel fees" shall include any and all reasonable attorneys', paralegal and law clerk fees and disbursements, including, but not limited to, fees and disbursements at the pre-trial, trial and appellate levels, incurred or paid by Lender in protecting its interest in the Property, the Leases, the Rents, the sums due under the Lease Guaranties, and/or in enforcing its rights hereunder. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms.

## ARTICLE XIII.

### MISCELLANEOUS PROVISIONS

Section 13.01 **No Oral Change**.  This Mortgage, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party(ies) against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

Section 13.02 **Successors and Assigns**.  This Mortgage shall be binding upon, and shall inure to the benefit of, Borrower and Lender and their respective successors and permitted assigns, as set forth in the Loan Agreement.

Section 13.03 **Inapplicable Provisions**.  If any provision of this Mortgage is held to be illegal, invalid or unenforceable under present or future laws effective during the term of this Mortgage, such provision shall be fully severable and this Mortgage shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Mortgage, and the remaining provisions of this Mortgage shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Mortgage, unless such continued effectiveness of this Mortgage, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

Section 13.04 **Headings, Etc**.  The headings and captions of the various Sections of this Mortgage are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

Section 13.05 **Subrogation**.  If any or all of the proceeds of the Note have been used to extinguish, extend or renew any indebtedness heretofore existing against the Property, then, to the extent of the funds so used, Lender shall be subrogated to all of the rights, claims, liens, titles and interests existing against the Property heretofore held by, or in favor of, the holder of such indebtedness and such former rights, claims, liens, titles and interests, if any, are not waived, but rather are continued in full force and effect in favor of Lender and are merged with the Lien and security interest created herein as cumulative security for the payment, performance and discharge of the Obligations (including, but not limited to, the payment of the Debt).

Section 13.06 **Entire Agreement**.  The Note, the Loan Agreement, this Mortgage and the other Loan Documents constitute the entire understanding and agreement between Borrower and Lender with respect to the transactions arising in connection with the Obligations and supersede all prior written or oral understandings and agreements between Borrower and Lender with respect thereto.  Borrower hereby acknowledges that, except as incorporated in writing in the Note, the Loan Agreement, this Mortgage and the other Loan Documents, there are not, and were not, and no Persons are or were authorized by Lender to make, any representations, understandings, stipulations, agreements or promises, oral or written, with respect to the transaction which is the subject of the Note, the Loan Agreement, this Mortgage and the other Loan Documents.

Section 13.07 **Limitation on Lender's Responsibility**.  No provision of this Mortgage shall operate to place any obligation or liability for the control, care, management or repair of the Property upon Lender, nor shall it operate to make Lender responsible or liable for any waste committed on the Property by the Tenants or any other Person, or for any dangerous or defective condition of the Property, or for any negligence in the management, upkeep, repair or control of the Property resulting in loss or injury or death to any Tenant, licensee, employee or stranger.  Nothing herein contained shall be construed as constituting Lender a "Lender in possession."

Section 13.08 **Recitals**.  The recitals hereof are a part hereof, form a basis for this Mortgage and shall be considered prima facie evidence of the facts and documents referred to therein.

Section 13.09 **Time of Essence**.  Time is of the essence with respect to this Mortgage and each and every provision hereof.

## ARTICLE XIV.

## STATE-SPECIFIC PROVISIONS

**Section 14.01  Principles of Construction**.  Without limiting Section 11.01, to the extent that the laws of the State govern the interpretation or enforcement of this Mortgage, (a) the provisions of this Article XIV shall apply, and (b) in the event of any inconsistencies between the terms and provisions of this Article XIV and the other terms and provisions of this Mortgage, the terms and provisions of this Article XIV shall control and be binding.

**Section 14.02  Attorneys Fees; Costs of Enforcement and Property Preservation**.  In any action to enforce or to foreclose the lien of this Mortgage, Lender shall be entitled to recover from Borrower its reasonable attorneys' and paralegals' fees, and all costs and expenses incurred, whether incurred in court-ordered mediation, at trial, on appeal, or in bankruptcy and administrative proceedings, and including but not limited to any costs for environmental reports, appraisals, property inspections and inspection reports, title searches and reports, surveys, and costs of a similar nature incurred by Lender for the Property.

**Section 14.03  Maximum Principal Amount Secured**.  It is understood and agreed that this Mortgage shall secure payment of not only the indebtedness evidenced by the Note but also any and all substitutions, replacements, renewals and extensions of the Note, any and all indebtedness and obligations arising pursuant to the terms hereof and any and all indebtedness and obligations arising pursuant to the terms of the Loan Agreement or any of the other Loan Documents, all of which indebtedness is equally secured with and has the same priority as any amounts advanced as of the date hereof.  The maximum amount of principal indebtedness secured by this Mortgage at the time of execution hereof or which under any contingency may become secured by this Mortgage at any time hereafter is ONE MILLION TWENTY-THREE THOUSAND FIVE HUNDRED AND NO/100 Dollars ($1,023,500.00), plus accrued interest thereon, any additional advances made by Lender to protect or preserve the Property or the lien or security interest created hereby on the Property, including, without limitation, expenses of any litigation to prosecute or defend the rights and liens created by this Mortgage, or for taxes, assessments or insurance premiums or for performance of any of Borrower's obligations hereunder or under the other Loan Documents or for any other purpose provided herein or in the other Loan Documents and any amount, costs or charges to which Lender becomes subrogated, upon payment, whether under recognized principles of law or equity, or under express statutory authority.

**Section 14.04  [Reserved]**.

**Section 14.05  Trust Fund**.  Pursuant to Section 13 of the lien law of New York, Borrower shall receive the advances secured hereby and shall hold the right to receive such advances as a trust fund to be applied first for the purpose of paying the cost of any improvement and shall apply such advances first to the payment of the cost of any such improvements on the Property before using any part of the total of the same for any other purpose.

**Section 14.06  Real Property Law**.  Lender shall have all of the rights and privileges against lessees, sublessees, sub-sublessees and sub-sub-sublessees of the Property as set forth in Section 291(f) of the Real Property Law of New York.

23

**Section 14.07** <u>Section 254</u>.  The provisions of this Mortgage shall be in addition to the provisions set forth in Section 254 of the Real Property Law of New York and in the event of any inconsistency between this Mortgage and such Section 254, the provisions of this Mortgage shall control and supersede the inconsistent provisions of the statute.

**Section 14.08** <u>Taxes</u>.  In the event of a sale or other disposition of the Property or an interest in an entity having an interest in the Property, including a sale pursuant to a judgment of foreclosure or a transfer in lieu thereof, or any other transaction with respect to the Property, which would result in any transfer tax liability, Borrower shall fully and accurately complete and execute all forms and documents which Lender may reasonably require, and shall deliver such forms and documents, together with the amount of any tax liability that will be due, to Lender at least fifteen (15) days prior to the scheduled date of the sale or other disposition in question.  If Borrower fails to pay any such tax liability and Lender pays all or any part thereof, the amount of any such payment made by Lender, together with interest thereon at the Default Rate from the date paid by Lender until actually reimbursed by Borrower, shall be immediately paid by Borrower to Lender on demand and shall be secured by this Mortgage and by all of the other Loan Documents securing all or any part of the Obligations.

Borrower shall pay when due any and all mortgage recording and other taxes payable or determined to be payable in connection with the execution, delivery, recording or enforcement of this Mortgage and the other Loan Documents, and any interest and penalties thereon.

Borrower hereby indemnifies and agrees to hold Lender harmless from and against any and all liabilities (including, without limitation, reasonable attorneys' fees and disbursements) with respect to or resulting from any delay in paying or any omission or failure to pay any taxes described in this Section 14.08 (including all costs of responding to any audits and any and all penalties and interest imposed).

**Section 14.09** <u>Mortgage Assignment</u>.  If permitted by applicable law, including, without limitation, Section 275 of the Real Property Law of the State of New York, Lender shall, upon receipt by it (except by reason of a foreclosure of the lien of this Mortgage) of the payment, in full, of the Obligations, prepare and deliver, at Borrower's sole cost and expense, to the person or entity making such payment, an assignment, without recourse, representation or warranty, of its right, title and interest in the Note and this Mortgage.

**Section 14.10** <u>Non-Judicial Foreclosure Law</u>.  Upon the occurrence of an Event of Default, and the acceleration of the Obligations, to the extent permitted by applicable law, Lender shall have the right, subject to the provisions of applicable law, without limiting any other rights or remedies Lender may have hereunder, under any of the other Loan Documents, or at law or in equity, to sell the Property by foreclosure by power of sale by publication of notice pursuant to Article 14 of the New York Real Property Actions and Proceedings Law, as the same may be hereafter amended from time to time.

**[NO FURTHER TEXT ON THIS PAGE]**

IN WITNESS WHEREOF, THIS MORTGAGE has been executed by Borrower as of the day and year first above written.

**BORROWER:**

**HIRSCHHORN ESTATES, LLC,**
a Delaware limited liability company

By: _____
Name: Meyer Hirschhorn
Title:  Member

State of New York          )
                           ) ss.:
County of Rockland         )

On the 28th day of January ............... in the year 2021.. before me, the undersigned, a Notary Public in and for said State, personally appeared Meyer Hirschhorn, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
(Signature and office of individual taking acknowledgment.)

ALOMA EDWARDS
Notary Public - State of New York
NO. 01ED6074412
Qualified in Rockland County
My Commission Expires May 13, 2022

Mortgage                                                                        New York

## SCHEDULE 1

Property List

| Address | City | State | County | Zip |
|---------|------|-------|--------|-----|
| 103 Marion St | Rochester | NY | Monroe | 14610 |
| 117 W Filbert Street | East Rochester | NY | Monroe | 14445 |
| 136 Campbell St  Apts  1-6 | Rochester | NY | Monroe | 14611 |
| 14 Durgin St | Rochester | NY | Monroe | 14605 |
| 236 Saratoga Ave Apts 1-6 | Rochester | NY | Monroe | 14608 |
| 258 Avis St | Rochester | NY | Monroe | 14615 |
| 294 Lexington Ave | Rochester | NY | Monroe | 14613 |
| 301 Selye Ter | Rochester | NY | Monroe | 14613 |
| 31 Alice St | Rochester | NY | Monroe | 14611 |
| 36 Sterling St | Rochester | NY | Monroe | 14606 |
| 404 Emerson St | Rochester | NY | Monroe | 14613 |
| 74 Starling St | Rochester | NY | Monroe | 14613 |
| 76 Oriole St | Rochester | NY | Monroe | 14613 |
| 8 Immel St | Rochester | NY | Monroe | 14606 |
| 8 Velox St | Rochester | NY | Monroe | 14615 |
| 87 Dix St | Rochester | NY | Monroe | 14606 |
| 968 Ridgeway Ave | Rochester | NY | Monroe | 14615 |

## EXHIBIT A

Legal Description

Address: 103 Marion St, Rochester, NY  14610

County: Monroe Value $114,000

Parcel Identification Number: 122.40-2-2

Client Code: MEYER-HIRSCHHORN-01

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF
ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, BEING
LOT #16 AS THE SAME IS LAID DOWN ON AN AMENDED MAP OF A PART
OF THE MAHLON D. PHILLIPS SUBDIVISION OF A PART OF LOT #27 IN
THE SECOND SUBDIVISION OF LOTS IN THE TOWN OF BRIGHTON, NOW
THE CITY OF ROCHESTER, WHICH MAP WAS MADE BY A.B. TITUS,
SURVEYOR, FOR MILLICENT HOVEY AND FILED IN THE MONROE
COUNTY CLERK'S OFFICE FEBRUARY 15, 1910 IN LIBER 21 OF MAPS,
PAGE 19, SAID LOT #16 IS SITUATE ON THE WEST SIDE OF MARION
STREET.

\*\*\*

Address: 117 W Filbert Street, East Rochester, NY  14445

County: Monroe Value $84,600

Parcel Identification Number: 152.21-1-65

Client Code: MEYER-HIRSCHHORN-03

ALSO ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE
TOWN/VILLAGE OF EAST ROCHESTER, COUNTY OF MONROE AND
STATE OF NEW YORK, AND BEING KNOWN AND DESIGNATED AS LOT
NUMBER TWELVE (12) IN BLOCK NUMBER FIFTY-SIX (56) AS SHOWN ON
A MAP OF THE LANDS OF THE VANDERBILT IMPROVEMENT CO. ON FILE
IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 10 OF MAPS, AT
PAGE 35. EXCEPTING AND RESERVING THEREFROM, THE STREET OR
THE STREET ABUTTING UPON SAID PREMISES, THE FEE OF WHICH,
SUBJECT TO THE USED OF SAID TOWNN/VILLAGE OF EAST
ROCHESTER, AS A HIGHWAY OR HIGHWAYS IS RETAINED IN SAID
TOWNN/VILLAGE.

\*\*\*

Exhibit A  Mortgage (*Monroe County, New York*)

Address: 136 Campbell St  Apts  1-6, Rochester, NY  14611

County: Monroe　　Value $120,000

Parcel Identification Number: 120.27-1-19

Client Code: MEYER-HIRSCHHORN-04

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN AND DISTINGUISHED AS A PART OF LOT NUMBER SEVEN (7) SECTION A OF THE WHITNEY TRACT AS THE SAME IS LAID DOWN UPON A MAP OF SAID TRACT FILED IN MONROE COUNTY CLERK'S OFFICE IN LIBER 2 OF MAPS AT PAGE 8, AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF WALNUT AND CAMPBELL STREETS AND RUNNING THENCE NORTHERLY ALONG THE WEST LINE OF WALNUT STREET, NINETY-EIGHT (98) FEET; THENCE WESTERLY PARALLEL WITH THE NORTH LINE OF CAMPBELL STREET FIFTY (50) FEET TO THE WEST LINE OF SAID LOT NUMBER SEVEN (7); THENCE SOUTHERLY PARALLEL WITH THE WEST LINE OF WALNUT STREET AND ALONG THE WEST LINE OF SAID LOT NINETY EIGHT (98) FEET TO THE NORTH LINE OF CAMPBELL STREET AND THENCE EASTERLY ALONG THE SAID NORTH LINE FIFTY (50) FEET TO THE PLACE OF BEGINNING, TOGETHER WITH ALL THE RIGHT, TITLE AND INTEREST OF THE PARTIES OF THE FIRST PART IN AND TO SUCH PORTIONS OF CAMPBELL AND WALNUT STREETS AS LIE IN FRONT OF THE PREMISES HEREBY CONVEYED, HEREBY INTENDING TO CONVEY ALL THAT PART OF PARCEL OF LOT NUMBER SEVEN (7) SOUTH OF A LINE DRAWN SOUTH OF THE NORTH LINE OF SAID LOT AND THIRTY-FOUR (34) FEET DISTANT THEREFROM.

*** 

Address: 236 Saratoga Ave Apts 1-6, Rochester, NY  14608

County: Monroe　　Value $227,200

Parcel Identification Number: 105.51-3-1

Client Code: MEYER-HIRSCHHORN-06

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE COUNTY OF MONROE, STATE OF NEW YORK, AND IS DESCRIBED AS FOLLOWS:

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN

Exhibit A

AND DESCRIBED AS LOT NUMBER ONE (1) OF THE JONES TRACT, SECTION "G", AS SHOWN ON A MAP THEREOF FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 35 OF MAPS AT PAGE 29.

SAID LOT NUMBER ONE (1) FRONTS 31 FEET ON THE EAST SIDE OF SARATOGA AVENUE AND IS OF THE FURTHER DIMENSIONS AS SHOWN ON SAID MAP.

\*\*\*

Address: 258 Avis St, Rochester, NY  14615

County: Monroe        Value $72,900

Parcel Identification Number: 090.41-1-34

Client Code: MEYER-HIRSCHHORN-07

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, FORMERLY TOWN OF GREECE, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN AND DESCRIBED AS LOT NO. 340 OF W. N. BRITTON TRACT, WEST OF DEWEY AVENUE AS THE SAME IS LAID DOWN ON A MAP THEREOF FILED IN LIBER 25 OF MAPS AT PAGE 35.

SAID LOT 340 FRONTS 50 FEET ON THE NORTHERLY SIDE OF AVIS STREET AND EXTENDS BACK OF EQUAL WIDTH THROUGHOUT 100 FEET.

\*\*\*

Address: 294 Lexington Ave, Rochester, NY  14613

County: Monroe    Value $38,000

Parcel Identification Number: 105.26-1-12

Client Code: MEYER-HIRSCHHORN-08

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, BEING LOT #1 OF JESSE M. FROST'S SUBDIVISION OF PART OF LOT #4 OF THE 20,000.00 ACRE TRACT, A MAP OF WHICH SUBDIVISION IS FILED IN MONROE COUNTY CLERK'S OFFICE IN LIBER 54 OF MAPS, PAGE 1.

SAID LOT #1 OF SAID FROST'S SUBDIVISION IS SITUATE ON THE NORTH SIDE OF LEXINGTON AVENUE AND IS 37 FEET WIDE FRONT AND REAR AND 85 FEET DEEP.

Exhibit A

THE EASTERLY LINE OF LOT #1 IS PARALLEL TO THE WESTERLY LINE
OF STRAUB STREET, ROCHESTER, NEW YORK.


***


Address: 301 Selye Ter, Rochester, NY  14613

County: Monroe          Value $60,500

Parcel Identification Number: 090.81-2-27

Client Code: MEYER-HIRSCHHORN-09

ALSO ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF
ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN
AND DESCRIBED AS LOT NUMBER SIXTY-FIVE (65) AS SHOWN AND LAID
DOWN ON THE MAP OF THE ROCHESTER DRIVING PARK TRACT, SO-
CALLED, MADE BY J.C. RYAN, SURVEYOR, AND FILED IN THE MONROE
COUNTY CLERK'S OFFICE IN LIBER 15 OF MAPS, AT PAGE 33. SAID LOT
NUMBER SIXTY-FIVE (65) FRONTS ON THE SOUTH SIDE OF SELYE
TERRACE AND IS FORTY (40) FEET WIDE IN FRONT AND EXTENDS BACK
OF EQUAL WIDTH WITH THE FRONT ONE HUNDRED AND SIXTEEN (116)
FEET IN DEPTH.


***


Address: 31 Alice St, Rochester, NY  14611

County: Monroe          Value $33,400

Parcel Identification Number: 120.31-2-26

Client Code: MEYER-HIRSCHHORN-10

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF
ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN
AND DISTINGUISHED AS LOT NUMBER FOURTEEN (14), IN SECTION "B",
ON THE SOUTH SIDE OF ALICE STREET, AS THE SAID LOT IS LAID DOWN
ON A MAP OF A SUBDIVISION OF PART OF THE BINGEN TRACT, MADE BY
HORACE JONES, SURVEYOR, AUGUST 1872, AND FILED IN THE MONROE
COUNTY CLERK'S OFFICE IN LIBER 5 OF MAPS, PAGE 88. THE SAID LOT
BEING FORTY (40) FEET IN WIDTH FRONT AND REAR AND ONE
HUNDRED SIXTY-SIX (166) FEET DEEP.


Exhibit A

\*\*\*

Address: 36 Sterling St, Rochester, NY  14606

County: Monroe    Value $37,900

Parcel Identification Number: 105.49-1-40

Client Code: MEYER-HIRSCHHORN-11

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, BEING KNOWN AND DESCRIBED AS LOT NO. 5 ON A SUBDIVISION OF LOTS NO. 72 TO 82 INCLUSIVE, OF THE HOUSTON TRACT, AS SHOWN ON A MAP FILED IN LIBER 11 OF MAPS, PAGE 100 IN THE MONROE COUNTY CLERK'S OFFICE. SAID LOT NO. 5 BEING 33 FEET AND 3 INCHES FRONT AND REAR AND 125 FEET DEEP, AND IS SITUATE ON THE EAST SIDE OF STERLING STREET.

\*\*\*

Address: 404 Emerson St, Rochester, NY  14613

County: Monroe    Value $49,600

Parcel Identification Number: 105.41-2-17

Client Code: MEYER-HIRSCHHORN-12

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN AND DESIGNATED AS LOT #2 OF THE KONDOLF & BRAYER TRACT, AS THE SAME IS LAID OUT ON A MAP OF THE SAID TRACT FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 3 OF MAPS, PAGE 25. SAID LOT BEING 240 FEET EASTERLY FROM THE EASTERLY RIGHT OF WAY LINE OF PLOVER STREET, AS MEASURED ALONG THE NORTHERLY RIGHT OF WAY LINE OF EMERSON STREET; THENCE IN A NORTHERLY DIRECTION AT AN INTERIOR ANGLE OF 89 DEGREES 26' 15'' WITH THE PRECEDING COURSE A DISTANCE OF 187.42 FEET TO A POINT ON THE SOUTHERLY RIGHT OF WAY LINE OF THE FORMER ERIE CANAL PROPERTY; THENCE IN A SOUTHEASTERLY DIRECTION AT AN INTERIOR ANGLE OF 39 DEGREES 36' 35'' WITH THE PRECEDING COURSE ALONG THE SOUTHERLY RIGHT OF WAY LINE OF THE FORMER ERIE CANAL PROPERTY A DISTANCE OF 47.68 FEET TO AN ANGLE POINT; THENCE CONTINUING IN A SOUTHEASTERLY DIRECTION AT AN INTERIOR ANGLE WITH THE PRECEDING COURSE OF 168 DEGREES 04' 37'', ALONG THE SOUTHERLY RIGHT OF WAY LINE OF THE FORMER ERIE CANAL PROPERTY A DISTANCE OF 47.68 FEET TO AN ANGLE POINT; THENCE CONTINUING IN A SOUTHEASTERLY DIRECTION AT AN INTERIOR ANGLE

Exhibit A

WITH THE PRECEDING COURSE OF 168 DEGREES 04' 37'', ALONG THE SOUTHERLY RIGHT OF WAY LINE OF THE FORMER ERIE CANAL PROPERTY, A DISTANCE OF 20.66 FEET TO A POINT; THENCE IN A SOUTHERLY DIRECTION AT AN INTERIOR ANGLE OF 152 DEGREES 18' 48'' WITH THE PRECEDING COURSE, A DISTANCE OF 132 FEET TO A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF EMERSON STREET, AT AN INTERIOR ANGLE OF 90 DEGREES 33' 45'' WITH THE PRECEDING COURSE A DISTANCE OF 40 FEET TO THE POINT OF BEGINNING.


\*\*\*


Address: 74 Starling St, Rochester, NY  14613

County: Monroe     Value $34,900

Parcel Identification Number: 105.25-1-33

Client Code: MEYER-HIRSCHHORN-13

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK KNOWN AND DISTINGUISHED AS LOT #23, JAMES N. WHITNEY'S SUBDIVISION OF PART OF ORIGINAL TOWN LOT #64, AS SHOWN ON A MAP THEREOF, MADE BY HORACE JONES, SURVEYOR, FOR SAID WHITNEY AND FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 3 OR MAPS, PAGE 52.

SAID LOT #23 BEING SITUATE ON THE EAST SIDE OF STARLING STREET AND BEING 50 FEET WIDE FRONT AND REAR AND 150 FEET DEEP.


\*\*\*


Address: 76 Oriole St, Rochester, NY  14613

County: Monroe     Value $43,300

Parcel Identification Number: 105.25-3-57

Client Code: MEYER-HIRSCHHORN-14

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK KNOWN AND DESCRIBED AS LOT NO. NINETY-TWO (92) OF A MAP OF MONROE CO-OPERATIVE BUILDING LOT ASSOCIATION TRACT, FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 2 OF MAPS, PAGE 30; SAID LOT NO. 92 FRONTING ON THE EAST SIDE OF ORIOLE STREET AS DESIGNATED AND LAID OUT ON SAID MAP, AND BEING FORTY-FIVE (45)

Exhibit A

FEET WIDE, FRONT AND REAR, AND ONE HUNDRED THIRTY (130) FEET IN DEPTH.


\*\*\*


Address: 8 Immel St, Rochester, NY  14606

County: Monroe     Value $46,600

Parcel Identification Number: 105.81-2-26

Client Code: MEYER-HIRSCHHORN-15

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN AND DESIGNATED AS LOT #6 IN A SUBDIVISION MAP OF IMMEL PLACE FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 7 OF MAPS, PAGE 38. SAID LOT #6 IS SITUATE ON THE EAST SIDE OF IMMEL PLACE AND IS 40 FEET FRONT AND REAR AND 76 FEET DEEP.


\*\*\*


Address: 8 Velox St, Rochester, NY  14615

County: Monroe     Value $66,800

Parcel Identification Number: 075.82-2-40

Client Code: MEYER-HIRSCHHORN-16

ALSO ALL THAT TRACT OR PARCEL OF LAND, WITH THE BUILDINGS AND IMPROVEMENTS THEREON ERECTED, SITUATE, LYING AND BEING IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN AND DISTINGUISHED AS LOT NUMBER ONE HUNDRED AND TWENTY (120) OF ADELGONDE EDDY TRACT ACCORDING TO A MAP OF SAID TRACT MADE BY R.E. GASKIN, SURVEYOR, AND FILED IN MONROE COUNTY CLERK'S OFFICE IN LIBER 29 OF MAPS AT PAGE 22.

THIS CONVEYANCE IS MADE AND ACCEPTED SUBJECT TO COVENANTS AND RESTRICTIONS CONTAINED IN A DEED MADE BY THOMAS H. EDDY AND OTHERS, TO ANNA WEISS, RECORDED IN MONROE COUNTY CLERK'S OFFICE IN LIBER 895 OF DEEDS AT PAGE 326. ALSO SUBJECT TO A RIGHT OF WAY GRANTED BY ANNA WEISS AND PETER WEISS TO THE ROCHESTER GAS & ELECTRIC CORPORATION AND OTHERS, RECORDED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 1078 OF DEEDS AT PAGE 340.


Exhibit A

***

Address: 87 Dix St, Rochester, NY  14606

County: Monroe          Value $36,000

Parcel Identification Number: 105.48-2-12

Client Code: MEYER-HIRSCHHORN-17

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF
ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK.
BOUNDED AND DESCRIBED AS FOLLOWS: LOT NO. 7, M.F. SCHIED
SUBDIVISION AS LAID DOWN ON A MAP OF A SUBDIVISION OF LOTS
NOS. 124 AND 128 INCLUSIVE AND 143, 144 AND 145 OF THE HOUSON
TRACT MADE FOR MICHAEL J. SCHIED BY J.C. RYAN, SURVEYOR, FILED
IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 26 OF MAPS, PAGE
23.

SAID LOT NO. 7 IS SITUATE ON THE WEST SIDE OF DIX STREET AND IS
THIRTY-SEVEN (37) FEET WIDE FRONT AND REAR AND 116.43 FEET
DEEP AS SHOWN ON SAID MAP.

***

Address: 968 Ridgeway Ave, Rochester, NY  14615

County: Monroe          Value $53,200

Parcel Identification Number: 090.39-1-20

Client Code: MEYER-HIRSCHHORN-18

ALSO ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF
ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN
AND DESCRIBED AS LOT 12 AND THE WEST 10 FEET OF LOT NO. 13 AS
SAID LOTS ARE LAID DOWN ON A MAP OF RIDGEWAY AVENUE
TERRACE, FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 29
OF MAPS AT PAGE 26.

SAID LOT NO. 12, TOGETHER WITH THE WEST 10 FEET OF LOT NO. 13,
CONSTITUTES A PARCEL OF LAND FRONTING 50 FEET ON THE NORTH
SIDE OF RIDGEWAY AVENUE 50 FEET WIDE IN REAR, AND ABOUT 98.26
FEET IN DEPTH, MORE OR LESS.

Exhibit A

SUBJECT TO THE SEVEN FOOT PERPETUAL EASEMENT RESERVED BY THE CITY OF ROCHESTER BY DEED RECORDED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 2673 IF DEEDS, PAGE 130.

ALSO ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN AND DESCRIBED AS THE WESTERLY 50 FEET OF LOT NOS., 15 AND 16 AS SAID LOTS ARE LAID DOWN ON A MAP OF THE RIDGEWAY AVENUE TERRACE TRACT FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 29 OF MAPS, PAGE 26.

SAID WESTERLY 50 FEET OF SAID LOTS NOS., 15 AND 16 CONSTITUTES PARCEL OF LAND 55 FEET WIDE FRONTING ON THE EASTERLY SIDE OF PERINTON STREET, FORMERLY PERRINGTON AVENUE, RUNNING BACK OF EVEN WIDTH 50 FEET TO THE EASTERLY LINE OF PREMISES CONVEYED TO THE PARTY OF THE FIRST PART HEREIN BY DEED RECORDED IN MONROE COUNTY CLERK'S OFFICE MARCH 30, 1950 IN LIBER 2673 OF DEEDS, PAGE 130, EXTEND NORTHERLY TO THE NORTH LINE OF SAID LOT NO. 16.

***

Address: 14 Durgin St, Rochester, NY 14605
County: Monroe　　Value $120,000
Parcel Identification Number: 106.37-2-45.003
Client Code: MEYER-HIRSCHHORN-05
PARCEL I

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE, AND STATE OF NEW YORK, KNOWN AND DESCRIBED AS LOT NO. TWENTY- SIX (26) AS SHOWN ON A MAP ANNEXED TO THE REPORT OF J. P. VARNUM, REFEREE, TO REPORT ORDER OF SALE OF LAND MORTGAGED BY FRANCES G. WORCESTER AND DAVID F. WORCESTER TO THE ROCHESTER SAVINGS BANK, THE SAME BEING ON FILE IN THE MONROE COUNTY CLERK'S OFFICE AND IS ABOUT 30 FEET ON THE EAST SIDE OF EVERGREEN PLACE (NOW KNOWN AS DURGIN STREET) AND EXTENDS BACK THE SAME WIDTH TO THE EASTERLY LINE OF SAID MORTGAGED PREMISES.

ALSO, ALL THAT STRIP OF LAND, SITUATE IN SAID CITY, COUNTY AND STATE, ADJOINING SAID PARCEL ON THE EAST AND BEING SEVEN AND ONE HALF (7 ½ ) FEET WIDE FROM EAST TO WEST AND 30 FEET LONG FROM NORTH TO SOUTH, SITUATED BETWEEN THE NORTH AND SOUTH LINES OF THE FIRST PARCEL EXTENDING EASTERLY.

Exhibit A

THE TWO PARCELS ABOVE DESCRIBED FORM A SINGLE LOT OF LAND BOUNDED AND DESCRIBED AS FOLLOWS:

COMMENCING AT A POINT IN THE EAST LINE OF DURGIN STREET, 100 FEET SOUTHERLY FROM THE SOUTH LINE OF EVERGREEN STREET; RUNNING THENCE

(1) EASTERLY PARALLEL WITH EVERGREEN STREET 66.06 FEET; THENCE

(2) SOUTHERLY PARALLEL WITH DURGIN STREET, 30 FEET; THENCE

(3) WESTERLY PARALLEL WITH EVERGREEN STREET, 65.57 FEET TO THE EAST LINE OF DURGIN STREET; THENCE

(4) NORTHERLY ALONG THE EAST LINE OF DURGIN STREET, 30 FEET TO THE PLACE OF BEGINNING.

ALSO, ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE EASTERLY LINE OF DURGIN STREET, 130 FEET SOUTHERLY FROM THE SOUTHERLY LINE OF EVERGREEN STREET; THENCE

(1) SOUTHERLY ALONG THE EASTERLY LINE OF DURGIN STREET, 19 FEET TO A POINT; THENCE

(2) EASTERLY AT RIGHT ANGLES TO THE EASTERLY LINE OF DURGIN STREET, 65.26 FEET TO A POINT; THENCE

(3) NORTHERLY 19 FEET TO A POINT 65.57 FEET EASTERLY FROM THE POINT OF BEGINNING; THENCE

(4) WESTERLY 65.57 FEET TO THE POINT OR PLACE OF BEGINNING.

PARCEL II

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE, STATE OF NEW YORK KNOWN AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE EASTERLY LINE OF DURGIN STREET, 149 FEET SOUTHERLY FROM THE SOUTHERLY LINE OF EVERGREEN STREET; THENCE

Exhibit A

(1) SOUTHERLY ALONG THE EASTERLY LINE OF DURGIN STREET 19 FEET TO A POINT; THENCE

(2) EASTERLY AT RIGHT ANGLES TO THE EASTERLY LINE OF DURGIN STREET 62.95 FEET TO A POINT; THENCE

(3) NORTHERLY 19 FEET TO A POINT 63.26 FEET EASTERLY FROM THE POINT OF BEGINNING; THENCE

(4) WESTERLY 63.26 FEET TO THE POINT OR PLACE OF BEGINNING.

***

Exhibit A

# EXHIBIT E

MONROE COUNTY CLERK'S OFFICE          THIS IS NOT A BILL. THIS IS YOUR RECEIPT.

Receipt # 2837019

Book    Page    A 01899  0208

Return To:                                    No. Pages: 18
OS NATIONAL - RESWARE
3097 SATELLITE BLVD, STE 400                  Instrument: ASSIGNMENT OF MORTGAGE
DULUTH, GA 30096
                                              Control #:        202109101047
                                              Ref #:            MDM006474

                                              Date: 09/10/2021

COREVEST PURCHASER 2, LLC,                    Time: 2:42:51 PM


COREVEST PURCHASER 2, LLC,


| | |
|---|---|
| Pages Fee | $85.00 |
| State Fee Cultural Education | $14.25 |
| State Fee Records Management | $4.75 |
| County Fee Assign of Mtg | $26.50 |

Employee: ED

Total Fees Paid:          $130.50


State of New York

MONROE COUNTY CLERK'S OFFICE
WARNING – THIS SHEET CONSTITUTES THE CLERKS
ENDORSEMENT, REQUIRED BY SECTION 317-a(5) &
SECTION 319 OF THE REAL PROPERTY LAW OF THE
STATE OF NEW YORK. DO NOT DETACH OR REMOVE.

JAMIE ROMEO

MONROE COUNTY CLERK



PREPARED BY:
CoreVest American Finance Lender LLC
4 Park Plaza, Suite 900
Irvine, CA 92614


UPON RECORDATION RETURN TO:
OS National, LLC
3097 Satellite Blvd., Suite 400
Duluth, GA 30096
(770) 497-9100

## ASSIGNMENT OF SECURITY INSTRUMENT

by

## COREVEST AMERICAN FINANCE LENDER LLC,
a Delaware limited liability company

to

## COREVEST PURCHASER 2, LLC,
a Delaware limited liability company

| | |
|---|---|
| **Dated:** | As of March 31, 2021 |
| **State:** | New York |
| **County:** | Monroe |

Mortgage Reference: Instrument 202106041414 Book 29252 Page 152
Reference: MDM006474

## ASSIGNMENT OF SECURITY INSTRUMENT

This **ASSIGNMENT OF SECURITY INSTRUMENT** (this "Assignment"), dated as of March 31, 2021, is made and entered into by **COREVEST AMERICAN FINANCE LENDER LLC**, a Delaware limited liability company, having an address at 4 Park Plaza, Suite 900, Irvine, CA 92614 ("Assignor"), in favor of **COREVEST PURCHASER 2, LLC**, a Delaware limited liability company ("Assignee").

## W I T N E S S E T H

WHEREAS, Assignor is the present legal and equitable owner and holder of that certain Promissory Note, dated as of March 31, 2021, executed by **HIRSCHHORN ESTATES, LLC**, a Delaware limited liability company ("Borrower"), and made payable to the order of Assignor in the stated principal amount of One Million Twenty-Three Thousand Five Hundred and No/100 Dollars ($1,023,500.00) (the "Note") in connection with certain real property and improvements located thereon situated in the County of Monroe, State of New York, identified on Schedule 1 attached hereto and made a part hereof and more particularly described on Exhibit A, attached hereto and made a part hereof (the "Premises"); and

WHEREAS, the Note is secured, inter alia, by the Security Instrument (as hereinafter defined); and

WHEREAS, the parties hereto desire that Assignor assign to Assignee, its successors and assigns, all of Assignor's right, title and interest in and to the Security Instrument.

NOW, THEREFORE, in consideration of the premises above set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and agreed, Assignor and Assignee hereby covenant and agree as follows:

1.        Assignment. Assignor does hereby transfer, assign, grant and convey to Assignee, its successors and assigns, all of the right, title and interest of Assignor in and to the following described instrument, and does hereby grant and delegate to Assignee, its successors and assigns, any and all of the duties and obligations of Assignor thereunder from and after the date hereof:

That certain Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of March 31, 2021, executed by Borrower for the benefit of Assignor, as lender, and recorded on June 4, 2021 in the Real Property Records of Monroe County, New York, as Inst # 202106041414  BK : 29252 PG: 0152 (the "Security Instrument"), in respect of the Premises.   *Reference: MDM006474 (sm)

2.        Assumption. From and after the date hereof, Assignee hereby accepts this Assignment and assumes and agrees to observe, perform and be bound by all of the terms, covenants, agreements, conditions and obligations of the Security Instrument required to be observed or performed by Assignor thereunder.

3.         Governing Law.  With respect to matters relating to the creation, perfection and procedures relating to the enforcement of this Assignment, this Assignment shall be governed by, and be construed in accordance with, the laws of the State of New York, it being understood that, except as expressly set forth above in this paragraph and to the fullest extent permitted by the law of the State of New York, the law of the State of New York applicable to contracts made and performed in such State (pursuant to Section 5-1401 of the New York General Obligations Law) shall govern all matters relating to this Assignment and all of the indebtedness or obligations arising hereunder.

4.         Successors and Assigns.  This Assignment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

5.         Headings.   The headings of the paragraphs of this Assignment have been included only for convenience, and shall not be deemed in any manner to modify or limit any of the provisions of this Assignment or be used in any manner in the interpretation of this Assignment.

6.         Interpretation.  Whenever the context so requires in this Assignment, all words used in the singular shall be construed to have been used in the plural (and vice versa), each gender shall be construed to include any other genders, and the word "person" shall be construed to include a natural person, a corporation, a firm, a partnership, a joint venture, a trust, an estate or any other entity.

7.         Partial Invalidity.  Each provision of this Assignment shall be valid and enforceable to the fullest extent permitted by law.  If any provision of this Assignment or the application of such provision to any person or circumstance shall, to any extent, be invalid or unenforceable, then the remainder of this Assignment, or the application of such provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected by such invalidity or unenforceability.

8. Section 275. The assignment is not subject to the requirements of section 275 of the Real Property Law because it is an assignment within the secondary mortgage market.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, Assignor has executed this Assignment of Security Instrument as of the day and year first above written.

**ASSIGNOR:**

**CoreVest American Finance Lender LLC,**
a Delaware limited liability company

By: _____
Name: Sokun Soun
Title:    Authorized Signatory


<u>Address</u>:

4 Park Plaza, Suite 900
Irvine, CA 92614
Attention: Head of Term Lending

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

CIVIL CODE § 1189

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California             )

County of __Orange__           )

On ___April 7, 2021___ before me, __Jaime Chavez, Notary Public__,
         *Date*                *Here Insert Name and Title of the Officer*

personally appeared __Sokun Soun__
                         *Name(s) of Signer(s)*

               __N/A__,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

JAIME CHAVEZ
COMM. #2349460
Notary Public - California
Orange County
My Comm. Expires Mar. 1, 2025
NR01

Signature _____
            *Signature of Notary Public*

*Place Notary Seal Above*

──────────── **OPTIONAL** ────────────

*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: _____
Document Date: _____ Number of Pages: _____
Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Individual     ☐ Attorney in Fact
☐ Trustee      ☐ Guardian or Conservator
☐ Other: _____
Signer Is Representing: _____

Signer's Name: _____
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Individual     ☐ Attorney in Fact
☐ Trustee      ☐ Guardian or Conservator
☐ Other: _____
Signer Is Representing: _____

©2016 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)    Item #5907

## SCHEDULE 1

Property List

| Address | City | State | County | Zip |
|---|---|---|---|---|
| 103 Marion St | Rochester | NY | Monroe | 14610 |
| 117 W Filbert Street | East Rochester | NY | Monroe | 14445 |
| 136 Campbell St  Apts  1-6 | Rochester | NY | Monroe | 14611 |
| 14 Durgin St | Rochester | NY | Monroe | 14605 |
| 236 Saratoga Ave Apts 1-6 | Rochester | NY | Monroe | 14608 |
| 258 Avis St | Rochester | NY | Monroe | 14615 |
| 294 Lexington Ave | Rochester | NY | Monroe | 14613 |
| 301 Selye Ter | Rochester | NY | Monroe | 14613 |
| 31 Alice St | Rochester | NY | Monroe | 14611 |
| 36 Sterling St | Rochester | NY | Monroe | 14606 |
| 404 Emerson St | Rochester | NY | Monroe | 14613 |
| 74 Starling St | Rochester | NY | Monroe | 14613 |
| 76 Oriole St | Rochester | NY | Monroe | 14613 |
| 8 Immel St | Rochester | NY | Monroe | 14606 |
| 8 Velox St | Rochester | NY | Monroe | 14615 |
| 87 Dix St | Rochester | NY | Monroe | 14606 |
| 968 Ridgeway Ave | Rochester | NY | Monroe | 14615 |

Schedule 1     Mortgage (*Monroe County, New York*)

# EXHIBIT A

Legal Description

Address: 103 Marion St, Rochester, NY  14610

County: Monroe

Parcel Identification Number: 122.40-2-2

Client Code: MEYER-HIRSCHHORN-01

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, BEING LOT #16 AS THE SAME IS LAID DOWN ON AN AMENDED MAP OF A PART OF THE MAHLON D. PHILLIPS SUBDIVISION OF A PART OF LOT #27 IN THE SECOND SUBDIVISION OF LOTS IN THE TOWN OF BRIGHTON, NOW THE CITY OF ROCHESTER, WHICH MAP WAS MADE BY A.B. TITUS, SURVEYOR, FOR MILLICENT HOVEY AND FILED IN THE MONROE COUNTY CLERK'S OFFICE FEBRUARY 15, 1910 IN LIBER 21 OF MAPS, PAGE 19, SAID LOT #16 IS SITUATE ON THE WEST SIDE OF MARION STREET.

\*\*\*

Address: 117 W Filbert Street, East Rochester, NY  14445

County: Monroe

Parcel Identification Number: 152.21-1-65

Client Code: MEYER-HIRSCHHORN-03

ALSO ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE TOWN/VILLAGE OF EAST ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, AND BEING KNOWN AND DESIGNATED AS LOT NUMBER TWELVE (12) IN BLOCK NUMBER FIFTY-SIX (56) AS SHOWN ON A MAP OF THE LANDS OF THE VANDERBILT IMPROVEMENT CO. ON FILE IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 10 OF MAPS, AT PAGE 35. EXCEPTING AND RESERVING THEREFROM, THE STREET OR THE STREET ABUTTING UPON SAID PREMISES, THE FEE OF WHICH, SUBJECT TO THE USED OF SAID TOWNN/VILLAGE OF EAST ROCHESTER, AS A HIGHWAY OR HIGHWAYS IS RETAINED IN SAID TOWNN/VILLAGE.

\*\*\*

Exhibit A          Mortgage (*Monroe County, New York*)

Address: 136 Campbell St Apts 1-6, Rochester, NY 14611

County: Monroe

Parcel Identification Number: 120.27-1-19

Client Code: MEYER-HIRSCHHORN-04

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF
ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN
AND DISTINGUISHED AS A PART OF LOT NUMBER SEVEN (7) SECTION A
OF THE WHITNEY TRACT AS THE SAME IS LAID DOWN UPON A MAP OF
SAID TRACT FILED IN MONROE COUNTY CLERK'S OFFICE IN LIBER 2 OF
MAPS AT PAGE 8, AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF WALNUT AND CAMPBELL
STREETS AND RUNNING THENCE NORTHERLY ALONG THE WEST LINE
OF WALNUT STREET, NINETY-EIGHT (98) FEET; THENCE WESTERLY
PARALLEL WITH THE NORTH LINE OF CAMPBELL STREET FIFTY (50)
FEET TO THE WEST LINE OF SAID LOT NUMBER SEVEN (7); THENCE
SOUTHERLY PARALLEL WITH THE WEST LINE OF WALNUT STREET AND
ALONG THE WEST LINE OF SAID LOT NINETY EIGHT (98) FEET TO THE
NORTH LINE OF CAMPBELL STREET AND THENCE EASTERLY ALONG
THE SAID NORTH LINE FIFTY (50) FEET TO THE PLACE OF BEGINNING,
TOGETHER WITH ALL THE RIGHT, TITLE AND INTEREST OF THE PARTIES
OF THE FIRST PART IN AND TO SUCH PORTIONS OF CAMPBELL AND
WALNUT STREETS AS LIE IN FRONT OF THE PREMISES HEREBY
CONVEYED, HEREBY INTENDING TO CONVEY ALL THAT PART OF
PARCEL OF LOT NUMBER SEVEN (7) SOUTH OF A LINE DRAWN SOUTH
OF THE NORTH LINE OF SAID LOT AND THIRTY-FOUR (34) FEET DISTANT
THEREFROM.


***


Address: 236 Saratoga Ave Apts 1-6, Rochester, NY 14608

County: Monroe

Parcel Identification Number: 105.51-3-1

Client Code: MEYER-HIRSCHHORN-06

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE COUNTY
OF MONROE, STATE OF NEW YORK, AND IS DESCRIBED AS FOLLOWS:

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF
ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN

Exhibit A

AND DESCRIBED AS LOT NUMBER ONE (1) OF THE JONES TRACT, SECTION "G", AS SHOWN ON A MAP THEREOF FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 35 OF MAPS AT PAGE 29.

SAID LOT NUMBER ONE (1) FRONTS 31 FEET ON THE EAST SIDE OF SARATOGA AVENUE AND IS OF THE FURTHER DIMENSIONS AS SHOWN ON SAID MAP.

***

Address: 258 Avis St, Rochester, NY  14615

County: Monroe

Parcel Identification Number: 090.41-1-34

Client Code: MEYER-HIRSCHHORN-07

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, FORMERLY TOWN OF GREECE, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN AND DESCRIBED AS LOT NO. 340 OF W. N. BRITTON TRACT, WEST OF DEWEY AVENUE AS THE SAME IS LAID DOWN ON A MAP THEREOF FILED IN LIBER 25 OF MAPS AT PAGE 35.

SAID LOT 340 FRONTS 50 FEET ON THE NORTHERLY SIDE OF AVIS STREET AND EXTENDS BACK OF EQUAL WIDTH THROUGHOUT 100 FEET.

***

Address: 294 Lexington Ave, Rochester, NY  14613

County: Monroe

Parcel Identification Number: 105.26-1-12

Client Code: MEYER-HIRSCHHORN-08

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, BEING LOT #1 OF JESSE M. FROST'S SUBDIVISION OF PART OF LOT #4 OF THE 20,000.00 ACRE TRACT, A MAP OF WHICH SUBDIVISION IS FILED IN MONROE COUNTY CLERK'S OFFICE IN LIBER 54 OF MAPS, PAGE 1.

SAID LOT #1 OF SAID FROST'S SUBDIVISION IS SITUATE ON THE NORTH SIDE OF LEXINGTON AVENUE AND IS 37 FEET WIDE FRONT AND REAR AND 85 FEET DEEP.

Exhibit A

THE EASTERLY LINE OF LOT #1 IS PARALLEL TO THE WESTERLY LINE
OF STRAUB STREET, ROCHESTER, NEW YORK.


*** 


Address: 301 Selye Ter, Rochester, NY  14613

County: Monroe

Parcel Identification Number: 090.81-2-27

Client Code: MEYER-HIRSCHHORN-09

ALSO ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF
ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN
AND DESCRIBED AS LOT NUMBER SIXTY-FIVE (65) AS SHOWN AND LAID
DOWN ON THE MAP OF THE ROCHESTER DRIVING PARK TRACT, SO-
CALLED, MADE BY J.C. RYAN, SURVEYOR, AND FILED IN THE MONROE
COUNTY CLERK'S OFFICE IN LIBER 15 OF MAPS, AT PAGE 33. SAID LOT
NUMBER SIXTY-FIVE (65) FRONTS ON THE SOUTH SIDE OF SELYE
TERRACE AND IS FORTY (40) FEET WIDE IN FRONT AND EXTENDS BACK
OF EQUAL WIDTH WITH THE FRONT ONE HUNDRED AND SIXTEEN (116)
FEET IN DEPTH.


*** 


Address: 31 Alice St, Rochester, NY  14611

County: Monroe

Parcel Identification Number: 120.31-2-26

Client Code: MEYER-HIRSCHHORN-10

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF
ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN
AND DISTINGUISHED AS LOT NUMBER FOURTEEN (14), IN SECTION "B",
ON THE SOUTH SIDE OF ALICE STREET, AS THE SAID LOT IS LAID DOWN
ON A MAP OF A SUBDIVISION OF PART OF THE BINGEN TRACT, MADE BY
HORACE JONES, SURVEYOR, AUGUST 1872, AND FILED IN THE MONROE
COUNTY CLERK'S OFFICE IN LIBER 5 OF MAPS, PAGE 88. THE SAID LOT
BEING FORTY (40) FEET IN WIDTH FRONT AND REAR AND ONE
HUNDRED SIXTY-SIX (166) FEET DEEP.


Exhibit A

\*\*\*

Address: 36 Sterling St, Rochester, NY  14606

County: Monroe

Parcel Identification Number: 105.49-1-40

Client Code: MEYER-HIRSCHHORN-11

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF
ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, BEING
KNOWN AND DESCRIBED AS LOT NO. 5 ON A SUBDIVISION OF LOTS NO.
72 TO 82 INCLUSIVE, OF THE HOUSTON TRACT, AS SHOWN ON A MAP
FILED IN LIBER 11 OF MAPS, PAGE 100 IN THE MONROE COUNTY
CLERK'S OFFICE. SAID LOT NO. 5 BEING 33 FEET AND 3 INCHES FRONT
AND REAR AND 125 FEET DEEP, AND IS SITUATE ON THE EAST SIDE OF
STERLING STREET.


\*\*\*

Address: 404 Emerson St, Rochester, NY  14613

County: Monroe

Parcel Identification Number: 105.41-2-17

Client Code: MEYER-HIRSCHHORN-12

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF
ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN
AND DESIGNATED AS LOT #2 OF THE KONDOLF & BRAYER TRACT, AS
THE SAME IS LAID OUT ON A MAP OF THE SAID TRACT FILED IN THE
MONROE COUNTY CLERK'S OFFICE IN LIBER 3 OF MAPS, PAGE 25. SAID
LOT BEING 240 FEET EASTERLY FROM THE EASTERLY RIGHT OF WAY
LINE OF PLOVER STREET, AS MEASURED ALONG THE NORTHERLY
RIGHT OF WAY LINE OF EMERSON STREET; THENCE IN A NORTHERLY
DIRECTION AT AN INTERIOR ANGLE OF 89 DEGREES 26' 15" WITH THE
PRECEDING COURSE A DISTANCE OF 187.42 FEET TO A POINT ON THE
SOUTHERLY RIGHT OF WAY LINE OF THE FORMER ERIE CANAL
PROPERTY; THENCE IN A SOUTHEASTERLY DIRECTION AT AN INTERIOR
ANGLE OF 39 DEGREES 36' 35" WITH THE PRECEDING COURSE ALONG
THE SOUTHERLY RIGHT OF WAY LINE OF THE FORMER ERIE CANAL
PROPERTY A DISTANCE OF 47.68 FEET TO AN ANGLE POINT; THENCE
CONTINUING IN A SOUTHEASTERLY DIRECTION AT AN INTERIOR ANGLE
WITH THE PRECEDING COURSE OF 168 DEGREES 04' 37", ALONG THE
SOUTHERLY RIGHT OF WAY LINE OF THE FORMER ERIE CANAL
PROPERTY A DISTANCE OF 47.68 FEET TO AN ANGLE POINT; THENCE
CONTINUING IN A SOUTHEASTERLY DIRECTION AT AN INTERIOR ANGLE

Exhibit A

WITH THE PRECEDING COURSE OF 168 DEGREES 04' 37", ALONG THE SOUTHERLY RIGHT OF WAY LINE OF THE FORMER ERIE CANAL PROPERTY, A DISTANCE OF 20.66 FEET TO A POINT; THENCE IN A SOUTHERLY DIRECTION AT AN INTERIOR ANGLE OF 152 DEGREES 18' 48" WITH THE PRECEDING COURSE, A DISTANCE OF 132 FEET TO A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF EMERSON STREET, AT AN INTERIOR ANGLE OF 90 DEGREES 33' 45" WITH THE PRECEDING COURSE A DISTANCE OF 40 FEET TO THE POINT OF BEGINNING.

***

Address: 74 Starling St, Rochester, NY 14613

County: Monroe

Parcel Identification Number: 105.25-1-33

Client Code: MEYER-HIRSCHHORN-13

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK KNOWN AND DISTINGUISHED AS LOT #23, JAMES N. WHITNEY'S SUBDIVISION OF PART OF ORIGINAL TOWN LOT #64, AS SHOWN ON A MAP THEREOF, MADE BY HORACE JONES, SURVEYOR, FOR SAID WHITNEY AND FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 3 OR MAPS, PAGE 52.

SAID LOT #23 BEING SITUATE ON THE EAST SIDE OF STARLING STREET AND BEING 50 FEET WIDE FRONT AND REAR AND 150 FEET DEEP.

***

Address: 76 Oriole St, Rochester, NY 14613

County: Monroe

Parcel Identification Number: 105.25-3-57

Client Code: MEYER-HIRSCHHORN-14

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK KNOWN AND DESCRIBED AS LOT NO. NINETY-TWO (92) OF A MAP OF MONROE CO-OPERATIVE BUILDING LOT ASSOCIATION TRACT, FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 2 OF MAPS, PAGE 30; SAID LOT NO. 92 FRONTING ON THE EAST SIDE OF ORIOLE STREET AS DESIGNATED AND LAID OUT ON SAID MAP, AND BEING FORTY-FIVE (45)

Exhibit A

FEET WIDE, FRONT AND REAR, AND ONE HUNDRED THIRTY (130) FEET
IN DEPTH.


***


Address: 8 Immel St, Rochester, NY  14606

County: Monroe

Parcel Identification Number: 105.81-2-26

Client Code: MEYER-HIRSCHHORN-15

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF
ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN
AND DESIGNATED AS LOT #6 IN A SUBDIVISION MAP OF IMMEL PLACE
FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 7 OF MAPS,
PAGE 38. SAID LOT #6 IS SITUATE ON THE EAST SIDE OF IMMEL PLACE
AND IS 40 FEET FRONT AND REAR AND 76 FEET DEEP.


***


Address: 8 Velox St, Rochester, NY  14615

County: Monroe

Parcel Identification Number: 075.82-2-40

Client Code: MEYER-HIRSCHHORN-16

ALSO ALL THAT TRACT OR PARCEL OF LAND, WITH THE BUILDINGS AND
IMPROVEMENTS THEREON ERECTED, SITUATE, LYING AND BEING IN
THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW
YORK, KNOWN AND DISTINGUISHED AS LOT NUMBER ONE HUNDRED
AND TWENTY (120) OF ADELGONDE EDDY TRACT ACCORDING TO A MAP
OF SAID TRACT MADE BY R.E. GASKIN, SURVEYOR, AND FILED IN
MONROE COUNTY CLERK'S OFFICE IN LIBER 29 OF MAPS AT PAGE 22.

THIS CONVEYANCE IS MADE AND ACCEPTED SUBJECT TO COVENANTS
AND RESTRICTIONS CONTAINED IN A DEED MADE BY THOMAS H. EDDY
AND OTHERS, TO ANNA WEISS, RECORDED IN MONROE COUNTY
CLERK'S OFFICE IN LIBER 895 OF DEEDS AT PAGE 326. ALSO SUBJECT
TO A RIGHT OF WAY GRANTED BY ANNA WEISS AND PETER WEISS TO
THE ROCHESTER GAS & ELECTRIC CORPORATION AND OTHERS,
RECORDED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 1078 OF
DEEDS AT PAGE 340.


Exhibit A

***

Address: 87 Dix St, Rochester, NY  14606

County: Monroe

Parcel Identification Number: 105.48-2-12

Client Code: MEYER-HIRSCHHORN-17

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF
ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK.
BOUNDED AND DESCRIBED AS FOLLOWS: LOT NO. 7, M.F. SCHIED
SUBDIVISION AS LAID DOWN ON A MAP OF A SUBDIVISION OF LOTS
NOS. 124 AND 128 INCLUSIVE AND 143, 144 AND 145 OF THE HOUSON
TRACT MADE FOR MICHAEL J. SCHIED BY J.C. RYAN, SURVEYOR, FILED
IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 26 OF MAPS, PAGE
23.

SAID LOT NO. 7 IS SITUATE ON THE WEST SIDE OF DIX STREET AND IS
THIRTY-SEVEN (37) FEET WIDE FRONT AND REAR AND 116.43 FEET
DEEP AS SHOWN ON SAID MAP.

***

Address: 968 Ridgeway Ave, Rochester, NY  14615

County: Monroe

Parcel Identification Number: 090.39-1-20

Client Code: MEYER-HIRSCHHORN-18

ALSO ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF
ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN
AND DESCRIBED AS LOT 12 AND THE WEST 10 FEET OF LOT NO. 13 AS
SAID LOTS ARE LAID DOWN ON A MAP OF RIDGEWAY AVENUE
TERRACE, FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 29
OF MAPS AT PAGE 26.

SAID LOT NO. 12, TOGETHER WITH THE WEST 10 FEET OF LOT NO. 13,
CONSTITUTES A PARCEL OF LAND FRONTING 50 FEET ON THE NORTH
SIDE OF RIDGEWAY AVENUE 50 FEET WIDE IN REAR, AND ABOUT 98.26
FEET IN DEPTH, MORE OR LESS.

Exhibit A

SUBJECT TO THE SEVEN FOOT PERPETUAL EASEMENT RESERVED BY THE CITY OF ROCHESTER BY DEED RECORDED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 2673 IF DEEDS, PAGE 130.

ALSO ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN AND DESCRIBED AS THE WESTERLY 50 FEET OF LOT NOS., 15 AND 16 AS SAID LOTS ARE LAID DOWN ON A MAP OF THE RIDGEWAY AVENUE TERRACE TRACT FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 29 OF MAPS, PAGE 26.

SAID WESTERLY 50 FEET OF SAID LOTS NOS., 15 AND 16 CONSTITUTES PARCEL OF LAND 55 FEET WIDE FRONTING ON THE EASTERLY SIDE OF PERINTON STREET, FORMERLY PERRINGTON AVENUE, RUNNING BACK OF EVEN WIDTH 50 FEET TO THE EASTERLY LINE OF PREMISES CONVEYED TO THE PARTY OF THE FIRST PART HEREIN BY DEED RECORDED IN MONROE COUNTY CLERK'S OFFICE MARCH 30, 1950 IN LIBER 2673 OF DEEDS, PAGE 130, EXTEND NORTHERLY TO THE NORTH LINE OF SAID LOT NO. 16.

***

Address: 14 Durgin St, Rochester, NY 14605
County: Monroe
Parcel Identification Number: 106.37-2-45.003
Client Code: MEYER-HIRSCHHORN-05
PARCEL I

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE, AND STATE OF NEW YORK, KNOWN AND DESCRIBED AS LOT NO. TWENTY- SIX (26) AS SHOWN ON A MAP ANNEXED TO THE REPORT OF J. P. VARNUM, REFEREE, TO REPORT ORDER OF SALE OF LAND MORTGAGED BY FRANCES G. WORCESTER AND DAVID F. WORCESTER TO THE ROCHESTER SAVINGS BANK, THE SAME BEING ON FILE IN THE MONROE COUNTY CLERK'S OFFICE AND IS ABOUT 30 FEET ON THE EAST SIDE OF EVERGREEN PLACE (NOW KNOWN AS DURGIN STREET) AND EXTENDS BACK THE SAME WIDTH TO THE EASTERLY LINE OF SAID MORTGAGED PREMISES.

ALSO, ALL THAT STRIP OF LAND, SITUATE IN SAID CITY, COUNTY AND STATE, ADJOINING SAID PARCEL ON THE EAST AND BEING SEVEN AND ONE HALF (7 ½) FEET WIDE FROM EAST TO WEST AND 30 FEET LONG FROM NORTH TO SOUTH, SITUATED BETWEEN THE NORTH AND SOUTH LINES OF THE FIRST PARCEL EXTENDING EASTERLY.

Exhibit A

THE TWO PARCELS ABOVE DESCRIBED FORM A SINGLE LOT OF LAND BOUNDED AND DESCRIBED AS FOLLOWS:

COMMENCING AT A POINT IN THE EAST LINE OF DURGIN STREET, 100 FEET SOUTHERLY FROM THE SOUTH LINE OF EVERGREEN STREET; RUNNING THENCE

(1) EASTERLY PARALLEL WITH EVERGREEN STREET 66.06 FEET; THENCE

(2) SOUTHERLY PARALLEL WITH DURGIN STREET, 30 FEET; THENCE

(3) WESTERLY PARALLEL WITH EVERGREEN STREET, 65.57 FEET TO THE EAST LINE OF DURGIN STREET; THENCE

(4) NORTHERLY ALONG THE EAST LINE OF DURGIN STREET, 30 FEET TO THE PLACE OF BEGINNING.

ALSO, ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE EASTERLY LINE OF DURGIN STREET, 130 FEET SOUTHERLY FROM THE SOUTHERLY LINE OF EVERGREEN STREET; THENCE

(1) SOUTHERLY ALONG THE EASTERLY LINE OF DURGIN STREET, 19 FEET TO A POINT; THENCE

(2) EASTERLY AT RIGHT ANGLES TO THE EASTERLY LINE OF DURGIN STREET, 65.26 FEET TO A POINT; THENCE

(3) NORTHERLY 19 FEET TO A POINT 65.57 FEET EASTERLY FROM THE POINT OF BEGINNING; THENCE

(4) WESTERLY 65.57 FEET TO THE POINT OR PLACE OF BEGINNING.

PARCEL II

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE, STATE OF NEW YORK KNOWN AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE EASTERLY LINE OF DURGIN STREET, 149 FEET SOUTHERLY FROM THE SOUTHERLY LINE OF EVERGREEN STREET; THENCE

Exhibit A

(1) SOUTHERLY ALONG THE EASTERLY LINE OF DURGIN STREET 19 FEET TO A POINT; THENCE

(2) EASTERLY AT RIGHT ANGLES TO THE EASTERLY LINE OF DURGIN STREET 62.95 FEET TO A POINT; THENCE

(3) NORTHERLY 19 FEET TO A POINT 63.26 FEET EASTERLY FROM THE POINT OF BEGINNING; THENCE

(4) WESTERLY 63.26 FEET TO THE POINT OR PLACE OF BEGINNING.

***

Exhibit A

# EXHIBIT F

MONROE COUNTY CLERK'S OFFICE        THIS IS NOT A BILL. THIS IS YOUR RECEIPT.

Receipt # 2837019

Book    Page    A   01899   0226

Return To:
OS NATIONAL - RESWARE
3097 SATELLITE BLVD, STE 400
DULUTH, GA 30096

No. Pages: 18

Instrument: ASSIGNMENT OF MORTGAGE

Control #:       202109101048
Ref #:         MDM006474

Date: 09/10/2021

COREVEST PURCHASER 2, LLC,

Time: 2:42:52 PM

CAF TERM BORROWER WF, LLC,

| | | |
|---|---|---|
| Pages Fee | $85.00 | |
| State Fee Cultural Education | $14.25 | |
| State Fee Records | $4.75 | |
| Management | | Employee: ED |
| County Fee Assign of Mtg | $26.50 | |
| | | |
| Total Fees Paid: | $130.50 | |

State of New York

MONROE COUNTY CLERK'S OFFICE
WARNING – THIS SHEET CONSTITUTES THE CLERKS
ENDORSEMENT, REQUIRED BY SECTION 317-a(5) &
SECTION 319 OF THE REAL PROPERTY LAW OF THE
STATE OF NEW YORK. DO NOT DETACH OR REMOVE.

JAMIE ROMEO

MONROE COUNTY CLERK



PREPARED BY:

CoreVest American Finance Lender LLC
4 Park Plaza, Suite 900
Irvine, CA 92614

UPON RECORDATION RETURN TO:
OS National, LLC
3097 Satellite Blvd., Suite 400
Duluth, GA 30096
(770) 497-9100

## ASSIGNMENT OF SECURITY INSTRUMENT

by

## COREVEST PURCHASER 2, LLC,
a Delaware limited liability company

to

## CAF TERM BORROWER WF, LLC,
a Delaware limited liability company

| | |
|---|---|
| **Dated:** | As of March 31, 2021 |
| **State:** | New York |
| **County:** | Monroe |

Mortgage Referencd: Instrument 202106041414 Book 29252 Page 0152
Reference: MDM006474

## ASSIGNMENT OF SECURITY INSTRUMENT

This **ASSIGNMENT OF SECURITY INSTRUMENT** (this "Assignment"), dated as of March 31, 2021, is made by **COREVEST PURCHASER 2, LLC**, a Delaware limited liability company, successor by assignment to CoreVest American Finance Lender LLC ("Assignor"), in favor of **CAF TERM BORROWER WF, LLC**, a Delaware limited liability company, having an address at 4 Park Plaza, Suite 900, Irvine, CA 92614, ("Assignee").

## W I T N E S S E T H

WHEREAS, Assignor is the present legal and equitable owner and holder of that certain Promissory Note, dated as of March 31, 2021, executed by **HIRSCHHORN ESTATES, LLC**, a Delaware limited liability company ("Borrower"), and made payable to the order of CoreVest American Finance Lender LLC, a Delaware limited liability company ("CoreVest"), predecessor-in-interest to Assignor, in the stated principal amount of One Million Twenty-Three Thousand Five Hundred and No/100 Dollars ($1,023,500.00) (the "Note") in connection with certain real property and improvements located thereon situated in the County of Monroe, State of New York, identified on Schedule 1 attached hereto and made a part hereof and more particularly described on Exhibit A, attached hereto and made a part hereof (the "Premises"); and

WHEREAS, the Note is secured, inter alia, by the Security Instrument (as hereinafter defined); and

WHEREAS, the parties hereto desire that Assignor assign to Assignee, its successors and assigns, all of Assignor's right, title and interest in and to the Security Instrument.

NOW, THEREFORE, in consideration of the premises above set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and agreed, Assignor and Assignee hereby covenant and agree as follows:

1.        Assignment. Assignor does hereby transfer, assign, grant and convey to Assignee, its successors and assigns, all of the right, title and interest of Assignor in and to the following described instruments, and does hereby grant and delegate to Assignee, its successors and assigns, any and all of the duties and obligations of Assignor thereunder from and after the date hereof:

That certain Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of March 31, 2021, executed by Borrower for the benefit of CoreVest, as lender, and recorded on June 4, 2021 in the Real Property Records of Monroe County, New York, as Inst # 202106041414  BK : 29252 PG: 0152, as assigned by that certain Assignment of Security Instrument from CoreVest, as assignor, to Assignor, as assignee (as so assigned, the "Security Instrument"), in respect of the Premises.

*Reference: MDM006474 (sm)

**2.** Assumption. From and after the date hereof, Assignee hereby accepts this Assignment and assumes and agrees to observe, perform and be bound by all of the terms, covenants, agreements, conditions and obligations of the Security Instrument required to be observed or performed by Assignor thereunder.

**3.** Governing Law. With respect to matters relating to the creation, perfection and procedures relating to the enforcement of this Assignment, this Assignment shall be governed by, and be construed in accordance with, the laws of the State of New York, it being understood that, except as expressly set forth above in this paragraph and to the fullest extent permitted by the law of the State of New York, the law of the State of New York applicable to contracts made and performed in such State (pursuant to Section 5-1401 of the New York General Obligations Law) shall govern all matters relating to this Assignment and all of the indebtedness or obligations arising hereunder.

**4.** Successors and Assigns. This Assignment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

**5.** Headings. The headings of the paragraphs of this Assignment have been included only for convenience, and shall not be deemed in any manner to modify or limit any of the provisions of this Assignment or be used in any manner in the interpretation of this Assignment.

**6.** Interpretation. Whenever the context so requires in this Assignment, all words used in the singular shall be construed to have been used in the plural (and vice versa), each gender shall be construed to include any other genders, and the word "person" shall be construed to include a natural person, a corporation, a firm, a partnership, a joint venture, a trust, an estate or any other entity.

**7.** Partial Invalidity. Each provision of this Assignment shall be valid and enforceable to the fullest extent permitted by law. If any provision of this Assignment or the application of such provision to any person or circumstance shall, to any extent, be invalid or unenforceable, then the remainder of this Assignment, or the application of such provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected by such invalidity or unenforceability.

8. Section 275. The assignment is not subject to the requirements of section 275 of the Real Property Law because it is an assignment within the secondary mortgage market.

**[SIGNATURE PAGE FOLLOWS]**

Loan No. 34631
Assignment of Security Instrument - CP2 to CAF Term Borr WE

IN WITNESS WHEREOF, Assignor has executed this Assignment of Security Instrument as of the day and year first above written.

ASSIGNOR:

**COREVEST PURCHASER 2, LLC,**
a Delaware limited liability company

By: _____
Name: Sokun Soun
Title:  Authorized Signatory


Address:

4 Park Plaza, Suite 900
Irvine, CA 92614
Attention: Head of Term Lending

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**       CIVIL CODE § 1189

---

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California                         )
County of __Orange_____ )

On ____April 7, 2021____ before me, __Jaime Chavez, Notary Public_____,
       *Date*                             *Here Insert Name and Title of the Officer*
personally appeared _____**Sokun Soun**_____
                                   *Name(s) of Signer(s)*
_____**N/A**_____,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
                *Signature of Notary Public*

JAIME CHAVEZ
COMM. #2349460
Notary Public · California
Orange County
My Comm. Expires Mar. 1, 2025

*Place Notary Seal Above*

──────────────── **OPTIONAL** ────────────────
*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: _____
Document Date: _____ Number of Pages: _____
Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**
Signer's Name: _____    Signer's Name: _____
☐ Corporate Officer — Title(s): _____    ☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General    ☐ Partner — ☐ Limited ☐ General
☐ Individual    ☐ Attorney in Fact    ☐ Individual    ☐ Attorney in Fact
☐ Trustee    ☐ Guardian or Conservator    ☐ Trustee    ☐ Guardian or Conservator
☐ Other: _____    ☐ Other: _____
Signer Is Representing: _____    Signer Is Representing: _____

©2016 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)    Item #5907

## SCHEDULE 1

Property List

| Address | City | State | County | Zip |
|---|---|---|---|---|
| 103 Marion St | Rochester | NY | Monroe | 14610 |
| 117 W Filbert Street | East Rochester | NY | Monroe | 14445 |
| 136 Campbell St  Apts  1-6 | Rochester | NY | Monroe | 14611 |
| 14 Durgin St | Rochester | NY | Monroe | 14605 |
| 236 Saratoga Ave Apts 1-6 | Rochester | NY | Monroe | 14608 |
| 258 Avis St | Rochester | NY | Monroe | 14615 |
| 294 Lexington Ave | Rochester | NY | Monroe | 14613 |
| 301 Selye Ter | Rochester | NY | Monroe | 14613 |
| 31 Alice St | Rochester | NY | Monroe | 14611 |
| 36 Sterling St | Rochester | NY | Monroe | 14606 |
| 404 Emerson St | Rochester | NY | Monroe | 14613 |
| 74 Starling St | Rochester | NY | Monroe | 14613 |
| 76 Oriole St | Rochester | NY | Monroe | 14613 |
| 8 Immel St | Rochester | NY | Monroe | 14606 |
| 8 Velox St | Rochester | NY | Monroe | 14615 |
| 87 Dix St | Rochester | NY | Monroe | 14606 |
| 968 Ridgeway Ave | Rochester | NY | Monroe | 14615 |

**EXHIBIT A**

Legal Description

Address: 103 Marion St, Rochester, NY  14610

County: Monroe

Parcel Identification Number: 122.40-2-2

Client Code: MEYER-HIRSCHHORN-01

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF
ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, BEING
LOT #16 AS THE SAME IS LAID DOWN ON AN AMENDED MAP OF A PART
OF THE MAHLON D. PHILLIPS SUBDIVISION OF A PART OF LOT #27 IN
THE SECOND SUBDIVISION OF LOTS IN THE TOWN OF BRIGHTON, NOW
THE CITY OF ROCHESTER, WHICH MAP WAS MADE BY A.B. TITUS,
SURVEYOR, FOR MILLICENT HOVEY AND FILED IN THE MONROE
COUNTY CLERK'S OFFICE FEBRUARY 15, 1910 IN LIBER 21 OF MAPS,
PAGE 19, SAID LOT #16 IS SITUATE ON THE WEST SIDE OF MARION
STREET.

\*\*\*

Address: 117 W Filbert Street, East Rochester, NY  14445

County: Monroe

Parcel Identification Number: 152.21-1-65

Client Code: MEYER-HIRSCHHORN-03

ALSO ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE
TOWN/VILLAGE OF EAST ROCHESTER, COUNTY OF MONROE AND
STATE OF NEW YORK, AND BEING KNOWN AND DESIGNATED AS LOT
NUMBER TWELVE (12) IN BLOCK NUMBER FIFTY-SIX (56) AS SHOWN ON
A MAP OF THE LANDS OF THE VANDERBILT IMPROVEMENT CO. ON FILE
IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 10 OF MAPS, AT
PAGE 35. EXCEPTING AND RESERVING THEREFROM, THE STREET OR
THE STREET ABUTTING UPON SAID PREMISES, THE FEE OF WHICH,
SUBJECT TO THE USED OF SAID TOWNN/VILLAGE OF EAST
ROCHESTER, AS A HIGHWAY OR HIGHWAYS IS RETAINED IN SAID
TOWNN/VILLAGE.

\*\*\*

Exhibit A        Mortgage (*Monroe County, New York*)

Address: 136 Campbell St Apts 1-6, Rochester, NY 14611

County: Monroe

Parcel Identification Number: 120.27-1-19

Client Code: MEYER-HIRSCHHORN-04

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN AND DISTINGUISHED AS A PART OF LOT NUMBER SEVEN (7) SECTION A OF THE WHITNEY TRACT AS THE SAME IS LAID DOWN UPON A MAP OF SAID TRACT FILED IN MONROE COUNTY CLERK'S OFFICE IN LIBER 2 OF MAPS AT PAGE 8, AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF WALNUT AND CAMPBELL STREETS AND RUNNING THENCE NORTHERLY ALONG THE WEST LINE OF WALNUT STREET, NINETY-EIGHT (98) FEET; THENCE WESTERLY PARALLEL WITH THE NORTH LINE OF CAMPBELL STREET FIFTY (50) FEET TO THE WEST LINE OF SAID LOT NUMBER SEVEN (7); THENCE SOUTHERLY PARALLEL WITH THE WEST LINE OF WALNUT STREET AND ALONG THE WEST LINE OF SAID LOT NINETY EIGHT (98) FEET TO THE NORTH LINE OF CAMPBELL STREET AND THENCE EASTERLY ALONG THE SAID NORTH LINE FIFTY (50) FEET TO THE PLACE OF BEGINNING, TOGETHER WITH ALL THE RIGHT, TITLE AND INTEREST OF THE PARTIES OF THE FIRST PART IN AND TO SUCH PORTIONS OF CAMPBELL AND WALNUT STREETS AS LIE IN FRONT OF THE PREMISES HEREBY CONVEYED, HEREBY INTENDING TO CONVEY ALL THAT PART OF PARCEL OF LOT NUMBER SEVEN (7) SOUTH OF A LINE DRAWN SOUTH OF THE NORTH LINE OF SAID LOT AND THIRTY-FOUR (34) FEET DISTANT THEREFROM.

***

Address: 236 Saratoga Ave Apts 1-6, Rochester, NY 14608

County: Monroe

Parcel Identification Number: 105.51-3-1

Client Code: MEYER-HIRSCHHORN-06

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE COUNTY OF MONROE, STATE OF NEW YORK, AND IS DESCRIBED AS FOLLOWS:

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN

Exhibit A

AND DESCRIBED AS LOT NUMBER ONE (1) OF THE JONES TRACT, SECTION "G", AS SHOWN ON A MAP THEREOF FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 35 OF MAPS AT PAGE 29.

SAID LOT NUMBER ONE (1) FRONTS 31 FEET ON THE EAST SIDE OF SARATOGA AVENUE AND IS OF THE FURTHER DIMENSIONS AS SHOWN ON SAID MAP.

\*\*\*

Address: 258 Avis St, Rochester, NY  14615

County: Monroe

Parcel Identification Number: 090.41-1-34

Client Code: MEYER-HIRSCHHORN-07

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, FORMERLY TOWN OF GREECE, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN AND DESCRIBED AS LOT NO. 340 OF W. N. BRITTON TRACT, WEST OF DEWEY AVENUE AS THE SAME IS LAID DOWN ON A MAP THEREOF FILED IN LIBER 25 OF MAPS AT PAGE 35.

SAID LOT 340 FRONTS 50 FEET ON THE NORTHERLY SIDE OF AVIS STREET AND EXTENDS BACK OF EQUAL WIDTH THROUGHOUT 100 FEET.

\*\*\*

Address: 294 Lexington Ave, Rochester, NY  14613

County: Monroe

Parcel Identification Number: 105.26-1-12

Client Code: MEYER-HIRSCHHORN-08

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, BEING LOT #1 OF JESSE M. FROST'S SUBDIVISION OF PART OF LOT #4 OF THE 20,000.00 ACRE TRACT, A MAP OF WHICH SUBDIVISION IS FILED IN MONROE COUNTY CLERK'S OFFICE IN LIBER 54 OF MAPS, PAGE 1.

SAID LOT #1 OF SAID FROST'S SUBDIVISION IS SITUATE ON THE NORTH SIDE OF LEXINGTON AVENUE AND IS 37 FEET WIDE FRONT AND REAR AND 85 FEET DEEP.

Exhibit A

THE EASTERLY LINE OF LOT #1 IS PARALLEL TO THE WESTERLY LINE OF STRAUB STREET, ROCHESTER, NEW YORK.

\*\*\*

Address: 301 Selye Ter, Rochester, NY 14613

County: Monroe

Parcel Identification Number: 090.81-2-27

Client Code: MEYER-HIRSCHHORN-09

ALSO ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN AND DESCRIBED AS LOT NUMBER SIXTY-FIVE (65) AS SHOWN AND LAID DOWN ON THE MAP OF THE ROCHESTER DRIVING PARK TRACT, SO-CALLED, MADE BY J.C. RYAN, SURVEYOR, AND FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 15 OF MAPS, AT PAGE 33. SAID LOT NUMBER SIXTY-FIVE (65) FRONTS ON THE SOUTH SIDE OF SELYE TERRACE AND IS FORTY (40) FEET WIDE IN FRONT AND EXTENDS BACK OF EQUAL WIDTH WITH THE FRONT ONE HUNDRED AND SIXTEEN (116) FEET IN DEPTH.

\*\*\*

Address: 31 Alice St, Rochester, NY 14611

County: Monroe

Parcel Identification Number: 120.31-2-26

Client Code: MEYER-HIRSCHHORN-10

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN AND DISTINGUISHED AS LOT NUMBER FOURTEEN (14), IN SECTION "B", ON THE SOUTH SIDE OF ALICE STREET, AS THE SAID LOT IS LAID DOWN ON A MAP OF A SUBDIVISION OF PART OF THE BINGEN TRACT, MADE BY HORACE JONES, SURVEYOR, AUGUST 1872, AND FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 5 OF MAPS, PAGE 88. THE SAID LOT BEING FORTY (40) FEET IN WIDTH FRONT AND REAR AND ONE HUNDRED SIXTY-SIX (166) FEET DEEP.

Exhibit A

\*\*\*

Address: 36 Sterling St, Rochester, NY  14606

County: Monroe

Parcel Identification Number: 105.49-1-40

Client Code: MEYER-HIRSCHHORN-11

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF
ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, BEING
KNOWN AND DESCRIBED AS LOT NO. 5 ON A SUBDIVISION OF LOTS NO.
72 TO 82 INCLUSIVE, OF THE HOUSTON TRACT, AS SHOWN ON A MAP
FILED IN LIBER 11 OF MAPS, PAGE 100 IN THE MONROE COUNTY
CLERK'S OFFICE. SAID LOT NO. 5 BEING 33 FEET AND 3 INCHES FRONT
AND REAR AND 125 FEET DEEP, AND IS SITUATE ON THE EAST SIDE OF
STERLING STREET.


\*\*\*


Address: 404 Emerson St, Rochester, NY  14613

County: Monroe

Parcel Identification Number: 105.41-2-17

Client Code: MEYER-HIRSCHHORN-12

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF
ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN
AND DESIGNATED AS LOT #2 OF THE KONDOLF & BRAYER TRACT, AS
THE SAME IS LAID OUT ON A MAP OF THE SAID TRACT FILED IN THE
MONROE COUNTY CLERK'S OFFICE IN LIBER 3 OF MAPS, PAGE 25. SAID
LOT BEING 240 FEET EASTERLY FROM THE EASTERLY RIGHT OF WAY
LINE OF PLOVER STREET, AS MEASURED ALONG THE NORTHERLY
RIGHT OF WAY LINE OF EMERSON STREET; THENCE IN A NORTHERLY
DIRECTION AT AN INTERIOR ANGLE OF 89 DEGREES 26' 15" WITH THE
PRECEDING COURSE A DISTANCE OF 187.42 FEET TO A POINT ON THE
SOUTHERLY RIGHT OF WAY LINE OF THE FORMER ERIE CANAL
PROPERTY; THENCE IN A SOUTHEASTERLY DIRECTION AT AN INTERIOR
ANGLE OF 39 DEGREES 36' 35" WITH THE PRECEDING COURSE ALONG
THE SOUTHERLY RIGHT OF WAY LINE OF THE FORMER ERIE CANAL
PROPERTY A DISTANCE OF 47.68 FEET TO AN ANGLE POINT; THENCE
CONTINUING IN A SOUTHEASTERLY DIRECTION AT AN INTERIOR ANGLE
WITH THE PRECEDING COURSE OF 168 DEGREES 04' 37", ALONG THE
SOUTHERLY RIGHT OF WAY LINE OF THE FORMER ERIE CANAL
PROPERTY A DISTANCE OF 47.68 FEET TO AN ANGLE POINT; THENCE
CONTINUING IN A SOUTHEASTERLY DIRECTION AT AN INTERIOR ANGLE

Exhibit A

WITH THE PRECEDING COURSE OF 168 DEGREES 04' 37", ALONG THE SOUTHERLY RIGHT OF WAY LINE OF THE FORMER ERIE CANAL PROPERTY, A DISTANCE OF 20.66 FEET TO A POINT; THENCE IN A SOUTHERLY DIRECTION AT AN INTERIOR ANGLE OF 152 DEGREES 18' 48" WITH THE PRECEDING COURSE, A DISTANCE OF 132 FEET TO A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF EMERSON STREET, AT AN INTERIOR ANGLE OF 90 DEGREES 33' 45" WITH THE PRECEDING COURSE A DISTANCE OF 40 FEET TO THE POINT OF BEGINNING.

\*\*\*

Address: 74 Starling St, Rochester, NY  14613

County: Monroe

Parcel Identification Number: 105.25-1-33

Client Code: MEYER-HIRSCHHORN-13

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK KNOWN AND DISTINGUISHED AS LOT #23, JAMES N. WHITNEY'S SUBDIVISION OF PART OF ORIGINAL TOWN LOT #64, AS SHOWN ON A MAP THEREOF, MADE BY HORACE JONES, SURVEYOR, FOR SAID WHITNEY AND FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 3 OR MAPS, PAGE 52.

SAID LOT #23 BEING SITUATE ON THE EAST SIDE OF STARLING STREET AND BEING 50 FEET WIDE FRONT AND REAR AND 150 FEET DEEP.

\*\*\*

Address: 76 Oriole St, Rochester, NY  14613

County: Monroe

Parcel Identification Number: 105.25-3-57

Client Code: MEYER-HIRSCHHORN-14

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK KNOWN AND DESCRIBED AS LOT NO. NINETY-TWO (92) OF A MAP OF MONROE CO-OPERATIVE BUILDING LOT ASSOCIATION TRACT, FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 2 OF MAPS, PAGE 30; SAID LOT NO. 92 FRONTING ON THE EAST SIDE OF ORIOLE STREET AS DESIGNATED AND LAID OUT ON SAID MAP, AND BEING FORTY-FIVE (45)

Exhibit A

FEET WIDE, FRONT AND REAR, AND ONE HUNDRED THIRTY (130) FEET IN DEPTH.

***

Address: 8 Immel St, Rochester, NY  14606

County: Monroe

Parcel Identification Number: 105.81-2-26

Client Code: MEYER-HIRSCHHORN-15

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN AND DESIGNATED AS LOT #6 IN A SUBDIVISION MAP OF IMMEL PLACE FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 7 OF MAPS, PAGE 38. SAID LOT #6 IS SITUATE ON THE EAST SIDE OF IMMEL PLACE AND IS 40 FEET FRONT AND REAR AND 76 FEET DEEP.

***

Address: 8 Velox St, Rochester, NY  14615

County: Monroe

Parcel Identification Number: 075.82-2-40

Client Code: MEYER-HIRSCHHORN-16

ALSO ALL THAT TRACT OR PARCEL OF LAND, WITH THE BUILDINGS AND IMPROVEMENTS THEREON ERECTED, SITUATE, LYING AND BEING IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN AND DISTINGUISHED AS LOT NUMBER ONE HUNDRED AND TWENTY (120) OF ADELGONDE EDDY TRACT ACCORDING TO A MAP OF SAID TRACT MADE BY R.E. GASKIN, SURVEYOR, AND FILED IN MONROE COUNTY CLERK'S OFFICE IN LIBER 29 OF MAPS AT PAGE 22.

THIS CONVEYANCE IS MADE AND ACCEPTED SUBJECT TO COVENANTS AND RESTRICTIONS CONTAINED IN A DEED MADE BY THOMAS H. EDDY AND OTHERS, TO ANNA WEISS, RECORDED IN MONROE COUNTY CLERK'S OFFICE IN LIBER 895 OF DEEDS AT PAGE 326. ALSO SUBJECT TO A RIGHT OF WAY GRANTED BY ANNA WEISS AND PETER WEISS TO THE ROCHESTER GAS & ELECTRIC CORPORATION AND OTHERS, RECORDED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 1078 OF DEEDS AT PAGE 340.

Exhibit A

\*\*\*

Address: 87 Dix St, Rochester, NY  14606

County: Monroe

Parcel Identification Number: 105.48-2-12

Client Code: MEYER-HIRSCHHORN-17

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK. BOUNDED AND DESCRIBED AS FOLLOWS: LOT NO. 7, M.F. SCHIED SUBDIVISION AS LAID DOWN ON A MAP OF A SUBDIVISION OF LOTS NOS. 124 AND 128 INCLUSIVE AND 143, 144 AND 145 OF THE HOUSON TRACT MADE FOR MICHAEL J. SCHIED BY J.C. RYAN, SURVEYOR, FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 26 OF MAPS, PAGE 23.

SAID LOT NO. 7 IS SITUATE ON THE WEST SIDE OF DIX STREET AND IS THIRTY-SEVEN (37) FEET WIDE FRONT AND REAR AND 116.43 FEET DEEP AS SHOWN ON SAID MAP.

\*\*\*

Address: 968 Ridgeway Ave, Rochester, NY  14615

County: Monroe

Parcel Identification Number: 090.39-1-20

Client Code: MEYER-HIRSCHHORN-18

ALSO ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN AND DESCRIBED AS LOT 12 AND THE WEST 10 FEET OF LOT NO. 13 AS SAID LOTS ARE LAID DOWN ON A MAP OF RIDGEWAY AVENUE TERRACE, FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 29 OF MAPS AT PAGE 26.

SAID LOT NO. 12, TOGETHER WITH THE WEST 10 FEET OF LOT NO. 13, CONSTITUTES A PARCEL OF LAND FRONTING 50 FEET ON THE NORTH SIDE OF RIDGEWAY AVENUE 50 FEET WIDE IN REAR, AND ABOUT 98.26 FEET IN DEPTH, MORE OR LESS.

Exhibit A

SUBJECT TO THE SEVEN FOOT PERPETUAL EASEMENT RESERVED BY THE CITY OF ROCHESTER BY DEED RECORDED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 2673 IF DEEDS, PAGE 130.

ALSO ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN AND DESCRIBED AS THE WESTERLY 50 FEET OF LOT NOS., 15 AND 16 AS SAID LOTS ARE LAID DOWN ON A MAP OF THE RIDGEWAY AVENUE TERRACE TRACT FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 29 OF MAPS, PAGE 26.

SAID WESTERLY 50 FEET OF SAID LOTS NOS., 15 AND 16 CONSTITUTES PARCEL OF LAND 55 FEET WIDE FRONTING ON THE EASTERLY SIDE OF PERINTON STREET, FORMERLY PERRINGTON AVENUE, RUNNING BACK OF EVEN WIDTH 50 FEET TO THE EASTERLY LINE OF PREMISES CONVEYED TO THE PARTY OF THE FIRST PART HEREIN BY DEED RECORDED IN MONROE COUNTY CLERK'S OFFICE MARCH 30, 1950 IN LIBER 2673 OF DEEDS, PAGE 130, EXTEND NORTHERLY TO THE NORTH LINE OF SAID LOT NO. 16.


***


Address: 14 Durgin St, Rochester, NY 14605
County: Monroe
Parcel Identification Number: 106.37-2-45.003
Client Code: MEYER-HIRSCHHORN-05
PARCEL I

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE, AND STATE OF NEW YORK, KNOWN AND DESCRIBED AS LOT NO. TWENTY- SIX (26) AS SHOWN ON A MAP ANNEXED TO THE REPORT OF J. P. VARNUM, REFEREE, TO REPORT ORDER OF SALE OF LAND MORTGAGED BY FRANCES G. WORCESTER AND DAVID F. WORCESTER TO THE ROCHESTER SAVINGS BANK, THE SAME BEING ON FILE IN THE MONROE COUNTY CLERK'S OFFICE AND IS ABOUT 30 FEET ON THE EAST SIDE OF EVERGREEN PLACE (NOW KNOWN AS DURGIN STREET) AND EXTENDS BACK THE SAME WIDTH TO THE EASTERLY LINE OF SAID MORTGAGED PREMISES.

ALSO, ALL THAT STRIP OF LAND, SITUATE IN SAID CITY, COUNTY AND STATE, ADJOINING SAID PARCEL ON THE EAST AND BEING SEVEN AND ONE HALF (7 ½ ) FEET WIDE FROM EAST TO WEST AND 30 FEET LONG FROM NORTH TO SOUTH, SITUATED BETWEEN THE NORTH AND SOUTH LINES OF THE FIRST PARCEL EXTENDING EASTERLY.

Exhibit A

THE TWO PARCELS ABOVE DESCRIBED FORM A SINGLE LOT OF LAND BOUNDED AND DESCRIBED AS FOLLOWS:

COMMENCING AT A POINT IN THE EAST LINE OF DURGIN STREET, 100 FEET SOUTHERLY FROM THE SOUTH LINE OF EVERGREEN STREET; RUNNING THENCE

(1) EASTERLY PARALLEL WITH EVERGREEN STREET 66.06 FEET; THENCE

(2) SOUTHERLY PARALLEL WITH DURGIN STREET, 30 FEET; THENCE

(3) WESTERLY PARALLEL WITH EVERGREEN STREET, 65.57 FEET TO THE EAST LINE OF DURGIN STREET; THENCE

(4) NORTHERLY ALONG THE EAST LINE OF DURGIN STREET, 30 FEET TO THE PLACE OF BEGINNING.

ALSO, ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE EASTERLY LINE OF DURGIN STREET, 130 FEET SOUTHERLY FROM THE SOUTHERLY LINE OF EVERGREEN STREET; THENCE

(1) SOUTHERLY ALONG THE EASTERLY LINE OF DURGIN STREET, 19 FEET TO A POINT; THENCE

(2) EASTERLY AT RIGHT ANGLES TO THE EASTERLY LINE OF DURGIN STREET, 65.26 FEET TO A POINT; THENCE

(3) NORTHERLY 19 FEET TO A POINT 65.57 FEET EASTERLY FROM THE POINT OF BEGINNING; THENCE

(4) WESTERLY 65.57 FEET TO THE POINT OR PLACE OF BEGINNING.

PARCEL II

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE, STATE OF NEW YORK KNOWN AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE EASTERLY LINE OF DURGIN STREET, 149 FEET SOUTHERLY FROM THE SOUTHERLY LINE OF EVERGREEN STREET; THENCE

Exhibit A

(1) SOUTHERLY ALONG THE EASTERLY LINE OF DURGIN STREET 19 FEET TO A POINT; THENCE

(2) EASTERLY AT RIGHT ANGLES TO THE EASTERLY LINE OF DURGIN STREET 62.95 FEET TO A POINT; THENCE

(3) NORTHERLY 19 FEET TO A POINT 63.26 FEET EASTERLY FROM THE POINT OF BEGINNING; THENCE

(4) WESTERLY 63.26 FEET TO THE POINT OR PLACE OF BEGINNING.

***

Exhibit A

# EXHIBIT G

MONROE COUNTY CLERK'S OFFICE          THIS IS NOT A BILL. THIS IS YOUR RECEIPT.

Receipt # 3200320

Book   Page    A 01918 0473

Return To:                                    No. Pages:  18
SOURCEPOINT FULFILLMENT SERVICES, INC.
2330 COMMERCE PARK DR NE SUITE 2              Instrument: ASSIGNMENT OF MORTGAGE
PALM BAY, FL 32905-7721

Control #:          202209201014
Ref #:              MDM006474

Date: 09/20/2022

CAF TERM BORROWER WF, LLC,                    Time: 3:07:23 PM

COREVEST PURCHASER 2, LLC,

| | | |
|---|---|---|
| Pages Fee | $85.00 | |
| State Fee Cultural Education | $14.25 | |
| State Fee Records | $4.75 | |
| Management | | Employee: ED |
| County Fee Assign of Mtg | $26.50 | |
| | | |
| Total Fees Paid: | $130.50 | |

State of New York

MONROE COUNTY CLERK'S OFFICE
WARNING – THIS SHEET CONSTITUTES THE CLERKS
ENDORSEMENT, REQUIRED BY SECTION 317-a(5) &
SECTION 319 OF THE REAL PROPERTY LAW OF THE
STATE OF NEW YORK. DO NOT DETACH OR REMOVE.

JAMIE ROMEO

MONROE COUNTY CLERK



PREPARED BY:
Karen Wade, Esq.
Alston & Bird LLP
2200 Ross Avenue, Suite 2300
Dallas, TX 75201

UPON RECORDATION RETURN TO:
Attn: Tim Murray
OS National LLC
3097 Satellite Blvd, Ste 400
Duluth, GA 30096

## ASSIGNMENT OF SECURITY INSTRUMENT

### by

### CAF TERM BORROWER WF, LLC,

a Delaware limited liability company,

### to

### COREVEST PURCHASER 2, LLC

a Delaware limited liability company

**Dated: As of April 30, 2021**

**State: New York**
**County: Monroe**

Mortgage Reference: Instrument 202106041414 Book 29252 Page 152
Reference" MDM006474

## ASSIGNMENT OF SECURITY INSTRUMENT

THIS ASSIGNMENT OF SECURITY INSTRUMENT (this "Assignment"), made and entered into as of the April 30, 2021, is made by **CAF TERM BORROWER WF, LLC**, a Delaware limited liability company, having an address at 4 Park Plaza, Suite 900, Irvine, CA 92614 ("Assignor"), in favor of **COREVEST PURCHASER 2 LLC**, a Delaware limited liability company, having an address at 1920 Main Street, Suite 850, Irvine, CA 92614 ("Assignee").

### W I T N E S S E T H

WHEREAS, Assignor is the present legal and equitable owner and holder of that certain Promissory Note dated as of March 31, 2021 executed by **Hirschhorn Estates, LLC**, a **Delaware** limited liability company ("Borrower"), and made payable to the order of CoreVest American Finance Lender LLC, a Delaware limited liability company ("CAFL"), predecessor-in-interest to Assignor, in the stated principal amount of One million twenty-three thousand five hundred dollars and no cents ($1,023,500.00) (the "Note") in connection with certain real property and improvements located thereon situated in the County of Monroe State of New York, and more particularly described on Exhibit A annexed hereto and made a part hereof (the "Premises"); and

WHEREAS, the Note is secured, inter alia, by the Security Instrument (as hereinafter defined); and

WHEREAS, the parties hereto desire that Assignor assign to Assignee, its successors and assigns, all of Assignor's right, title and interest in and to the Security Instrument.

NOW, THEREFORE, in consideration of the premises above set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and agreed, Assignor and Assignee hereby covenant and agree as follows:

1. <u>Assignment</u>. Assignor does hereby transfer, assign, grant and convey to Assignee, its successors and assigns, all of the right, title and interest of Assignor in and to the following described instrument, and does hereby grant and delegate to Assignee, its successors and assigns, any and all of the duties and obligations of Assignor thereunder from and after the date hereof:

> That certain Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of March 31, 2021, executed by Borrower for the benefit of CoreVest American Finance Lender LLC, as lender, and recorded on June 4, 2021 in the Real Property Records of Monroe County, New York, as Document No. 202106041414, Book 29252, Page 0152 (as the same may heretofore have been assigned, the "Security Instrument"), in respect of the Premises, together with all rights accrued or to accrue under said Security Instrument.
> * Reference MDM006474

Loan # 34631
Assignment of Security Instrument (CAF TERM MS TO PURCHASER) – Page 1
Monroe / New York
#35666147

2.    <u>Representations and Warranties of Assignor</u>.  This Assignment is an absolute assignment.  This Assignment is without recourse, representation or warranty, express or implied, upon Assignor, except Assignor hereby warrants and represents to Assignee that:

    (a)    Prior to the execution hereof, Assignor has not sold, transferred, assigned, conveyed, pledged or endorsed any right, title or interest in the Security Instrument to any person or entity other than Assignee; and

    (b)    Assignor has full right and power to sell and assign the same to Assignee subject to no interest or participation of, or agreement with, any party other than Assignee.

3.    <u>Governing Law</u>.  With respect to matters relating to the creation, perfection and procedures relating to the enforcement of this Assignment, this Assignment shall be governed by, and be construed in accordance with, the laws of the State of New York, it being understood that, except as expressly set forth above in this paragraph and to the fullest extent permitted by the law of the State of New York, the law of the State of New York applicable to contracts made and performed in such State (pursuant to Section 5-1401 of the New York General Obligations Law) shall govern all matters relating to this Assignment and all of the indebtedness or obligations arising hereunder.

4.    <u>Successors and Assigns</u>.  This Assignment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

5.    <u>Headings</u>.  The headings of the paragraphs of this Assignment have been included only for convenience, and shall not be deemed in any manner to modify or limit any of the provisions of this Assignment or be used in any manner in the interpretation of this Assignment.

6.    <u>Interpretation</u>.  Whenever the context so requires in this Assignment, all words used in the singular shall be construed to have been used in the plural (and vice versa), each gender shall be construed to include any other genders, and the word "person" shall be construed to include a natural person, a corporation, a firm, a partnership, a joint venture, a trust, an estate or any other entity.

7.    <u>Partial Invalidity</u>.  Each provision of this Assignment shall be valid and enforceable to the fullest extent permitted by law.  If any provision of this Assignment or the application of such provision to any person or circumstance shall, to any extent, be invalid or unenforceable, then the remainder of this Assignment, or the application of such provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected by such invalidity or unenforceability.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, Assignor has executed this Assignment of Security Instrument as of the day and year first above written.

ASSIGNOR:

**CAF TERM BORROWER WF LLC,**
A Delaware limited liability company

By: _____
       Sokun Soun
       Authorized Signatory

Witness #1
Print Name: _____

Witness #2
Print Name: _____

Signature Page

Assignment of Security Instrument (BORROWER GS TO PURCHASER)

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**      **CIVIL CODE § 1189**

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California            )
County of __Orange__          )

On __May 4, 2021__ before me, __Corine Goddard, Notary Public__,
      *Date*                   *Here Insert Name and Title of the Officer*

personally appeared __Sokun Soun__
                            *Name(s) of Signer(s)*

__N/A__,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

CORINE GODDARD
Notary Public · California
Orange County
Commission # 2264348
My Comm. Expires Oct 26, 2022

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature *Corine Goddard*
                   *Signature of Notary Public*

*Place Notary Seal Above*
————— **OPTIONAL** —————
*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: _____
Document Date: _____ Number of Pages: _____
Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**
Signer's Name: _____
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Individual      ☐ Attorney in Fact
☐ Trustee      ☐ Guardian or Conservator
☐ Other: _____
Signer Is Representing: _____

Signer's Name: _____
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Individual      ☐ Attorney in Fact
☐ Trustee      ☐ Guardian or Conservator
☐ Other: _____
Signer Is Representing: _____

©2016 National Notary Association · www.NationalNotary.org · 1-800-US NOTARY (1-800-876-6827)    Item #5907

## **SCHEDULE 1**

Property List

| Address | City | State | County | Zip |
|---|---|---|---|---|
| 103 Marion St | Rochester | NY | Monroe | 14610 |
| 117 W Filbert Street | East Rochester | NY | Monroe | 14445 |
| 136 Campbell St  Apts  1-6 | Rochester | NY | Monroe | 14611 |
| 14 Durgin St | Rochester | NY | Monroe | 14605 |
| 236 Saratoga Ave Apts 1-6 | Rochester | NY | Monroe | 14608 |
| 258 Avis St | Rochester | NY | Monroe | 14615 |
| 294 Lexington Ave | Rochester | NY | Monroe | 14613 |
| 301 Selye Ter | Rochester | NY | Monroe | 14613 |
| 31 Alice St | Rochester | NY | Monroe | 14611 |
| 36 Sterling St | Rochester | NY | Monroe | 14606 |
| 404 Emerson St | Rochester | NY | Monroe | 14613 |
| 74 Starling St | Rochester | NY | Monroe | 14613 |
| 76 Oriole St | Rochester | NY | Monroe | 14613 |
| 8 Immel St | Rochester | NY | Monroe | 14606 |
| 8 Velox St | Rochester | NY | Monroe | 14615 |
| 87 Dix St | Rochester | NY | Monroe | 14606 |
| 968 Ridgeway Ave | Rochester | NY | Monroe | 14615 |

Schedule 1　　　Mortgage (*Monroe County, New York*)

## EXHIBIT A

Legal Description

Address: 103 Marion St, Rochester, NY  14610

County: Monroe

Parcel Identification Number: 122.40-2-2

Client Code: MEYER-HIRSCHHORN-01

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF
ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, BEING
LOT #16 AS THE SAME IS LAID DOWN ON AN AMENDED MAP OF A PART
OF THE MAHLON D. PHILLIPS SUBDIVISION OF A PART OF LOT #27 IN
THE SECOND SUBDIVISION OF LOTS IN THE TOWN OF BRIGHTON, NOW
THE CITY OF ROCHESTER, WHICH MAP WAS MADE BY A.B. TITUS,
SURVEYOR, FOR MILLICENT HOVEY AND FILED IN THE MONROE
COUNTY CLERK'S OFFICE FEBRUARY 15, 1910 IN LIBER 21 OF MAPS,
PAGE 19, SAID LOT #16 IS SITUATE ON THE WEST SIDE OF MARION
STREET.

\*\*\*

Address: 117 W Filbert Street, East Rochester, NY  14445

County: Monroe

Parcel Identification Number: 152.21-1-65

Client Code: MEYER-HIRSCHHORN-03

ALSO ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE
TOWN/VILLAGE OF EAST ROCHESTER, COUNTY OF MONROE AND
STATE OF NEW YORK, AND BEING KNOWN AND DESIGNATED AS LOT
NUMBER TWELVE (12) IN BLOCK NUMBER FIFTY-SIX (56) AS SHOWN ON
A MAP OF THE LANDS OF THE VANDERBILT IMPROVEMENT CO. ON FILE
IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 10 OF MAPS, AT
PAGE 35. EXCEPTING AND RESERVING THEREFROM, THE STREET OR
THE STREET ABUTTING UPON SAID PREMISES, THE FEE OF WHICH,
SUBJECT TO THE USED OF SAID TOWNN/VILLAGE OF EAST
ROCHESTER, AS A HIGHWAY OR HIGHWAYS IS RETAINED IN SAID
TOWNN/VILLAGE.

\*\*\*

Exhibit A          Mortgage (*Monroe County, New York*)

Address: 136 Campbell St Apts 1-6, Rochester, NY 14611

County: Monroe

Parcel Identification Number: 120.27-1-19

Client Code: MEYER-HIRSCHHORN-04

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF
ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN
AND DISTINGUISHED AS A PART OF LOT NUMBER SEVEN (7) SECTION A
OF THE WHITNEY TRACT AS THE SAME IS LAID DOWN UPON A MAP OF
SAID TRACT FILED IN MONROE COUNTY CLERK'S OFFICE IN LIBER 2 OF
MAPS AT PAGE 8, AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF WALNUT AND CAMPBELL
STREETS AND RUNNING THENCE NORTHERLY ALONG THE WEST LINE
OF WALNUT STREET, NINETY-EIGHT (98) FEET; THENCE WESTERLY
PARALLEL WITH THE NORTH LINE OF CAMPBELL STREET FIFTY (50)
FEET TO THE WEST LINE OF SAID LOT NUMBER SEVEN (7); THENCE
SOUTHERLY PARALLEL WITH THE WEST LINE OF WALNUT STREET AND
ALONG THE WEST LINE OF SAID LOT NINETY EIGHT (98) FEET TO THE
NORTH LINE OF CAMPBELL STREET AND THENCE EASTERLY ALONG
THE SAID NORTH LINE FIFTY (50) FEET TO THE PLACE OF BEGINNING,
TOGETHER WITH ALL THE RIGHT, TITLE AND INTEREST OF THE PARTIES
OF THE FIRST PART IN AND TO SUCH PORTIONS OF CAMPBELL AND
WALNUT STREETS AS LIE IN FRONT OF THE PREMISES HEREBY
CONVEYED, HEREBY INTENDING TO CONVEY ALL THAT PART OF
PARCEL OF LOT NUMBER SEVEN (7) SOUTH OF A LINE DRAWN SOUTH
OF THE NORTH LINE OF SAID LOT AND THIRTY-FOUR (34) FEET DISTANT
THEREFROM.

***

Address: 236 Saratoga Ave Apts 1-6, Rochester, NY 14608

County: Monroe

Parcel Identification Number: 105.51-3-1

Client Code: MEYER-HIRSCHHORN-06

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE COUNTY
OF MONROE, STATE OF NEW YORK, AND IS DESCRIBED AS FOLLOWS:

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF
ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN

Exhibit A

AND DESCRIBED AS LOT NUMBER ONE (1) OF THE JONES TRACT, SECTION "G", AS SHOWN ON A MAP THEREOF FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 35 OF MAPS AT PAGE 29.

SAID LOT NUMBER ONE (1) FRONTS 31 FEET ON THE EAST SIDE OF SARATOGA AVENUE AND IS OF THE FURTHER DIMENSIONS AS SHOWN ON SAID MAP.

\*\*\*

Address: 258 Avis St, Rochester, NY  14615

County: Monroe

Parcel Identification Number: 090.41-1-34

Client Code: MEYER-HIRSCHHORN-07

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, FORMERLY TOWN OF GREECE, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN AND DESCRIBED AS LOT NO. 340 OF W. N. BRITTON TRACT, WEST OF DEWEY AVENUE AS THE SAME IS LAID DOWN ON A MAP THEREOF FILED IN LIBER 25 OF MAPS AT PAGE 35.

SAID LOT 340 FRONTS 50 FEET ON THE NORTHERLY SIDE OF AVIS STREET AND EXTENDS BACK OF EQUAL WIDTH THROUGHOUT 100 FEET.

\*\*\*

Address: 294 Lexington Ave, Rochester, NY  14613

County: Monroe

Parcel Identification Number: 105.26-1-12

Client Code: MEYER-HIRSCHHORN-08

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, BEING LOT #1 OF JESSE M. FROST'S SUBDIVISION OF PART OF LOT #4 OF THE 20,000.00 ACRE TRACT, A MAP OF WHICH SUBDIVISION IS FILED IN MONROE COUNTY CLERK'S OFFICE IN LIBER 54 OF MAPS, PAGE 1.

SAID LOT #1 OF SAID FROST'S SUBDIVISION IS SITUATE ON THE NORTH SIDE OF LEXINGTON AVENUE AND IS 37 FEET WIDE FRONT AND REAR AND 85 FEET DEEP.

Exhibit A

THE EASTERLY LINE OF LOT #1 IS PARALLEL TO THE WESTERLY LINE OF STRAUB STREET, ROCHESTER, NEW YORK.

*** 

Address: 301 Selye Ter, Rochester, NY 14613

County: Monroe

Parcel Identification Number: 090.81-2-27

Client Code: MEYER-HIRSCHHORN-09

ALSO ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN AND DESCRIBED AS LOT NUMBER SIXTY-FIVE (65) AS SHOWN AND LAID DOWN ON THE MAP OF THE ROCHESTER DRIVING PARK TRACT, SO-CALLED, MADE BY J.C. RYAN, SURVEYOR, AND FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 15 OF MAPS, AT PAGE 33. SAID LOT NUMBER SIXTY-FIVE (65) FRONTS ON THE SOUTH SIDE OF SELYE TERRACE AND IS FORTY (40) FEET WIDE IN FRONT AND EXTENDS BACK OF EQUAL WIDTH WITH THE FRONT ONE HUNDRED AND SIXTEEN (116) FEET IN DEPTH.

*** 

Address: 31 Alice St, Rochester, NY 14611

County: Monroe

Parcel Identification Number: 120.31-2-26

Client Code: MEYER-HIRSCHHORN-10

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN AND DISTINGUISHED AS LOT NUMBER FOURTEEN (14), IN SECTION "B", ON THE SOUTH SIDE OF ALICE STREET, AS THE SAID LOT IS LAID DOWN ON A MAP OF A SUBDIVISION OF PART OF THE BINGEN TRACT, MADE BY HORACE JONES, SURVEYOR, AUGUST 1872, AND FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 5 OF MAPS, PAGE 88. THE SAID LOT BEING FORTY (40) FEET IN WIDTH FRONT AND REAR AND ONE HUNDRED SIXTY-SIX (166) FEET DEEP.

Exhibit A

\*\*\*

Address: 36 Sterling St, Rochester, NY 14606

County: Monroe

Parcel Identification Number: 105.49-1-40

Client Code: MEYER-HIRSCHHORN-11

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, BEING KNOWN AND DESCRIBED AS LOT NO. 5 ON A SUBDIVISION OF LOTS NO. 72 TO 82 INCLUSIVE, OF THE HOUSTON TRACT, AS SHOWN ON A MAP FILED IN LIBER 11 OF MAPS, PAGE 100 IN THE MONROE COUNTY CLERK'S OFFICE. SAID LOT NO. 5 BEING 33 FEET AND 3 INCHES FRONT AND REAR AND 125 FEET DEEP, AND IS SITUATE ON THE EAST SIDE OF STERLING STREET.

\*\*\*

Address: 404 Emerson St, Rochester, NY 14613

County: Monroe

Parcel Identification Number: 105.41-2-17

Client Code: MEYER-HIRSCHHORN-12

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN AND DESIGNATED AS LOT #2 OF THE KONDOLF & BRAYER TRACT, AS THE SAME IS LAID OUT ON A MAP OF THE SAID TRACT FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 3 OF MAPS, PAGE 25. SAID LOT BEING 240 FEET EASTERLY FROM THE EASTERLY RIGHT OF WAY LINE OF PLOVER STREET, AS MEASURED ALONG THE NORTHERLY RIGHT OF WAY LINE OF EMERSON STREET; THENCE IN A NORTHERLY DIRECTION AT AN INTERIOR ANGLE OF 89 DEGREES 26' 15" WITH THE PRECEDING COURSE A DISTANCE OF 187.42 FEET TO A POINT ON THE SOUTHERLY RIGHT OF WAY LINE OF THE FORMER ERIE CANAL PROPERTY; THENCE IN A SOUTHEASTERLY DIRECTION AT AN INTERIOR ANGLE OF 39 DEGREES 36' 35" WITH THE PRECEDING COURSE ALONG THE SOUTHERLY RIGHT OF WAY LINE OF THE FORMER ERIE CANAL PROPERTY A DISTANCE OF 47.68 FEET TO AN ANGLE POINT; THENCE CONTINUING IN A SOUTHEASTERLY DIRECTION AT AN INTERIOR ANGLE WITH THE PRECEDING COURSE OF 168 DEGREES 04' 37", ALONG THE SOUTHERLY RIGHT OF WAY LINE OF THE FORMER ERIE CANAL PROPERTY A DISTANCE OF 47.68 FEET TO AN ANGLE POINT; THENCE CONTINUING IN A SOUTHEASTERLY DIRECTION AT AN INTERIOR ANGLE

Exhibit A

WITH THE PRECEDING COURSE OF 168 DEGREES 04' 37", ALONG THE
SOUTHERLY RIGHT OF WAY LINE OF THE FORMER ERIE CANAL
PROPERTY, A DISTANCE OF 20.66 FEET TO A POINT; THENCE IN A
SOUTHERLY DIRECTION AT AN INTERIOR ANGLE OF 152 DEGREES 18'
48" WITH THE PRECEDING COURSE, A DISTANCE OF 132 FEET TO A
POINT IN THE NORTHERLY RIGHT OF WAY LINE OF EMERSON STREET,
AT AN INTERIOR ANGLE OF 90 DEGREES 33' 45" WITH THE PRECEDING
COURSE A DISTANCE OF 40 FEET TO THE POINT OF BEGINNING.

***

Address: 74 Starling St, Rochester, NY 14613

County: Monroe

Parcel Identification Number: 105.25-1-33

Client Code: MEYER-HIRSCHHORN-13

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF
ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK KNOWN
AND DISTINGUISHED AS LOT #23, JAMES N. WHITNEY'S SUBDIVISION OF
PART OF ORIGINAL TOWN LOT #64, AS SHOWN ON A MAP THEREOF,
MADE BY HORACE JONES, SURVEYOR, FOR SAID WHITNEY AND FILED
IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 3 OR MAPS, PAGE
52.

SAID LOT #23 BEING SITUATE ON THE EAST SIDE OF STARLING STREET
AND BEING 50 FEET WIDE FRONT AND REAR AND 150 FEET DEEP.

***

Address: 76 Oriole St, Rochester, NY 14613

County: Monroe

Parcel Identification Number: 105.25-3-57

Client Code: MEYER-HIRSCHHORN-14

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF
ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK KNOWN
AND DESCRIBED AS LOT NO. NINETY-TWO (92) OF A MAP OF MONROE
CO-OPERATIVE BUILDING LOT ASSOCIATION TRACT, FILED IN THE
MONROE COUNTY CLERK'S OFFICE IN LIBER 2 OF MAPS, PAGE 30; SAID
LOT NO. 92 FRONTING ON THE EAST SIDE OF ORIOLE STREET AS
DESIGNATED AND LAID OUT ON SAID MAP, AND BEING FORTY-FIVE (45)

Exhibit A

FEET WIDE, FRONT AND REAR, AND ONE HUNDRED THIRTY (130) FEET
IN DEPTH.


***


Address: 8 Immel St, Rochester, NY  14606

County: Monroe

Parcel Identification Number: 105.81-2-26

Client Code: MEYER-HIRSCHHORN-15

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF
ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN
AND DESIGNATED AS LOT #6 IN A SUBDIVISION MAP OF IMMEL PLACE
FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 7 OF MAPS,
PAGE 38. SAID LOT #6 IS SITUATE ON THE EAST SIDE OF IMMEL PLACE
AND IS 40 FEET FRONT AND REAR AND 76 FEET DEEP.


***


Address: 8 Velox St, Rochester, NY  14615

County: Monroe

Parcel Identification Number: 075.82-2-40

Client Code: MEYER-HIRSCHHORN-16

ALSO ALL THAT TRACT OR PARCEL OF LAND, WITH THE BUILDINGS AND
IMPROVEMENTS THEREON ERECTED, SITUATE, LYING AND BEING IN
THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW
YORK, KNOWN AND DISTINGUISHED AS LOT NUMBER ONE HUNDRED
AND TWENTY (120) OF ADELGONDE EDDY TRACT ACCORDING TO A MAP
OF SAID TRACT MADE BY R.E. GASKIN, SURVEYOR, AND FILED IN
MONROE COUNTY CLERK'S OFFICE IN LIBER 29 OF MAPS AT PAGE 22.

THIS CONVEYANCE IS MADE AND ACCEPTED SUBJECT TO COVENANTS
AND RESTRICTIONS CONTAINED IN A DEED MADE BY THOMAS H. EDDY
AND OTHERS, TO ANNA WEISS, RECORDED IN MONROE COUNTY
CLERK'S OFFICE IN LIBER 895 OF DEEDS AT PAGE 326. ALSO SUBJECT
TO A RIGHT OF WAY GRANTED BY ANNA WEISS AND PETER WEISS TO
THE ROCHESTER GAS & ELECTRIC CORPORATION AND OTHERS,
RECORDED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 1078 OF
DEEDS AT PAGE 340.


Exhibit A

***

Address: 87 Dix St, Rochester, NY 14606

County: Monroe

Parcel Identification Number: 105.48-2-12

Client Code: MEYER-HIRSCHHORN-17

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF
ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK.
BOUNDED AND DESCRIBED AS FOLLOWS: LOT NO. 7, M.F. SCHIED
SUBDIVISION AS LAID DOWN ON A MAP OF A SUBDIVISION OF LOTS
NOS. 124 AND 128 INCLUSIVE AND 143, 144 AND 145 OF THE HOUSON
TRACT MADE FOR MICHAEL J. SCHIED BY J.C. RYAN, SURVEYOR, FILED
IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 26 OF MAPS, PAGE
23.

SAID LOT NO. 7 IS SITUATE ON THE WEST SIDE OF DIX STREET AND IS
THIRTY-SEVEN (37) FEET WIDE FRONT AND REAR AND 116.43 FEET
DEEP AS SHOWN ON SAID MAP.

***

Address: 968 Ridgeway Ave, Rochester, NY 14615

County: Monroe

Parcel Identification Number: 090.39-1-20

Client Code: MEYER-HIRSCHHORN-18

ALSO ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF
ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN
AND DESCRIBED AS LOT 12 AND THE WEST 10 FEET OF LOT NO. 13 AS
SAID LOTS ARE LAID DOWN ON A MAP OF RIDGEWAY AVENUE
TERRACE, FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 29
OF MAPS AT PAGE 26.

SAID LOT NO. 12, TOGETHER WITH THE WEST 10 FEET OF LOT NO. 13,
CONSTITUTES A PARCEL OF LAND FRONTING 50 FEET ON THE NORTH
SIDE OF RIDGEWAY AVENUE 50 FEET WIDE IN REAR, AND ABOUT 98.26
FEET IN DEPTH, MORE OR LESS.

Exhibit A

SUBJECT TO THE SEVEN FOOT PERPETUAL EASEMENT RESERVED BY
THE CITY OF ROCHESTER BY DEED RECORDED IN THE MONROE
COUNTY CLERK'S OFFICE IN LIBER 2673 IF DEEDS, PAGE 130.

ALSO ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF
ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN
AND DESCRIBED AS THE WESTERLY 50 FEET OF LOT NOS., 15 AND 16
AS SAID LOTS ARE LAID DOWN ON A MAP OF THE RIDGEWAY AVENUE
TERRACE TRACT FILED IN THE MONROE COUNTY CLERK'S OFFICE IN
LIBER 29 OF MAPS, PAGE 26.

SAID WESTERLY 50 FEET OF SAID LOTS NOS., 15 AND 16 CONSTITUTES
PARCEL OF LAND 55 FEET WIDE FRONTING ON THE EASTERLY SIDE OF
PERINTON STREET, FORMERLY PERRINGTON AVENUE, RUNNING BACK
OF EVEN WIDTH 50 FEET TO THE EASTERLY LINE OF PREMISES
CONVEYED TO THE PARTY OF THE FIRST PART HEREIN BY DEED
RECORDED IN MONROE COUNTY CLERK'S OFFICE MARCH 30, 1950 IN
LIBER 2673 OF DEEDS, PAGE 130, EXTEND NORTHERLY TO THE NORTH
LINE OF SAID LOT NO. 16.

\*\*\*

Address: 14 Durgin St, Rochester, NY 14605
County: Monroe
Parcel Identification Number: 106.37-2-45.003
Client Code: MEYER-HIRSCHHORN-05
PARCEL I

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF
ROCHESTER, COUNTY OF MONROE, AND STATE OF NEW YORK, KNOWN
AND DESCRIBED AS LOT NO. TWENTY- SIX (26) AS SHOWN ON A MAP
ANNEXED TO THE REPORT OF J. P. VARNUM, REFEREE, TO REPORT
ORDER OF SALE OF LAND MORTGAGED BY FRANCES G. WORCESTER
AND DAVID F. WORCESTER TO THE ROCHESTER SAVINGS BANK, THE
SAME BEING ON FILE IN THE MONROE COUNTY CLERK'S OFFICE AND IS
ABOUT 30 FEET ON THE EAST SIDE OF EVERGREEN PLACE (NOW
KNOWN AS DURGIN STREET) AND EXTENDS BACK THE SAME WIDTH TO
THE EASTERLY LINE OF SAID MORTGAGED PREMISES.

ALSO, ALL THAT STRIP OF LAND, SITUATE IN SAID CITY, COUNTY AND
STATE, ADJOINING SAID PARCEL ON THE EAST AND BEING SEVEN AND
ONE HALF (7 ½ ) FEET WIDE FROM EAST TO WEST AND 30 FEET LONG
FROM NORTH TO SOUTH, SITUATED BETWEEN THE NORTH AND SOUTH
LINES OF THE FIRST PARCEL EXTENDING EASTERLY.

Exhibit A

THE TWO PARCELS ABOVE DESCRIBED FORM A SINGLE LOT OF LAND BOUNDED AND DESCRIBED AS FOLLOWS:

COMMENCING AT A POINT IN THE EAST LINE OF DURGIN STREET, 100 FEET SOUTHERLY FROM THE SOUTH LINE OF EVERGREEN STREET; RUNNING THENCE

(1) EASTERLY PARALLEL WITH EVERGREEN STREET 66.06 FEET; THENCE

(2) SOUTHERLY PARALLEL WITH DURGIN STREET, 30 FEET; THENCE

(3) WESTERLY PARALLEL WITH EVERGREEN STREET, 65.57 FEET TO THE EAST LINE OF DURGIN STREET; THENCE

(4) NORTHERLY ALONG THE EAST LINE OF DURGIN STREET, 30 FEET TO THE PLACE OF BEGINNING.

ALSO, ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE EASTERLY LINE OF DURGIN STREET, 130 FEET SOUTHERLY FROM THE SOUTHERLY LINE OF EVERGREEN STREET; THENCE

(1) SOUTHERLY ALONG THE EASTERLY LINE OF DURGIN STREET, 19 FEET TO A POINT; THENCE

(2) EASTERLY AT RIGHT ANGLES TO THE EASTERLY LINE OF DURGIN STREET, 65.26 FEET TO A POINT; THENCE

(3) NORTHERLY 19 FEET TO A POINT 65.57 FEET EASTERLY FROM THE POINT OF BEGINNING; THENCE

(4) WESTERLY 65.57 FEET TO THE POINT OR PLACE OF BEGINNING.

PARCEL II

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE, STATE OF NEW YORK KNOWN AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE EASTERLY LINE OF DURGIN STREET, 149 FEET SOUTHERLY FROM THE SOUTHERLY LINE OF EVERGREEN STREET; THENCE

Exhibit A

(1) SOUTHERLY ALONG THE EASTERLY LINE OF DURGIN STREET 19 FEET TO A POINT; THENCE

(2) EASTERLY AT RIGHT ANGLES TO THE EASTERLY LINE OF DURGIN STREET 62.95 FEET TO A POINT; THENCE

(3) NORTHERLY 19 FEET TO A POINT 63.26 FEET EASTERLY FROM THE POINT OF BEGINNING; THENCE

(4) WESTERLY 63.26 FEET TO THE POINT OR PLACE OF BEGINNING.

*** 

Exhibit A

# EXHIBIT H

MONROE COUNTY CLERK'S OFFICE                THIS IS NOT A BILL. THIS IS YOUR RECEIPT.

Receipt # 3200320

Book    Page    A 01918 0491

Return To:                                  No. Pages: 18
SOURCEPOINT FULFILLMENT SERVICES, INC.
2330 COMMERCE PARK DR NE SUITE 2            Instrument: ASSIGNMENT OF MORTGAGE
PALM BAY, FL 32905-7721

Control #:        202209201015
Ref #:            MDM006474

Date: 09/20/2022

COREVEST PURCHASER 2, LLC,                  Time: 3:07:24 PM

COREVEST AMERICAN FINANCE DEPOSITOR LLC,

| | | |
|---|---|---|
| Pages Fee | $85.00 | |
| State Fee Cultural Education | $14.25 | |
| State Fee Records | $4.75 | |
| Management | | Employee: ED |
| County Fee Assign of Mtg | $26.50 | |
| | | |
| Total Fees Paid: | $130.50 | |

State of New York

MONROE COUNTY CLERK'S OFFICE
WARNING – THIS SHEET CONSTITUTES THE CLERKS
ENDORSEMENT, REQUIRED BY SECTION 317-a(5) &
SECTION 319 OF THE REAL PROPERTY LAW OF THE
STATE OF NEW YORK. DO NOT DETACH OR REMOVE.

JAMIE ROMEO

MONROE COUNTY CLERK



PREPARED BY:
Karen Wade, Esq.
Alston & Bird LLP
2200 Ross Avenue, Suite 2300
Dallas, TX 75201

UPON RECORDATION RETURN TO:
Attn: Tim Murray
OS National LLC
3097 Satellite Blvd, Ste 400
Duluth, GA 30096

## ASSIGNMENT OF SECURITY INSTRUMENT

**by**

### COREVEST PURCHASER 2, LLC,
a Delaware limited liability company,

**to**

### COREVEST AMERICAN FINANCE DEPOSITOR LLC,
a Delaware limited liability company

**Dated: As of April 30, 2021**

**State: New York**
**County: Monroe**

Mortgage Reference: Instrument 202106041414 Book 29252 Page 152
Reference" MDM006474

# ASSIGNMENT OF SECURITY INSTRUMENT

THIS ASSIGNMENT OF SECURITY INSTRUMENT (this "Assignment"), made and entered into as of the April 30, 2021, is made by **COREVEST PURCHASER 2 LLC**, a Delaware limited liability company, having an address at 1920 Main Street, Suite 850, Irvine, CA 92614 ("Assignor"), in favor of **COREVEST AMERICAN FINANCE DEPOSITOR LLC**, a Delaware limited liability company, having an address at 1920 Main Street, Suite 850, Irvine, CA 92614 ("Assignee").

W I T N E S S E T H

WHEREAS, Assignor is the present legal and equitable owner and holder of that certain Promissory Note dated as of March 31, 2021 executed by **Hirschhorn Estates, LLC**, a **Delaware** limited liability company ("Borrower"), and made payable to the order of CoreVest American Finance Lender LLC, a Delaware limited liability company ("CAFL"), predecessor-in-interest to Assignor, in the stated principal amount of One million twenty-three thousand five hundred dollars and no cents ($1,023,500.00) (the "Note") in connection with certain real property and improvements located thereon situated in the County of Monroe, State of New York and more particularly described on Exhibit A annexed hereto and made a part hereof (the "Premises"); and

WHEREAS, the Note is secured, inter alia, by the Security Instrument (as hereinafter defined); and

WHEREAS, the parties hereto desire that Assignor assign to Assignee, its successors and assigns, all of Assignor's right, title and interest in and to the Security Instrument.

NOW, THEREFORE, in consideration of the premises above set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and agreed, Assignor and Assignee hereby covenant and agree as follows:

1.    Assignment.    Assignor does hereby transfer, assign, grant and convey to Assignee, its successors and assigns, all of the right, title and interest of Assignor in and to the following described instrument, and does hereby grant and delegate to Assignee, its successors and assigns, any and all of the duties and obligations of Assignor thereunder from and after the date hereof:

> That certain Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of March 31, 2021, executed by Borrower for the benefit of CoreVest American Finance Lender LLC, as lender, and recorded on June 4, 2021 in the Real Property Records of Monroe County, New York, as Document No. 202106041414, Book 29252, Page 0152 (as the same may heretofore have been assigned, the "Security Instrument"), in respect of the Premises, together with all rights accrued or to accrue under said Security Instrument.
> * Reference MDM006474

Loan # 34631
Assignment of Security Instrument (PURCHASER TO DEPOSITOR) – Page 1
Monroe / New York
#35666147

2.  <u>Representations and Warranties of Assignor</u>.  This Assignment is an absolute assignment.  This Assignment is without recourse, representation or warranty, express or implied, upon Assignor, except Assignor hereby warrants and represents to Assignee that:

      (a)  Prior to the execution hereof, Assignor has not sold, transferred, assigned, conveyed, pledged or endorsed any right, title or interest in the Security Instrument to any person or entity other than Assignee; and

      (b)  Assignor has full right and power to sell and assign the same to Assignee subject to no interest or participation of, or agreement with, any party other than Assignee.

3.  <u>Governing Law</u>.  With respect to matters relating to the creation, perfection and procedures relating to the enforcement of this Assignment, this Assignment shall be governed by, and be construed in accordance with, the laws of the State of New York, it being understood that, except as expressly set forth above in this paragraph and to the fullest extent permitted by the law of the State of New York, the law of the State of New York applicable to contracts made and performed in such State (pursuant to Section 5-1401 of the New York General Obligations Law) shall govern all matters relating to this Assignment and all of the indebtedness or obligations arising hereunder.

4.  <u>Successors and Assigns</u>.  This Assignment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

5.  <u>Headings</u>.  The headings of the paragraphs of this Assignment have been included only for convenience, and shall not be deemed in any manner to modify or limit any of the provisions of this Assignment or be used in any manner in the interpretation of this Assignment.

6.  <u>Interpretation</u>.  Whenever the context so requires in this Assignment, all words used in the singular shall be construed to have been used in the plural (and vice versa), each gender shall be construed to include any other genders, and the word "person" shall be construed to include a natural person, a corporation, a firm, a partnership, a joint venture, a trust, an estate or any other entity.

7.  <u>Partial Invalidity</u>.  Each provision of this Assignment shall be valid and enforceable to the fullest extent permitted by law.  If any provision of this Assignment or the application of such provision to any person or circumstance shall, to any extent, be invalid or unenforceable, then the remainder of this Assignment, or the application of such provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected by such invalidity or unenforceability.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, Assignor has executed this Assignment of Security Instrument as of the day and year first above written.

ASSIGNOR:

**COREVEST PURCHASER 2, LLC,**
A Delaware limited liability company

By: _____
Sokun Soun
Authorized Signatory

Witness #1
Print Name: _CHRIS CABLAYAN_

Witness #2
Print Name: _CHRIS TERRANOVA_

Signature Page

Assignment of Security Instrument (PURCHASER TO DEPOSITOR)

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT   CIVIL CODE § 1189

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California ) 

County of **Orange** )

On **May 4, 2021** before me, **Jaime Chavez, Notary Public**,
    *Date*                    *Here Insert Name and Title of the Officer*

personally appeared **Sokun Soun**
                        *Name(s) of Signer(s)*

**N/A**,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

> JAIME CHAVEZ
> COMM. #2349460
> Notary Public · California
> Orange County
> My Comm. Expires Mar. 1, 2025

Signature _____
              *Signature of Notary Public*

*Place Notary Seal Above*
——————————— **OPTIONAL** ———————————
*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: _____
Document Date: _____   Number of Pages: _____
Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____        Signer's Name: _____
☐ Corporate Officer — Title(s): _____        ☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited  ☐ General        ☐ Partner — ☐ Limited  ☐ General
☐ Individual       ☐ Attorney in Fact        ☐ Individual       ☐ Attorney in Fact
☐ Trustee        ☐ Guardian or Conservator        ☐ Trustee        ☐ Guardian or Conservator
☐ Other: _____        ☐ Other: _____
Signer Is Representing: _____        Signer Is Representing: _____

©2016 National Notary Association · www.NationalNotary.org · 1-800-US NOTARY (1-800-876-6827)   Item #5907

## <u>SCHEDULE 1</u>

Property List

| Address | City | State | County | Zip |
|---|---|---|---|---|
| 103 Marion St | Rochester | NY | Monroe | 14610 |
| 117 W Filbert Street | East Rochester | NY | Monroe | 14445 |
| 136 Campbell St  Apts  1-6 | Rochester | NY | Monroe | 14611 |
| 14 Durgin St | Rochester | NY | Monroe | 14605 |
| 236 Saratoga Ave Apts 1-6 | Rochester | NY | Monroe | 14608 |
| 258 Avis St | Rochester | NY | Monroe | 14615 |
| 294 Lexington Ave | Rochester | NY | Monroe | 14613 |
| 301 Selye Ter | Rochester | NY | Monroe | 14613 |
| 31 Alice St | Rochester | NY | Monroe | 14611 |
| 36 Sterling St | Rochester | NY | Monroe | 14606 |
| 404 Emerson St | Rochester | NY | Monroe | 14613 |
| 74 Starling St | Rochester | NY | Monroe | 14613 |
| 76 Oriole St | Rochester | NY | Monroe | 14613 |
| 8 Immel St | Rochester | NY | Monroe | 14606 |
| 8 Velox St | Rochester | NY | Monroe | 14615 |
| 87 Dix St | Rochester | NY | Monroe | 14606 |
| 968 Ridgeway Ave | Rochester | NY | Monroe | 14615 |

## EXHIBIT A

Legal Description

Address: 103 Marion St, Rochester, NY 14610

County: Monroe

Parcel Identification Number: 122.40-2-2

Client Code: MEYER-HIRSCHHORN-01

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, BEING LOT #16 AS THE SAME IS LAID DOWN ON AN AMENDED MAP OF A PART OF THE MAHLON D. PHILLIPS SUBDIVISION OF A PART OF LOT #27 IN THE SECOND SUBDIVISION OF LOTS IN THE TOWN OF BRIGHTON, NOW THE CITY OF ROCHESTER, WHICH MAP WAS MADE BY A.B. TITUS, SURVEYOR, FOR MILLICENT HOVEY AND FILED IN THE MONROE COUNTY CLERK'S OFFICE FEBRUARY 15, 1910 IN LIBER 21 OF MAPS, PAGE 19, SAID LOT #16 IS SITUATE ON THE WEST SIDE OF MARION STREET.

***

Address: 117 W Filbert Street, East Rochester, NY 14445

County: Monroe

Parcel Identification Number: 152.21-1-65

Client Code: MEYER-HIRSCHHORN-03

ALSO ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE TOWN/VILLAGE OF EAST ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, AND BEING KNOWN AND DESIGNATED AS LOT NUMBER TWELVE (12) IN BLOCK NUMBER FIFTY-SIX (56) AS SHOWN ON A MAP OF THE LANDS OF THE VANDERBILT IMPROVEMENT CO. ON FILE IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 10 OF MAPS, AT PAGE 35. EXCEPTING AND RESERVING THEREFROM, THE STREET OR THE STREET ABUTTING UPON SAID PREMISES, THE FEE OF WHICH, SUBJECT TO THE USED OF SAID TOWNN/VILLAGE OF EAST ROCHESTER, AS A HIGHWAY OR HIGHWAYS IS RETAINED IN SAID TOWNN/VILLAGE.

***

Exhibit A     Mortgage (*Monroe County, New York*)

Address: 136 Campbell St  Apts  1-6, Rochester, NY  14611

County: Monroe

Parcel Identification Number: 120.27-1-19

Client Code: MEYER-HIRSCHHORN-04

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF
ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN
AND DISTINGUISHED AS A PART OF LOT NUMBER SEVEN (7) SECTION A
OF THE WHITNEY TRACT AS THE SAME IS LAID DOWN UPON A MAP OF
SAID TRACT FILED IN MONROE COUNTY CLERK'S OFFICE IN LIBER 2 OF
MAPS AT PAGE 8, AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF WALNUT AND CAMPBELL
STREETS AND RUNNING THENCE NORTHERLY ALONG THE WEST LINE
OF WALNUT STREET, NINETY-EIGHT (98) FEET; THENCE WESTERLY
PARALLEL WITH THE NORTH LINE OF CAMPBELL STREET FIFTY (50)
FEET TO THE WEST LINE OF SAID LOT NUMBER SEVEN (7); THENCE
SOUTHERLY PARALLEL WITH THE WEST LINE OF WALNUT STREET AND
ALONG THE WEST LINE OF SAID LOT NINETY EIGHT (98) FEET TO THE
NORTH LINE OF CAMPBELL STREET AND THENCE EASTERLY ALONG
THE SAID NORTH LINE FIFTY (50) FEET TO THE PLACE OF BEGINNING,
TOGETHER WITH ALL THE RIGHT, TITLE AND INTEREST OF THE PARTIES
OF THE FIRST PART IN AND TO SUCH PORTIONS OF CAMPBELL AND
WALNUT STREETS AS LIE IN FRONT OF THE PREMISES HEREBY
CONVEYED, HEREBY INTENDING TO CONVEY ALL THAT PART OF
PARCEL OF LOT NUMBER SEVEN (7) SOUTH OF A LINE DRAWN SOUTH
OF THE NORTH LINE OF SAID LOT AND THIRTY-FOUR (34) FEET DISTANT
THEREFROM.

\*\*\*

Address: 236 Saratoga Ave Apts 1-6, Rochester, NY  14608

County: Monroe

Parcel Identification Number: 105.51-3-1

Client Code: MEYER-HIRSCHHORN-06

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE COUNTY
OF MONROE, STATE OF NEW YORK, AND IS DESCRIBED AS FOLLOWS:

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF
ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN

Exhibit A

AND DESCRIBED AS LOT NUMBER ONE (1) OF THE JONES TRACT, SECTION "G", AS SHOWN ON A MAP THEREOF FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 35 OF MAPS AT PAGE 29.

SAID LOT NUMBER ONE (1) FRONTS 31 FEET ON THE EAST SIDE OF SARATOGA AVENUE AND IS OF THE FURTHER DIMENSIONS AS SHOWN ON SAID MAP.

***

Address: 258 Avis St, Rochester, NY  14615

County: Monroe

Parcel Identification Number: 090.41-1-34

Client Code: MEYER-HIRSCHHORN-07

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, FORMERLY TOWN OF GREECE, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN AND DESCRIBED AS LOT NO. 340 OF W. N. BRITTON TRACT, WEST OF DEWEY AVENUE AS THE SAME IS LAID DOWN ON A MAP THEREOF FILED IN LIBER 25 OF MAPS AT PAGE 35.

SAID LOT 340 FRONTS 50 FEET ON THE NORTHERLY SIDE OF AVIS STREET AND EXTENDS BACK OF EQUAL WIDTH THROUGHOUT 100 FEET.

***

Address: 294 Lexington Ave, Rochester, NY  14613

County: Monroe

Parcel Identification Number: 105.26-1-12

Client Code: MEYER-HIRSCHHORN-08

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, BEING LOT #1 OF JESSE M. FROST'S SUBDIVISION OF PART OF LOT #4 OF THE 20,000.00 ACRE TRACT, A MAP OF WHICH SUBDIVISION IS FILED IN MONROE COUNTY CLERK'S OFFICE IN LIBER 54 OF MAPS, PAGE 1.

SAID LOT #1 OF SAID FROST'S SUBDIVISION IS SITUATE ON THE NORTH SIDE OF LEXINGTON AVENUE AND IS 37 FEET WIDE FRONT AND REAR AND 85 FEET DEEP.

Exhibit A

THE EASTERLY LINE OF LOT #1 IS PARALLEL TO THE WESTERLY LINE OF STRAUB STREET, ROCHESTER, NEW YORK.

\*\*\*

Address: 301 Selye Ter, Rochester, NY 14613

County: Monroe

Parcel Identification Number: 090.81-2-27

Client Code: MEYER-HIRSCHHORN-09

ALSO ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN AND DESCRIBED AS LOT NUMBER SIXTY-FIVE (65) AS SHOWN AND LAID DOWN ON THE MAP OF THE ROCHESTER DRIVING PARK TRACT, SO-CALLED, MADE BY J.C. RYAN, SURVEYOR, AND FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 15 OF MAPS, AT PAGE 33. SAID LOT NUMBER SIXTY-FIVE (65) FRONTS ON THE SOUTH SIDE OF SELYE TERRACE AND IS FORTY (40) FEET WIDE IN FRONT AND EXTENDS BACK OF EQUAL WIDTH WITH THE FRONT ONE HUNDRED AND SIXTEEN (116) FEET IN DEPTH.

\*\*\*

Address: 31 Alice St, Rochester, NY 14611

County: Monroe

Parcel Identification Number: 120.31-2-26

Client Code: MEYER-HIRSCHHORN-10

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN AND DISTINGUISHED AS LOT NUMBER FOURTEEN (14), IN SECTION "B", ON THE SOUTH SIDE OF ALICE STREET, AS THE SAID LOT IS LAID DOWN ON A MAP OF A SUBDIVISION OF PART OF THE BINGEN TRACT, MADE BY HORACE JONES, SURVEYOR, AUGUST 1872, AND FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 5 OF MAPS, PAGE 88. THE SAID LOT BEING FORTY (40) FEET IN WIDTH FRONT AND REAR AND ONE HUNDRED SIXTY-SIX (166) FEET DEEP.

Exhibit A

***

Address: 36 Sterling St, Rochester, NY  14606

County: Monroe

Parcel Identification Number: 105.49-1-40

Client Code: MEYER-HIRSCHHORN-11

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF
ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, BEING
KNOWN AND DESCRIBED AS LOT NO. 5 ON A SUBDIVISION OF LOTS NO.
72 TO 82 INCLUSIVE, OF THE HOUSTON TRACT, AS SHOWN ON A MAP
FILED IN LIBER 11 OF MAPS, PAGE 100 IN THE MONROE COUNTY
CLERK'S OFFICE. SAID LOT NO. 5 BEING 33 FEET AND 3 INCHES FRONT
AND REAR AND 125 FEET DEEP, AND IS SITUATE ON THE EAST SIDE OF
STERLING STREET.

***

Address: 404 Emerson St, Rochester, NY  14613

County: Monroe

Parcel Identification Number: 105.41-2-17

Client Code: MEYER-HIRSCHHORN-12

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF
ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN
AND DESIGNATED AS LOT #2 OF THE KONDOLF & BRAYER TRACT, AS
THE SAME IS LAID OUT ON A MAP OF THE SAID TRACT FILED IN THE
MONROE COUNTY CLERK'S OFFICE IN LIBER 3 OF MAPS, PAGE 25. SAID
LOT BEING 240 FEET EASTERLY FROM THE EASTERLY RIGHT OF WAY
LINE OF PLOVER STREET, AS MEASURED ALONG THE NORTHERLY
RIGHT OF WAY LINE OF EMERSON STREET; THENCE IN A NORTHERLY
DIRECTION AT AN INTERIOR ANGLE OF 89 DEGREES 26' 15" WITH THE
PRECEDING COURSE A DISTANCE OF 187.42 FEET TO A POINT ON THE
SOUTHERLY RIGHT OF WAY LINE OF THE FORMER ERIE CANAL
PROPERTY; THENCE IN A SOUTHEASTERLY DIRECTION AT AN INTERIOR
ANGLE OF 39 DEGREES 36' 35" WITH THE PRECEDING COURSE ALONG
THE SOUTHERLY RIGHT OF WAY LINE OF THE FORMER ERIE CANAL
PROPERTY A DISTANCE OF 47.68 FEET TO AN ANGLE POINT; THENCE
CONTINUING IN A SOUTHEASTERLY DIRECTION AT AN INTERIOR ANGLE
WITH THE PRECEDING COURSE OF 168 DEGREES 04' 37", ALONG THE
SOUTHERLY RIGHT OF WAY LINE OF THE FORMER ERIE CANAL
PROPERTY A DISTANCE OF 47.68 FEET TO AN ANGLE POINT; THENCE
CONTINUING IN A SOUTHEASTERLY DIRECTION AT AN INTERIOR ANGLE

Exhibit A

WITH THE PRECEDING COURSE OF 168 DEGREES 04' 37", ALONG THE SOUTHERLY RIGHT OF WAY LINE OF THE FORMER ERIE CANAL PROPERTY, A DISTANCE OF 20.66 FEET TO A POINT; THENCE IN A SOUTHERLY DIRECTION AT AN INTERIOR ANGLE OF 152 DEGREES 18' 48" WITH THE PRECEDING COURSE, A DISTANCE OF 132 FEET TO A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF EMERSON STREET, AT AN INTERIOR ANGLE OF 90 DEGREES 33' 45" WITH THE PRECEDING COURSE A DISTANCE OF 40 FEET TO THE POINT OF BEGINNING.


\*\*\*


Address: 74 Starling St, Rochester, NY  14613

County: Monroe

Parcel Identification Number: 105.25-1-33

Client Code: MEYER-HIRSCHHORN-13

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK KNOWN AND DISTINGUISHED AS LOT #23, JAMES N. WHITNEY'S SUBDIVISION OF PART OF ORIGINAL TOWN LOT #64, AS SHOWN ON A MAP THEREOF, MADE BY HORACE JONES, SURVEYOR, FOR SAID WHITNEY AND FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 3 OR MAPS, PAGE 52.

SAID LOT #23 BEING SITUATE ON THE EAST SIDE OF STARLING STREET AND BEING 50 FEET WIDE FRONT AND REAR AND 150 FEET DEEP.


\*\*\*


Address: 76 Oriole St, Rochester, NY  14613

County: Monroe

Parcel Identification Number: 105.25-3-57

Client Code: MEYER-HIRSCHHORN-14

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK KNOWN AND DESCRIBED AS LOT NO. NINETY-TWO (92) OF A MAP OF MONROE CO-OPERATIVE BUILDING LOT ASSOCIATION TRACT, FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 2 OF MAPS, PAGE 30; SAID LOT NO. 92 FRONTING ON THE EAST SIDE OF ORIOLE STREET AS DESIGNATED AND LAID OUT ON SAID MAP, AND BEING FORTY-FIVE (45)

Exhibit A

FEET WIDE, FRONT AND REAR, AND ONE HUNDRED THIRTY (130) FEET
IN DEPTH.

\*\*\*

Address: 8 Immel St, Rochester, NY 14606

County: Monroe

Parcel Identification Number: 105.81-2-26

Client Code: MEYER-HIRSCHHORN-15

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF
ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN
AND DESIGNATED AS LOT #6 IN A SUBDIVISION MAP OF IMMEL PLACE
FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 7 OF MAPS,
PAGE 38. SAID LOT #6 IS SITUATE ON THE EAST SIDE OF IMMEL PLACE
AND IS 40 FEET FRONT AND REAR AND 76 FEET DEEP.

\*\*\*

Address: 8 Velox St, Rochester, NY 14615

County: Monroe

Parcel Identification Number: 075.82-2-40

Client Code: MEYER-HIRSCHHORN-16

ALSO ALL THAT TRACT OR PARCEL OF LAND, WITH THE BUILDINGS AND
IMPROVEMENTS THEREON ERECTED, SITUATE, LYING AND BEING IN
THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW
YORK, KNOWN AND DISTINGUISHED AS LOT NUMBER ONE HUNDRED
AND TWENTY (120) OF ADELGONDE EDDY TRACT ACCORDING TO A MAP
OF SAID TRACT MADE BY R.E. GASKIN, SURVEYOR, AND FILED IN
MONROE COUNTY CLERK'S OFFICE IN LIBER 29 OF MAPS AT PAGE 22.

THIS CONVEYANCE IS MADE AND ACCEPTED SUBJECT TO COVENANTS
AND RESTRICTIONS CONTAINED IN A DEED MADE BY THOMAS H. EDDY
AND OTHERS, TO ANNA WEISS, RECORDED IN MONROE COUNTY
CLERK'S OFFICE IN LIBER 895 OF DEEDS AT PAGE 326. ALSO SUBJECT
TO A RIGHT OF WAY GRANTED BY ANNA WEISS AND PETER WEISS TO
THE ROCHESTER GAS & ELECTRIC CORPORATION AND OTHERS,
RECORDED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 1078 OF
DEEDS AT PAGE 340.

Exhibit A

\*\*\*

Address: 87 Dix St, Rochester, NY  14606

County: Monroe

Parcel Identification Number: 105.48-2-12

Client Code: MEYER-HIRSCHHORN-17

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF
ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK.
BOUNDED AND DESCRIBED AS FOLLOWS: LOT NO. 7, M.F. SCHIED
SUBDIVISION AS LAID DOWN ON A MAP OF A SUBDIVISION OF LOTS
NOS. 124 AND 128 INCLUSIVE AND 143, 144 AND 145 OF THE HOUSON
TRACT MADE FOR MICHAEL J. SCHIED BY J.C. RYAN, SURVEYOR, FILED
IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 26 OF MAPS, PAGE
23.

SAID LOT NO. 7 IS SITUATE ON THE WEST SIDE OF DIX STREET AND IS
THIRTY-SEVEN (37) FEET WIDE FRONT AND REAR AND 116.43 FEET
DEEP AS SHOWN ON SAID MAP.

\*\*\*

Address: 968 Ridgeway Ave, Rochester, NY  14615

County: Monroe

Parcel Identification Number: 090.39-1-20

Client Code: MEYER-HIRSCHHORN-18

ALSO ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF
ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN
AND DESCRIBED AS LOT 12 AND THE WEST 10 FEET OF LOT NO. 13 AS
SAID LOTS ARE LAID DOWN ON A MAP OF RIDGEWAY AVENUE
TERRACE, FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 29
OF MAPS AT PAGE 26.

SAID LOT NO. 12, TOGETHER WITH THE WEST 10 FEET OF LOT NO. 13,
CONSTITUTES A PARCEL OF LAND FRONTING 50 FEET ON THE NORTH
SIDE OF RIDGEWAY AVENUE 50 FEET WIDE IN REAR, AND ABOUT 98.26
FEET IN DEPTH, MORE OR LESS.

Exhibit A

SUBJECT TO THE SEVEN FOOT PERPETUAL EASEMENT RESERVED BY THE CITY OF ROCHESTER BY DEED RECORDED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 2673 IF DEEDS, PAGE 130.

ALSO ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN AND DESCRIBED AS THE WESTERLY 50 FEET OF LOT NOS., 15 AND 16 AS SAID LOTS ARE LAID DOWN ON A MAP OF THE RIDGEWAY AVENUE TERRACE TRACT FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 29 OF MAPS, PAGE 26.

SAID WESTERLY 50 FEET OF SAID LOTS NOS., 15 AND 16 CONSTITUTES PARCEL OF LAND 55 FEET WIDE FRONTING ON THE EASTERLY SIDE OF PERINTON STREET, FORMERLY PERRINGTON AVENUE, RUNNING BACK OF EVEN WIDTH 50 FEET TO THE EASTERLY LINE OF PREMISES CONVEYED TO THE PARTY OF THE FIRST PART HEREIN BY DEED RECORDED IN MONROE COUNTY CLERK'S OFFICE MARCH 30, 1950 IN LIBER 2673 OF DEEDS, PAGE 130, EXTEND NORTHERLY TO THE NORTH LINE OF SAID LOT NO. 16.

*** 

Address: 14 Durgin St, Rochester, NY 14605
County: Monroe
Parcel Identification Number: 106.37-2-45.003
Client Code: MEYER-HIRSCHHORN-05
PARCEL I

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE, AND STATE OF NEW YORK, KNOWN AND DESCRIBED AS LOT NO. TWENTY- SIX (26) AS SHOWN ON A MAP ANNEXED TO THE REPORT OF J. P. VARNUM, REFEREE, TO REPORT ORDER OF SALE OF LAND MORTGAGED BY FRANCES G. WORCESTER AND DAVID F. WORCESTER TO THE ROCHESTER SAVINGS BANK, THE SAME BEING ON FILE IN THE MONROE COUNTY CLERK'S OFFICE AND IS ABOUT 30 FEET ON THE EAST SIDE OF EVERGREEN PLACE (NOW KNOWN AS DURGIN STREET) AND EXTENDS BACK THE SAME WIDTH TO THE EASTERLY LINE OF SAID MORTGAGED PREMISES.

ALSO, ALL THAT STRIP OF LAND, SITUATE IN SAID CITY, COUNTY AND STATE, ADJOINING SAID PARCEL ON THE EAST AND BEING SEVEN AND ONE HALF (7 ½ ) FEET WIDE FROM EAST TO WEST AND 30 FEET LONG FROM NORTH TO SOUTH, SITUATED BETWEEN THE NORTH AND SOUTH LINES OF THE FIRST PARCEL EXTENDING EASTERLY.

Exhibit A

THE TWO PARCELS ABOVE DESCRIBED FORM A SINGLE LOT OF LAND BOUNDED AND DESCRIBED AS FOLLOWS:

COMMENCING AT A POINT IN THE EAST LINE OF DURGIN STREET, 100 FEET SOUTHERLY FROM THE SOUTH LINE OF EVERGREEN STREET; RUNNING THENCE

(1) EASTERLY PARALLEL WITH EVERGREEN STREET 66.06 FEET; THENCE

(2) SOUTHERLY PARALLEL WITH DURGIN STREET, 30 FEET; THENCE

(3) WESTERLY PARALLEL WITH EVERGREEN STREET, 65.57 FEET TO THE EAST LINE OF DURGIN STREET; THENCE

(4) NORTHERLY ALONG THE EAST LINE OF DURGIN STREET, 30 FEET TO THE PLACE OF BEGINNING.

ALSO, ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE EASTERLY LINE OF DURGIN STREET, 130 FEET SOUTHERLY FROM THE SOUTHERLY LINE OF EVERGREEN STREET; THENCE

(1) SOUTHERLY ALONG THE EASTERLY LINE OF DURGIN STREET, 19 FEET TO A POINT; THENCE

(2) EASTERLY AT RIGHT ANGLES TO THE EASTERLY LINE OF DURGIN STREET, 65.26 FEET TO A POINT; THENCE

(3) NORTHERLY 19 FEET TO A POINT 65.57 FEET EASTERLY FROM THE POINT OF BEGINNING; THENCE

(4) WESTERLY 65.57 FEET TO THE POINT OR PLACE OF BEGINNING.

PARCEL II

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE, STATE OF NEW YORK KNOWN AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE EASTERLY LINE OF DURGIN STREET, 149 FEET SOUTHERLY FROM THE SOUTHERLY LINE OF EVERGREEN STREET; THENCE

Exhibit A

(1) SOUTHERLY ALONG THE EASTERLY LINE OF DURGIN STREET 19 FEET TO A POINT; THENCE

(2) EASTERLY AT RIGHT ANGLES TO THE EASTERLY LINE OF DURGIN STREET 62.95 FEET TO A POINT; THENCE

(3) NORTHERLY 19 FEET TO A POINT 63.26 FEET EASTERLY FROM THE POINT OF BEGINNING; THENCE

(4) WESTERLY 63.26 FEET TO THE POINT OR PLACE OF BEGINNING.

*** 

Exhibit A

# EXHIBIT I

MONROE COUNTY CLERK'S OFFICE         THIS IS NOT A BILL. THIS IS YOUR RECEIPT.

Receipt # 3200320

Book   Page   A 01918 0509

Return To:
SOURCEPOINT FULFILLMENT SERVICES, INC.          No. Pages: 18
2330 COMMERCE PARK DR NE SUITE 2
PALM BAY, FL 32905-7721                          Instrument: ASSIGNMENT OF MORTGAGE

Control #:          202209201016
Ref #:              MDM006474

Date: 09/20/2022

COREVEST AMERICAN FINANCE DEPOSITOR LLC,         Time: 3:07:25 PM

WILMINGTON TRUST, NATIONAL ASSOCIATION,,

| | |
|---|---|
| Pages Fee | $85.00 |
| State Fee Cultural Education | $14.25 |
| State Fee Records | $4.75 |
| Management | |
| County Fee Assign of Mtg | $26.50 |
| | |
| Total Fees Paid: | $130.50 |

Employee: ED

State of New York

MONROE COUNTY CLERK'S OFFICE
WARNING – THIS SHEET CONSTITUTES THE CLERKS
ENDORSEMENT, REQUIRED BY SECTION 317-a(5) &
SECTION 319 OF THE REAL PROPERTY LAW OF THE
STATE OF NEW YORK. DO NOT DETACH OR REMOVE.

JAMIE ROMEO

MONROE COUNTY CLERK



PREPARED BY:
Karen Wade, Esq.
Alston & Bird LLP
2220 Ross Avenue, Suite 2300
Dallas, TX 75201

UPON RECORDATION RETURN TO:
Attn: Tim Murray
OS National LLC
3097 Satellite Blvd, Ste 400
Duluth, GA 30096

## ASSIGNMENT OF SECURITY INSTRUMENT

### by

### COREVEST AMERICAN FINANCE DEPOSITOR LLC,
a Delaware limited liability company,

### to

### WILMINGTON TRUST, NATIONAL ASSOCIATION, AS TRUSTEE, FOR THE BENEFIT OF THE HOLDERS OF COREVEST AMERICAN FINANCE 2021-1 TRUST MORTGAGE PASS-THROUGH CERTIFICATES

### Dated:  As of April 30, 2021

### State:    New York
### County:  Monroe

Mortgage Reference: Instrument 202106041414 Book 29252 Page 152
Reference" MDM006474

## ASSIGNMENT OF SECURITY INSTRUMENT

THIS ASSIGNMENT OF SECURITY INSTRUMENT (this "Assignment"), made and entered into as of the April 30, 2021, is made by **COREVEST AMERICAN FINANCE DEPOSITOR LLC** , a Delaware limited liability company, having an address at 1920 Main Street, Suite 850, Irvine, CA 92614 ("Assignor"), in favor of **WILMINGTON TRUST, NATIONAL ASSOCIATION, AS TRUSTEE, FOR THE BENEFIT OF THE HOLDERS OF COREVEST AMERICAN FINANCE 2021-1 TRUST MORTGAGE PASS-THROUGH CERTIFICATES**, having an address at 1100 North Market Street, Wilmington, DE 19890 ("Assignee").

W I T N E S S E T H

WHEREAS, Assignor is the present legal and equitable owner and holder of that certain Promissory Note dated as March 31, 2021 executed by **Hirschhorn Estates, LLC**, a Delaware limited liability company ("Borrower"), and made payable to the order of CoreVest American Finance Lender LLC, a Delaware limited liability company ("CAFL"), predecessor-in-interest to Assignor, in the stated principal amount of One million twenty-three thousand five hundred dollars and no cents ($1,023,500.00) (the "Note") in connection with certain real property and improvements located thereon situated in the County of Monroe, State of New York, and more particularly described on Exhibit A annexed hereto and made a part hereof (the "Premises"); and

WHEREAS, the Note is secured, inter alia, by the Security Instrument (as hereinafter defined); and

WHEREAS, the parties hereto desire that Assignor assign to Assignee, its successors and assigns, all of Assignor's right, title and interest in and to the Security Instrument.

NOW, THEREFORE, in consideration of the premises above set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and agreed, Assignor and Assignee hereby covenant and agree as follows:

1.     Assignment.    Assignor does hereby transfer, assign, grant and convey to Assignee, its successors and assigns, all of the right, title and interest of Assignor in and to the following described instrument, and does hereby grant and delegate to Assignee, its successors and assigns, any and all of the duties and obligations of Assignor thereunder from and after the date hereof:

> That certain Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of March 31, 2021, executed by Borrower for the benefit of CoreVest American Finance Lender LLC, as lender, and recorded on June 4, 2021 in the Real Property Records of Monroe County, New York, as Document No. 202106041414, Book 29252, Page 0152 (as the same may heretofore have been assigned, the "Security Instrument"), in respect of the Premises, together with all rights accrued or to accrue under said Security Instrument.
> \* Reference MDM006474

Loan # 34631
Assignment of Security Instrument (DEPOSITOR TO TRUST) – Page 1
Monroe / New York
#35666147

 2. <u>Representations and Warranties of Assignor</u>. This Assignment is an absolute assignment. This Assignment is without recourse, representation or warranty, express or implied, upon Assignor, except Assignor hereby warrants and represents to Assignee that:

 (a) Prior to the execution hereof, Assignor has not sold, transferred, assigned, conveyed, pledged or endorsed any right, title or interest in the Security Instrument to any person or entity other than Assignee; and

 (b) Assignor has full right and power to sell and assign the same to Assignee subject to no interest or participation of, or agreement with, any party other than Assignee.

 3. <u>Governing Law</u>. With respect to matters relating to the creation, perfection and procedures relating to the enforcement of this Assignment, this Assignment shall be governed by, and be construed in accordance with, the laws of the State of New York, it being understood that, except as expressly set forth above in this paragraph and to the fullest extent permitted by the law of the State of New York, the law of the State of New York applicable to contracts made and performed in such State (pursuant to Section 5-1401 of the New York General Obligations Law) shall govern all matters relating to this Assignment and all of the indebtedness or obligations arising hereunder.

 4. <u>Successors and Assigns</u>. This Assignment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

 5. <u>Headings</u>. The headings of the paragraphs of this Assignment have been included only for convenience, and shall not be deemed in any manner to modify or limit any of the provisions of this Assignment or be used in any manner in the interpretation of this Assignment.

 6. <u>Interpretation</u>. Whenever the context so requires in this Assignment, all words used in the singular shall be construed to have been used in the plural (and vice versa), each gender shall be construed to include any other genders, and the word "person" shall be construed to include a natural person, a corporation, a firm, a partnership, a joint venture, a trust, an estate or any other entity.

 7. <u>Partial Invalidity</u>. Each provision of this Assignment shall be valid and enforceable to the fullest extent permitted by law. If any provision of this Assignment or the application of such provision to any person or circumstance shall, to any extent, be invalid or unenforceable, then the remainder of this Assignment, or the application of such provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected by such invalidity or unenforceability.

Loan # 34631
Assignment of Security Instrument (DEPOSITOR TO TRUST) – Page 2
Monroe / New York
#35666147

IN WITNESS WHEREOF, Assignor has executed this Assignment of Security Instrument as of the day and year first above written.

ASSIGNOR:

**COREVEST AMERICAN FINANCE DEPOSITOR LLC**, A Delaware limited liability company

By: _____
Sokun Soun
Authorized Signatory

Witness #1
Print Name: _CHRIS CABLAYAN_

Witness #2
Print Name: _Chris Jennner_

Signature Page

Assignment of Security Instrument (DEPOSITOR TO TRUST)

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

**CIVIL CODE § 1189**

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California               )

County of __Orange_____ )

On __May 4, 2021_____ before me, __Corine Goddard, Notary Public__,
        *Date*                    *Here Insert Name and Title of the Officer*

personally appeared    __Sokun Soun_____

_____N/A_____,
                             *Name(s) of Signer(s)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

> CORINE GODDARD
> Notary Public - California
> Orange County
> Commission # 2264348
> My Comm. Expires Oct 26, 2022

Signature _Corine Goddard_____

*Signature of Notary Public*

*Place Notary Seal Above*
———————————— **OPTIONAL** ————————————
*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Individual    ☐ Attorney in Fact
☐ Trustee    ☐ Guardian or Conservator
☐ Other: _____
Signer Is Representing: _____

Signer's Name: _____
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Individual    ☐ Attorney in Fact
☐ Trustee    ☐ Guardian or Conservator
☐ Other: _____
Signer Is Representing: _____

©2016 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)    Item #5907

## SCHEDULE 1

Property List

| Address | City | State | County | Zip |
|---------|------|-------|--------|-----|
| 103 Marion St | Rochester | NY | Monroe | 14610 |
| 117 W Filbert Street | East Rochester | NY | Monroe | 14445 |
| 136 Campbell St  Apts  1-6 | Rochester | NY | Monroe | 14611 |
| 14 Durgin St | Rochester | NY | Monroe | 14605 |
| 236 Saratoga Ave Apts 1-6 | Rochester | NY | Monroe | 14608 |
| 258 Avis St | Rochester | NY | Monroe | 14615 |
| 294 Lexington Ave | Rochester | NY | Monroe | 14613 |
| 301 Selye Ter | Rochester | NY | Monroe | 14613 |
| 31 Alice St | Rochester | NY | Monroe | 14611 |
| 36 Sterling St | Rochester | NY | Monroe | 14606 |
| 404 Emerson St | Rochester | NY | Monroe | 14613 |
| 74 Starling St | Rochester | NY | Monroe | 14613 |
| 76 Oriole St | Rochester | NY | Monroe | 14613 |
| 8 Immel St | Rochester | NY | Monroe | 14606 |
| 8 Velox St | Rochester | NY | Monroe | 14615 |
| 87 Dix St | Rochester | NY | Monroe | 14606 |
| 968 Ridgeway Ave | Rochester | NY | Monroe | 14615 |

Schedule 1    Mortgage (*Monroe County, New York*)

## EXHIBIT A

Legal Description

Address: 103 Marion St, Rochester, NY 14610

County: Monroe

Parcel Identification Number: 122.40-2-2

Client Code: MEYER-HIRSCHHORN-01

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, BEING LOT #16 AS THE SAME IS LAID DOWN ON AN AMENDED MAP OF A PART OF THE MAHLON D. PHILLIPS SUBDIVISION OF A PART OF LOT #27 IN THE SECOND SUBDIVISION OF LOTS IN THE TOWN OF BRIGHTON, NOW THE CITY OF ROCHESTER, WHICH MAP WAS MADE BY A.B. TITUS, SURVEYOR, FOR MILLICENT HOVEY AND FILED IN THE MONROE COUNTY CLERK'S OFFICE FEBRUARY 15, 1910 IN LIBER 21 OF MAPS, PAGE 19, SAID LOT #16 IS SITUATE ON THE WEST SIDE OF MARION STREET.

***

Address: 117 W Filbert Street, East Rochester, NY 14445

County: Monroe

Parcel Identification Number: 152.21-1-65

Client Code: MEYER-HIRSCHHORN-03

ALSO ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE TOWN/VILLAGE OF EAST ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, AND BEING KNOWN AND DESIGNATED AS LOT NUMBER TWELVE (12) IN BLOCK NUMBER FIFTY-SIX (56) AS SHOWN ON A MAP OF THE LANDS OF THE VANDERBILT IMPROVEMENT CO. ON FILE IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 10 OF MAPS, AT PAGE 35. EXCEPTING AND RESERVING THEREFROM, THE STREET OR THE STREET ABUTTING UPON SAID PREMISES, THE FEE OF WHICH, SUBJECT TO THE USED OF SAID TOWNN/VILLAGE OF EAST ROCHESTER, AS A HIGHWAY OR HIGHWAYS IS RETAINED IN SAID TOWNN/VILLAGE.

***

Exhibit A      Mortgage (*Monroe County, New York*)

Address: 136 Campbell St Apts 1-6, Rochester, NY 14611

County: Monroe

Parcel Identification Number: 120.27-1-19

Client Code: MEYER-HIRSCHHORN-04

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN AND DISTINGUISHED AS A PART OF LOT NUMBER SEVEN (7) SECTION A OF THE WHITNEY TRACT AS THE SAME IS LAID DOWN UPON A MAP OF SAID TRACT FILED IN MONROE COUNTY CLERK'S OFFICE IN LIBER 2 OF MAPS AT PAGE 8, AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF WALNUT AND CAMPBELL STREETS AND RUNNING THENCE NORTHERLY ALONG THE WEST LINE OF WALNUT STREET, NINETY-EIGHT (98) FEET; THENCE WESTERLY PARALLEL WITH THE NORTH LINE OF CAMPBELL STREET FIFTY (50) FEET TO THE WEST LINE OF SAID LOT NUMBER SEVEN (7); THENCE SOUTHERLY PARALLEL WITH THE WEST LINE OF WALNUT STREET AND ALONG THE WEST LINE OF SAID LOT NINETY EIGHT (98) FEET TO THE NORTH LINE OF CAMPBELL STREET AND THENCE EASTERLY ALONG THE SAID NORTH LINE FIFTY (50) FEET TO THE PLACE OF BEGINNING, TOGETHER WITH ALL THE RIGHT, TITLE AND INTEREST OF THE PARTIES OF THE FIRST PART IN AND TO SUCH PORTIONS OF CAMPBELL AND WALNUT STREETS AS LIE IN FRONT OF THE PREMISES HEREBY CONVEYED, HEREBY INTENDING TO CONVEY ALL THAT PART OF PARCEL OF LOT NUMBER SEVEN (7) SOUTH OF A LINE DRAWN SOUTH OF THE NORTH LINE OF SAID LOT AND THIRTY-FOUR (34) FEET DISTANT THEREFROM.

\*\*\*

Address: 236 Saratoga Ave Apts 1-6, Rochester, NY 14608

County: Monroe

Parcel Identification Number: 105.51-3-1

Client Code: MEYER-HIRSCHHORN-06

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE COUNTY OF MONROE, STATE OF NEW YORK, AND IS DESCRIBED AS FOLLOWS:

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN

Exhibit A

AND DESCRIBED AS LOT NUMBER ONE (1) OF THE JONES TRACT, SECTION "G", AS SHOWN ON A MAP THEREOF FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 35 OF MAPS AT PAGE 29.

SAID LOT NUMBER ONE (1) FRONTS 31 FEET ON THE EAST SIDE OF SARATOGA AVENUE AND IS OF THE FURTHER DIMENSIONS AS SHOWN ON SAID MAP.


***


Address: 258 Avis St, Rochester, NY  14615

County: Monroe

Parcel Identification Number: 090.41-1-34

Client Code: MEYER-HIRSCHHORN-07

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, FORMERLY TOWN OF GREECE, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN AND DESCRIBED AS LOT NO. 340 OF W. N. BRITTON TRACT, WEST OF DEWEY AVENUE AS THE SAME IS LAID DOWN ON A MAP THEREOF FILED IN LIBER 25 OF MAPS AT PAGE 35.

SAID LOT 340 FRONTS 50 FEET ON THE NORTHERLY SIDE OF AVIS STREET AND EXTENDS BACK OF EQUAL WIDTH THROUGHOUT 100 FEET.


***


Address: 294 Lexington Ave, Rochester, NY  14613

County: Monroe

Parcel Identification Number: 105.26-1-12

Client Code: MEYER-HIRSCHHORN-08

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, BEING LOT #1 OF JESSE M. FROST'S SUBDIVISION OF PART OF LOT #4 OF THE 20,000.00 ACRE TRACT, A MAP OF WHICH SUBDIVISION IS FILED IN MONROE COUNTY CLERK'S OFFICE IN LIBER 54 OF MAPS, PAGE 1.

SAID LOT #1 OF SAID FROST'S SUBDIVISION IS SITUATE ON THE NORTH SIDE OF LEXINGTON AVENUE AND IS 37 FEET WIDE FRONT AND REAR AND 85 FEET DEEP.

Exhibit A

THE EASTERLY LINE OF LOT #1 IS PARALLEL TO THE WESTERLY LINE OF STRAUB STREET, ROCHESTER, NEW YORK.

\*\*\*

Address: 301 Selye Ter, Rochester, NY 14613

County: Monroe

Parcel Identification Number: 090.81-2-27

Client Code: MEYER-HIRSCHHORN-09

ALSO ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN AND DESCRIBED AS LOT NUMBER SIXTY-FIVE (65) AS SHOWN AND LAID DOWN ON THE MAP OF THE ROCHESTER DRIVING PARK TRACT, SO-CALLED, MADE BY J.C. RYAN, SURVEYOR, AND FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 15 OF MAPS, AT PAGE 33. SAID LOT NUMBER SIXTY-FIVE (65) FRONTS ON THE SOUTH SIDE OF SELYE TERRACE AND IS FORTY (40) FEET WIDE IN FRONT AND EXTENDS BACK OF EQUAL WIDTH WITH THE FRONT ONE HUNDRED AND SIXTEEN (116) FEET IN DEPTH.

\*\*\*

Address: 31 Alice St, Rochester, NY 14611

County: Monroe

Parcel Identification Number: 120.31-2-26

Client Code: MEYER-HIRSCHHORN-10

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN AND DISTINGUISHED AS LOT NUMBER FOURTEEN (14), IN SECTION "B", ON THE SOUTH SIDE OF ALICE STREET, AS THE SAID LOT IS LAID DOWN ON A MAP OF A SUBDIVISION OF PART OF THE BINGEN TRACT, MADE BY HORACE JONES, SURVEYOR, AUGUST 1872, AND FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 5 OF MAPS, PAGE 88. THE SAID LOT BEING FORTY (40) FEET IN WIDTH FRONT AND REAR AND ONE HUNDRED SIXTY-SIX (166) FEET DEEP.

Exhibit A

\*\*\*

Address: 36 Sterling St, Rochester, NY 14606

County: Monroe

Parcel Identification Number: 105.49-1-40

Client Code: MEYER-HIRSCHHORN-11

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, BEING KNOWN AND DESCRIBED AS LOT NO. 5 ON A SUBDIVISION OF LOTS NO. 72 TO 82 INCLUSIVE, OF THE HOUSTON TRACT, AS SHOWN ON A MAP FILED IN LIBER 11 OF MAPS, PAGE 100 IN THE MONROE COUNTY CLERK'S OFFICE. SAID LOT NO. 5 BEING 33 FEET AND 3 INCHES FRONT AND REAR AND 125 FEET DEEP, AND IS SITUATE ON THE EAST SIDE OF STERLING STREET.

\*\*\*

Address: 404 Emerson St, Rochester, NY 14613

County: Monroe

Parcel Identification Number: 105.41-2-17

Client Code: MEYER-HIRSCHHORN-12

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN AND DESIGNATED AS LOT #2 OF THE KONDOLF & BRAYER TRACT, AS THE SAME IS LAID OUT ON A MAP OF THE SAID TRACT FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 3 OF MAPS, PAGE 25. SAID LOT BEING 240 FEET EASTERLY FROM THE EASTERLY RIGHT OF WAY LINE OF PLOVER STREET, AS MEASURED ALONG THE NORTHERLY RIGHT OF WAY LINE OF EMERSON STREET; THENCE IN A NORTHERLY DIRECTION AT AN INTERIOR ANGLE OF 89 DEGREES 26' 15" WITH THE PRECEDING COURSE A DISTANCE OF 187.42 FEET TO A POINT ON THE SOUTHERLY RIGHT OF WAY LINE OF THE FORMER ERIE CANAL PROPERTY; THENCE IN A SOUTHEASTERLY DIRECTION AT AN INTERIOR ANGLE OF 39 DEGREES 36' 35" WITH THE PRECEDING COURSE ALONG THE SOUTHERLY RIGHT OF WAY LINE OF THE FORMER ERIE CANAL PROPERTY A DISTANCE OF 47.68 FEET TO AN ANGLE POINT; THENCE CONTINUING IN A SOUTHEASTERLY DIRECTION AT AN INTERIOR ANGLE WITH THE PRECEDING COURSE OF 168 DEGREES 04' 37", ALONG THE SOUTHERLY RIGHT OF WAY LINE OF THE FORMER ERIE CANAL PROPERTY A DISTANCE OF 47.68 FEET TO AN ANGLE POINT; THENCE CONTINUING IN A SOUTHEASTERLY DIRECTION AT AN INTERIOR ANGLE

Exhibit A

WITH THE PRECEDING COURSE OF 168 DEGREES 04' 37", ALONG THE SOUTHERLY RIGHT OF WAY LINE OF THE FORMER ERIE CANAL PROPERTY, A DISTANCE OF 20.66 FEET TO A POINT; THENCE IN A SOUTHERLY DIRECTION AT AN INTERIOR ANGLE OF 152 DEGREES 18' 48" WITH THE PRECEDING COURSE, A DISTANCE OF 132 FEET TO A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF EMERSON STREET, AT AN INTERIOR ANGLE OF 90 DEGREES 33' 45" WITH THE PRECEDING COURSE A DISTANCE OF 40 FEET TO THE POINT OF BEGINNING.

\*\*\*

Address: 74 Starling St, Rochester, NY 14613

County: Monroe

Parcel Identification Number: 105.25-1-33

Client Code: MEYER-HIRSCHHORN-13

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK KNOWN AND DISTINGUISHED AS LOT #23, JAMES N. WHITNEY'S SUBDIVISION OF PART OF ORIGINAL TOWN LOT #64, AS SHOWN ON A MAP THEREOF, MADE BY HORACE JONES, SURVEYOR, FOR SAID WHITNEY AND FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 3 OR MAPS, PAGE 52.

SAID LOT #23 BEING SITUATE ON THE EAST SIDE OF STARLING STREET AND BEING 50 FEET WIDE FRONT AND REAR AND 150 FEET DEEP.

\*\*\*

Address: 76 Oriole St, Rochester, NY 14613

County: Monroe

Parcel Identification Number: 105.25-3-57

Client Code: MEYER-HIRSCHHORN-14

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK KNOWN AND DESCRIBED AS LOT NO. NINETY-TWO (92) OF A MAP OF MONROE CO-OPERATIVE BUILDING LOT ASSOCIATION TRACT, FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 2 OF MAPS, PAGE 30; SAID LOT NO. 92 FRONTING ON THE EAST SIDE OF ORIOLE STREET AS DESIGNATED AND LAID OUT ON SAID MAP, AND BEING FORTY-FIVE (45)

Exhibit A

FEET WIDE, FRONT AND REAR, AND ONE HUNDRED THIRTY (130) FEET
IN DEPTH.


\*\*\*


Address: 8 Immel St, Rochester, NY  14606

County: Monroe

Parcel Identification Number: 105.81-2-26

Client Code: MEYER-HIRSCHHORN-15

ALSO ALL THAT TRACT OR PARCEL OF LAND SITUATE IN THE CITY OF
ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN
AND DESIGNATED AS LOT #6 IN A SUBDIVISION MAP OF IMMEL PLACE
FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 7 OF MAPS,
PAGE 38. SAID LOT #6 IS SITUATE ON THE EAST SIDE OF IMMEL PLACE
AND IS 40 FEET FRONT AND REAR AND 76 FEET DEEP.


\*\*\*


Address: 8 Velox St, Rochester, NY  14615

County: Monroe

Parcel Identification Number: 075.82-2-40

Client Code: MEYER-HIRSCHHORN-16

ALSO ALL THAT TRACT OR PARCEL OF LAND, WITH THE BUILDINGS AND
IMPROVEMENTS THEREON ERECTED, SITUATE, LYING AND BEING IN
THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW
YORK, KNOWN AND DISTINGUISHED AS LOT NUMBER ONE HUNDRED
AND TWENTY (120) OF ADELGONDE EDDY TRACT ACCORDING TO A MAP
OF SAID TRACT MADE BY R.E. GASKIN, SURVEYOR, AND FILED IN
MONROE COUNTY CLERK'S OFFICE IN LIBER 29 OF MAPS AT PAGE 22.

THIS CONVEYANCE IS MADE AND ACCEPTED SUBJECT TO COVENANTS
AND RESTRICTIONS CONTAINED IN A DEED MADE BY THOMAS H. EDDY
AND OTHERS, TO ANNA WEISS, RECORDED IN MONROE COUNTY
CLERK'S OFFICE IN LIBER 895 OF DEEDS AT PAGE 326. ALSO SUBJECT
TO A RIGHT OF WAY GRANTED BY ANNA WEISS AND PETER WEISS TO
THE ROCHESTER GAS & ELECTRIC CORPORATION AND OTHERS,
RECORDED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 1078 OF
DEEDS AT PAGE 340.


Exhibit A

*\*\**

Address: 87 Dix St, Rochester, NY 14606

County: Monroe

Parcel Identification Number: 105.48-2-12

Client Code: MEYER-HIRSCHHORN-17

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK. BOUNDED AND DESCRIBED AS FOLLOWS: LOT NO. 7, M.F. SCHIED SUBDIVISION AS LAID DOWN ON A MAP OF A SUBDIVISION OF LOTS NOS. 124 AND 128 INCLUSIVE AND 143, 144 AND 145 OF THE HOUSON TRACT MADE FOR MICHAEL J. SCHIED BY J.C. RYAN, SURVEYOR, FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 26 OF MAPS, PAGE 23.

SAID LOT NO. 7 IS SITUATE ON THE WEST SIDE OF DIX STREET AND IS THIRTY-SEVEN (37) FEET WIDE FRONT AND REAR AND 116.43 FEET DEEP AS SHOWN ON SAID MAP.

*\*\**

Address: 968 Ridgeway Ave, Rochester, NY 14615

County: Monroe

Parcel Identification Number: 090.39-1-20

Client Code: MEYER-HIRSCHHORN-18

ALSO ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN AND DESCRIBED AS LOT 12 AND THE WEST 10 FEET OF LOT NO. 13 AS SAID LOTS ARE LAID DOWN ON A MAP OF RIDGEWAY AVENUE TERRACE, FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 29 OF MAPS AT PAGE 26.

SAID LOT NO. 12, TOGETHER WITH THE WEST 10 FEET OF LOT NO. 13, CONSTITUTES A PARCEL OF LAND FRONTING 50 FEET ON THE NORTH SIDE OF RIDGEWAY AVENUE 50 FEET WIDE IN REAR, AND ABOUT 98.26 FEET IN DEPTH, MORE OR LESS.

Exhibit A

SUBJECT TO THE SEVEN FOOT PERPETUAL EASEMENT RESERVED BY THE CITY OF ROCHESTER BY DEED RECORDED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 2673 IF DEEDS, PAGE 130.

ALSO ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN AND DESCRIBED AS THE WESTERLY 50 FEET OF LOT NOS., 15 AND 16 AS SAID LOTS ARE LAID DOWN ON A MAP OF THE RIDGEWAY AVENUE TERRACE TRACT FILED IN THE MONROE COUNTY CLERK'S OFFICE IN LIBER 29 OF MAPS, PAGE 26.

SAID WESTERLY 50 FEET OF SAID LOTS NOS., 15 AND 16 CONSTITUTES PARCEL OF LAND 55 FEET WIDE FRONTING ON THE EASTERLY SIDE OF PERINTON STREET, FORMERLY PERRINGTON AVENUE, RUNNING BACK OF EVEN WIDTH 50 FEET TO THE EASTERLY LINE OF PREMISES CONVEYED TO THE PARTY OF THE FIRST PART HEREIN BY DEED RECORDED IN MONROE COUNTY CLERK'S OFFICE MARCH 30, 1950 IN LIBER 2673 OF DEEDS, PAGE 130, EXTEND NORTHERLY TO THE NORTH LINE OF SAID LOT NO. 16.

***

Address: 14 Durgin St, Rochester, NY 14605
County: Monroe
Parcel Identification Number: 106.37-2-45.003
Client Code: MEYER-HIRSCHHORN-05
PARCEL I

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE, AND STATE OF NEW YORK, KNOWN AND DESCRIBED AS LOT NO. TWENTY- SIX (26) AS SHOWN ON A MAP ANNEXED TO THE REPORT OF J. P. VARNUM, REFEREE, TO REPORT ORDER OF SALE OF LAND MORTGAGED BY FRANCES G. WORCESTER AND DAVID F. WORCESTER TO THE ROCHESTER SAVINGS BANK, THE SAME BEING ON FILE IN THE MONROE COUNTY CLERK'S OFFICE AND IS ABOUT 30 FEET ON THE EAST SIDE OF EVERGREEN PLACE (NOW KNOWN AS DURGIN STREET) AND EXTENDS BACK THE SAME WIDTH TO THE EASTERLY LINE OF SAID MORTGAGED PREMISES.

ALSO, ALL THAT STRIP OF LAND, SITUATE IN SAID CITY, COUNTY AND STATE, ADJOINING SAID PARCEL ON THE EAST AND BEING SEVEN AND ONE HALF (7 ½ ) FEET WIDE FROM EAST TO WEST AND 30 FEET LONG FROM NORTH TO SOUTH, SITUATED BETWEEN THE NORTH AND SOUTH LINES OF THE FIRST PARCEL EXTENDING EASTERLY.

Exhibit A

THE TWO PARCELS ABOVE DESCRIBED FORM A SINGLE LOT OF LAND BOUNDED AND DESCRIBED AS FOLLOWS:

COMMENCING AT A POINT IN THE EAST LINE OF DURGIN STREET, 100 FEET SOUTHERLY FROM THE SOUTH LINE OF EVERGREEN STREET; RUNNING THENCE

(1) EASTERLY PARALLEL WITH EVERGREEN STREET 66.06 FEET; THENCE

(2) SOUTHERLY PARALLEL WITH DURGIN STREET, 30 FEET; THENCE

(3) WESTERLY PARALLEL WITH EVERGREEN STREET, 65.57 FEET TO THE EAST LINE OF DURGIN STREET; THENCE

(4) NORTHERLY ALONG THE EAST LINE OF DURGIN STREET, 30 FEET TO THE PLACE OF BEGINNING.

ALSO, ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE AND STATE OF NEW YORK, KNOWN AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE EASTERLY LINE OF DURGIN STREET, 130 FEET SOUTHERLY FROM THE SOUTHERLY LINE OF EVERGREEN STREET; THENCE

(1) SOUTHERLY ALONG THE EASTERLY LINE OF DURGIN STREET, 19 FEET TO A POINT; THENCE

(2) EASTERLY AT RIGHT ANGLES TO THE EASTERLY LINE OF DURGIN STREET, 65.26 FEET TO A POINT; THENCE

(3) NORTHERLY 19 FEET TO A POINT 65.57 FEET EASTERLY FROM THE POINT OF BEGINNING; THENCE

(4) WESTERLY 65.57 FEET TO THE POINT OR PLACE OF BEGINNING.

PARCEL II

ALL THAT TRACT OR PARCEL OF LAND, SITUATE IN THE CITY OF ROCHESTER, COUNTY OF MONROE, STATE OF NEW YORK KNOWN AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE EASTERLY LINE OF DURGIN STREET, 149 FEET SOUTHERLY FROM THE SOUTHERLY LINE OF EVERGREEN STREET; THENCE

Exhibit A

(1) SOUTHERLY ALONG THE EASTERLY LINE OF DURGIN STREET 19 FEET TO A POINT; THENCE

(2) EASTERLY AT RIGHT ANGLES TO THE EASTERLY LINE OF DURGIN STREET 62.95 FEET TO A POINT; THENCE

(3) NORTHERLY 19 FEET TO A POINT 63.26 FEET EASTERLY FROM THE POINT OF BEGINNING; THENCE

(4) WESTERLY 63.26 FEET TO THE POINT OR PLACE OF BEGINNING.

*** 

Exhibit A

# EXHIBIT J

## FORBEARANCE AGREEMENT

This Forbearance Agreement ("**Agreement**") is made effective as of October __, 2022 (the "**Effective Date**"), by and among Wilmington Trust, National Association, as Trustee, for the Benefit of the Holders of Corevest American Finance 2020-1 Trust Mortgage Pass-Through Certificates (together, with any of its assignees, "**Lender**"), Hirschhorn Estates, LLC ("**Borrower**") and Meyer Hirschhorn ("**Guarantor**"). Borrower and Guarantor are sometimes hereinafter collectively referred to in this Agreement as the "**Obligors.**" Lender and Obligors are sometimes hereinafter collectively referred to in this Agreement as the "**Parties**" and each as a "**Party**."

### RECITALS

The following Recitals are a material part of this Agreement:

A.     Lender is the owner and holder of that certain loan ("**Loan**") evidenced in part by that certain Promissory Note, dated March 31, 2021, executed by Borrower in favor of Corevest American Finance Lender, LLC ("**Original Lender**") in the original principal amount of $1,023,500 (the "**Note**"). The terms and condition of the Loan are set forth in that certain Loan Agreement dated as of March 31, 2021, by and between Original Lender and Borrower (as amended, the "**Loan Agreement**").

B.     In connection with the execution of the Note, Guarantor executed that certain Sponsor Guaranty dated as of March 31, 2021 (the "**Sponsor Guaranty**"), pursuant to which Guarantor guaranteed payment of certain amounts due and owing under the Note, all as further described in the Sponsor Guaranty. In addition, Guarantor executed that certain Pledgor Guaranty (the "**Pledge Guaranty**") dated as of March 31, 2021, pursuant to which Guarantor guaranteed payment of certain amounts owed in connection with the Loan, as further described in the Pledge Guaranty.

C.     The indebtedness owed under the Note and Pledge Guaranty is secured by the following: (i) that certain Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of March 31, 2021 (the "**Security Instrument**") executed by Borrower and encumbering certain real property, and the improvements thereon, located in Monroe County, New York (collectively, the "**Properties**") and (ii) that certain Pledge Agreement date March 31, 2021 (the "**Pledge Agreement**"), pursuant to which Guarantor pledged all of his right, title and interest in the Borrower Equity Interests (as defined in the Pledge Agreement).

D.     Lender is the owner and holder of the Note, Loan Agreement, Sponsor Guaranty, Pledge Guaranty, Security Instrument, Pledge Agreement and all other documents executed in connection with or further securing the amounts owed under the Note (collectively, the "**Loan Documents**"). All capitalized terms used in this Agreement that are not otherwise defined in this Agreement shall have the meanings ascribed to them in the Loan Documents, as in effect on the Effective Date.

E.     An Event of Default occurred with respect to the Loan as a result of Borrower failing to pay the amounts due and owing under the Note as provided for in the Loan Documents

for the month of December 2022 and each subsequent month thereafter (the "**Existing Default**"). As a result of the Existing Default, Lender elected to accelerate the debt due and owing under the Note, and the full debt owed thereunder is now due and payable, which amounts include interest at the default rate, prepayment consideration and fees and costs, including, without limitation, attorneys fees (referred to herein as the "**Indebtedness**").

F.     The Existing Default continues to exist and has not been waived. Obligors have requested that Lender forbear from exercising its rights and remedies under the Loan Documents with respect to the Existing Default, which include but are not limited to: (i) the right to seek the appointment of a receiver to take possession of and administer the Property, (ii) the right to foreclose the Property and/or the Pledged Collateral, and (iii) the right to obtain a judgment against Obligors in the full amount of the Indebtedness. Lender has agreed to temporarily forbear from the enforcement of its rights and to reinstate the Loan, pursuant to the terms set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.     Recitals; Acknowledgments. The Recitals set forth above are true and accurate, are a material part of this Agreement, and are hereby incorporated by reference, and the Parties are entitled to rely thereon.

2.     Forbearance Period. Subject to the terms of this Agreement, Lender agrees to forbear from enforcing its rights and remedies under the Loan Documents for a period of time beginning on the Effective Date and ending on the earlier to occur of either (A) the payoff of the Loan in full or (B) the date a Forbearance Termination Event (as defined below) occurs (the "**Forbearance Expiration Date**;" and such time period between the Effective Date and the Forbearance Expiration Date being hereinafter referred to as the "**Forbearance Period**").

3.     Sale of the Properties. Obligors acknowledge that as a result of the Existing Default, Borrower has no right of any kind to obtain a partial release of with respect to any of the Properties from the Security Instrument and the other Loan Documents without first paying to Lender all of the Indebtedness in full. Notwithstanding the foregoing, and so long as no Forbearance Termination Event at any time occurs, during the Forbearance Period Borrower is hereby granted the right to sell the Properties in accordance with the following terms and conditions:

(a)     Borrower shall list each of the Properties for sale no later than November 1, 2023 with listing prices that have been approved by Lender (the "**Listing Price**"). Prior to executing any sale contract with respect to any portion of the Properties, Borrower shall present to Lender any reasonable offers received by Borrower with respect to any such sale for Lender's review and approval, which approval will not be withheld or unduly delayed or conditioned;

(b)     Any sale contract executed by Borrower with respect to the Properties must expressly provide therein that (i) Lender shall have no liability under the sales contract and (ii) other than in connection with the closing of the contemplated sale, the buyer thereunder and any

2

assignee of such buyer shall have no right to record any document or instrument against the Properties or to otherwise encumber the Properties and any such recorded document or instrument recorded in violation of such covenant shall be deemed to be void *ab initio*.  Within two (2) business days after Borrower and any prospective purchaser executes a contract for the sale of any of the Properties, Borrower shall deliver a copy of the executed sale contract to Lender (any such sale contract as so amended or modified from time to time is referred to herein as a "**Sale Contract**").  Borrower shall thereafter seek Lender's approval prior to entering into any amendment, addendum or modification of any Sale Contract, and Borrower further agrees to notify Lender in writing of any termination or cancellation of any Sale Contract within five (5) business days after any such termination or cancellation; and

(c)     Provided that all of the other terms and conditions set forth in this **Section 3** are satisfied and that no Forbearance Termination Event occurs, and provided further that Lender receives the Individual Property Payoff Amount (as defined below) in immediately available funds by wire transfer, then Lender shall accept the Individual Property Payoff Amount and apply such amount to the Indebtedness, and Lender shall promptly release its liens against the portion of the Properties that is related to the Individual Property Payoff Amount.  As used in this Agreement, the term "**Individual Property Payoff Amount**" shall be equal to the net proceeds from the sale of any portion of the Properties, after taking into account the payment of all reasonable, customary and ordinary closing expenses to be paid by Borrower under the Sale Contract until such time that the Indebtedness is paid in full.

4.     Payment of Forbearance Fee.  In exchange for Lender's agreement to forbear from the enforcement of its rights and remedies under the Loan Documents as provided for herein, Obligors shall pay a fee (the "**Forbearance Fee**"), which Forbearance Fee shall be equal to one percent (1%) of the unpaid principal balance owed under the Note and which Forbearance Fee shall be an amount owed by Obligors in addition to the Indebtedness.  The Forbearance Fee shall be paid from the sale of the Properties after the Indebtedness is paid in full.  To the extent there are insufficient funds to pay the Forbearance Fee, or any portion thereof, from the sale of the Properties, Lender shall agree to waive any remaining unpaid portion of the Forbearance Fee following the sales of all the Properties.

5.     Forbearance Termination Events.  Obligors agree that the occurrence of any of the following events shall constitute a "**Forbearance Termination Event**" under this Agreement, regardless of the reason or reasons for the occurrence of any such event, whether or not such occurrence is voluntary or involuntary, and whether or not such event occurs by operation of law or from some other cause that is not within the control of Obligors:

(a)     The failure by Obligors to paydown the Indebtedness by the total sum of $250,000 on or before February 1, 2024, which paydown can be made from the application of funds from the sale of Properties as set forth in Section 3 above;

(b)     The failure by Obligors to pay the Indebtedness in full on or before September 30, 2024;

3

(c)     Any failure by Obligors to perform when due or required any of the covenants, agreements or obligations to be performed under this Agreement, or any of the other Loan Documents as modified hereby;

(d)     Any of the representations or warranties made by Obligors in this Agreement, in connection with the negotiation and execution of this Agreement, or in any report, statement, or information provided by Obligors to Lender in accordance with the terms of this Agreement shall have been false or misleading when made;

(e)     Any of the Obligors: (i) institutes or has instituted against it or him or any of its or his property, including the Property, any bankruptcy, reorganization, receivership, conservatorship, custodianship, sequestration, or other similar judicial or non-judicial proceedings; (ii) makes, permits or agrees to make or permit an assignment or abandonment, whether or not conditional, of some or all of its property for the benefit of some or all of its or his creditors; (iii) ceases doing business in the ordinary course; or (iv) has commenced against it or its property, including the Property, a foreclosure or other action for the collection of any indebtedness; or

(f)     The occurrence of any default or Event of Default under any of the Loan Documents other than the Existing Default.

Any Forbearance Termination Event shall also constitute an additional Event of Default under all of the Loan Documents, for which no notice shall be required and with respect to which no grace or cure period shall apply.

6.     Warranties, Representations, and Ratification. As of the Effective Date, Obligors unconditionally, jointly and severally, and respectively ratify, remake and confirm all warranties and representations previously made in the respective Loan Documents to which Obligors are a party. As of the Effective Date, Obligors (i) ratify their respective obligations under the Loan Documents, (ii) confirm that such obligations, and all waivers, covenants and agreements by Obligors in the Loan Documents remain in full force and effect, without any defense, offset or excuse available to Obligors, (iii) reaffirm their respective continuing absolute liability for the entire Indebtedness and payment and/or performance of all obligations under the Loan Documents, all without defense, offset or excuse available to Obligors, and (iv) confirm and agree that income generated by the Remaining Properties will be used for no other purpose other than the operation and maintenance of the Remaining Properties or making payments due on the Indebtedness.

7.     Conditions to Forbearance; Effects of Forbearance.

(a)     Lender's agreement herein to forego immediate pursuit of Lender's rights and remedies under the Loan Documents constitutes a postponement and forbearance only and does not in any event constitute a waiver of any such rights or remedies under the Loan Documents, at law, or in equity.

(b)     Lender's agreement to forbear shall not operate to prevent Lender from taking any action that Lender may take under any of the Loan Documents to preserve and protect the Properties, any of the collateral or other property described in the Security Instrument, Pledge

4

Agreement and the other Loan Documents or the interests of Lender in the Properties or any such collateral or other property, including, without limitation, the Borrower Equity Interests.

(c)    The Parties agree that the running of all statutes of limitation or doctrine of laches applicable to all claims or causes of action that Lender may be entitled to take or bring in order to enforce its rights and remedies against Obligors or with respect to the Property are, to the fullest extent permitted by applicable law, tolled and suspended until the occurrence of a Forbearance Termination Event.

8.    Modifications of Loan Documents.  The Parties agree that the Loan Documents are hereby modified in accordance with the following provisions:

(a)    All references in any Loan Document to any other Loan Document shall hereafter be construed to refer to such other Loan Document as modified by this Agreement and the other provisions of this Agreement, and the provisions of this Agreement shall control over any contrary or inconsistent provisions of any of the other Loan Documents.

(b)    All provisions of the Loan Documents requiring any notice to Obligors or to any other person or entity as a condition precedent to the existence of any breach, default, Default, Event of Default, acceleration or remedial action by Lender, creating any grace period during which nonpayment or nonperformance does not constitute a default, Default or Event of Default or that requires Lender to delay remedial action, or granting any period after the giving or receipt of any notice for the cure of any breach, default, Default, or Event of Default under the Loan Documents prior to acceleration or other remedial action by Lender are hereby deleted in their entirety and shall be of no further force or effect.

9.    Releases and Indemnifications.  As of the Effective Date, Obligors and their respective past, present and future employees, agents, attorneys, representatives, successors, assigns, and all persons and entities claiming by, through, or under any of them (and their respective heirs, executors, personal and legal representatives, successors and assigns, collectively, the "**Releasing Parties**") hereby:

(a)    acknowledge, agree and affirm that none of them possesses any claims, defenses, offsets, rights of recoupment or counterclaims of any kind or nature against or with respect to the enforcement or administration of the Loan or any of the Loan Documents (including, without limitation, any aspect of the origination, administration or enforcement thereof), or any knowledge of any facts or circumstances that might give rise to or be the basis of any such claims, defenses, offsets, rights of recoupment or counterclaims;

(b)    remise, release, acquit and forever discharge Lender, and its predecessors in interest, affiliates, subsidiaries, participants and assigns, and all of their respective past, present, and future shareholders, members, directors, managers, officers, employees, attorneys, advisers, consultants, loan servicers, representatives and agents (collectively, the "**Lender Released Parties**") from any and all manner of debts, accounts, bonds, warranties, representations, covenants, promises, contracts, controversies, agreements, liabilities, obligations, expenses, damages, judgments, executions, actions, claims, demands and causes of action of any nature whatsoever, whether at law or in equity, whether known or unknown, that any of the Releasing

5

Parties now have or may hereafter have by reason of any act, omission, matter, cause or thing, from the beginning of the world to and including the Effective Date, including matters arising out of or relating to the Loan and any of the Loan Documents, including, without limitation, the origination, funding, servicing or administration thereof and any other agreement or transaction between any of the Releasing Parties and any of the Lender Released Parties concerning the Loan (all of the foregoing released claims are sometimes hereinafter referred to in this Agreement as the "**Released Claims**");

(c)     agree that it is the intention of each of the Releasing Parties that the foregoing release shall be effective with respect to all matters, past and present, known and unknown, suspected and unsuspected. Each of the Releasing Parties realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to losses, damages, liabilities, costs and expenses which are presently unknown, unanticipated and unsuspected, and that each of the Releasing Parties further agrees that the waivers and releases in this Agreement have been negotiated and agreed upon in light of that realization and that each of the Releasing Parties nevertheless hereby intends to release, discharge and acquit the Lender Released Parties from any such unknown losses, damages, liabilities, costs and expenses.

(d)     agree, jointly and severally, to indemnify the Lender Released Parties for, hold the Lender Released Parties harmless from and against, and undertake the defense of the Lender Released Parties with respect to, all Released Claims that each of the Releasing Parties may assert with respect to any of the Released Claims, despite the existence of the releases granted by the Releasing Parties in this Agreement;

(e)     acknowledge that Lender is specifically relying upon each of the Releasing Parties' acknowledgements and agreements in this Section in executing this Agreement, and that in the absence of such agreements Lender would not be willing to agree to the modifications provided for in this Agreement; and

(f)     agree that all releases and discharges by each of the Releasing Parties in this Agreement shall have the same effect as if each released or discharged matter had been the subject of a legal proceeding, adjudicated to final judgment from which no appeal could be taken and therein dismissed with prejudice.

10.     Lender's Rights upon Occurrence of a Forbearance Termination Event. Upon and at any time after the occurrence of any Forbearance Termination Event, Lender may take any actions or assert any rights available to Lender under the Loan Documents, or applicable law, or in equity, including but not limited to, immediately ceasing the forbearance to which Lender agreed pursuant to **Section 2** of this Agreement and commencing and pursuing any or all rights and remedies Lender may have under the Loan Documents or applicable law, all in such order and manner as Lender may elect from time to time in its discretion, as if **Section 2** had never been agreed to by Lender, which rights and remedies include, but are not limited to, scheduling a non-judicial foreclosure sale for any Properties that remain encumbered by the Security Instrument, and Obligors hereby consent to any such sale of any of the Properties as set forth in this **Section 10** and waive any and all defenses with respect to the same.

6

11.     Additional Documents; Further Assurances.  Obligors shall at any time, and from time to time, upon the written request of Lender, promptly sign and deliver such further documents and do such further acts and things as Lender may request to effectuate the purposes of this Agreement.  In addition, Borrower shall timely respond to Lender's requests for documents and information related to Borrower's efforts to obtain financing or capital sufficient to pay the Loan, including, if applicable, in connection with any proposed sale of the Properties.

12.     Time is of the Essence.  Time is of the essence with respect to all agreements and obligations of Borrower contained in this Agreement.

13.     Entire Agreement; Written Modifications Only.  This Agreement and the documents referred to, contemplated, or required herein, constitute the sole and entire agreement between the Parties with respect to the subject matter hereof, and there are no other covenants, promises, agreements or understandings regarding the same.  This Agreement, including the provisions of this **Section 12**, may not be modified except by written amendment to this Agreement signed by the Parties affected by the same, and the Parties hereby: (a) expressly agree that it shall not be reasonable for any of them to rely on any alleged, non-written amendment to this Agreement; (b) waive any and all right to enforce any alleged, non-written amendment to this Agreement; and (c) expressly agree that it shall be beyond the scope of authority (apparent or otherwise) for any of their respective agents to agree to any non-written modification of this Agreement.

14.     No Third-Party Beneficiaries.  This Agreement is solely for the benefit of the Parties hereto and no persons other than the Parties and the Lender Released Parties shall be entitled to claim or receive any benefit by reason of this Agreement.

15.     Conditions of Lender's Obligations under this Agreement.  Each obligation of Lender under this Agreement is subject to, among other matters, the continuing satisfaction of the following conditions, any of which may be waived by Lender in its sole discretion with respect to the Loan: (a) all warranties and representations made by Obligors under this Agreement are true and correct as of the Effective Date and shall remain true and correct thereafter; and (b) no Forbearance Termination Event shall occur.

16.     Due Diligence Performed; Parties Fully Informed; No Right to Rely.  Each of the Obligors hereby warrants, represents and agrees that each of the Obligors has, by itself and with the assistance of counsel (or, if without the assistance of counsel, each of the Obligors having of its own volition chosen not to seek such assistance), performed any and all due diligence and investigation it deems necessary or desirable in connection with making a fully informed decision to enter into and sign this Agreement.  Obligors are relying on their own investigations and their own decision-making processes in determining to sign this Agreement, are not relying on the representations or omissions of each other or of Lender or any of the Lender Released Parties in so doing, and fully understand the terms and provisions of this Agreement and of the documents contemplated hereby.

17.     Severability.  If any one or more of the provisions of this Agreement are deemed unenforceable, the remainder of this Agreement shall, at the sole option of Lender, remain enforceable in accordance with its original terms to the fullest extent possible.

7

18.     Successors and Assigns.  This Agreement shall be binding on and shall inure to the benefit of each Party's heirs, executors, personal and legal representatives, successors and permitted assigns.

19.     Counterparts.  This Agreement may be executed in more than one counterpart, each of which shall be deemed an original and all of which together shall constitute one and the same document, binding upon all the Parties hereto notwithstanding that all such Parties are not signatories to the same counterpart. This Agreement shall become effective when all Parties hereto have executed a counterpart hereof.  A facsimile, scanned, photocopied or other electronic signature of any Party to this Agreement shall have the same force and effect for all purposes as an original signature.

20.     Waiver of Jury Trial.  The Parties waive the right to jury trial with respect to any dispute arising under, in connection with or related to this Agreement or any of the Loan Documents, and all provisions contained in the Loan Documents with respect to waiver of jury trial are incorporated in this Agreement by reference.

*[Signatures appear on the following pages.]*

8

Forbearance Agreement
91059581.2

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

**LENDER:**

**Wilmington Trust, National Association, as Trustee, for the Benefit of the Holders of CoreVest American Finance 2021-1 Trust Mortgage Pass-Through Certificates**

By: Situs Holdings, LLC, as special servicer

By: _____

Name: Russ Tilman

Title: Senior Vice President

*[Signatures Continue on the Following Page]*

Signature Page to
Forbearance Agreement

91059581.2

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

**BORROWER:**

**Hirschhorn Estates, LLC,**
a Delaware limited liability company

By: _____
Name: Meyer Hirschhorn
Title: Manager

**GUARANTOR:**

_____
Meyer Hirschhorn

# EXHIBIT K

MONROE COUNTY CLERK'S OFFICE

THIS IS NOT A BILL. THIS IS YOUR RECEIPT.

Receipt # 3579639

Book    Page    CIVIL

Return To:
City of Rochester - Law Department

No. Pages:  19

Instrument: EFILING INDEX NUMBER

Control #:        202309251476
Index #:          E2023010950

Date: 09/25/2023

City of Rochester

Time: 3:31:34 PM

Hirschhorn Estates LLC
Hirschhorn Holdings LLC
Hirschhorn, Meyer
Corevest American Finance Lender LLC
IceCap Real Estate Loan Fund I, LLC

Total Fees Paid:                       $0.00

Employee: CW

State of New York

MONROE COUNTY CLERK'S OFFICE
WARNING – THIS SHEET CONSTITUTES THE CLERKS
ENDORSEMENT, REQUIRED BY SECTION 317-a(5) &
SECTION 319 OF THE REAL PROPERTY LAW OF THE
STATE OF NEW YORK. DO NOT DETACH OR REMOVE.

JAMIE ROMEO

MONROE COUNTY CLERK

**STATE OF NEW YORK**
**SUPREME COURT     COUNTY OF MONROE**

---

**CITY OF ROCHESTER**
30 Church Street
Rochester, NY 14614

                                        Petitioner,          **VERIFIED PETITION**

      -vs-
                                                             Index No.:

**HIRSCHHORN ESTATES LLC**
P.O. Box 191
Tallman, NY 10982

**HIRSCHHORN HOLDINGS LLC**
P.O. Box 191
Tallman, NY 10982

**MEYER HIRSCHHORN**
14 Stoneham Lane
New City, NY 10956

**COREVEST AMERICAN FINANCE**
**LENDER LLC**
1920 Main Street, Suite 850
Irvine, CA 92614

**ICECAP REAL ESTATE LOAN FUND I, LLC**
31 West 34th Street, 4th Floor
New York, NY 10001
                                        Respondents.

---

      Petitioner, the City of Rochester, by the Corporation Counsel of the City of

Rochester, its attorney, respectfully alleges:

<b>NATURE OF THE ACTION</b>

      1.     This is a proceeding brought by the City of Rochester (hereinafter the

"City") to eliminate and correct unsafe and hazardous housing code violations.

2. Hirschhorn Estates LLC and Hirschhorn Properties LLC, owners of a mid-sized real estate portfolio in Rochester, NY, have failed to maintain its residential properties resulting in hundreds of open code violations and unsafe living conditions. The owners have allowed their properties to deteriorate to the point where they pose an imminent threat to the health and safety of its tenants and to the public at large. These properties and their unsafe conditions create a public nuisance and violate municipal and state laws enacted to protect and safeguard the public.

3. At issue in this case are fifteen properties ("subject properties") located in the City of Rochester:

- 236 Saratoga Ave, Rochester, NY 14608;
- 308 Glenwood Ave, Rochester, NY 14613;
- 431-433 Clifford Ave, Rochester, NY 14621;
- 460 Colvin St., Rochester, NY 14606;
- 76 Oriole St., Rochester, NY 14613;
- 8 Velox St., Rochester, NY 14615;
- 104 Delmar St., Rochester, NY 14606;
- 62-64 Saratoga Ave, Rochester, NY 14608;
- 294 Lexington Ave, Rochester, NY 14613;
- 78 Roycroft Dr., Rochester, NY 14621;
- 136-140 Campbell St., Rochester, NY 14611;
- 301 Selye Ter, Rochester, NY 14613;
- 14 Durgin St., Rochester, NY 14605;
- 258 Avis St., Rochester, NY 14615; and
- 404 Emerson St., Rochester, NY 14613.

4. The owners purchased this portfolio between 2019 and 2021 and have failed to obtain a single certificate of occupancy themselves for these properties to date. The City's Neighborhood and Business Development Department ("NBD") issued **473** outstanding citations for significant property, fire, and housing code violations for these properties, including **216** that directly impact occupants' health and safety. **Ex. A.**

Case 6:23-cv-06662-EAW Document 1-1 Filed 11/22/23 Page 238 of 257

5.      The City issued orders to remedy, final warning letters, and tickets. And yet, despite ample opportunity, Respondents have failed to make the necessary repairs.

6.      In this action, the City seeks (1) an injunction halting Respondents' unlawful behavior, (2) timely abatement of all open code violations, (3) civil penalties, costs, and fines, and (4) a receiver appointed to collect rent and make repairs if Respondents continue to refuse to clear the open violations.

7.      This is an action of last resort. The City has engaged in extensive pre-litigation administrative enforcement efforts to compel Respondents to correct the violations, but Respondents continue to allow the unsafe open code violations to go unabated. This action is necessitated by Respondents' willful inaction.

### THE PARTIES

8.      The Petitioner is the City of Rochester, a municipal corporation duly organized under the laws of the State of New York, having its principal office at City Hall, 30 Church Street, Rochester, NY 14614.

9.      Respondent HIRSCHHORN ESTATES LLC is a Delaware limited liability company maintaining its principal place of business at P.O. Box 901 Tallman, NY 10982. Respondent is the record owner of the following subject properties pursuant to deeds filed in the Monroe County Clerk's Office and annexed as Exhibit B.:

- 236 Saratoga Ave, Rochester, NY 14608
- 76 Oriole St, Rochester, NY 14613
- 8 Velox St, Rochester, NY 14615
- 294 Lexington Ave, Rochester, NY 14613
- 136-140 Campbell St, Rochester, NY 14611
- 301 Selye Ter, Rochester, NY 14613
- 14 Durgin St, Rochester, NY 14605
- 258 Avis St, Rochester, NY 14615
- 404 Emerson St, Rochester, NY 14613

10. Respondent HIRSCHHORN HOLDINGS LLC is a Delaware limited liability company that maintains its principal place of business at P.O. Box 901 Tallman, NY 10982. Respondent is the record owner of the following subject properties pursuant to deeds filed in the Monroe County Clerk's Office and annexed as Exhibit B.:

- 308 Glenwood Ave, Rochester, NY 14613
- 431-433 Clifford Ave, Rochester, NY 14621
- 460 Colvin St, Rochester, NY, 14606
- 104 Delmar St, Rochester, NY 14606
- 62-64 Saratoga Ave, Rochester, NY 14608
- 78 Roycroft Dr, Rochester, NY 14621

11. Respondent MEYER HIRSCHHORN is the managing member of both Hirschhorn Estates LLC and Hirschhorn Holdings LLC, and has authority to exercise control over the subject properties, including collecting rent, making repairs, and selling the properties. Mr. Hirschhorn is also the authorized signatory on numerous documents filed by both Hirschhorn Estates LLC and Hirschhorn Holdings LLC. As such, Mr. Hirschhorn is a proper party to the proceeding under Rochester City Code § 52-3(C). Upon information and belief, Mr. Hirschhorn resides at 14 Stoneham Lane, New City, NY 10956.

12. Respondent COREVEST AMERICAN FINANCE LENDER LLC is a financial institution with a principal place of business at 1920 Main Street, Suite 850, Irvine, CA 92614. Respondent is the mortgage holder and received an assignment of rents and leases for the following subject properties, and thus is a proper party to the proceeding under Rochester City Code § 52-3(C).:

a. 136-140 Campbell St, Rochester, NY 14611
b. 236 Saratoga Ave, Rochester, NY 14608
c. 258 Avis St, Rochester, NY 14615
d. 294 Lexington Ave, Rochester, NY 14613
e. 404 Emerson St, Rochester, NY 14613

    f.   76 Oriole St, Rochester, NY 14613

    g.   8 Velox St, Rochester, NY 14615

    h.   14 Durgin St, Rochester, NY 14605

    i.   301 Selye Ter, Rochester, NY 14613. **Ex. C**

13.      Respondent ICECAP REAL ESTATE LOAN FUND I, LLC is a financial institution with a principal place of business at 31 West 34th Street, 4th Floor, New York, NY 10001. Respondent is the mortgage holder and received an assignment of rents and leases for the following subject properties, and this is a proper party to the proceeding under Rochester City Code § 52-3(C):

    a.   308 Glenwood Ave, Rochester, NY 14613

    b.   431-433 Clifford Ave, Rochester, NY 14621

    c.   460 Colvin St, Rochester, NY, 14606

    d.   104 Delmar St, Rochester, NY 14606

    e.   62-64 Saratoga Ave, Rochester, NY 14608

    f.   78 Roycroft Dr, Rochester, NY 14621. **Ex. C**

**JURISDICTION**

14.      This Court has jurisdiction over the parties and claims alleged under CPLR § 302(a)(4), and Rochester City Codes §§ 9-21 and 52-1 et seq.

15.      Venue in Monroe County is proper under CPLR §§ 502, 503(a), and 507.

**STATEMENT OF FACTS**

16.      The City has inspected Respondents' subject properties and found many conditions that violate City codes designed to ensure safe and habitable premises.

17.      Violations were cited, Notice and Orders were sent, tickets issued, and fines incurred. The Notice and Orders list the open violations and a deadline for remedy. Nothing has moved Respondents to correct their violations.

18.      Moreover, every single subject property in this action save one fails to hold a valid certificate of occupancy.

19.     The City send additional letters requesting that Respondents provide a proposed work schedule for the open violations. Nothing has worked to compel Respondents to make sufficient repairs.

20.     The City is concerned that Respondents have neither the means nor the motivation to repair their properties to a habitable standard as required by law since they amassed this portfolio of properties. Respondents' track record for maintaining properties in the City of Rochester is dismal at best. The average number of open violations for the subject properties in this action is 31.5 violations per property.

21.     Respondents have systematically and flagrantly ignored code enforcement efforts to remedy substantial open property code violations. And despite ample notice, Respondents refuse to address many of the issues cited by code enforcement since it purchased these properties. As of filing, the subject properties have 471 open code violations.

**Exhibits**

22.     The documents referenced in the next paragraphs can be found in the following exhibits:

| | |
|---|---|
| Open Violations: | **EXHIBIT A** |
| Notice and Orders: | **EXHIBIT D** |
| Certificates of Occupancy: | **EXHIBIT E** |

**236 Saratoga**

23.     The property located at 236 Saratoga is a six-unit apartment building. It currently has 62 open property code violations. Of those 62 violations, 24 are cited as

RECEIVED NYSCEF: 09/25/2023

health and safety violations. Those violations include inoperable plumbing, missing smoke detectors and carbon monoxide detectors, complete interior disrepair, and broken windows. The City cited many of these violations as early as September 27, 2021.

24.     Respondents have also failed to obtain a certificate of occupancy after it expired on September 1, 2021.

25.     The City sent Respondent numerous Notice and Orders since 2021. The City sent its most recent Notice and Orders on March 27, 2023.

26.     The City even sent a Final Warning Letter on September 14, 2022 and requested that Respondent provide a proposed work schedule to abate the violations.

27.     The City also ticketed Respondent in an attempt to compel Respondent to abate the open code violations.

28.     And yet, despite being given almost two years to remedy these hazardous conditions, Respondents refuse to make repairs.

### 308 Glenwood

29.     The property located at 308 Glenwood is a six-unit apartment building. It currently has 52 open violations, including 23 sub-coded as health and safety issues. Violations include boarded windows and doors, roof disrepair, leaking pipes, missing smoke detectors, and an insect infestation.

30.     The City sent Respondents three Notice and Orders this year: March 1, April 19, and June 28, 2023.

31.     Respondents have been renting and occupying the property without a certificate of occupancy since February 1, 2023.

32.     Respondents have failed to comply with the order to abate violations.

### 431-433 Clifford

33.     The property located at 431-433 Clifford Ave is a four-unit apartment building. It has 41 open violations and 21 sub-coded as health and safety issues. Open violations include leaking roof, missing smoke alarms, deteriorated paint, and ceiling disrepair.

34.     Respondents have also been renting and occupying the property without a certificate of occupancy since June 1, 2022.

35.     The City sent two Notice and Orders: August 18, 2022 and July 26, 2023.

36.     Respondents have failed to comply with the order to abate violations.

### 460 Colvin

37.     The property located at 460 Colvin is a two-family residential structure. It has 41 open violations, 23 of which are sub-coded as health and safety issues. Violations include insect infestation, missing smoke detectors, broken windows, broken and missing doors, and deteriorated paint.

38.     Respondents operate this rental property without a certificate of occupancy. The last certificate expired on November 1, 2016.

39.     The City sent Respondents numerous Notice and Orders since 2021. The City sent its most recent Notice and Order on March 11, 2022.

40.     Despite these notices, Respondent has not remedied a single violation since 2021. Respondents have failed to comply with the order to abate violations.

## 76 Oriole

41.     The property located at 76 Oriole is a single-family residential structure. It has 34 open violations, 11 of which are sub-coded as health and safety issues. Open violations include mice and rat infestation, leaking pipes, floor and wall disrepair, and missing smoke detectors.

42.     The city sent two Notice and Orders: August 29 and October 3, 2022.

43.     In addition, On June 26, 2022, a fire in the kitchen created a hole in the floor and wall. The Rochester Fire Department Officer in charge pointed out the necessary repairs to Respondents' property manager. **Ex. F**. The Officer also had to install two smoke detectors and a carbon monoxide detector. Three months later Rochester Fire Department visited the property to address a sparking breaker box. While there, the Officer again observed the hole in the floor and ceiling damage causing water to drip onto electrical light fixtures. **Ex. F**.

44.     Respondents have failed to comply with any order to abate violations.

## 8 Velox

45.     The property located at 8 Velox is a single-family residential structure. It has 33 open violations, including 15 sub-coded as health and safety issues. Violations include deteriorated paint, inoperable heating system, missing smoke alarms, leaking pipes, and complete interior disrepair.

46.     Respondents have been renting and occupying the property without a certificate of occupancy since June 1, 2022.

47.     The City sent four Notice and Orders since 2022. The City sent Respondents its latest notice on June 23, 2023.

48.     Respondents have failed to comply with the order to abate violations.

### 104 Delmar

49.     The property located at 104 Delmar Copeland is a single-family residential structure. It has 31 open violations, 10 of which are sub-coded as health and safety issues. Violations include broken heat ducts, open sewer drain, broken and missing doors, animals inside the walls, and deteriorated paint.

50.     The property has not had a valid certificate of occupancy since June 1, 2018.

51.     The City has issued three Notice and Orders since 2021, including most recently on August 15, 2023.

52.     Respondents have failed to comply with the order to abate violations.

### 62-64 Saratoga

53.     The property located at 62-64 Saratoga Ave is a two-family residential structure. It has 31 open code violations, including 17 sub-coded as health and safety violations. Violations include deteriorated paint, ceiling disrepair, missing window panes, deteriorated roof eaves, and missing smoke alarms.

54.     The property has lacked a certificate of occupancy since August 1, 2020.

55.     The City has issued four Notice and Orders since 2021, and most recently on May 10, 2023.

56.     Respondents have failed to comply with the order to abate violations.

### 294 Lexington

57.     The property located at 294 Lexington is a single-family residential structure. It has 30 open code violations, including 14 sub-coded as health and safety

violations.  Violations include interior disrepair, missing smoke alarms, and deteriorated accessory structure.

58.     The property has not had a valid certificate of occupancy since June 1, 2018.

59.     The City issued two Notice and Orders: January 14 and July 27, 2022.

60.     Respondents have failed to comply with the order to abate violations.

## 78 Roycroft

61.     The property located at 78 Roycroft is a two-family residential structure. It has 29 open code violations, including 16 sub-coded as health and safety violations. Violations include inoperable heating equipment, loose pipes, missing smoke alarms, and inoperable windows.

62.     The property has lacked a certificate of occupancy since January 1, 2019.

63.     The City has issued six Notice and Orders since 2021, including most recently on August 8, 2023.

64.     Respondents have failed to comply with the order to abate violations.

## 136-140 Campbell

65.     The property located at 136-140 Campbell is a six-unit apartment building. It has 21 open code violations, including 12 sub-coded as health and safety violations. Violations include rodent and insect infestation, missing smoke alarms, broken windows, missing electrical outlets, and blocked fire exits.

66.     Respondents have been operating this property without a certificate of occupancy since October 1, 2022.

67.     The City sent three Notice and Orders since 2021, including most recently on June 23, 2023.

68.     Respondents have failed to comply with the order to abate violations

**301 Selye**

69.     The property located at 301 Selye Terrace is a single-family residential structure. It has 19 open violations including 12 sub-coded as health and safety violations. Violations include missing smoke alarms, ceiling and wall disrepair, deteriorated paint, and illegal third-floor occupancy.

70.     Respondents have operated this property without a certificate of occupancy since August 1, 2021.

71.     The City issued three Notice and Orders, with the latest issued on November 14, 2022.

72.     Respondent failed to comply with the order to abate violations.

**14 Durgin**

73.     The property located at 14 Durgin is a single-family residential structure. It has 19 open violations including 9 sub-coded as health and safety violations. Violations include leaking pipes, infestation, interior disrepair, and broken doors.

74.     Respondents operate this property without a certificate of occupancy. The last certificate expired on August 24, 2003.

75.     The City issued six notice and orders, most recently on August 16, 2023.

76.     Respondents failed to comply with the order to abate violations.

## 258 Avis

77.     The property located at 258 Avis is a single-family residential structure. It has 14 open violations including 4 sub-coded as health and safety violations. Violations include floor and ceiling disrepair, deteriorating roof eaves, and broken windows.

78.     The property has lacked a certificate of occupancy since April 1, 2018.

79.     The City issued five Notice and Orders, with the latest one issued on July 31, 2023.

80.     Respondents have failed to comply with the order to abate violations.

## 404 Emerson

81.     The property located at 404 Emerson is a single-family residential structure. It has 12 open violations including 4 sub-coded as health and safety violations. Violations include missing smoke alarms and deteriorated paint.

82.     The property has lacked a certificate of occupancy since January 1, 2023.

83.     The City issued two Notice and Orders: March 1 and April 20, 2023.

84.     Respondents have failed to abate the cited open code violations.

### CAUSES OF ACTION

### First Cause of Action
### Rochester City Code

85.     Chapter 52 of the Rochester City Code authorizes the City to bring an action in Supreme Court to enjoin and abate the continued violation of municipal code and recover the costs of said proceeding.

86.     Respondents are in violation of numerous local and state codes incorporated into the Rochester City Code as set forth in the Affidavit of Anne Wallace.

87.     Respondent was served Notice and Orders to correct those violations via first class mail at the address provided to the City by the Respondent.

88.     Respondents have failed to comply with those orders and abate the listed violations, and continue to violate local and state law.

89.     The City is entitled to injunctive relief directing Respondents to comply with the issued Notice and Orders, and to recover civil fines and penalties as applicable.

90.     The City is also entitled to costs and civil fines accrued for Respondents' continued violation of municipal codes.

## Second Cause of Action
## Certificate of Occupancy

91.     Rochester City Code § 90-16 requires Respondents to obtain a valid certificate of occupancy for each of the subject properties.

92.     Respondents do not have valid certificates of occupancy on any of the subject properties.

93.     Respondents are allowing individuals to occupy these premises and collect rent in these premises in direct violation of Rochester City Code § 90-16.

94.     Respondents were even served Notice and Orders listing the failure to obtain a certificate of occupancy as a violation, but to date Respondents has failed to comply or obtain the requisite certificates.

## Third Cause of Action
## Nuisance

95.     Rochester Charter § 9-21 authorizes the City to maintain an action to restrain and abate nuisances.

96.     Respondents' failure to remove and abate health and safety hazards
constitutes a public nuisance.

97.     The City is entitled to injunctive relief ordering Respondents to
immediately abate all nuisances, as well as costs, fines, and fees.

**WHEREFORE**, the Petitioner requests an Order and Judgment as follows:

### As to the First Cause of Action

98.    Declaring that Respondents have failed to correct and comply with the violations complained of herein;

99.    Ordering Respondents to immediately remedy all violations deemed hazardous by the City;

100.    Ordering Respondents to remedy all health and safety violations within 30 days of this Court's Order;

101.    Ordering Respondents to remedy all remaining violations within 45 days of this Court's Order;

102.    Directing entry of judgment in the amount of $500 per day per violation pursuant to Rochester City Code Chapter 52; and

103.    Imposing accruing penalties for ongoing violations, and directing entry of judgment for those penalties.

### As to the Second Cause of Action

104.    Directing Respondents to obtain certificates of occupancy within 30 days;

105.    Directing entry of judgment for penalties and fines under Rochester City Code § 90-70 at $500 for each day that Respondents lacked a certificate of occupancy;

106.    Enjoining Respondents occupying vacant properties or units until they obtain a valid certificate of occupancy.

### As to the Third Cause of Action

107.    Declaring Respondents' failure to remove and abate municipal code violations a public nuisance; and

108. Ordering Respondents to remove and abate all nuisances.

**As to All Causes of Action**

109. Directing the entry of judgment in the amount of all actual costs, fines expenses, and disbursements incurred by the City in this action;

110. Reasonable attorney's fees under Rochester City Code § 52-3;

111. Enjoining the sale of the subject property until all violations are cleared;

112. Appointing a receiver to collect rent and make repairs if Respondents do not comply with the Court's order; and

113. For such other and further relief that the Court may deem proper and just.

DATED: September 25, 2023

**Linda S. Kingsley, Corporation Counsel**

/S/ Michael Furlano
**Michael Furlano, Esq. of Counsel**
Attorney for Petitioner City of Rochester
30 Church Street, Room 400A
Rochester, NY 14614
Telephone: (585) 428-7021
michael.furlano@cityofrochester.gov

STATE OF NEW YORK)
COUNTY OF MONROE) ss:

MICHAEL FURLANO, being duly sworn, deposes and says:

1.     That he is a Municipal Attorney for the City of Rochester, the corporation named in the foregoing papers; that he has read the foregoing Verified Petition and knows the contents thereof; that the same is true upon information and belief; and as to those matters, he believes it to be true.

2.     Deponent further says that the reason this verification is made solely by deponent, and not additionally by said City of Rochester, is because the said City of Rochester is a governmental subdivision, and that he is a Municipal Attorney, and that the grounds of deponent's belief as to all matters in said Verified Petition, not stated upon his own knowledge, are upon investigations caused to be made concerning the matters involved or purporting to be involved herein and information acquired by the deponent in the regular course of his duties as an employee of said governmental subdivision and from the books, papers and records of said governmental subdivision.

Michael Furlano
Municipal Attorney

Sworn to before me this
25 Day of September, 2023

Notary Public

JAMES E. PATRICK
Notary Public, State of New York
No. 01PA6153885
Qualified in Livingston County
Commission Expires Oct. 16, 2026

EXHIBIT L



900 W. 48th Place, Suite 900, Kansas City, MO 64112 • (816) 753-1000

November 13, 2023

Amy E. Hatch
(816) 360-4178
(816) 572-5178 Direct Fax
ahatch@polsinelli.com

**VIA FEDERAL EXPRESS**

<u>**NOTICE OF FORBEARANCE TERMINATION EVENT**</u>
<u>**AND LOAN ACCELERATION**</u>

Hirschhorn Estates, LLC
Attn: Meyer Hirschhorn
14 Stoneham Lane
New City, NY 10956

Meyer Hirschhorn
14 Stoneham Lane
New City, NY 10956

      **Re:**    **Borrower: Hirschhorn Estates, LLC**

Ladies and Gentlemen:

      This Firm is counsel to Wilmington Trust, National Association, as Trustee, for the Benefit of the Holders of CoreVest American Finance 2021-1 Trust Mortgage Pass-Through Certificates ("**Lender**"). On or about March 31, 2021, Corevest American Finance Lender LLC ("**Original Lender**") entered into a loan transaction (the "**Loan**") with Hirschhorn Estates, LLC ("**Borrower**"), which loan is evidenced by a Promissory Note dated March 31, 2021, in the original principal amount of $1,023,500.00 (the "**Note**"). The terms and condition of the Loan are set forth in that certain Loan Agreement dated as of March 31, 2021, by and between Original Lender and Borrower (as amended, the "**Loan Agreement**"). In connection with the Loan, Meyer Hirschhorn ("**Guarantor**") executed that certain Pledgor Guaranty and that certain Sponsor Guaranty (collectively, the "**Guaranty**") pursuant to which Guarantor absolutely and unconditionally guaranteed payment of certain amounts due and owing under the Note, as set forth in the Guaranty.

      The indebtedness owed in connection with the Loan is secured by that certain Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of March 31, 2021 (the "**Security Instrument**") executed by Borrower and encumbering real property, and the improvements thereon, located in Monroe County, New York (collectively, the "**Properties**"). Lender is the owner and holder of the Note, the Guaranty, the Loan Agreement,

polsinelli.com

Atlanta  Boston  Chicago  Dallas  Denver  Houston  Kansas City  Los Angeles  Miami  Nashville  New York
Phoenix  St. Louis  San Francisco  Seattle  Silicon Valley  Washington, D.C.  Wilmington
Polsinelli PC, Polsinelli LLP in California

Hirschhorn Estates, LLC
November 13, 2023
Page 2

the Security Instrument, and all other documents and instruments further evidencing, securing, or executed in connection with the Loan (collectively, the "**Loan Documents**").

Lender has previously notified Borrower that Borrower is in default under the Note and other Loan Documents as a result of Borrower's failure to timely make payments due and owing thereunder. Borrower failed to cure the existing defaults under the Loan and Loan Documents, and, as a result, Borrower and Lender entered into a certain forbearance agreement (the "**Forbearance Agreement**"), pursuant to which Lender agreed to forbear from the enforcement of its rights and remedies with respect to the Loan and under the Loan Documents until the occurrence of a Forbearance Termination Event (as defined in the Forbearance Agreement) and Borrower agreed to list and sell the Properties and pay the amounts owed to Lender in full within a certain period of time.

Lender was recently advised that Borrower and Guarantor are parties to numerous violations and claims asserted by the City of Rochester related to the manner in which Borrower and Guarantor are maintaining and managing properties under their control, including, without limitation, the Properties. A recent search by Lender revealed that there are over 250 ordinance violations related to the Properties. Under the Loan Agreement, Borrower covenanted to maintain the Properties in good and safe working order and to repair the Properties. Borrower further agreed to provide notice to Lender of any litigation or governmental proceedings pending or threatened against the Borrower and the Properties, which Borrower failed to do at the time the Forbearance Agreement was executed.

Please be advised that as a result of the foregoing, a Forbearance Termination Event has occurred under the Forbearance Agreement, the Loan is in default and Lender has the immediate right to enforce all rights and remedies under the Loan Documents. Further, please be further advised that Lender has elected to accelerate the indebtedness owed under the Note and other Loan Documents, and, as a result of such acceleration, Borrower's license under the Loan Documents to receive, collect and make use of rents, profits and income of any other type (the "**Rents**") is hereby revoked, and all such Rents are now the property of Lender. You shall hold the Rents in trust for the benefit of Lender. The revocation of Borrower's license to collect and make use of the Rents shall remain in full force and effect until such time as Lender and Borrower otherwise agree in a signed writing.

Lender may pursue any other available rights and remedies under the Loan Documents or at law or in equity, without further notice or demand, and all as Lender may determine in its sole discretion. Such rights and remedies include, but are not limited to, the appointment of a receiver to take possession of and administer the Property and foreclosure of the Property.

Lender, or Lender's servicer or other agents, may, from time to time, generate automated billing statements or other statements that are forwarded to Borrower or to other persons or entities on a monthly or other periodic basis. The forwarding to you of any billing statement from this time forward, including any billing statement that purports to state amounts due and owing by

Hirschhorn Estates, LLC
November 13, 2023
Page 3

Borrower that are different from the accelerated indebtedness owed, may not be relied upon by Borrower, does not act to de-accelerate or reinstate the debt in any manner, and does not result in any waiver of Lender's rights as set forth herein, all of which are reserved in their entirety.

Any partial payment made by Borrower, or acceptance of any partial payment by Lender or any of its representatives or loan servicing agents, of any amount that is not sufficient to pay the amounts owed Lender in full is not intended, and shall not be deemed, to constitute a waiver of any of Lender's rights, remedies or recourse under the Loan Documents or at law or in equity. Any application of any such payment is not intended, and shall not be deemed, to be a modification, rearrangement or extension of the existing Loan Documents. Any such payment shall be applied in such order and manner as Lender may elect in its sole discretion or as may be provided in the Loan Documents, without any waiver by Lender of its right to pursue any of its rights or remedies under the Loan Documents or at law or in equity.

Any past or future negotiation between you or your representatives or agents on the one hand and Lender and its representatives or agents on the other do not and shall not constitute a waiver of Lender's right to exercise its rights and remedies under the Loan Documents or at law or in equity. Any alleged waiver of any of Lender's rights shall not be effective unless in writing duly executed by an authorized representative of Lender. Neither Borrower nor any other obligor for the indebtedness owed under the Loan Documents shall be entitled to rely upon any oral statements made or purported to be made by or on behalf of Lender or its agents in connection with any alleged agreement by or on behalf of Lender to refrain from exercising any of Lender's rights under the Loan Documents or otherwise at law or in equity.

Nothing set forth herein is intended, and nothing herein shall be deemed, to modify, limit, release, reduce, or waive any of Lender's rights, remedies, or privileges under any of the Loan Documents, or at law or in equity, all of which are hereby specifically reserved. Furthermore, the enumeration of any specific default herein is not intended, and shall not be deemed, to waive other defaults that may currently exist under the Loan Documents.

Thank you for your immediate attention to this matter.

Sincerely,

Amy E. Hatch

AEH:jlb

92099067.1